1  Yasin M. Almadani (Cal. Bar No. 242798)
   ALMADANI LAW
2  14742 Beach Blvd., Suite 410
   La Mirada, California 90638
3  Telephone: (213) 335-3935
   E-Mail: yma@LawAlm.com
4
   Terrence M. Jones (Cal. Bar No. 256603)
5  LAW OFFICE OF TERRENCE JONES
   6737 Bright Ave., Suite B6
6  Whittier, CA 90601
   Telephone: (213) 863-4490
7  E-Mail: Terrence@jonesonlaw.com

8  *Attorneys for Plaintiffs*

9

10            **UNITED STATES DISTRICT COURT**

11           **NORTHERN DISTRICT OF CALIFORNIA**

12                  **OAKLAND DIVISION**

13

| | |
|---|---|
| MOCHA MILL, INC., MONK OF MOCHA SPECIALTY COFFEE PRODUCTION AND EXPORT, INC., IBRAHIM A. ALAELI, YASIR H. KHANSHALI, AND ADNAN G. AWNALLAH, <br><br> Plaintiffs, <br><br> v. <br><br> PORT OF MOKHA, INC., PORT OF MOKHA LLC, MOKHA FOUNDATION, BLUE BOTTLE COFFEE, INC., METRA COMPUTER GROUP FZCO, T&H COMPUTERS, INC., MOKHTAR F. ALKHANSHALI, AND IBRAHIM AHMAD IBRAHIM, <br><br> Defendants. | No. CV 18-2539 <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

I.     NATURE OF THE ACTION .......................................................................... 1

II.    JURISDICTION AND VENUE ..................................................................... 2

III.   PARTIES ...................................................................................................... 3

       A.   PLAINTIFFS ........................................................................................ 3

       B.   DEFENDANTS ..................................................................................... 4

IV.    RICO ALLEGATIONS................................................................................. 5

V.     FACTS COMMON TO ALL COUNTS........................................................ 7

       A.   THE FORMATION OF MOCHA MILL .................................................... 7

       B.   PLAINTIFFS INVESTED OVER HALF A MILLION DOLLARS TO FUND MOCHA MILL,
            EDUCATE CEO MOKHTAR IN THE COFFEE TRADE, AND PROVIDE RESOURCES FOR
            MOKHTAR TO BUILD RELATIONSHIPS FOR MOCHA MILL WITH YEMENI COFFEE
            FARMERS AND HIGH-END DISTRIBUTORS ......................................... 9

       C.   EMBEZZLEMENT AND WIRE FRAUD AS PART OF A PATTERN OF RACKETEERING ACTIVITY
            (APRIL 2014 – DECEMBER 2015) ..................................................... 12

       D.   EXTORTION AS PART OF A PATTERN OF RACKETEERING ACTIVITY (MARCH 2015) ....... 17

       E.   MOCHA MILL BECOMES POISED FOR TREMENDOUS SUCCESS ..................... 18

       F.   MOKHTAR EXPANDS THE RACKETEERING ENTERPRISE IN PREPARATION FOR A
            CORPORATE TAKEOVER .................................................................... 19

       G.   CONSPIRACY TO COMMIT WIRE FRAUD AND EXTORTION IN FURTHERANCE OF A
            PATTERN OF RACKETEERING ACTIVITY (JUNE - NOVEMBER 2015) ............................. 20

       H.   THE SCHEME TO SUPPLANT MOCHA MILL WITH PORT OF MOKHA THROUGH A PATTERN
            OF RACKETEERING ACTIVITY............................................................ 21

       I.   MOCHA MILL CEO MOKHTAR SEEKS DAVE EGGERS' HELP TO EXECUTE THE RICO
            ENTERPRISE'S CORPORATE TAKEOVER SCHEME .......................................... 22

       J.   CONSPIRACY TO SUPPLANT MOCHA MILL WITH PORT OF MOKHA USING WIRE FRAUD
            AS PART OF A PATTERN OF RACKETEERING ACTIVITY: TAKE ONE (NOVEMBER 2015 –
            APRIL 2016) .................................................................................. 23

            1.   Blue Bottle Conspires with the RICO Enterprise............................ 24

            2.   Port of Mokha Arranges for a Straw Buyer to Defraud Mocha Mill.............. 25

       K.   CONSPIRACY TO SUPPLANT MOCHA MILL WITH PORT OF MOKHA USING WIRE FRAUD
            AS PART OF A PATTERN OF RACKETEERING ACTIVITY: TAKE TWO (APRIL 2016 – JUNE
            2016) .......................................................................................... 29

L.   Extortion to Obtain a Release of Claims as Part of a Pattern of Racketeering Activity.................................................... 33

M.   Obstruction and Spoliation of Evidence to Cover Up the Racketeering Conspiracy.................................................... 34

N.   Money Laundering in Furtherance of a Pattern of Racketeering Activity. 35

**VI.   DISCOVERY RULE & FRAUDULENT CONCEALMENT ............... 35**

A.   Discovery Rule ........................................................... 35

B.   Fraudulent Concealment ................................................. 35

**VII.   PLAINTIFFS' CLAIMS FOR RELIEF ................................. 36**

**FIRST CLAIM FOR RELIEF ............................................... 36**

**SECOND CLAIM FOR RELIEF ............................................ 40**

**THIRD CLAIM FOR RELIEF .............................................. 41**

**FOURTH CLAIM FOR RELIEF ........................................... 42**

**FIFTH CLAIM FOR RELIEF ............................................... 43**

**SIXTH CLAIM FOR RELIEF .............................................. 45**

**SEVENTH CLAIM FOR RELIEF .......................................... 46**

**EIGHTH CLAIM FOR RELIEF ............................................ 47**

**NINTH CLAIM FOR RELIEF .............................................. 49**

**TENTH CLAIM FOR RELIEF .............................................. 51**

**ELEVENTH CLAIM FOR RELIEF ......................................... 52**

**TWELVTH CLAIM FOR RELIEF .......................................... 53**

**THIRTEENTH CLAIM FOR RELIEF ...................................... 54**

**VIII.   DEMAND FOR JURY TRIAL .......................................... 56**

Plaintiffs Mocha Mill, Inc. ("Mocha Mill"), Monk of Mocha Specialty Coffee Production and Export, Inc. ("Monk of Mocha"), Ibrahim A. Alaeli ("Alaeli"), Yasir H. Khanshali ("Khanshali"), and Adnan G. Awnallah ("Awnallah") (collectively, "Plaintiffs") bring this action against Port of Mokha, Inc. ("Port of Mokha"), Port of Mokha LLC, ("Port of Mokha"), The Mokha Foundation ("Mokha Foundation"), Blue Bottle Coffee, Inc. ("Blue Bottle"), Metra Computer Group Fzco ("Metra"), T&H Computers, Inc. ("T&H"), Mokhtar F. Alkhanshali ("Mokhtar"), and Ibrahim Ahmad Ibrahim ("Ahmad") (collectively, "Defendants").  Plaintiffs allege the following based upon information and belief and personal knowledge.

## I.      NATURE OF THE ACTION

1.      This action raises claims of conspiracy and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), including fraud, extortion and money laundering, as well as breach of fiduciary duty, interference with prospective economic relationships, conversion, unjust enrichment, and unfair competition.

2.      Before Mocha Mill, Yemeni coffee was considered inferior to most other coffees.  Plaintiffs' business plan was to locate, cultivate, refine, import, and sell for the first time in centuries premium, specialty Yemeni coffee.  To accomplish this goal, Plaintiffs invested years of effort and over half a million dollars developing relationships with Yemeni farmers to locate, refine, and cultivate coffee varieties that have come to be considered among the best in the world.  Mocha Mill also spent significant resources establishing relationships with and marketing to elite distributors worldwide, making Mocha Mill's Yemeni coffee the most highly anticipated coffee of 2016.  Given this allure and anticipation, Mocha Mill was poised to be thrust into the forefront of the specialty coffee market to earn itself a tremendous competitive advantage through first-mover relationships, establishing a dominant foothold in the industry.

3.      Defendants, led by Mocha Mill's own CEO (Mokhtar), knew this and sought to usurp Mocha Mill's business for competitor Port of Mokha through an extensive RICO

conspiracy. Defendants used Mokhtar's position of trust as Mocha Mill CEO to engage in a pattern of racketeering activity involving numerous unlawful acts, including:

    a.    Embezzlement and Wire Fraud (Apr. 2014 – Dec. 2015);

    b.    Extortion (Mar. 2015);

    c.    Wire Fraud and Extortion Conspiracy (Jun. – Nov. 2015);

    d.    Wire Fraud Conspiracy (Nov. 2015 – Apr. 2016);

    e.    Wire Fraud Conspiracy (Apr. 2016 – Jun. 2016);

    f.    Extortion Conspiracy (Apr. 2016 – Jun. 2016);

    g.    Obstruction and Spoliation of Evidence (May 2016 – unknown);

    h.    Money Laundering (May 2016 – present)

4.    Now, Port of Mokha thrives on the labor and assets stolen by the RICO enterprise, which continues to benefit from its unlawful activities as well as money laundering using criminal proceeds. Victim Mocha Mill continues to suffer injury and damages as a result.

## II.    JURISDICTION AND VENUE

5.    This Court has jurisdiction over this matter under 28 U.S.C. § 1331, based on the federal claims asserted under the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and 18 U.S.C. §§ 1331, 1334, 1962, and 1964.

6.    This Court may exercise supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367, because all of Plaintiffs' state-law claims are derived from a common nucleus of operative facts and are of the kind Plaintiffs would ordinarily expect to try in one judicial proceeding.

7.    This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391.

8.    Venue is proper in this District under 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b), because:

(a) the majority of defendants and witnesses reside, have their principal place of

business, are found, have agents, and/or transact business in this District; and

(b) a substantial part of the events or omissions giving rise to the claims raised

herein occurred in this District.

Furthermore, pursuant to 18 U.S.C. § 1965(b), the ends of justice require that other parties residing in any other district be brought before this Court given the significant contacts in this District of most defendants and witnesses.

## III.   PARTIES

### A.   Plaintiffs

9.     Plaintiff Mocha Mill, Inc. ("Mocha Mill") is a California corporation with its headquarters and principal place of business in Oakland, California.  The company was founded to locate, cultivate, refine, import, and bring to market premium Yemeni coffee for the first time in centuries.

10.     Mocha Mill's business was stolen by the Port of Mokha RICO enterprise through a pattern of racketeering activity.

11.     Plaintiff Monk of Mocha Specialty Coffee Production and Export, Inc. ("Monk of Mocha") is a California corporation with its headquarters and principal place of business in Oakland, California, and is the predecessor company to Mocha Mill.

12.     Plaintiff Ibrahim A. Alaeli ("Alaeli") is currently a citizen of the State of California, residing in or around Alameda County.  Plaintiff Alaeli is a partner and shareholder in Mocha Mill and Monk of Mocha.

13.     Plaintiff Yasir H. Khanshali ("Khanshali") is currently a citizen of the State of California, residing in or around Stanislaus County.  Plaintiff Yasir is a partner and shareholder in Mocha Mill.

14.     Plaintiff Adnan G. Awnallah ("Awnallah") is currently a citizen of the State of California, residing in or around Alameda County.  Adnan is a partner and shareholder in Mocha Mill.

**B.    Defendants**

15.    Defendant Port of Mokha, Inc. ("Port of Mokha") is a Delaware corporation with its headquarters and principal place of business in Oakland, California.

16.    Defendant Port of Mokha, Inc. is a member of the RICO enterprise that stole Mocha Mill's business and supplanted Mocha Mill with Port of Mokha through a pattern of racketeering activity, including, *inter alia*, fraud, extortion, and money laundering.

17.    Defendant Port of Mokha LLC ("Port of Mokha") is a Delaware limited liability company with its headquarters and principal place of business in Oakland, California.

18.    Defendant Port of Mokha LLC is a member of the RICO enterprise that stole Mocha Mill's business and supplanted Mocha Mill with Port of Mokha through a pattern of racketeering activity, including, *inter alia*, fraud, extortion, and money laundering.

19.    Port of Mokha, Inc. and Port of Mokha LLC operate interchangeably as "Port of Mokha," selling premium Yemeni coffee worldwide.

20.    The Mokha Foundation ("Mokha Foundation") appears to be a foundation established and operated by Port of Mokha, but the foundation appears to be registered in neither California nor Delaware.  A portion of each sale of Port of Mokha coffee appears to be funneled to The Mokha Foundation, which Port of Mokha appears to utilize to fund certain company operations with Yemeni coffee farmers and help strengthen Port of Mokha's goodwill.

21.    Defendant Blue Bottle, Inc. ("Blue Bottle") is a Delaware corporation with its headquarters and principal place of business in Oakland, California.  Blue Bottle is a major distributor and retailer of premium coffee.

22.    Defendant Blue Bottle engaged in a RICO conspiracy with Port of Mokha to defraud Plaintiffs.

23.    Defendant Metra Computer Group Fzco ("Metra") is a company based in Dubai, United Arab Emirates that operates as a distributor of information technology

*Complaint – CV 18-2539*                    4

1   products in the Middle East.

2   24.   Defendant Metra engaged in a RICO conspiracy with Port of Mokha to

3   defraud Plaintiffs.

4   25.   Defendant T&H Computers, Inc. ("T&H") is a California corporation with its

5   headquarters and principal place of business in San Carlos, California.  T&H is a

6   subsidiary of Metra Computer Group Fzco.  T&H's business includes wholesale

7   distribution of computers, computer peripheral equipment, and computer software.

8   26.   Defendant T&H engaged in a RICO conspiracy with Port of Mokha to

9   defraud Plaintiffs.

10   27.   Mokhtar F. Alkhanshali ("Mokhtar") is currently a citizen of the State of

11   California, residing in or around Alameda County.

12   28.   Mokhtar is the CEO of Port of Mokha, Inc., and is a founding shareholder of

13   the corporation.  Mokhtar is also a founding member/owner of Port of Mokha LLC.

14   29.   Mokhtar is the leader of the RICO enterprise that stole Mocha Mill's

15   business and supplanted Mocha Mill with Port of Mokha through a pattern of

16   racketeering activity.

17   30.   Ibrahim Ahmad Ibrahim ("Ahmad") is currently a citizen of the State of

18   California, residing in or around Alameda County.

19   31.   Ahmad is the Operations and Finance Executive of Port of Mokha, Inc., and

20   is a founding shareholder of the corporation.  Ahmad is also a founding member/owner of

21   Port of Mokha LLC.

22   32.   Ahmad is the second-in-command of the RICO Enterprise that stole Mocha

23   Mill's business and supplanted Mocha Mill with Port of Mokha through a pattern of

24   racketeering activity.

## IV.   RICO ALLEGATIONS

25

26   33.   As alleged herein, Plaintiffs bring claims pursuant to 18 U.S.C. §§ 1962(c)

27   and (d), and 1964 of the Racketeer Influenced and Corrupt Organizations Act ("RICO")

28

against all Defendants.  The following allegations pertain to each claim for relief under RICO.

34.   Plaintiffs are each "persons," as that term is defined in 18 U.S.C. § 1961(3), who were injured in their business or property as a result of Defendants' wrongful conduct.

35.   Defendants are, and at all relevant times were, "persons" within the meaning of 18 U.S.C. § 1961(3), because they are entities capable of holding legal or beneficial interest in property.

36.   Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. § 1964(c).

37.   Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).

38.   RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

39.   Section 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [§ 1962]."

40.   As alleged throughout this Complaint, the Enterprise orchestrated and conspired with others to orchestrate and carry out coordinated schemes designed to steal through a pattern of racketeering activity the business assets, relationships, and opportunities that Mocha Mill had spent significant time and money developing, causing injury and damages to Mocha Mill in the amount of tens and hundreds of millions of

dollars.  Defendants conspired to and did conduct their affairs through a growing association-in-fact enterprise, in violation of section §§ 1962(c) and (d), by engaging in **a pattern of racketeering activity** as defined under § 1961(5), including **wire fraud**, **extortion**, and **money laundering** as enumerated under § 1961(1), for the purpose of improperly profiting from the racketeering activity.

41.    Mocha Mill spent years and over half a million dollars to develop relationships with Yemeni coffee farmers to identify, refine, and import premium specialty Yemeni coffee for the first time in centuries.  Mocha Mill spent significant effort developing publicity and relationships with high-end distributors and retailers to launch Mocha Mill with worldwide attention and gain a first-mover advantage that would cement long-lasting farmer and distributor relationships and propel Mocha Mill to the forefront of the specialty coffee industry.

42.    Defendant Port of Mokha, in a RICO conspiracy using Mokhtar's position of trust as Mocha Mill CEO, defrauded Mocha Mill out of its best coffee and sold it under the Port of Mokha brand just as Mocha Mill was about to launch.  In the same conspiracy, Port of Mokha stole all of Mocha Mill's farmer and distributor relationships cutting Mocha Mill at the knees.

43.    Defendants' racketeering activity had the desired effect of causing Mocha Mill to lose its business, while Defendants enjoy tremendous wealth and success as a result.

## V.      FACTS COMMON TO ALL COUNTS

### A.      The Formation of Mocha Mill

44.    Yemen is the birthplace of coffee, yet centuries of underdevelopment left the country's coffee industry in obscurity.  In 2013, Yemeni coffee was considered unsophisticated and inconsistent.  By contrast, Ethiopia had become a model producer of premium coffee.

45.    In August 2013, Defendant Mokhtar and Plaintiff Alaeli discussed the idea

of a business partnership to start a coffee import/export company cultivating, processing, and distributing specialty coffee sourced from Yemen.

46.    At this time, Plaintiff Alaeli was a successful, well-respected Yemeni-American businessman with contacts in both the San Francisco Bay Area and Yemen. Though now involved in a wide array of businesses, Alaeli got his start and developed special expertise in agricultural distribution; so he was an excellent partner for a business focused on distribution of green coffee sourced from Yemen.

47.    Mokhtar was struggling at the time.  He was a Bay Area Yemeni-American in his mid-twenties who had been unable to complete his junior college courses or hold a steady job.

48.    To Plaintiff Alaeli, Mokhtar seemed like an eager, young, struggling Yemeni-American who Alaeli wanted to help.  Plaintiff Alaeli also saw a promising opportunity in the coffee business and the ability to help poor farmers in Yemen.

49.    At the time, Mokhtar knew very little about specialty coffee and coffee production, and even less about running a business, let alone an international import/export business.

50.    In or about October 2013, Alaeli took Mokhtar under his wing; so began their partnership and coffee company venture which would eventually materialize into Mocha Mill.

51.    Mocha Mill's goal was to be the first company to market and sell premium Yemeni coffee under the Mocha Mill brand, and thereby establish a strong and sustainable foothold in the coffee market.  A key part of the company's vision and marketing strategy was to help Yemeni farmers by training them to produce premium coffee and paying them a fair price for their improved product.

52.    It was clear to Plaintiff Alaeli and Defendant Mokhtar that to accomplish Mocha Mill's grand vision would require additional partners.

53.    In or about April 2014, Mokhtar approached his uncle, Plaintiff Khanshali,

and Alaeli approached his friend and business associate, Plaintiff Awnallah, to join Mocha Mill. Mokhtar's uncle, Plaintiff Khanshali, was a successful business owner with significant retail experience, and Plaintiff Awnallah was the owner of a successful produce distribution company. In addition to bringing their own unique business acumen, Plaintiffs Khanshali and Awnallah made large capital contributions to develop Mocha Mill.

54.     Plaintiffs Alaeli, Khanshali, and Awnallah and Defendant Mokhtar came to an agreement in April 2014. They agreed to have a partnership with each partner owning an equal 25% interest in Mocha Mill. Plaintiffs would provide the legitimacy and business acumen, and pay all expenses to build and grow the company into a dominant force in the coffee market. Mokhtar had no money at the time, so he agreed to initially contribute "sweat equity" and later add capital when he had the means to do so.

55.     In consideration of their respective investments, each partner agreed that he would not start a competing coffee business. The partners trusted that Mokhtar would honor his fiduciary duty and would freely share with them the knowledge and relationships they would help him develop for their company.

56.     Mokhtar was made President and CEO of Mocha Mill. As a company executive, he drew a monthly salary of $2,500 and was given full access to company accounts for expenses. The partners agreed that all expenses would be itemized with receipts or similar proof.

**B.      Plaintiffs Invested Over Half a Million Dollars to Fund Mocha Mill, Educate CEO Mokhtar in the Coffee Trade, and Provide Resources for Mokhtar to Build Relationships for Mocha Mill with Yemeni Coffee Farmers and High-End Distributors**

57.     From late 2013 through 2016, Plaintiffs invested over half a million dollars to: (a) educate Mokhtar in the coffee business; (b) have him travel nationally and internationally to develop relationships for Mocha Mill with high-end coffee distributors and retailers worldwide; (c) have him travel internationally to develop relationships for Mocha Mill with Yemeni coffee farmers; (d) train Yemeni coffee farmers to improve the

quality of their crop; (e) set up coffee processing infrastructure in Yemen; (f) identify, refine, cultivate, and process premium Yemeni coffee varieties for Mocha Mill; and (g) purchase, package, and import that coffee for sale worldwide.

58.     Mocha Mill also paid thousands of dollars for the purchase, registration, and development of a website and marketing plan.

59.     Plaintiffs taught Mokhtar about business formation, management, accounting, marketing, distribution, supply chain, and other business methods so that Mokhtar could manage the coffee business operations.  In return, Mokhtar was responsible for on-the-ground development of the company's business relationships and day-to-day management of the business.

60.     In January 2014, Plaintiffs funded Mokhtar's trip to attend an international Ethiopian coffee conference in Los Angeles, California on behalf of Mocha Mill.  The event organizer was Willem Boot ("Boot"), a coffee expert who owned the Boot Coffee company in Mill Valley, California.  Boot had co-authored a report on the state of Yemeni coffee and was considered an authority on the subject.

61.     At the conference, Boot saw Mokhtar as a novice and advised that Mokhtar attend the consulting courses and certification classes Boot Coffee offered.

62.     Plaintiffs saw tremendous value to Mocha Mill in educating Mokhtar in the coffee trade as Boot had advised.  Between February 2014 and May 2015, Plaintiffs paid Boot Coffee approximately $18,800 in consulting and course fees for this engagement so that Mokhtar could develop certain expertise for Mocha Mill's benefit.  At the time, Mokhtar had neither the relationships nor the funds to do any of this on his own.  He relied entirely on Plaintiffs.

63.     Between February and April 2014, Willem Boot and the Boot Coffee team, including Stephen Ezell, Jodi Wieser ("Wieser"), and Marlee Benefield ("Benefield"), educated Mokhtar in all things coffee, including, *inter alia*: (a) how to train farmers to grow and process raw coffee for Mocha Mill; (b) how to taste and identify premium coffee;

(c) how to package and ship coffee properly to ensure freshness; and (d) which conferences to attend to develop relationships for proper visibility and distribution.  Boot also worked with Mokhtar on the Q-grading certification, a coveted certification in the coffee industry.  Plaintiffs paid Mokhtar's salary and all expenses to develop this expertise as their partner and CEO of Mocha Mill.

64.    Upon Boot's advice, Mokhtar attended the annual symposium of the Specialty Coffee Association of America ("SCAA") in April 2014 to develop distributor relationships for Mocha Mill.  For this trip, Mocha Mill paid thousands of dollars in membership, registration fees, travel expenses, and equipment.  Plaintiffs joined Mokhtar at the conference to provide guidance and legitimacy.

65.    Boot devised a plan that called for Mokhtar to travel to Ethiopia to learn proper production practices for training Yemeni farmers, and to Yemen to develop relationships with coffee farmers and select samples for Mocha Mill.  These samples would be tested by Boot Coffee to identify Yemeni varieties for further Mocha Mill investment and development.

66.    In or about May 2014, Mokhtar traveled to Yemen to execute the next phase in the company's plan; Mocha Mill paid thousands in expenses and provided logistical support.

67.    To conduct business in Yemen required that it be done through a Yemeni company.  Plaintiff Alaeli met Mokhtar in Yemen and introduced him to Ahmed Mahyoub Ghaleb ("Ghaleb") to help Mokhtar navigate the Yemeni business community for Mocha Mill, set up a Yemeni company to serve as Mocha Mill's counterpart (the "Ghaleb company"), manage the business in Yemen, and help Mocha Mill build farmer relationships to acquire, process, and ship coffee to the United States.

68.    Mocha Mill also paid for Mokhtar's travel to Ethiopia to meet with experienced Ethiopian coffee farmers and learn proper coffee cultivation methods to train unsophisticated Yemeni farmers.

69.     Plaintiff Alaeli met Mokhtar in Ethiopia to provide his young business partner legitimacy and advice.  Together, they attended an Ethiopian coffee conference where Mokhtar was able to develop relationships with farmers and distributors for Mocha Mill as company CEO and Plaintiffs' partner.

70.     In or about July 2014, Mokhtar returned from his trip with samples.  Boot tested the samples and graded four to five varieties as having tremendous potential.  Boot told Mokhtar that Mocha Mill had tremendous potential with these varieties.  Based on Boot's reaction, Mokhtar realized that Mocha Mill had a blockbuster product on its hands.

71.     Mokhtar went back to Yemen on behalf of Mocha Mill in October 2014 for about ten months, taking with him the lessons he had learned from Boot and Ethiopian farmers to refine and import the promising Yemeni coffee varieties Boot had identified. Mocha Mill paid tens of thousands of dollars for the trip.

## C.     Embezzlement and Wire Fraud as Part of a Pattern of Racketeering Activity (April 2014 – December 2015)

72.     As President and CEO of Mocha Mill, Mokhtar had been given cash and full access to company accounts.  The agreement was that Mokhtar would undertake only legitimate company expenses and would provide justification and receipts for all expenditures.

73.     Beginning as early as April 2014, Mokhtar devised a scheme to defraud Mocha Mill and his business partners by, willfully and with the intent to defraud, embezzling cash from company accounts under the guise of necessary and legitimate company expenses.  Each time Mokhtar withdrew money from a bank account or caused a wire transfer to himself, he knowingly caused one or more interstate wires, which naturally and foreseeably occur with each bank transaction.  Furthermore, each time Mokhtar requested or represented an embezzled amount as a legitimate expense over phone, email, text, or social media to his partners, he made an intentionally fraudulent wire communication.

74.     Between April 2014 and May 2015, inclusive, Mokhtar made and/or caused

to be made bank and wire transactions, totaling approximately $92,990, for which he was unable to provide any receipt or sufficient justification.  Plaintiffs believe that each of the unsupported and unjustified transactions was an act of embezzlement and wire fraud as part of a pattern of racketeering activity.  Each transaction utilized the wire facilities of the United States either directly or indirectly through a foreseeable chain of wires required for the transfer of U.S. bank.  The transactions are detailed in the chart below.

| **Date** | **Amount** | **Account** |
| --- | --- | --- |
| May 26, 2015 | $400 | Bank of America '5331 |
| May 14, 2015 | $403 | Bank of America '5331 |
| March 25, 2015 | $500 | Bank of America '5331 |
| March 10, 2015 | $9,000 | Tadhamon International Bank |
| March 2, 2015 | $8,000 | Tadhamon International Bank |
| February 26, 2015 | $7,000 | Tadhamon International Bank |
| February 16, 2015 | $5,000 | Western Union |
| February 9, 2015 | $10,000 | Tadhamon International Bank |
| February 4, 2015 | $500 | Bank of America '5331 |
| February 4, 2015 | $500 | Bank of America '5331 |
| February 4, 2015 | $186 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $186 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $186 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |

| | | |
|---|---|---|
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $186 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| January 28, 2015 | $500 | Bank of America '5331 |
| January 28, 2015 | $500 | Bank of America '5331 |
| January 28, 2015 | $500 | Bank of America '5331 |
| January 28, 2015 | $186 | Bank of America '5331 |
| January 27, 2015 | $500 | Bank of America '5331 |
| January 27, 2015 | $186 | Bank of America '5331 |
| January 27, 2015 | $500 | Bank of America '5331 |
| January 27, 2015 | $500 | Bank of America '5331 |
| January 26, 2015 | $186 | Bank of America '5331 |
| January 20, 2015 | $186 | Bank of America '5331 |
| January 20, 2015 | $186 | Bank of America '5331 |
| January 20, 2015 | $500 | Bank of America '5331 |
| January 15, 2015 | $500 | Bank of America '5331 |
| January 14, 2015 | $500 | Bank of America '5331 |
| January 12, 2015 | $186 | Bank of America '5331 |
| January 12, 2015 | $500 | Bank of America '5331 |
| January 8, 2015 | $186 | Bank of America '5331 |
| December 8, 2014 | $18,000 | Al Shamahi Currency Exchange |
| November 19, 2014 | $500 | Bank of America '5331 |
| November 19, 2014 | $202 | Bank of America '5331 |
| November 14, 2014 | $200 | Bank of America '5331 |
| November 14, 2014 | $200 | Bank of America '5331 |

*Complaint – CV 18-2539*       14

| November 13, 2014 | $200 | Bank of America '5331 |
|---|---|---|
| November 13, 2014 | $200 | Bank of America '5331 |
| November 12, 2014 | $200 | Bank of America '5331 |
| November 12, 2014 | $200 | Bank of America '5331 |
| November 12, 2014 | $200 | Bank of America '5331 |
| November 10, 2014 | $200 | Bank of America '5331 |
| November 10, 2014 | $200 | Bank of America '5331 |
| November 10, 2014 | $200 | Bank of America '5331 |
| November 10, 2014 | $200 | Bank of America '5331 |
| October 20, 2014 | $40 | Bank of America '5755 |
| October 7, 2014 | $600 | Bank of America '5755 |
| September 16, 2014 | $4,810 | Bank of America '5755 |
| September 11, 2014 | $260 | Bank of America '5755 |
| September 10, 2014 | $460 | Bank of America '5755 |
| August 19, 2014 | $5,000 | Bank of America '5755 |
| August 18, 2014 | $100 | Bank of America '5755 |
| August 5, 2014 | $1,000 | Bank of America '5755 |
| June 26, 2014 | $140 | Bank of America '5755 |
| June 23, 2014 | $140 | Bank of America '5755 |
| June 16, 2014 | $400 | Bank of America '5755 |
| June 16, 2014 | $500 | Bank of America '5755 |
| June 16, 2014 | $100 | Bank of America '5755 |
| June 13, 2014 | $500 | Bank of America '5755 |
| June 13, 2014 | $93 | Bank of America '5755 |
| June 9, 2014 | $500 | Bank of America '5755 |
| June 9, 2014 | $93 | Bank of America '5755 |

| | | |
|---|---|---|
| June 5, 2014 | $500 | Bank of America '5755 |
| June 2, 2014 | $400 | Bank of America '5755 |
| May 27, 2014 | $500 | Bank of America '5755 |
| May 27, 2014 | $93 | Bank of America '5755 |
| May 22, 2014 | $500 | Bank of America '5755 |
| May 19, 2014 | $500 | Bank of America '5755 |
| May 19, 2014 | $93 | Bank of America '5755 |
| May 16, 2014 | $500 | Bank of America '5755 |
| May 15, 2014 | $93 | Bank of America '5755 |
| May 12, 2014 | $500 | Bank of America '5755 |
| April 30, 2014 | $320 | Bank of America '5755 |

75.     In December 2015, Mokhtar withdrew approximately $47,952 from Mocha Mill Bank of America account ending in '5331, for which he provided no receipt or justification.

76.     In total, Mokhtar embezzled at least approximately $140,942 from Mocha Mill accounts.[1]

77.     Mokhtar kept promising to provide proper paperwork and receipts for his expenditures, but never did.  Mocha Mill froze his access to the accounts as a result.

78.     Mokhtar also embezzled Mocha Mill coffee, sold it without his partners' knowledge (causing foreseeable wires), and kept the proceeds for himself.

79.     Upon information and belief, Mokhtar used some or all of the stolen and embezzled funds to finance his RICO Enterprise, including Port of Mokha, and carry out the schemes described below that ultimately allowed Port of Mokha to usurp Mocha Mill's business through a continuous pattern of racketeering activity.

---

[1] Plaintiffs reserve the right to amend the figures in this section in light of discovery.

**D.**    **Extortion as Part of a Pattern of Racketeering Activity (March 2015)**

80.    By the first quarter of 2015, Plaintiffs' significant investments had, *inter alia*: (a) enriched Mokhtar with tremendous knowledge, including optimal production and processing methods; (b) funded Mokhtar's Q-grader certification, which garnered considerable respect in the coffee industry; (c) allowed Mokhtar to develop significant relationships with Yemeni farmers; (d) allowed Mokhtar to develop significant relationships with high-end coffee distributors and retailers worldwide; and (e) afforded Mokhtar considerable legitimacy in the coffee industry.  This was all funded by and supposed to be for the benefit of Mocha Mill.  Mokhtar owed a fiduciary duty to his partners and to Mocha Mill, and they fully trusted him to honor that.

81.    By March 2015, Mokhtar was confident that Mocha Mill's coffee would sell incredibly well, and the company would be a huge success.  Mokhtar also knew that he (not his business partners) had the knowledge and the relationships with the farmers and distributors.  Mokhtar knew that he could walk away with those relationships, albeit in violation of his fiduciary duty and the law.  At this crossroads, despite the deep trust his partners had placed in him, Mokhtar resorted to extortion as part of a pattern of racketeering activity.

82.    Mokhtar secretly lined up other investors to start a competing company.

83.    In March 2015, Mokhtar began demanding that his three partners give him portions of their shares for no consideration at all.  Despite the partnership agreement and his fiduciary duty, Mokhtar threatened to start a competing company with other investors.  He threatened to walk away with Mocha Mill's farmer and distributor relationships and vast knowledgebase that the company had helped him develop.

84.    Plaintiffs had completely trusted Mokhtar, as their partner and CEO; they were now being taken advantage of for this trust.  Plaintiffs pleaded that this was unfair, contrary to their agreement, and would deprive them of their rightful shares, but Mokhtar was intractable in his threats and demands.

85.     Placed in fear that they would lose their entire investment because Mokhtar held all the cards, Plaintiffs acquiesced to Mokhtar's extortionate demands and signed a "Partnership Agreement" on or about March 29, 2015, each agreeing to give Mokhtar an additional 5% share in the company for a total of 15%.  Through this agreement, Mokhtar's ownership in the company jumped from 25% to 40%, while each of the remaining three partners' ownership went down from 25% to 20%.  In one extortionate fell swoop, Mokhtar doubled his ownership in comparison to his partners' for no consideration at all.

86.     In order to protect against future extortion from Mokhtar, the March 2015 Partnership Agreement memorialized certain conditions the parties' had agreed to all along, including, *inter alia*, that: (1) no partner would engage in a competing business; and (2) Mokhtar would prepare and maintain for Mocha Mill a database of Yemeni farmers that Mocha Mill had identified as producing the highest-quality coffee.

**E.     Mocha Mill Becomes Poised for Tremendous Success**

87.     With the Saudi-Yemeni conflict ensuing in Yemen, Mokhtar returned to the United States in April 2015; he was met with media attention.

88.     The coffee varieties Mokhtar brought back for Mocha Mill scored incredibly well.  Boot (considered among the toughest of graders) gave several varieties scores that ranked them among the top coffees the world.  CEO of Blue Bottle James Freeman gave the coffee similar high marks.

89.     At the SCAA annual symposium that year (2015), the Mocha Mill coffee varieties were hailed as some of the best in show.  The coffee received attention from around the globe and Mokhtar started making deals with high-end distributors and retailers such as Blue Bottle and Coutume.

90.     Mocha Mill spent hundreds of thousands of dollars to purchase the best crops of Yemeni coffee and have the coffee carefully processed and shipped to the United States for sale to high-end distributors and retailers, many of whom had given

commitments in mid-late 2015 to buy the coffee in 2016. Being the first-to-market with this highly anticipated premium Yemeni coffee was guaranteed to propel Mocha Mill to the forefront of the specialty coffee market.

91.     Just after his return from Yemen, Mokhtar also connected with Dave Eggers, a well-known American author, and the two began collaborating on a book focused on the development of Mocha Mill.

92.     As CEO of Mocha Mill, Mokhtar started spending significant time with Eggers to work on the Mocha Mill book, telling Plaintiffs that this was part of his "sweat equity" in the company, and that his time as company CEO was well-spent with Eggers, because the book would greatly benefit Mocha Mill's marketing and business relationships with major distributors, including Blue Bottle, Coutume, and others. Mokhtar assured Plaintiffs that the publicity for Mocha Mill would be tremendous.

93.     Upon information and belief, Mokhtar used Mocha Mill funds, embezzled and otherwise, to pay for significant international travel with Eggers to explain the development of the Mocha Mill company. Eggers liked the story, and a book and potential movie deal were in place, built in large part on Mocha Mill's time and resources.

**F.     Mokhtar Expands the Racketeering Enterprise in Preparation for a Corporate Takeover**

94.     Mocha Mill had a blockbuster product. By Mokhtar's estimates, Mocha Mill was valued in the tens of millions shortly after the company's successful showing at the April 2015 SCAA symposium.

95.     While still serving as CEO of Mocha Mill, Mokhtar secretly began lining up investors loyal to him; the Mocha Mill partners/shareholders were kept in the dark.

96.     Mokhtar solicited the Founders Fund ("Founders") to invest in Mocha Mill. Founders was interested; the Mocha Mill partners/shareholders were kept in the dark.

97.     In or about Summer of 2015, Mokhtar secretly expanded the racketeering enterprise to include himself, Ahmad, Stephen Ezell ("Ezell" – an operative Mokhtar planted as "Director" of Mocha Mill to secretly work against Mocha Mill), and victim

Mocha Mill (the "RICO Enterprise" or "Enterprise").

98.     Mokhtar also enlisted attorney Inder Comar ("Comar"), an attorney for venture capital groups like Founders, with close ties to Eggers, to serve as the RICO Enterprise's counsel.  Mokhtar sought Comar's advice on how to execute a corporate takeover scheme involving fraud.

99.     The Enterprise members engaged in organized and coordinated racketeering activity, including numerous acts of trick, fraud, deception, extortion, and money laundering, directly and proximately harming Plaintiffs.

100.    The Enterprise had an informal hierarchical decision-making structure: Mokhtar was at the helm controlling the Enterprise and controlling victim member Mocha Mill (as its CEO) to do the Enterprise's bidding; Ahmad was Mokhtar's second-in-command, plotting, advising, and carrying out orders behind the scenes.  Ezell was the workhorse carrying out orders from Mokhtar and Ahmad; Mokhtar gave Ezell a double role, making him "Director of Mocha Mill," working on the inside with Mokhtar to sabotage Mocha Mill; and Comar served as the Enterprise's counselor and lawyer to facilitate the Enterprise's racketeering activity.  Port of Mokha was the Enterprise entity designed to benefit from the racketeering activity.

## G.     Conspiracy to Commit Wire Fraud and Extortion in Furtherance of a Pattern of Racketeering Activity (June - November 2015)

101.    Continuing the pattern of racketeering, in or about June 2015, Mokhtar engaged Comar to purportedly do some corporate work for Mocha Mill.  Mokhtar and Comar, however, conspired and devised a scheme to fraudulently dilute Plaintiffs' ownership interests in Mocha Mill by having Comar provide inadvisable recommendations to Mocha Mill, with intentional material omissions, under the guise of legitimate legal advice.  Mokhtar, Comar, and others utilized the wire facilities of the United States to execute the fraud as part of a pattern of racketeering activity.

102.    On or about June 22, 2015, Comar sent Mokhtar an email advising Mokhtar to have his Mocha Mill partners mischaracterize their capital investments as "loans,"

despite knowing that they were capitalization investments, purportedly so that Mokhtar and his partners could avoid tax liability.  Tax evasion implications aside, this was actually a way for Mokhtar to trick his partners into diluting their ownership claims to Mocha Mill by inappropriately turning their capitalization into loans after-the-fact. Mokhtar (as CEO of Mocha Mill) forwarded Comar's email along with his (Mokhtar's) own endorsement to his unwitting partners (Plaintiffs) who were unsophisticated in the finer legal points of corporate capitalization.  Missing from Comar and Mokhtar's emails were the negative dilution implications and potential tax evasion liability.

103.    Upon information and belief, Mokhtar and Ahmad also had Comar draft a "Term Sheet Agreement" characterizing certain of Plaintiffs' capitalization investments as "loans" and giving 85% of the company to Mokhtar for no real consideration at all.

104.    Between September and November 2015, Mokhtar again made extortionate threats to his Mocha Mill partners (Plaintiffs).  Mokhtar again threatened that he would start a competing company with other investors unlawfully taking away Mocha Mill's knowledgebase and relationships if Plaintiffs did not sign the new agreement giving Mokhtar 85% of the company.  Mokhtar sent the agreement over email at least once in October 2015.

105.    This time Mokhtar's partners felt more protected by the March 2015 written partnership agreement that had memorialized the initial April 2014 agreement to not start competing businesses.  The partners refused to be extorted and so the Enterprise's conspiracy failed.

## H.    The Scheme to Supplant Mocha Mill with Port of Mokha Through a Pattern of Racketeering Activity

106.    The September 2015 fraud and extortion attempts having failed, members of the Enterprise conspired amongst themselves and with others to devise and execute another wire fraud scheme to accomplish their illegal corporate takeover.

107.    While using Mocha Mill to carry on business activities, members of the Enterprise secretly plotted to supplant Mocha Mill with a new competitor company called

Port of Mokha, funded and controlled by Mokhtar, Ahmad, Founders, and others. The objective was to steal Mocha Mill's most valuable assets, including its knowledgebase, farmer and distributor relationships, first-mover advantage, goodwill, and publicity to leave Mocha Mill in obscurity.

108.   To accomplish this, Enterprise members conspired with others to engage in various schemes to defraud Plaintiffs using Mokhtar's position of trust as company CEO. Each scheme involved numerous foreseeable acts of wire fraud comprising racketeering activity.

## I.   Mocha Mill CEO Mokhtar Seeks Dave Eggers' Help to Execute the RICO Enterprise's Corporate Takeover Scheme

109.   Mocha Mill had devoted its CEO's time to travel with Eggers for the purpose of developing publicity for Mocha Mill through Eggers' book and cement long-lasting relationships with high-end distributors and retailers.

110.   To steal this publicity, Mokhtar convinced Eggers to exclude Mocha Mill and his Mocha Mill partners from the book despite all the support Mocha Mill had provided for the book.

111.   Eggers wanted to oblige his protagonist (Mokhtar) who was going to help Eggers sell books. Eggers thus agreed, helping Mokhtar breach his fiduciary duty to Mocha Mill and commit intentional interference with Mocha Mill's prospective economic relationships. Later, when the book was ready to be released, Eggers would tell Mokhtar to get ready to sell tons of "Port of Mokha" coffee. The book and the coffee were marketed together giving Port of Mokha the tremendous boost Mokhtar had promised Mocha Mill as CEO.

112.   At Mokhtar's direction, Eggers wrote a false narrative concealing Mokhtar's questionable business dealings and schemes. Just as Mokhtar had directed, Eggers wrote Mocha Mill and the victim partners (Plaintiffs) completely out of the story. Instead, Eggers highlighted Port of Mokha along with Blue Bottle, Intelligentsia, and other distributors and retailers with whom Mocha Mill was looking to develop relationships—

relationships that, as a result, were siphoned to Port of Mokha.

113.   Untruthfully, Eggers told his readers that he had verified the facts in his book and that the book was "as accurate and thorough as possible."  Eggers knew, however, that true accuracy would hurt his narrative by exposing his protagonist, Mokhtar.

114.   Fearing legal action, Eggers repeatedly insisted that Mokhtar obtain a release of claims from his Mocha Mill partners.

**J.   Conspiracy to Supplant Mocha Mill with Port of Mokha Using Wire Fraud as Part of a Pattern of Racketeering Activity: Take One (November 2015 – April 2016)**

115.   Starting in early summer 2015, the buzz around Mocha Mill's highly anticipated coffee had grown considerably.  Many of the coffee varieties had scored in the 90s ranking them among the best in the world.  Blue Bottle had begun advertising the Mocha Mill coffee on its Instagram feed as early as April 2015.  Coutume had done the same in May 2015.

116.   By November 2015, high-end distributors such as Blue Bottle and Coutume had placed orders and made commitments to buy the coffee from Mocha Mill for $100 to $135 per pound.  Mokhtar (as Mocha Mill's CEO) had agreed and the coffee had been sold in principle.

117.   After Mokhtar's November 2015 fraud/extortion-based corporate *coup d'état* failed (*see supra* § V(G)), and while Mokhtar was still Mocha Mill CEO, the two heads of the RICO Enterprise (Mokhtar and Ahmad) sought to supplant Mocha Mill with a new competing company, "Port of Mokha."  To do that, they realized they needed Port of Mokha to be the first company to market Mocha Mill's highly anticipated premium coffee under the "Port of Mokha" brand and take advantage of the tremendous attention the coffee was getting at the time.  In other words, they needed to ensure that Port of Mokha (not Mocha Mill) would sell Mocha Mill's best coffee to the distributors Mocha Mill had lined up.  Port of Mokha would then easily be able to steal the farmer and distributor

networks that Mocha Mill had developed through years of investment.

118.   The challenge was in obtaining the Mocha Mill coffee, however.  Mokhtar and Ahmad recognized that they could not just ask Mocha Mill to hand over the coffee. After all, the victim Mocha Mill partners had no idea that competitor Port of Mokha was in the works—that Mokhtar and Ahmad were plotting a hostile corporate takeover.

119.   Mokhtar understood that if Plaintiffs got wind of his scheme, Plaintiffs would not allow it.  Plaintiffs were expecting a grand Mocha Mill launch with premier distributors and retailers, paving the way for tremendous brand value, long-lasting relationships, and increased growth.  Plaintiffs had no intention of letting another company swoop in and steal the imminent fruits of Mocha Mill's labor and investments.

120.   In order to take Mocha Mill's ultra-premium coffee, Enterprise members devised a scheme to defraud Plaintiffs into parting with the coffee as part of a pattern of racketeering activity.  Defendants Mokhtar, Ahmad, and Ezell, with Comar's counsel, conspired with Defendant Blue Bottle to mislead Plaintiffs into believing that high-end distributors and retailers were no longer interested in buying Mocha Mill coffee.

121.   Given the posture of the Mocha Mill brand and the excitement around its coffee, it was foreseeable to Blue Bottle and Comar that the scheme would be long and elaborate involving numerous acts of wire fraud, because email and text messages were the preferred methods of communication between the players involved and would be used extensively in the scheme.

122.   To convince Plaintiffs that Blue Bottle was no longer interested in their coffee, Mokhtar first had to convince Blue Bottle to play along and feign disinterest.

### *1.   Blue Bottle Conspires with the RICO Enterprise*

123.   Upon information and belief, Mokhtar convinced Blue Bottle CEO James Freeman that it was in Blue Bottle's best interest to participate in the scheme, because Eggers' book showcasing Port of Mokha (not Mocha Mill) would boost coffee sales for Blue Bottle.  Mokhtar also promised to give Blue Bottle a prominent place in the book casting

the company in a very positive light to further build the Blue Bottle brand.  In return, Blue Bottle agreed to show a lack of interest in Mocha Mill coffee by not advertising the coffee in its social media feeds as it had been doing and refusing to deal with Plaintiffs. Mokhtar assured Blue Bottle that Blue Bottle would receive the coffee from Port of Mokha once Mocha Mill parted with it after being convinced that high-end buyers were no longer interested.

124.    Blue Bottle knew of the Enterprise and intentionally agreed to help Mokhtar with the Enterprise's RICO fraud scheme.  Blue Bottle planned the ruse with Mokhtar and did as Mokhtar directed, exercising a level of management and control of the Enterprise.

### 2.    Port of Mokha Arranges for a Straw Buyer to Defraud Mocha Mill

125.    Mocha Mill had engaged Atlas Coffee ("Atlas") to import and store its premium coffee pending distribution.

126.    In November 2015, Mokhtar and Ezell arranged for Atlas to serve as a straw buyer for Port of Mokha.  Through a series of fraudulent acts over the course of the next seven months, Mokhtar and Ezell, as Mocha Mill officers, working in concert with other Enterprise members and Blue Bottle, convinced Plaintiffs that high-end distributors were no longer interested in buying Mocha Mill coffee for over $100 per kilogram.

127.    Records appear to indicate that Mokhtar and Ezell also falsified coffee scores (showing lower than actual scores) in attempts to convince Plaintiffs that Mocha Mill's best option was to sell the coffee to Atlas for $50 per kilogram.[2]

128.    In December 2015, Mokhtar communicated with Comar over email seeking advice on aspects of the fraud scheme.  In one such email, Mokhtar expresses concern that his partners (Plaintiffs) could become suspicious and derail the scheme, and asks for advice that could help keep the scheme concealed.

---

[2] The graders for these scores, Wieser and Benefield of Boot Coffee, would later be given roles at Port of Mokha after the company illegally supplanted Mocha Mill.

129.     Fearing that his scheme would be discovered, Mokhtar, as CEO of Mocha Mill, instructed Atlas to communicate with no one at Mocha Mill but himself and Ezell. Atlas obliged.

130.     During the course of the Atlas fraud scheme, while Mokhtar was still Mocha Mill CEO, Enterprise members and their co-conspirators sent and/or caused to be sent several foreseeable wires in interstate commerce, each of which was an act of wire fraud as part of a pattern of racketeering activity.  Examples of such wires are summarized below:[3]

      a.     On November 22, 2015, Mokhtar sent an email to Atlas copying Enterprise members Ahmad and Ezell; Mokhtar purposely excluded Plaintiffs form this email.  The email reflected that Mocha Mill had sold 240 kilograms of coffee to Coutume Café in Japan for prices ranging from $100 per pound to $135 per pound.

      b.     On February 8, 2016, Mokhtar sent an email to Coutume Café copying Ezell; Mokhtar purposely excluded Plaintiffs from this email.  The email confirmed Coutume Café's order for Mocha Mill coffee and asked Coutume to help find additional buyers in Japan.

      c.     On February 16, 2016, there was an email exchange between Mokhtar, Ahmad, and Ezell reflecting plans for Port of Mokha operations and management.  The emails appear to discuss coffee orders with Blue Bottle and Coutume Café, with Atlas Coffee acting as the intermediary to process and ship the orders on behalf of Port of Mokha.  Plaintiffs were purposely excluded from this email exchange.

      d.     On February 22, 2016, Ahmad sent an email to Mokhtar copying

---

[3] Plaintiffs believe that many more emails and text messages (each comprising an act of wire fraud) were sent and/or caused to be sent in the course of the scheme.  Before Mocha Mill was able to discover the fraud, Mokhtar hacked into the Mocha Mill email account and willfully and intentionally destroyed these communications to conceal the racketeering activity.  (*See infra* § V(M).)  Plaintiffs were able to recover some of the data Mokhtar had destroyed.

Ezell.  The email contained a very broad release of claims for Mokhtar to have Plaintiffs sign.  Plaintiffs were purposely excluded from this email.

e.    Between March 5 and March 19, 2016, there was an email exchange between Ahmad, Mokhtar, Ezell, and Blue Bottle, reflecting an agreement in principle to buy Mocha Mill coffee and continue a long-term relationship.  This appeared to be for the benefit of Port of Mokha (not Mocha Mill) even though Mokhtar was Mocha Mill's CEO at the time.  Plaintiffs were purposely excluded from this email exchange.

f.    On March 19, 2016, Ezell received an email (at his Mocha Mill address) from Conduit Coffee expressing interest in purchasing Mocha Mill coffee.  On March 21, 2016, Ezell forwarded the email to his Port of Mokha email address.  Per Mokhtar and Ahmad's orders, Ezell kept the email hidden from Plaintiffs.

g.    On March 19, 2016, Ezell received an email (at his Mocha Mill email address) from Lever Head Coffee expressing interest in purchasing Mocha Mill coffee.  On March 21, 2016, Ezell forwarded the email to his Port of Mokha email address.  Per Mokhtar and Ahmad's orders, Ezell kept the email hidden from the Plaintiffs.

h.    On March 21, 2016, Ezell, as "Director of Mocha Mill," sent an email to Atlas Coffee asking Atlas to change his contact email to his Port of Mokha domain.

i.    On March 23, 2016, Atlas sent an email to Ezell's Mocha Mill and Port of Mokha accounts responding to Ezell's inquiry concerning a coffee shipment request to France, presumably to Coutume.

j.    On March 26, 2016, Ahmad sent an email to the Executive Assistant

of Blue Bottle CEO James Freeman to set up a meeting the week of April 11, 2016, to discuss the Monk of Mokha book and other coffee related logistics for Port of Mokha. Mokhtar and Ezell were copied, while Plaintiffs were purposely excluded. Mokhtar was Mocha Mill CEO at the time.

k.   On March 29, 2016, in order to ensure the scheme's secrecy and success, Mokhtar sent an email to Ahmad and Ezell directing them to ensure that Atlas used only Mocha Mill (and not Port of Mokha) email addresses if Atlas were copying Plaintiffs on any email.

l.   On March 31, 2016, Atlas emailed Ezell in his capacity as Director of Mocha Mill to discuss "the transition [of coffee] from Mocha Mill to Port of Mokha." At this time, Ezell was serving as Director of Mocha Mill (appointed by Mokhtar), but acting on orders from Mokhtar and Ahmad as an agent for Port of Mokha.

m.   When Atlas refused to communicate with Plaintiffs on Mokhtar's orders, Plaintiffs retained a lawyer. On April 5, 2016, a lawyer representing Mocha Mill emailed Atlas a letter concerning Mokhtar's prohibition on communicating with Plaintiffs. The letter stated that Atlas's refusal to deal with Plaintiffs was a breach of contract with Mocha Mill.

n.   On April 6, 2016, at Mokhtar and Ahmad's direction, Ezell sent Plaintiffs an email making it appear that it was in Mocha Mill's best interest for Plaintiffs to not communicate with Atlas. Ezell reported back to Mokhtar and Ahmad about having sent the email.

o.   On April 6, 2016, on Mokhtar and Ahmad's orders, Ezell sent Plaintiffs an email, copying Mokhtar at his Mocha Mill email address, misrepresenting that Blue Bottle and other high-end distributors had

lost interest in Mocha Mill coffee.  Ezell pretended that Atlas had offered to buy the Mocha Mill coffee for $50 per kilo and advised that this was Mocha Mill's best option.  Ezell made it appear that $50 per kilo was a great price for the coffee and that a higher price was unlikely given the loss of interest among the high-end distributors; Ezell knew this was false and that deals were already in place through Port of Mokha.  Ezell stated that it was "the quickest way to making money" and that he and Mokhtar agreed that this was the best course of action for Mocha Mill.

p.     On April 6, 2016, Mokhtar sent Plaintiffs an email seconding Ezell's recommendation and asking Plaintiffs to fix the relationship with Atlas that the lawyer's letter had upset, so that the deal could proceed.  Mokhtar also knew this was false and that deals were already in place through Port of Mokha.

q.     On April 10, 2016, Mokhtar sent Plaintiffs an email attaching seemingly falsified coffee scores and providing elaborate explanations for why the scores were low.  This was done as part of the scheme to convince Plaintiffs that high-end distributors and retailers had lost interest in Mocha Mill coffee.

131.    In early April 2016, Plaintiffs became concerned about Mokhtar's representations and tried to talk to Atlas about what was happening, but Atlas kept Port of Mokha's scheme concealed.  After Plaintiffs involved a lawyer, however, Atlas backed out of the arrangement and decided not to help Mokhtar and Ahmad fraudulently transfer Mocha Mill's coffee to Port of Mokha.

**K.     Conspiracy to Supplant Mocha Mill with Port of Mokha Using Wire Fraud as Part of a Pattern of Racketeering Activity: Take Two (April 2016 – June 2016)**

132.    After the Enterprise's Atlas scheme collapsed, Mokhtar and Ahmad devised

an alternative wire fraud scheme with a different straw purchaser as part of the same racketeering conspiracy. Continuing with the theme that no high-end distributor or retailer was interested in Mocha Mill Coffee, Mokhtar and Ahmad found (or rather invented) a "new buyer" for the coffee, "T&H Imports," in conspiracy with T&H Computers and Metra Computer Group, both companies run by Ahmad's extended family.

133.   "T&H Imports" was a fake company created out of thin air solely to execute the Enterprise's fraud scheme. T&H and Metra knew of the Enterprise's objective and, acting through their executives Wael Fadl ("Wael") and Mohamed Eissa ("Eissa"), agreed to help execute the fraud scheme. T&H and Metra planned the scheme with Mokhtar and Ahmad and did as they directed, exercising a level of management and control of the Enterprise.

134.   In furtherance of the scheme, on April 8, 2016, Mokhtar resigned from his position as Mocha Mill CEO, telling Plaintiffs that he was no longer interested in selling coffee. He left Mocha Mill in a difficult situation because it still needed to sell its coffee. Mokhtar artificially exacerbated the situation by continuing to secretly sabotage Mocha Mill's distributor relationships, while leading Plaintiffs to believe that he would help them sell the coffee on hand as a favor even after resigning. Cutting Mocha Mill at the knees in this way was intended to make Plaintiffs desperate. It was a step towards executing the fraud scheme.

135.   As their names suggest, neither "T&H *Computers*" nor "Metra *Computer* Group" was in the coffee business. Nevertheless, at Mokhtar and Ahmad's direction, T&H and Metra provided for "T&H Imports" to pose as a Dubai-based business interested in selling Mocha Mill coffee in the Middle East, but actually serving as a straw purchaser for Port of Mokha.

136.   Through a series of seemingly genuine, but actually fraudulent email communications, Enterprise members conspired with T&H and Metra to defraud Mocha Mill into selling its best coffee (worth $135 per kilogram) for $58 per kilogram and giving

up its planned launch.  During the course of the T&H/Metra wire fraud scheme, Enterprise members and their co-conspirators sent and/or caused to be sent several foreseeable wires in interstate commerce, each of which was an act of wire fraud as part of a pattern of racketeering activity.  Examples of such wires are summarized below[4]:

     a.     On or before April 21, 2016, Mokhtar, Ahmed, and Wael (of T&H) created the fake email address *wael.th.imports@gmail.com*, in order to give the appearance of a genuine company called "T&H Imports."

     b.     On April 21, 2016, Mokhtar sent an email to Plaintiffs convincing them to sell Mocha Mill coffee to "T&H Imports," a company purportedly "looking to expand into coffee" in the Middle East. Mokhtar recommended that Mocha Mill sell all of its coffee to "T&H Imports" for $50 per kilogram and generated an invoice to that effect.

     c.     Subsequently, Mokhtar changed his mind about buying all the coffee and picked out only the best Mocha Mill varieties, which Mokhtar had promised to high-end retailers like Blue Bottle and Coutume to be marketed under the Port of Mokha brand.  On April 25, 2016, Mokhtar wired an invoice to "T&H Computers" in Fremont, California in the amount of $50,000 for 1,000 kilograms of Mocha Mill's best coffee, and had T&H Computers wire $50,000 to Mocha Mill.  Mokhtar then created a counterfeit invoice in the name of "T&H Imports" using Metra's address in Dubai, stamped it "Paid," and emailed it to Plaintiffs to show that "T&H Imports" had paid for the coffee.  But Plaintiffs were under the impression that "T&H Imports" was going to buy *all* of the coffee for $165,000, which prompted them to question

---

[4] Plaintiffs believe that many more emails and text messages (each comprising an act of wire fraud) were sent and/or caused to be sent in the course of the scheme.  Before Mocha Mill was able to discover the fraud, Mokhtar hacked into the Mocha Mill email account and willfully and intentionally destroyed these communications to conceal the racketeering activity.  (*See infra* § V(M).)  Plaintiffs were able to recover some of the data Mokhtar had destroyed.

the transfer of only the best varieties.

d.  On May 2, 2016, Wael (of T&H) sent Plaintiffs an email pretending to be a *bona fide* coffee purchaser seeking transfer of Mocha Mill's best coffee.

e.  On May 3, 2016, Mokhtar forwarded Plaintiffs an email pretending to negotiate with "T&H Imports" on Mocha Mill's behalf to make Mocha Mill believe that the deal was genuine.

f.  On May 4, 2016, Wael (of T&H) sent Mokhtar an email, copying Plaintiffs, pretending to have *bona fide* negotiations with Mokhtar while knowing all along that T&H Imports (a fake company) was a straw purchaser helping to accomplish the fraud scheme set up by the racketeering Enterprise.

g.  These fraudulent negotiations led Plaintiffs to believe that the deal was genuine.  Soon thereafter, Mocha Mill transferred to "T&H Imports" (in reality T&H Computers) 862 kilograms of its coffee (all the best varieties Mocha Mill had on hand) for the $50,000 payment, which amounted to $58 per kilogram.

h.  Immediately thereafter T&H Computers sold the same coffee to Port of Mocha for $51,000, taking a $1,000 commission for its part in the fraud scheme.

137.  On May 17, 2016, Port of Mokha sold under its own brand 390 kilograms of the fraudulently obtained Mocha Mill coffee to Blue Bottle for $135 per kilogram.  The coffee was also sold for a similar price to Coutume, and other high-end distributors.

138.  On May 31, 2016, in attempts to conceal the fraud scheme, Mokhtar sent Plaintiffs an email insisting that the T&H deal was great for Mocha Mill.

139.  On June 9, 2016, Mocha Mill's highly anticipated premium Yemeni coffee was made available for the first time and marketed heavily at Blue Bottle coffee shops

across the United States *under the "Port of Mokha" brand*.  There was no mention of Mocha Mill.  Other high-end retailers and distributors followed in like manner.  The Mocha Mill coffee (branded now as "Port of Mokha" coffee) was recognized by experts as an ultra-premium variety garnering some of the best coffee scores in the world, eventually being hailed by the coffee industry as one of the best coffees in history.

140.   In addition, images that belonged to Mocha Mill were/are used by Port of Mokha and its customers, including Blue Bottle, to market the coffee, as well as by Dave Eggers to promote <u>The Monk of Mokha</u> book alongside Port of Mokha coffee.

141.   The stolen Mocha Mill coffee along with its attendant hype and publicity noticeably improved the brand value and goodwill of Blue Bottle and other high-end retailer and distributors, cementing long-lasting relationships for Port of Mokha that rightfully belonged to Mocha Mill.

142.   Port of Mokha thus usurped through a RICO conspiracy Mocha Mill's entire business at the critical moment of launch.

143.   To date, Port of Mokha continues to thrive on the farmer and distributor relationships, opportunities, publicity, first-mover advantage, images, and other assets stolen from Mocha Mill.

144.   Upon information and belief, a portion of each sale of Port of Mokha coffee is funneled to The Mokha Foundation, which funds certain Port of Mokha operations and helps maintain relationships with Yemeni coffee farmers by providing microloans and training, and increases Port of Mokha's goodwill.  This means of operation was part of Mocha Mill's business plan and was also stolen when Port of Mokha clandestinely raided Mocha Mill's assets, relationships, and ideas through Mocha Mill partner and CEO Mokhtar.

## L.   Extortion to Obtain a Release of Claims as Part of a Pattern of Racketeering Activity

145.   Upon information and belief, Comar and Eggers advised Mokhtar several times to obtain a broad release of claims from Mocha Mill to avoid legal exposure.

Mokhtar knew that obtaining such a release would be difficult, however, so he resorted to extortion once again.

146.   Despite his fiduciary duty, Mokhtar purposely allowed the "mochamill.com" domain to expire and directed Enterprise member Ahmad to purchase the domain in or about April 2016.  Mokhtar proceeded to use the domain as a bargaining chip in attempts to extort Plaintiffs into signing a broad release of claims, engaging in both extortion and wire fraud.

147.   Furthermore, upon his resignation from Mocha Mill, Mokhtar had sole access and administrator privileges to all of Mocha Mill's internet accounts, including, *inter alia*, the log-in credentials for GoDaddy, SquareSpace, G-Suite and G-Mail, and various social media accounts such as Facebook, Twitter, and Instagram.

148.   Even after his resignation from Mocha Mill, Mokhtar refused to give Mocha Mill back these credentials and administrator privileges, essentially locking Mocha Mill out of its own accounts.  Mokhtar then used access to the accounts as a bargaining chip in attempts to extort the Mocha Mill partners into signing a broad release of claims absolving Mokhtar of all legal liability.  The extortion attempt failed and Mokhtar did not get his release.

149.   Instead, Mocha Mill was forced to engage in a lengthy process to regain access to its accounts directly from the service providers.  It was not until late June 2016 that Mocha Mill regained access to many of its accounts.

**M.    Obstruction and Spoliation of Evidence to Cover Up the Racketeering Conspiracy**

150.    After Mocha Mill regained access to its accounts, the company changed the credentials and privileges away from Mokhtar, but inadvertently left Mokhtar's phone number on the G-Mail account as a recovery phone number.  Using this recovery phone number, Mokhtar hacked back into the Mocha Mill email account, locked out Mocha Mill, and destroyed emails that evidenced his racketeering activity.

151.   More recently, after sending Defendants notice of impending litigation and

requests for preservation of evidence, Plaintiffs have seen potential evidence disappear off the Internet and are gravely concerned about continuing obstruction and spoliation.

## N. Money Laundering in Furtherance of a Pattern of Racketeering Activity

152. Transactional money laundering, a RICO predicate codified in 18 U.S.C. § 1957, prohibits monetary transactions of over $10,000 using criminally derived property from specified unlawful activity such as fraud and extortion.

153. Through a pattern of racketeering activity, including fraud and extortion, the Enterprise and defendants amassed large sums of money in criminal proceeds derived from fraud and extortion. Defendants used this money to engage in numerous monetary transactions of over $10,000 to grow Port of Mokha.

154. Each such transaction is an act of transactional money laundering that has harmed Mocha Mill by allowing competitor Port of Mokha to advance its dominance in the specialty coffee market as part of a pattern of racketeering activity.

## VI. DISCOVERY RULE & FRAUDULENT CONCEALMENT

### A. Discovery Rule

155. Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence that Defendants conspired to and did engage in a pattern of racketeering activity that involved fraud, extortion, and money laundering, giving rise to the federal and state law claims raised herein.

156. Defendants' RICO scheme and state law violations were elaborate and well concealed. Indeed, it was not until Plaintiffs started seeing "Port of Mokha" coffee appear at major distributors such as Blue Bottle and recovered some of the emails Mokhtar had destroyed, that Plaintiffs realized they had been defrauded.

### B. Fraudulent Concealment

157. Under the fraudulent concealment doctrine, the causes of action alleged herein did or will only accrue upon discovery of the true nature of the fraud-based RICO conspiracy and other violations perpetrated by Defendants.

158.    Defendants maliciously concealed from Plaintiffs material information required for the prosecution of Plaintiffs' claims.  Defendants took active and affirmative steps to hide the true character, quality, nature, and extent of their illegal RICO and fraud schemes, and other federal and state law violations.  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the true nature of the RICO conspiracy and related violations perpetrated by Defendants, because Defendant Mokhtar, *inter alia*, actively destroyed evidence to conceal his unlawful activities.

159.    Defendants are under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of the RICO and fraud schemes they perpetrated on Plaintiffs.

## VII.   PLAINTIFFS' CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Conspiracy to Commit Violations of the
### Racketeer Influenced and Corrupt Organizations Act)
### [18 U.S.C. § 1962(d)]

(*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad*)

160.    Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

161.    Plaintiffs bring this RICO claim for relief under 18 U.S.C. §§ 1962(d) and 1964 for conspiracy to violate § 1962(c), against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

162.    In or about April 2014, Mokhtar began engaging in a pattern of racketeering

activity using Mocha Mill as the RICO enterprise:

    a.    From about April 2014, through about December 2015, Mokhtar committed numerous acts of **wire fraud** in violation of 18 U.S.C. §§ 1341 and 1343, and **grand theft by fraud** in violation of Cal. Penal Code §§ 487 and 532, to embezzle from Mocha Mill at least approximately $140,942 as well as proceeds from clandestine sales of stolen Mocha Mill coffee.  (*See supra* § V(C).)

    b.    In about March 2015, Mokhtar engaged in acts of **extortion** in violation of 18 U.S.C. § 1951, and Cal. Penal Code §§ 518, 519, 520, 522, and 523.  (*See supra* § V(D)).

    163.    In or about April 2015 and thereafter, Mokhtar expanded the racketeering enterprise to form a larger association-in-fact enterprise that included Mokhtar, Mocha Mill, Ahmad, Ezell, Comar, Port of Mokha, and others (for purposes of this claim for relief, the "Enterprise").  The Enterprise sought to steal for the benefit of Port of Mokha the business Mocha Mill had spent years developing.  (*See supra* §§ V(F) – (K).) Enterprise members and their co-conspirators shared the objective of usurping and did usurp Mocha Mill by fraud and extortion.  (*See id.*)

    164.    From about June 2015 through about November 2015, Enterprise members conspired with each other and others known and unknown to Plaintiffs at this time:

    a.    To commit (and did commit) numerous acts of **wire fraud** in violation of 18 U.S.C. §§ 1341 and 1343, and attempted **grand theft by fraud** under California state law in violation of Cal. Penal Code §§ 487 and 532 (*see supra* § V(G)); and

    b.    To commit **extortion** in violation of 18 U.S.C. § 1951, and Cal. Penal Code §§ 518, 519, 520, 522, and 523; Defendants did commit **attempted extortion** in violation of 18 U.S.C. § 1951, and Cal. Penal Code § 524.  (*See supra* § V(G).)

165.    From about November 2015 through about May 2016, Enterprise members conspired with each other, Blue Bottle, T&H, Metra, and others known and unknown to Plaintiffs at this time to commit (and did commit) racketeering acts, including **wire fraud** in violation of 18 U.S.C. §§ 1341 and 1343, and **grand theft by fraud** in violation of Cal. Penal Code §§ 487 and 532.  (*See supra* §§ V(H) – (K).)

166.    From about April 2016 through about June 2016, Enterprise members conspired with each other and others known and unknown to Plaintiffs at this time to commit racketeering acts, including **extortion** in violation of 18 U.S.C. § 1951, and Cal. Penal Code §§ 518, 519, 520, 522, and 523; Defendants did commit **attempted extortion** in violation of 18 U.S.C. § 1951, and Cal. Penal Code § 524.  (*See supra* § V(L).)

167.    After resigning from Mocha Mill, Mokhtar engaged in racketeering acts by hacking into Mocha Mill emails accounts to destroy evidence in attempts to conceal the RICO Enterprise and its unlawful activities.  In doing so, he committed acts of **wire fraud** in violation of 18 U.S.C. §§ 1341 and 1343, by maliciously and with intent to deceive, misrepresenting himself to be a person with authorized access when he had no such authorization.  In fact, Mokhtar at the time knew that he was *prohibited* from accessing the accounts, especially for the purpose of destroying evidence of criminal activity.  (*See supra* § V(M).)

168.    From about April 2016 through the present, Enterprise members are continuing to commit racketeering acts by using criminal proceeds derived from fraud and extortion to engage in monetary transactions of over $10,000 to grow Port of Mokha; each such transaction is an act of **money laundering** in violation of 18 U.S.C. § 1957.  Port of Mokha continues to launder money to advance its dominance in the specialty coffee market thereby causing direct and proximate injury to competitor Mocha Mill.  (*See supra* § V(N).)

169.    As detailed above, at all relevant times, each member and co-conspirator of the Enterprise was aware of its purpose and conduct, and was a knowing, willing, and

active participant in that conduct, as detailed in the preceding paragraphs.  Each member and co-conspirator of the Enterprise reaped substantial profits from the unlawful activities of the Enterprise to the detriment of Mocha Mill.

170.   As detailed above, at all relevant times, each member of the Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the Enterprise's affairs.

171.   As detailed above, at all relevant times, the Enterprise and each of its members: (a) had an existence separate and distinct from each of its members; and (b) was separate and distinct from the pattern of racketeering in which Defendants engaged.

172.   As detailed above, at all relevant times, the members and co-conspirators of the Enterprise were/are systematically linked through continually coordinated activities, financial ties, and contractual business arrangements.

173.   The Enterprise is an ongoing and continuing enterprise.  The harm it caused continues to date and it continues to engage in the laundering of criminal proceeds, directly and proximately causing ongoing harm to Mocha Mill.

174.   As detailed above, at all relevant times, the members and co-conspirators of the Enterprise could not have accomplished the purpose of the Enterprise without each other's assistance and they all, with the exception of victim Mocha Mill, profited and continue to profit financially from the Enterprise's unlawful activities.

175.   As detailed above, at all relevant times, the pattern of racketeering activity undertaken by Enterprise members and their co-conspirators required and involved the regular and foreseeable use of electronic communications including text messages, emails, social media communications, and financial wires utilizing the wire facilities of the United States.

176.   As detailed above, at all relevant times, Enterprise members functioned as a continuing unit for the purposes of engaging in the Enterprise's racketeering activity to

accomplish the Enterprise's core objective to steal the assets and business (including, importantly, the farmer and distributor relationships and first-mover advantage) Mocha Mill had spent years developing and planning; each Enterprise member agreed to take actions to hide from others the existence of the Enterprise, its objectives, and its unlawful activities.

177.   As detailed above, at all relevant times, the RICO Enterprise engaged in and affected interstate commerce because it, *inter alia*: (a) involved (and continues to involve) the importation of coffee into the United States from abroad (Yemen), and the subsequent marketing and sale of that coffee nationwide and internationally; and (b) utilized wire facilities of the United States to carry out its schemes and unlawful activities.

178.   As a result of the Enterprise's racketeering activity, Port of Mokha unlawfully supplanted Mocha Mill, causing Mocha Mill to suffer significant damages amounting to tens and hundreds of millions of dollars.  Simply put, Port of Mokha is the stolen Mocha Mill.  The Enterprise's RICO violations through its members and co-conspirators continue to victimize and injure Mocha Mill.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CLAIM FOR RELIEF

**(Violations of the Racketeer Influenced and Corrupt Organizations Act)**
**[18 U.S.C. § 1962(c)]**

(*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*
*Mokha Foundation, Mokhtar, and Ahmad*)

179.   Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

180.   Plaintiffs bring this RICO claim for relief under 18 U.S.C. §§ 1962(c) and 1964 of RICO against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation,

1    Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

2    181.    The allegations in this claim for relief mirror the allegations in the First

3    Claim for Relief and so, for purposes of brevity, each and every allegation in the First

4    Claim for Relief as well as all the preceding paragraphs are alleged herein by reference

5    with the same force and effect as though fully set forth herein.

6    WHEREFORE, Plaintiffs pray for relief as set forth below.

7    ### THIRD CLAIM FOR RELIEF

8    ### (Fraud & Deceit)

9    (*Against Defendant Mokhtar, Port of Mokha, Inc.,*

10    *Port of Mokha LLC, and Mokha Foundation*)

11    182.    Plaintiffs reallege and incorporate by reference, in this claim for relief, each

12    and every allegation of the preceding paragraphs, with the same force and effect as

13    though fully set forth herein.

14    183.    Plaintiffs bring this fraud-by-deceit claim for relief against Mokhtar, Port of

15    Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are

16    collectively referred to as "Port of Mokha"), and Mokha Foundation.

17    184.    As detailed in Section V(C), from April 2014 through December 2015, under

18    the guise of legitimate company expenses, Mokhtar willfully, maliciously, and with intent

19    to defraud embezzled at least approximately $140,942 from Mocha Mill for personal

20    expenses and to fund his competitor company Port of Mokha.

21    185.    Plaintiffs made Mokhtar CEO of Mocha Mill and gave him full access to

22    company accounts for legitimate company expenses.

23    186.    Plaintiffs relied on Mokhtar's representations that he was drawing upon

24    Mocha Mill's accounts only for the purpose of legitimate company expenses.

25    187.    Mokhtar assured Plaintiffs that he would provide proof of all expenses but

26    never did so because the expenses were not legitimate.

27    188.    Mokhtar's conduct directly, proximately, and substantially caused Plaintiffs

28

*Complaint – CV 18-2539*                    41

to suffer significant injury.

189.   Because Mokhtar's fraudulent conduct was done maliciously, oppressively, deliberately, and/or with intent to defraud, Plaintiffs are further entitled to an award of exemplary and punitive damages, pursuant to California Civil Code section 3294.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FOURTH CLAIM FOR RELIEF

### (Fraud & Deceit)

### (Conspiracy and Aiding & Abetting)

(*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad*)

190.   Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

191.   Plaintiffs bring this fraud-by-deceit claim for relief against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

192.   Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a fraudulent scheme, which conduct constitutes fraud and deceit.  The fraud and deceit was designed as part of a deliberate and intentional scheme to induce Plaintiffs to abandon significant business opportunities so that Port of Mokha could supplant Mocha Mill as the company first to market Mocha Mill's highly anticipated premium Yemeni coffee, thereby stealing the attendant publicity and business relationships rightfully due Mocha Mill, causing Mocha Mill to suffer significant injury and damages that continue to date.

193.   As detailed in Sections V(H) – (K), Defendants conspired and carried out through a series of coordinated acts a methodical scheme to defraud Mocha Mill into

believing that high-end distributors and retailers were no longer interested in Mocha Mill's premium coffee.  Defendants knew this to be false and willfully, maliciously, and with intent to defraud intended for Plaintiffs to rely on Defendants' misrepresentations. Defendants perpetrated this scheme to steal the fruits of Mocha Mill's investments and supplant it with Port of Mokha.

194.    Plaintiffs reasonably relied on Defendants' misrepresentations.  As a result, Defendants' intentional, willful, and malicious fraud and deceit directly, proximately, and substantially caused Plaintiffs to suffer significant injury and damages amounting to tens and hundreds of millions of dollars.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FIFTH CLAIM FOR RELIEF

### (Fraudulent Concealment)

### (Conspiracy and Aiding & Abetting)

*(Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad)*

195.    Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

196.    Plaintiffs bring this fraud-by-concealment claim for relief against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

197.    Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a fraudulent scheme, which conduct constitutes fraudulent concealment.  The fraudulent concealment was designed as part of a deliberate and intentional scheme to induce Plaintiffs to abandon significant business opportunities so that Port of Mokha could supplant Mocha Mill as the company first to market Mocha

Mill's highly anticipated premium Yemeni coffee, thereby stealing the attendant publicity and business relationships rightfully due Mocha Mill, causing Mocha Mill to suffer significant injury and damages that continue to date.

198.   As detailed in Sections V(H) – (K), defendant Mokhtar was in a fiduciary relationship with Plaintiffs and willfully, maliciously, and with intent to defraud actively concealed and failed to disclose that Mocha Mill's business plan was on track and that high-end coffee distributors and retailers were anxiously waiting to receive and market Mocha Mill's highly anticipated premium coffee that would thrust Mocha Mill to the forefront of the premium coffee market with significant positive publicity creating a solid future for the company.  Defendant Mokhtar conspired with others to actively conceal and failed to disclose that deals-in-principle were in place; he did this to steal Mocha Mill's relationships, assets, opportunities, and business advantage in order to supplant Mocha Mill with Port of Mokha.

199.   Through a series of coordinated acts, defendants Blue Bottle, T&H, Metra, and Ahmad willfully, maliciously, and with intent to defraud conspired with Mokhtar and Ezell to help perpetrate the scheme to deceive Plaintiffs out of their business.  (*See supra* V(H) – V(K).)

200.   Plaintiffs did not know of the concealed facts.  Had Plaintiffs known the truth, they would have been first to market their premium coffee at high-end distributors and retailers, and would have received the continuing benefits that Port of Mokha stole using fraud and deceit.

201.   Defendants' willful and intentional concealment directly, proximately, and substantially caused Plaintiffs to suffer significant damages amounting to tens and hundreds of millions of dollars.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**SIXTH CLAIM FOR RELIEF**

**(Negligent Misrepresentation)**

**(Conspiracy and Aiding & Abetting)**

(*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad*)

202.   Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

203.   Plaintiffs bring this negligent misrepresentation claim for relief against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

204.   Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a scheme involving negligent misrepresentations. Defendants' conduct induced Plaintiffs to abandon significant business opportunities and provided Port of Mokha the means to supplant Mocha Mill as the company first to market Mocha Mill's highly anticipated premium Yemeni coffee, thereby stealing the attendant publicity and business relationships rightfully due Mocha Mill, causing Mocha Mill to suffer significant injuries that continue to date.

205.   As detailed in Sections V(H) – (K), through a series of coordinated acts, including acts of aiding and abetting, Defendants represented to Plaintiffs that high-end distributors and retailers were no longer interested in Mocha Mill's premium coffee. Defendants were negligent because the representations were false, and Defendants had no reasonable grounds to believe they were true.

206.   Defendants intended for Plaintiffs to rely on the false representations in order to steal Mocha Mill's investments and supplant Mocha Mill with Port of Mokha.

207.   Plaintiffs did reasonably rely on Defendants' misrepresentations. As a

result, Defendants' negligent misrepresentations directly, proximately, and substantially caused Plaintiffs to suffer significant damages amounting to tens and hundreds of millions of dollars.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

### (Conspiracy and Aiding & Abetting)

(*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad*)

208.   Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

209.   Plaintiffs bring this breach of fiduciary duty claim for relief against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

210.   Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a scheme involving significant breaches of fiduciary duty.  Defendants' conduct induced Plaintiffs to abandon significant business opportunities and provided Port of Mokha, by deceit and other wrongful methods, the means to supplant Mocha Mill as the company first to market Mocha Mill's highly anticipated premium Yemeni coffee, along with the attendant publicity and business relationships rightfully due Mocha Mill, causing Mocha Mill to suffer significant injuries that continue to date.

211.   As a partner and CEO of Mocha Mill, Mokhtar owed Plaintiffs a fiduciary duty of undivided loyalty, that is, a duty to act with the utmost good faith in the best interest of his partners, Mocha Mill, and its shareholders.

212.   As Director of *Mocha Mill* (albeit, planted by CEO Mokhtar), Ezell owed Mocha Mill (not Mokhtar and Port of Mokha) a fiduciary duty of undivided loyalty, that is, a duty to act with the utmost good faith in the best interest of Mocha Mill.  Ezell, however, acted against Mocha Mill interests on behalf of Port of Mokha on CEO Mokhtar's orders.

213.   At all relevant times, T&H, Metra, Blue Bottle, and Ahmad knew of Mokhtar and Ezell's fiduciary relationships and positions of trust at Mocha Mill.

214.   Without Plaintiffs' informed consent, Mokhtar and Ezell (on Mokhtar's command) knowingly and intentionally acted against Plaintiffs' interests by engaging in the RICO conspiracy detailed above, including acts of fraud and extortion.  Mokhtar acted for the benefit of Port of Mokha and with the knowledge and assistance of T&H, Metra, Blue Bottle, and Ahmad.

215.   The primary goal of the numerous breaches of fiduciary duty was to steal Mocha Mill's investments and supplant Mocha Mill with Port of Mokha.  Defendants were successful in their goal and they all aided and abetted, and benefitted from Mokhtar's and Ezell's breaches of fiduciary duty.

216.   Defendants' conduct directly, proximately, and substantially caused Plaintiffs to suffer significant damages amounting to tens and hundreds of millions of dollars.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## EIGHTH CLAIM FOR RELIEF

### (Intentional Interference with Prospective Economic Relationships)

### (Conspiracy and Aiding & Abetting)

(*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad*)

217.   Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as

though fully set forth herein.

218. Plaintiffs bring this intentional interference with prospective economic relationships claim for relief against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

219. Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a scheme involving intentional interference with prospective economic relationships. Defendants' conduct induced Plaintiffs to abandon significant business opportunities and provided Port of Mokha, by deceit and other wrongful methods, the means to supplant Mocha Mill as the company first to market Mocha Mill's highly anticipated premium Yemeni coffee, along with the attendant publicity and business relationships rightfully due Mocha Mill, causing Mocha Mill to suffer significant injury and damages that continue to date.

220. In anticipation of the first sale of ultra-premium Yemeni coffee, Mocha Mill had set up several economic relationships (and prospective relationships) with various distributors and retailers of coffee; these relationships would have resulted in significant and continuing economic benefit to Mocha Mill as clearly demonstrated by Port of Mokha's success (built on Mocha Mill's labor and investments).

221. Defendants knew of these relationships. Nevertheless, Defendants willfully and intentionally engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered various RICO violations, acts of fraud, acts of extortion, and breaches of fiduciary duty.

222. By engaging in this conduct, Defendants knew that disruption of Mocha Mill's relationships and prospective business opportunities was certain or substantially certain to occur. In fact, the wrongful conduct was designed precisely to disrupt Mocha Mill's relationships and siphon them to Port of Mokha.

223.   Mocha Mill's relationships and business opportunities were severely disrupted, and all defendants, especially competitor Port of Mokha, benefitted significantly from this.

224.   Defendants' conduct directly, proximately, and substantially caused Plaintiffs to suffer significant and continuing injury and damages amounting to tens and hundreds of millions of dollars.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## NINTH CLAIM FOR RELIEF

### (Negligent Interference with Prospective Economic Relationships)
### (Conspiracy and Aiding & Abetting)

*(Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad)*

225.   Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

226.   Plaintiffs bring this negligent interference with prospective economic relationships claim for relief against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

227.   Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a scheme involving negligent interference with prospective economic relationships.  Defendants' conduct induced Plaintiffs to abandon significant business opportunities and provided Port of Mokha, by deceit and other wrongful methods, the means to supplant Mocha Mill as the company first to market Mocha Mill's highly anticipated premium Yemeni coffee, along with the attendant publicity and business relationships rightfully due Mocha Mill, causing Mocha Mill to

suffer significant injuries that continue to date.

228.    In anticipation of the first sale of ultra-premium Yemeni coffee, Mocha Mill had set up several economic relationships (and prospective relationships) with various distributors and retailers of coffee; these relationships would have resulted in significant and continuing economic benefit to Mocha Mill as clearly demonstrated by Port of Mokha's success (built on Mocha Mill's labor and investments).  Defendants either knew or should have known of these relationships and prospective relationships based on their own close relationships with Mokhtar and Mocha Mill, and insight into the specialty coffee industry.

229.    Defendants knew or should have known that these relationships would be disrupted if Defendants failed to act with reasonable care when they engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered the schemes and numerous breaches of fiduciary duty orchestrated by Mokhtar and other Enterprise members.

230.    Defendants did fail to act with reasonable care by engaging in, participating in, agreeing to, aiding and abetting, conspiring in, and/or furthering the schemes and breaches of fiduciary duty orchestrated by Mokhtar and other Enterprise members.

231.    Defendants engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered various RICO violations, acts of fraud, acts of extortion, and breaches of fiduciary duty.  By engaging in this conduct, Defendants knew that disruption of the relationships was certain or substantially certain to occur.  In fact, the wrongful conduct was designed precisely to disrupt Mocha Mill's relationships for Port of Mokha's benefit.

232.    Mocha Mill's relationships and business opportunities were severely disrupted to Port of Mokha's benefit.  All defendants benefitted from this.

233.    Defendants' conduct directly, proximately, and substantially caused Plaintiffs to suffer significant damages in lost profits, past and future, amounting to tens

and hundreds of millions of dollars.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## TENTH CLAIM FOR RELIEF

### (Conversion)

(*Against Defendant Mokhtar Port of Mokha, Inc.,*

*Port of Mokha LLC, and Mokha Foundation*)

234.    Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

235.    Plaintiffs bring this conversion claim for relief against Mokhtar, Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), and Mokha Foundation.

236.    As detailed in Section V(C), from April 2014 through December 2015, under the guise of legitimate company expenses, Mokhtar willfully, maliciously, and with intent to defraud embezzled from Mocha Mill and Plaintiffs at least approximately $140,942 as well as proceeds from clandestine sales of stolen Mocha Mill coffee, to use for personal expenses and to fund his competitor company Port of Mokha.

237.    Because Mokhtar illegally stole and converted Mocha Mill's funds, Plaintiffs have an immediate right to a return of those funds including all benefits derived therefrom.

238.    Mokhtar continues to exercise dominion and control over those funds for the benefit of himself and Port of Mokha.

239.    As a substantial and proximate result of Mokhtar's unlawful conversion, Plaintiffs have suffered and continue to suffer injury and damages.

WHEREFORE, Plaintiffs pray for relief as set forth below.

# ELEVENTH CLAIM FOR RELIEF

## (Conversion)

*(Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad)*

240.    Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

241.    Plaintiffs bring this conversion claim for relief against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

242.    Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a scheme involving conversion.  Defendants' conduct induced Plaintiffs to abandon significant business opportunities and provided Port of Mokha, by deceit and other wrongful methods, the means to supplant Mocha Mill as the company first to market Mocha Mill's highly anticipated premium Yemeni coffee, along with the attendant publicity and business relationships rightfully due Mocha Mill, causing Mocha Mill to suffer significant injuries that continue to date.

243.    Because Defendants illegally stole and converted Mocha Mill's entire business, essentially supplanting Mocha Mill with Port of Mokha, and/or aided and abetting the same, Plaintiffs have an immediate right to Port of Mokha, including damages for all past and future profits of Port of Mokha commensurate with Plaintiffs' stake, as well as punitive damages.

244.    Port of Mokha continues to exercise dominion and control over a business that rightfully belongs to Mocha Mill.  All defendants have benefitted from this.

245.    As a substantial and proximate result of Defendants' unlawful conversion of the Mocha Mill company, Plaintiffs have suffered and continue to suffer significant injury

and damages amounting to tens and hundreds of millions of dollars.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## TWELVTH CLAIM FOR RELIEF

### (Unjust Enrichment)

(*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*
*Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad*)

246.   Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

247.   Plaintiffs bring this unjust enrichment claim for relief against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

248.   Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a scheme involving unjust enrichment.

249.   By their wrongful acts and omissions, Defendants, and each of them, were unjustly enriched at the expense of and to the detriment of Plaintiffs or while Plaintiffs were unjustly deprived.  That is, Defendants' conduct induced Plaintiffs to abandon significant business opportunities Plaintiffs had invested serious time and money to develop, and provided Port of Mokha, by deceit and other wrongful methods, the means to supplant Mocha Mill as the company first to market Mocha Mill's highly anticipated premium Yemeni coffee, along with the attendant publicity and business relationships rightfully due Mocha Mill, causing Mocha Mill to suffer significant injuries that continue to date.

250.   Plaintiffs seek restitution from Defendants, and each of them, and seek an order of this Court disgorging all payments, commissions, profits, benefits, year-end performance or other bonuses, and other compensation obtained by Defendants, and each

of them, from their wrongful conduct.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## THIRTEENTH CLAIM FOR RELIEF

## (Cal. Bus. & Prof. Code § 17200 – Unlawful, Unfair, and Fraudulent Practices)

*(Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar and Ahmad)*

251.    Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

252.    Plaintiffs bring this unlawful, unfair, and fraudulent practices claim for relief against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, T&H, Metra, Blue Bottle, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

253.    California's Unfair Competition Law ("UCL") prohibits any unlawful, unfair, or fraudulent business act or practice.  *See* Cal. Bus. & Prof. Code §§ 17200 *et. seq.*  The statutory violations, fraudulent misrepresentations, and unlawful practices and acts of defendants, and each of them, mentioned previously, constitute unfair, unlawful, and/or fraudulent business acts and/or practices within the meaning of the UCL.

254.    Defendants engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered acts and practices in violation of Section 17200 *et. seq.*

255.    By engaging in the unlawful acts and/or practices alleged in this complaint, Defendants have violated several state, federal, and common laws constituting *per se* violations of Section 17200 *et. seq.*, including, but not limited to: 18 U.S.C. §§ 1341 and 1343; 18 U.S.C. § 1951; 18 U.S.C. § 1957; 18 U.S.C. § 1962; Cal. Penal Code §§ 518, 519, 520, 522, 523, and 524; Cal Civ. Code §§ 1572, 1573, 1709, and 1710; and the common law.

256.   All of defendants' unlawful, fraudulent, and unfair business practices were designed to and did deprive Plaintiffs of the continuing business profits and opportunities they were entitled to as a result of years of investment and development.

257.   As a direct and proximate result of Defendants' conduct, and each of them, Plaintiffs have suffered and are continuing to suffer injury and damages.

258.   Plaintiffs bring this claim for relief on behalf of themselves and the public as private attorneys general pursuant to Business and Professions Code § 17204.

259.   Pursuant to Business and Professions Code § 17203, Plaintiffs seek from Defendants, and each of them, restitution and disgorgement of all earnings, profits, compensations, benefits, and other ill-begotten gains obtained by defendants as a result of Defendants' conduct in violation of Business and Professions Code § 17200 *et seq.* Plaintiffs also respectfully seek reasonable attorneys' fees and costs under applicable law, including California Code of Civil Procedure § 1021.5.

260.   Pursuant to Business and Professions Code § 17204, Plaintiffs seek an order from the Court enjoining defendants, and each of them, from continuing to engage in the acts set forth in this complaint, which acts constitute criminal and civil violations of the law and of Business and Professions Code § 17200 *et seq.*

WHEREFORE, Plaintiffs pray for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff pray that the Court grant judgment against Defendants as follows:

1.   An order enjoining Defendants from the further destruction/spoliation of evidence;

2.   Compensatory damages in an amount according to proof;

3.   Disgorgement of Port of Mokha assets and shares according to proof;

4.   Restructuring of Port of Mokha to provide Plaintiffs their rightful ownership, shares, and decision-making authority at Port of Mokha;

5.    Costs, restitution, and multiple damages under state law;

6.    Treble damages under RICO;

7.    Punitive and exemplary damages under state law;

8.    Any and all applicable statutory and civil penalties;

9.    Pre- and post-judgment interest on any amounts awarded;

10.   An award of attorneys' fees and costs, including expert costs;

11.   A declaration that all applicable statutes of limitations are tolled under the discovery rule or due to the fraudulent concealment alleged in this Complaint, and that Defendants are estopped from relying on any statute of limitation as a defense;

12.   An order enjoining Defendants from dissipating assets to avoid judgment;

13.   Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

14.   Such other and further relief as the Court deems just and proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all triable issues.

Dated:  April 30, 2018                    Respectfully submitted,

                                          */s/ Yasin M. Almadani*
                                          YASIN M. ALMADANI
                                          ALMADANI LAW

                                          TERRENCE M. JONES
                                          LAW OFFICE OF TERRENCE JONES

                                          *Attorneys for Plaintiffs*