1  Yasin M. Almadani (Cal. Bar No. 242798)
   ALMADANI LAW
2  14742 Beach Blvd., Suite 410
   La Mirada, California 90638
3  (213) 335-3935 | YMA@LawAlm.com

4  Terrence M. Jones (Cal. Bar No. 256603)
   THE LAW OFFICE OF TERRENCE JONES
5  6737 Bright Ave., Suite B6
   Whittier, California 90601
6  (213) 863-4490 | Terrence@JonesOnLaw.com

7  *Attorneys for Plaintiffs*

8

9                UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                     OAKLAND DIVISION

12
   MOCHA MILL, INC., MONK OF MOCHA          Case No. CV 18-2539-HSG
13 SPECIALTY COFFEE PRODUCTION
   AND EXPORT, INC., IBRAHIM A.
14 ALAELI, YASIR H. KHANSHALI, and
   ADNAN G. AWNALLAH,                       **FIRST AMENDED COMPLAINT**
15
            Plaintiffs,                     **DEMAND FOR JURY TRIAL**
16
              v.
17
   PORT OF MOKHA, INC., PORT OF             Case Filed:  April 30, 2018
18 MOKHA LLC, MOKHA FOUNDATION,             Trial Date:  None set
   BLUE BOTTLE COFFEE, INC., METRA
19 COMPUTER GROUP FZCO, T&H                 Hon. Haywood S. Gilliam, Jr.
   COMPUTERS, INC., MOKHTAR F.              United States District Judge
20 ALKHANSHALI, and IBRAHIM AHMAD
   IBRAHIM,
21
            Defendants.
22

23

24

25

26

27

28

I.     NATURE OF THE ACTION ................................................................. 1

II.    JURISDICTION AND VENUE ............................................................ 4

III.   PARTIES ............................................................................................ 6

       A.  PLAINTIFFS ......................................................................... 6

       B.  DEFENDANTS ....................................................................... 7

IV.    RICO ALLEGATIONS ....................................................................... 9

V.     FACTS COMMON TO ALL COUNTS ............................................. 11

       A.  THE FORMATION OF MOCHA MILL ...................................... 11

       B.  PLAINTIFFS INVESTED OVER HALF A MILLION DOLLARS TO FUND MOCHA MILL,
           EDUCATE CEO MOKHTAR IN THE COFFEE TRADE, AND PROVIDE RESOURCES FOR
           MOKHTAR TO BUILD RELATIONSHIPS FOR MOCHA MILL WITH YEMENI COFFEE
           FARMERS AND HIGH-END DISTRIBUTORS ...................................... 14

       C.  EMBEZZLEMENT AND WIRE FRAUD AS PART OF A PATTERN OF RACKETEERING ACTIVITY
           (APRIL 2014 – DECEMBER 2015) ............................................ 17

       D.  EXTORTION AS PART OF A PATTERN OF RACKETEERING ACTIVITY (MARCH 2015) ....... 21

       E.  MOCHA MILL BECOMES POISED FOR TREMENDOUS SUCCESS .................................... 23

       F.  MOKHTAR EXPANDS THE RACKETEERING ENTERPRISE IN PREPARATION FOR AN
           UNLAWFUL CORPORATE TAKEOVER .......................................... 25

       G.  CONSPIRACY TO COMMIT WIRE FRAUD AND EXTORTION IN FURTHERANCE OF A
           PATTERN OF RACKETEERING ACTIVITY (JUNE - NOVEMBER 2015) ............................. 26

       H.  THE SCHEME TO SUPPLANT MOCHA MILL WITH PORT OF MOKHA THROUGH A PATTERN
           OF RACKETEERING ACTIVITY .................................................. 28

       I.  MOCHA MILL CEO MOKHTAR SEEKS DAVE EGGERS' HELP TO EXECUTE THE RICO
           ENTERPRISE'S UNLAWFUL CORPORATE TAKEOVER SCHEME ................................. 28

       J.  CONSPIRACY TO SUPPLANT MOCHA MILL WITH PORT OF MOKHA USING WIRE FRAUD
           AS PART OF A PATTERN OF RACKETEERING ACTIVITY: *TAKE ONE* (NOVEMBER 2015 –
           APRIL 2016) ...................................................................... 30

           1.  *Blue Bottle Conspires with the RICO Enterprise* ............................... 32

           2.  *Port of Mokha Arranges for a Straw Buyer to Defraud Mocha Mill* ................ 39

       K.  CONSPIRACY TO SUPPLANT MOCHA MILL WITH PORT OF MOKHA USING WIRE FRAUD
           AS PART OF A PATTERN OF RACKETEERING ACTIVITY: *TAKE TWO* (APRIL 2016 – JUNE
           2016) .............................................................................. 44

i

L.   EXTORTION TO OBTAIN A RELEASE OF CLAIMS AS PART OF A PATTERN OF
      RACKETEERING ACTIVITY..................................................................... 50

M.   OBSTRUCTION AND SPOLIATION OF EVIDENCE TO COVER UP THE RACKETEERING
      CONSPIRACY......................................................................................... 51

N.   MONEY LAUNDERING IN FURTHERANCE OF A PATTERN OF RACKETEERING ACTIVITY. 51

VI.   DISCOVERY RULE & FRAUDULENT CONCEALMENT ........................... 52

A.   DISCOVERY RULE ................................................................................ 52

B.   FRAUDULENT CONCEALMENT ............................................................. 52

VII.   PLAINTIFFS' CLAIMS FOR RELIEF ................................................ 53

FIRST CLAIM FOR RELIEF .......................................................................... 53

SECOND CLAIM FOR RELIEF ....................................................................... 57

THIRD CLAIM FOR RELIEF .......................................................................... 57

FOURTH CLAIM FOR RELIEF ....................................................................... 58

FIFTH CLAIM FOR RELIEF .......................................................................... 60

SIXTH CLAIM FOR RELIEF .......................................................................... 61

SEVENTH CLAIM FOR RELIEF ..................................................................... 62

EIGHTH CLAIM FOR RELIEF ....................................................................... 64

NINTH CLAIM FOR RELIEF ......................................................................... 66

TENTH CLAIM FOR RELIEF ......................................................................... 67

ELEVENTH CLAIM FOR RELIEF ................................................................... 68

TWELVTH CLAIM FOR RELIEF ..................................................................... 69

THIRTEENTH CLAIM FOR RELIEF ............................................................... 70

VIII.   DEMAND FOR JURY TRIAL .......................................................... 73

*First Amended Complaint – CV 18-2539-HSG*

Plaintiffs Mocha Mill, Inc. ("Mocha Mill"), Monk of Mocha Specialty Coffee Production and Export, Inc. ("Monk of Mocha"), Ibrahim A. Alaeli ("Alaeli"), Yasir H. Khanshali ("Khanshali"), and Adnan G. Awnallah ("Awnallah") (collectively, "Plaintiffs"), bring this First Amended Complaint ("Complaint") demanding a jury trial against Defendants Port of Mokha, Inc. ("Port of Mokha"), Port of Mokha LLC, ("Port of Mokha"), The Mokha Foundation ("Mokha Foundation"), Blue Bottle Coffee, Inc. ("Blue Bottle"), Metra Computer Group Fzco ("Metra"), T&H Computers, Inc. ("T&H"), Mokhtar F. Alkhanshali ("Mokhtar"), and Ibrahim Ahmad Ibrahim ("Ahmad") (collectively, "Defendants").  Plaintiffs allege the following based upon information and belief, and personal knowledge.

## I.   NATURE OF THE ACTION

1.      This action raises claims of conspiracy and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), including fraud, extortion and money laundering, as well as breach of fiduciary duty, interference with prospective economic relationships, conversion, unjust enrichment, and unfair competition.

2.      After petroleum, coffee is the most sought commodity in the world.  By some estimates, more than 500 billion cups of coffee are consumed every year.  And what most coffee drinkers do not know, is that *Yemen* is birthplace of coffee—not Ethiopia or Italy or Colombia, as many might guess.  Yet, Yemeni coffee had languished in inferiority for centuries; the country's quality varieties—among the best in the world, but awaiting rediscovery—had not been properly cultivated and processed for international distribution.  And that likely would have remained true were it not for Plaintiffs' creation of the *"Mocha Mill"* coffee company and their efforts and investments in the company.

3.      With Mocha Mill, Plaintiffs' business plan was to locate, cultivate, refine, import, and sell worldwide for the first time in centuries premium, specialty Yemeni coffee under the Mocha Mill brand.  This was the incredible, untapped opportunity Plaintiffs risked significant time, money, and investment to tap.  The goal was to make

*First Amended Complaint – CV 18-2539-HSG*

1    the highest quality Yemeni coffee synonymous with the Mocha Mill brand.

2        4.     To accomplish this goal, Plaintiffs invested years of effort and over half a

3    million dollars developing relationships with Yemeni farmers to locate, refine, and

4    cultivate coffee varieties that have now come to be considered among the best in the

5    world.  Mocha Mill also spent significant resources establishing relationships with and

6    marketing to elite coffee distributors worldwide, making Mocha Mill's Yemeni varieties

7    the most highly anticipated coffee of 2016.  Given this allure and anticipation, Mocha Mill

8    was poised to be thrust into the forefront of the specialty coffee market, earning itself a

9    tremendous competitive advantage from its "first-mover" relationships with large scale

10    distributors, retailers and everyday consumers alike, thereby establishing a dominant

11    foothold in the industry.

12        5.     Defendants, led by Mocha Mill's then-CEO (Defendant Mokhtar), who had

13    been overtaken by his own greed and ego, knew this and sought to usurp Mocha Mill's

14    entire business, supplanting in its place a secret competitor company called *"Port of*

15    *Mokha"* through an extensive RICO conspiracy in collusion with Blue Bottle, T&H, and

16    Metra.  Defendants used Mokhtar's position of trust as Mocha Mill CEO to engage in a

17    pattern of racketeering activity involving numerous unlawful acts, including:

18            a.     Embezzlement and Wire Fraud (Apr. 2014 – Dec. 2015);

19            b.     Extortion (Mar. 2015);

20            c.     Wire Fraud and Extortion Conspiracy (Jun. – Nov. 2015);

21            d.     Wire Fraud Conspiracy (Nov. 2015 – Apr. 2016);

22            e.     Wire Fraud Conspiracy (Apr. 2016 – Jun. 2016);

23            f.     Extortion Conspiracy (Apr. 2016 – Jun. 2016);

24            g.     Obstruction and Spoliation of Evidence (May 2016 – unknown); and

25            h.     Money Laundering (May 2016 – present).

26        6.     In short, using racketeering activity and other fraudulent means, Port of

27    Mokha, through Mokhtar and his co-conspirators, stole the Mocha Mill business right out

28

2

from under Mokhtar's Mocha Mill partners.  In doing so, Mokhtar not only breached the contractual business agreement with his partners, he betrayed the loyalty and trust of friends and family who had invested so much into him and the joint venture.

7.     As CEO of Mocha Mill, Mokhtar conspired with other individuals and companies, including Defendants Ahmad, Blue Bottle, T&H, and Metra, to form Port of Mokha and execute a scheme to use all of the farming relationships, processes, goodwill, and harvest inventory Mocha Mill had developed to instead launch the sale of premium Yemeni coffee under the Port of Mokha brand.  Port of Mokha—not Mocha Mill—was then regarded as the "first mover" in the importation and sale of premium Yemeni coffee, and enjoyed all of the competitive advantages associated with being "first-to-market," including strong brand recognition and supplier, distributor, retailer, and customer loyalty.

8.     Similarly, for its part in the RICO conspiracy, Blue Bottle became regarded as the premier brick-and-mortar retailer of premium Yemeni coffee in the United States, capitalizing on its special partnership, exclusivity agreement, and investment opportunities with Port of Mokha.  As a result, Blue Bottle has enjoyed the tremendous public recognition and consumer excitement that flowed from its first-mover marketing campaign, including a prominent role in a *New York Times* "Best Seller" about Port of Mokha's efforts (which were actually Mocha Mill's efforts) to bring Yemeni coffee to the forefront of the premium coffee market.

9.     Today, Defendants thrive on the labor and assets stolen in the RICO scheme, particularly Port of Mokha and Blue Bottle.  Given its recognition as the pioneer of premium Yemeni coffee, Port of Mokha and its investors now value the company's worth in excess of $250 million.  Port of Mokha sells its Yemeni coffee varieties to Blue Bottle for upwards of $135 per kilogram.  Blue Bottle, in turn, sells 12-ounce retail bags of coffee to everyday consumers for $50 and single servings of Port of Mokha varieties in its coffeeshops for $16 per cup.  Indeed, on the heels of its introduction of Yemeni coffee

*First Amended Complaint – CV 18-2539-HSG*

varieties to its specialty retail lineup and the attendant boost to its brand name and profitability, Blue Bottle sold a majority stake in its company to Nestlé—the largest food company in the world—for an estimated $425 million.

10.     Meanwhile, Defendants' scheme destroyed Mocha Mill and left it with virtually nothing because, among other things, Mokhtar absconded with all of Mocha Mill's Yemeni farming contacts and distributor relationships.

11.     This suit seeks to vindicate the significant damage Defendants' conduct has caused and continues to cause Plaintiffs and the Mocha Mill brand.

## II.    <u>JURISDICTION AND VENUE</u>

12.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331, based on the federal claims asserted under the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and 18 U.S.C. §§ 1331, 1334, 1962, and 1964.

13.     This Court may exercise supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367, because all of Plaintiffs' state-law claims are derived from a common nucleus of operative facts and are of the kind Plaintiffs would ordinarily expect to try in one judicial proceeding.

14.     This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391.

15.     The Court has personal jurisdiction over Defendant Port of Mokha, Inc. in that Port of Mokha, Inc. is headquartered, registered to do business, and in fact, does do substantial business within the State of California and within the Northern District of California.

16.     The Court has personal jurisdiction over Defendant Port of Mokha LLC in that Port of Mokha LLC is headquartered, registered to do business, and in fact, does do substantial business within the State of California and within the Northern District of California.

17.     The Court has personal jurisdiction over Defendant Mokha Foundation in

that Mokha Foundation is an entity headquartered in the Northern District of California, which Plaintiffs are informed and believe, and on that basis allege, operates as a wholly-owned subsidiary of Port of Mokha, Inc. (or Port of Mokha LLC) at all times material to the allegations of this Complaint, and does substantial business, for the benefit of its parent company, within the State of California and within the Northern District of California.

18.     The Court has personal jurisdiction over Defendant Blue Bottle Coffee, Inc. in that Blue Bottle is headquartered, registered to do business, and in fact, does do substantial business within the State of California and within the Northern District of California.

19.     The Court has personal jurisdiction over Defendant Metra Computer Group Fzco in that Metra does substantial business within, and sends is products into the stream of commerce into, the State of California and the Northern District of California by and through its wholly-owned subsidiary and American-based agent, T&H Computers, Inc., which Plaintiffs are informed and believe, and on that basis allege, does substantial business, for the benefit of its parent company, within the State of California and within the Northern District of California.

20.     The Court has personal jurisdiction over Defendant T&H Computers, Inc., in that T&H is a California corporation headquartered, registered to do business, and in fact, does do substantial business within the State of California and within the Northern District of California.

21.     The Court has personal jurisdiction over Defendant Mokhtar F. Alkhanshali in that Mokhtar resides within the State of California, in the Northern District of California.

22.     The Court has personal jurisdiction over Defendant Ibrahim Ahmad Ibrahim in that Ahmad resides within the State of California, in the Northern District of California.

*First Amended Complaint – CV 18-2539-HSG*

23. Venue is proper in this District under 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b), because:

(a) the majority of defendants and witnesses reside, have their principal place of business, are found, have agents, and/or transact business in this District; and

(b) a substantial part of the events or omissions giving rise to the claims raised herein occurred in this District.

Furthermore, pursuant to 18 U.S.C. § 1965(b), the ends of justice require that other parties residing in any other district be brought before this Court given the significant contacts in this District of most defendants and witnesses.

## III.   PARTIES

### A.   Plaintiffs

24. Plaintiff Mocha Mill, Inc. ("Mocha Mill"), at all times material to the allegations of this Complaint, was and remains a California corporation with its headquarters and principal place of business in Oakland, California. The company was founded to locate, cultivate, refine, import, and bring to market premium Yemeni coffee for the first time in centuries.

25. Mocha Mill's business was stolen by the Port of Mokha RICO enterprise through a pattern of racketeering activity.

26. Plaintiff Monk of Mocha Specialty Coffee Production and Export, Inc. ("Monk of Mocha"), at all times material to the allegations of this Complaint, was and remains a California corporation with its headquarters and principal place of business in Oakland, California, and is the predecessor company to Mocha Mill.

27. Plaintiff Ibrahim A. Alaeli ("Alaeli") is an individual who, at all times material to the allegations of this Complaint, was and remains a citizen of the State of California, residing in or around Alameda County, and a partner and shareholder in Mocha Mill and Monk of Mocha.

*First Amended Complaint – CV 18-2539-HSG*

28.     Plaintiff Yasir H. Khanshali ("Khanshali") is an individual who, at all times material to the allegations of this Complaint, was and remains a citizen of the State of California, residing in or around Stanislaus County, and a partner and shareholder in Mocha Mill.

29.     Plaintiff Adnan G. Awnallah ("Awnallah") is an individual who, at all times material to the allegations of this Complaint, was and remains a citizen of the State of California, residing in or around Alameda County, and a partner and shareholder in Mocha Mill.

**B.     Defendants**

30.     Defendant Port of Mokha, Inc. ("Port of Mokha") is a Delaware corporation that, at all times material to the allegations of this Complaint, maintained its headquarters and principal place of business in Oakland, California.

31.     Defendant Port of Mokha, Inc. is a member of the RICO enterprise that stole Mocha Mill's business and supplanted Mocha Mill with Port of Mokha through a pattern of racketeering activity, including, *inter alia*, fraud, extortion, and money laundering.

32.     Defendant Port of Mokha LLC ("Port of Mokha") is a Delaware limited liability company that, at all times material to the allegations of this Complaint, maintained its headquarters and principal place of business in Oakland, California.

33.     Defendant Port of Mokha LLC is a member of the RICO enterprise that stole Mocha Mill's business and supplanted Mocha Mill with Port of Mokha through a pattern of racketeering activity, including, *inter alia*, fraud, extortion, and money laundering.

34.     Port of Mokha, Inc. and Port of Mokha LLC operate interchangeably as "Port of Mokha," selling premium Yemeni coffee worldwide.

35.     The Mokha Foundation ("Mokha Foundation") is, according to Port of Mokha, a "foundation" that, at all times material to the allegations of this Complaint, was established and operated by Port of Mokha.  Plaintiffs are informed and believe that, at all times material to the allegations of this Complaint, a portion of each sale of Port of

Mokha coffee was funneled to The Mokha Foundation, which Port of Mokha utilizes to fund certain company operations with Yemeni coffee farmers and help strengthen Port of Mokha's goodwill.

36.     Defendant Blue Bottle, Inc. ("Blue Bottle") is a Delaware corporation that, at all times material to the allegations of this Complaint, maintained its headquarters and principal place of business in Oakland, California.  Blue Bottle is a major roaster, distributor, and retailer of premium coffee.  Alongside a significant Internet sales operation, Blue Bottle operates 46 brick-and-mortar coffee shops throughout the United States, as well as eight in Japan.  Blue Bottle focuses on single-origin beans and is considered a major player in "third wave coffee," a movement to produce high-quality coffee and consider it an artisanal foodstuff, like wine, rather than just a commodity. Blue Bottle was founded in Oakland in the early 2000s by James Freeman, who remains the company's CEO today and held that position at all times material to the allegations of this Complaint.

37.     Defendant Blue Bottle engaged in a RICO conspiracy with Port of Mokha to defraud Plaintiffs.

38.     Defendant Metra Computer Group Fzco ("Metra") is a company based in Dubai, United Arab Emirates that operates as a distributor of information technology products in the Middle East.

39.     Defendant Metra engaged in a RICO conspiracy with Port of Mokha to defraud Plaintiffs.

40.     Defendant T&H Computers, Inc. ("T&H") is a California corporation with its headquarters and principal place of business in San Carlos, California.  Plaintiffs are informed and believe that T&H is a wholly-owned subsidiary of Metra Computer Group Fzco and acts as Metra's agent in the United States.  T&H's business includes wholesale distribution of computers, computer peripheral equipment, and computer software.

41.     Defendant T&H engaged in a RICO conspiracy with Port of Mokha to

*First Amended Complaint – CV 18-2539-HSG*

1   defraud Plaintiffs.

2       42.   Mokhtar F. Alkhanshali ("Mokhtar") is an individual who, at all times

3   material to the allegations of this Complaint, was and remains a citizen of the State of

4   California, residing in or around Alameda County.

5       43.   Mokhtar is the CEO of Port of Mokha, Inc., and is a founding shareholder of

6   the corporation.  Mokhtar is also a founding member/owner of Port of Mokha LLC.

7       44.   Mokhtar is the leader of the RICO enterprise that stole Mocha Mill's

8   business and supplanted Mocha Mill with Port of Mokha through a pattern of

9   racketeering activity.

10       45.   Ibrahim Ahmad Ibrahim ("Ahmad") is an individual who, at all times

11   material to the allegations of this Complaint, was and remains a citizen of the State of

12   California, residing in or around Alameda County.

13       46.   Ahmad is the Operations and Finance Executive of Port of Mokha, Inc., and

14   is a founding shareholder of the corporation.  Ahmad is also a founding member/owner of

15   Port of Mokha LLC.

16       47.   Ahmad is the second-in-command of the RICO Enterprise that stole Mocha

17   Mill's business and supplanted Mocha Mill with Port of Mokha through a pattern of

18   racketeering activity.

19       **IV.   RICO ALLEGATIONS**

20       48.   As alleged herein, Plaintiffs bring claims pursuant to 18 U.S.C. §§ 1962(c)

21   and (d), and 1964 of the Racketeer Influenced and Corrupt Organizations Act ("RICO")

22   against all Defendants.  The following allegations pertain to each claim for relief under

23   RICO.

24       49.   Plaintiffs are each "persons," as that term is defined in 18 U.S.C. § 1961(3),

25   who were injured in their business or property as a result of Defendants' wrongful

26   conduct.

27       50.   Defendants are, and at all relevant times were, "persons" within the

28   

9

meaning of 18 U.S.C. § 1961(3), because they are entities capable of holding legal or beneficial interest in property.

51.     Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. § 1964(c).

52.     Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).

53.     RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

54.     Section 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [§ 1962]."

55.     As alleged throughout this Complaint, the Port of Mokha RICO enterprise orchestrated and conspired with others to orchestrate and carry out coordinated schemes designed to steal through a pattern of racketeering activity the business assets, relationships, and opportunities that Mocha Mill had spent significant time and money developing, causing injury and damages to Mocha Mill in the amount of tens and hundreds of millions of dollars.  Defendants conspired to and did conduct their affairs through a growing association-in-fact enterprise, in violation of section §§ 1962(c) and (d), by engaging in **a pattern of racketeering activity** as defined under § 1961(5), including **wire fraud**, **extortion**, and **money laundering** as enumerated under § 1961(1), for the purpose of improperly profiting from the racketeering activity.

56.     As detailed below, Mocha Mill spent years' worth of time and effort, and over

*First Amended Complaint – CV 18-2539-HSG*

half a million dollars, to develop relationships with Yemeni coffee farmers to identify, refine, and import premium specialty Yemeni coffee for the first time in centuries. Mocha Mill spent significant effort developing publicity and relationships with high-end distributors and retailers (including Blue Bottle) to launch Mocha Mill with worldwide attention and gain a first-mover advantage that would cement long-lasting farmer and distributor relationships and propel Mocha Mill to the forefront of the specialty coffee industry.

57.     As further detailed below, Port of Mokha, in a RICO conspiracy using Mokhtar's position of trust as Mocha Mill CEO, defrauded Mocha Mill out of its best coffee and sold it under the Port of Mokha brand just as Mocha Mill was about to launch. In the same conspiracy, Port of Mokha stole all of Mocha Mill's farmer and distributor contacts and relationships, cutting Mocha Mill at the knees.

58.     As detailed below, Blue Bottle joined the RICO conspiracy, knowingly, willingly, and intentionally, to enter into a special partnership with Port of Mokha, gain preferred access to the best Yemeni specialty coffee, make good on promises to investors, and take full advantage of the unique opportunity to ride the very top of the first-mover marketing wave made possible by Mocha Mill's efforts and investments; unfortunately, it all came at the coordinated, unlawful demise of Mocha Mill.

59.     Defendants' racketeering activity had the desired effect of causing Mocha Mill to lose its business, while Defendants enjoy tremendous wealth and success as a result.

## V.     FACTS COMMON TO ALL COUNTS

### A.     The Formation of Mocha Mill

60.     Yemen is the birthplace of coffee. Yet, centuries of agricultural underdevelopment left the country's coffee industry in obscurity. In 2013, Yemeni coffee was considered unsophisticated and inconsistent. By contrast, Ethiopia had become a model producer of premium coffee.

*First Amended Complaint – CV 18-2539-HSG*

61.     In August 2013, Plaintiff Alaeli and Defendant Mokhtar discussed the idea of a business partnership to start a coffee import/export company cultivating, processing, and distributing specialty coffee sourced from Yemen.

62.     At the time, Plaintiff Alaeli was a successful, well-respected, Yemeni-American businessman with contacts in both the San Francisco Bay Area and Yemen. Though now involved in a wide array of businesses, Alaeli got his professional start and developed special expertise in agricultural distribution; so, he was an excellent partner for a business focused on the distribution of green coffee sourced from Yemen.

63.     Mokhtar, by contrast, was struggling at the time.  He was a Bay Area Yemeni-American in his mid-twenties who had been unable to complete his junior college courses or hold a steady job.

64.     Still, to Plaintiff Alaeli, Mokhtar seemed like an eager, young, struggling Yemeni-American who Alaeli wanted to help and mentor.  Plaintiff Alaeli also saw a promising opportunity in the coffee business and the ability to help poor farmers in Yemen.

65.     At the time, Mokhtar knew very little about specialty coffee and coffee production, and even less about running a business, let alone an international import/export business.

66.     In or about October 2013, Alaeli took Mokhtar under his wing; so began their partnership and coffee company venture which would eventually materialize into Mocha Mill.

67.     Mocha Mill's goal was to be the first company to market and sell premium Yemeni coffee under the Mocha Mill brand, thereby establishing a strong and sustainable foothold in the coffee market.  A key part of the company's vision and marketing strategy was to help Yemeni farmers by training them to produce premium coffee and paying them a fair price for their improved product.

68.     It soon became clear to Alaeli and Mokhtar, though, that accomplishing their

*First Amended Complaint – CV 18-2539-HSG*

grand vision for Mocha Mill would require additional partners.

69.    In or about April 2014, Mokhtar approached his uncle, Plaintiff Khanshali, and Alaeli approached his friend and business associate, Plaintiff Awnallah, to join Mocha Mill.  Mokhtar's uncle, Khanshali, was a successful business owner with significant retail experience, and Plaintiff Awnallah was the owner of a successful produce distribution company.  In addition to bringing their own unique business experience, Plaintiffs Khanshali and Awnallah made large capital contributions to develop Mocha Mill.

70.    The four of them—Plaintiffs Alaeli, Khanshali, and Awnallah, along with Defendant Mokhtar—came to an agreement in April 2014.  They agreed to form a business partnership with each partner owning an equal 25% interest in Mocha Mill. Plaintiffs would provide the legitimacy and business acumen, and pay all expenses to build and grow the company into a dominant force in the coffee market.  Mokhtar had no money at the time, so he agreed to initially contribute "sweat equity" and later add capital when he had the means to do so.

71.    Importantly, in consideration of their respective investments, each partner agreed that he would not start a competing coffee business.  The partners trusted that Mokhtar would honor his fiduciary duty and would use the knowledge, contacts, and relationships they would help him develop solely for the benefit of their Mocha Mill company.  Otherwise, it would have made little sense for them to make the significant investments they did.

72.    Plaintiffs made Mokhtar President and CEO of Mocha Mill and gave him their full trust.  As a company executive, he drew a monthly salary of $2,500 and was given full access to company accounts for expenses.  The four partners agreed that all expenses would be itemized with receipts or similar proof.

*First Amended Complaint – CV 18-2539-HSG*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.    Plaintiffs Invested Over Half a Million Dollars to Fund Mocha Mill, Educate CEO Mokhtar in the Coffee Trade, and Provide Resources for Mokhtar to Build Relationships for Mocha Mill with Yemeni Coffee Farmers and High-End Distributors**

73.    From late 2013 through 2016, Plaintiffs invested over half a million dollars to: (a) educate Mokhtar in the coffee business; (b) have him travel nationally and internationally to develop relationships for Mocha Mill with high-end coffee distributors and retailers worldwide; (c) have him travel internationally to develop relationships for Mocha Mill with Yemeni coffee farmers; (d) train Yemeni coffee farmers to improve the quality of their crop; (e) set up coffee processing infrastructure in Yemen; (f) identify, refine, cultivate, and process premium Yemeni coffee varieties for Mocha Mill; and (g) purchase, package, and import that coffee for sale worldwide.

74.    Mocha Mill also paid thousands of dollars for the purchase, registration, and development of a website and marketing plan.

75.    Plaintiffs taught Mokhtar about business formation, management, accounting, marketing, distribution, supply chain, and other business methods so that Mokhtar could manage the coffee business operations.  In return, Mokhtar was responsible for on-the-ground development of the company's business relationships and day-to-day management of the company.

76.    In January 2014, Plaintiffs funded Mokhtar's trip to attend an international Ethiopian coffee conference in Los Angeles, California on behalf of Mocha Mill.  The event organizer was Willem Boot ("Boot"), a coffee expert who owned the "Boot Coffee" company in Mill Valley, California.  Boot had co-authored a report on the state of Yemeni coffee and was considered an authority on the subject.

77.    At the conference, Boot saw Mokhtar as a novice and recommended that Mokhtar attend the consulting courses and certification classes that Boot Coffee offered.

78.    Plaintiffs saw tremendous value to Mocha Mill in educating Mokhtar in the coffee trade as Boot had advised.  Between February 2014 and May 2015, Plaintiffs paid Boot Coffee approximately $18,800 in consulting and course fees for this engagement so

14

that Mokhtar (as their CEO) could develop certain expertise for Mocha Mill's benefit.  At the time, Mokhtar had neither the relationships nor the funds to do any of this on his own.  He relied entirely on Plaintiffs.

79.     Between February and April 2014, Willem Boot and the Boot Coffee team, including Stephen Ezell ("Ezell"), Jodi Wieser ("Wieser"), and Marlee Benefield ("Benefield"), educated Mokhtar in all things coffee, including, *inter alia*: (a) how to train farmers to grow and process raw coffee; (b) how to taste and identify premium coffee; (c) how to package and ship coffee properly to ensure freshness; and (d) which conferences to attend to develop relationships for proper visibility and distribution.  Plaintiffs and Mokhtar (as their partner and CEO) understood that the purpose of receiving such training was to benefit Mocha Mill.

80.     Boot also worked with Mokhtar so that he could obtain a "Q-grading" certification, a coveted certification in the coffee industry that signifies one's ability to objectively assess coffee quality and to identify and articulate its coffee characteristics. Plaintiffs paid all of the expenses for Mokhtar to train to develop this expertise, as well as his salary as CEO while he was in training, as they all understood that the purpose of acquiring the certification was to benefit Mocha Mill.

81.     In April 2014, upon Boot's advice, Mokhtar attended the annual symposium of the Specialty Coffee Association of America ("SCAA"), the preeminent industry trade fair for the premium coffee industry.  Plaintiffs joined Mokhtar at the conference to provide guidance and legitimacy.  The primary purpose of attending SCAA was to develop distributor relationships for Mocha Mill.  Hence, Plaintiffs and Mokhtar, all as Mocha Mill representatives, interacted with industry insiders in order to further introduce Mocha Mill as the sole and premier importer and wholesaler of premium Yemeni coffee. For this trip, Mocha Mill paid thousands of dollars in membership, registration fees, travel expenses, and equipment.

82.     Thereafter, Boot devised a plan that called for Mokhtar to travel to Ethiopia

*First Amended Complaint – CV 18-2539-HSG*

to learn proper production practices for training Yemeni farmers, as well as travel to Yemen to develop relationships with coffee farmers and select samples for Mocha Mill. These samples would be tested by Boot Coffee to identify Yemeni varieties for further Mocha Mill investment and development.

83.     In or about May 2014, Mokhtar traveled to Yemen to execute the next phase in the company's plan; Mocha Mill paid thousands in expenses and provided logistical support.

84.     For Mocha Mill to conduct business in Yemen required that it be done through a Yemeni company.  Plaintiff Alaeli met Mokhtar in Yemen and introduced him to Ahmed Mahyoub Ghaleb ("Ghaleb") to: (1) help Mokhtar navigate the Yemeni business community on Mocha Mill's behalf; (2) set up a Yemeni company to serve as Mocha Mill's counterpart (the "Ghaleb company"); (3) manage the business in Yemen; and (4) help Mocha Mill build farmer relationships to acquire, process, and ship coffee to the United States.

85.     Mocha Mill also paid for Mokhtar's travel to Ethiopia to meet with experienced Ethiopian coffee farmers and learn proper coffee cultivation methods, which, in turn, Mokhtar would use to train unsophisticated Yemeni farmers.

86.     Plaintiff Alaeli met Mokhtar in Ethiopia to provide his young business partner legitimacy and advice.  Together, they attended an Ethiopian coffee conference where Mokhtar was able to develop relationships with farmers and distributors for Mocha Mill as Plaintiffs' partner and company CEO.

87.     In or about July 2014, Mokhtar returned from his trip with samples from the Yemeni farmers with which he had been working on behalf of Mocha Mill.  Boot tested the samples and graded four to five varieties as having tremendous potential.  Based on Boot's reaction, Mokhtar realized that Mocha Mill had a blockbuster product on its hands.

88.     Mokhtar went back to Yemen on behalf of Mocha Mill in October 2014 for about ten months, taking with him the lessons he had learned from Boot and Ethiopian

*First Amended Complaint – CV 18-2539-HSG*

farmers to refine and import the promising Yemeni coffee varieties Boot had identified. Mocha Mill paid tens of thousands of dollars for the trip.

**C.    Embezzlement and Wire Fraud as Part of a Pattern of Racketeering Activity (April 2014 – December 2015)**

89.    As President and CEO of Mocha Mill, Mokhtar had been given cash and full access to company accounts.  The agreement was that Mokhtar would undertake only legitimate company expenses and would provide justification and receipts for all expenditures.

90.    Beginning as early as April 2014, Mokhtar devised a scheme to defraud Mocha Mill and his business partners by, willfully and with the intent to defraud, embezzling cash from company accounts under the guise of necessary and legitimate company expenses.  Each time Mokhtar withdrew money from a bank account or caused a wire transfer to himself, he knowingly caused one or more interstate wires, which naturally and foreseeably occur with each bank transaction.  Furthermore, each time Mokhtar requested or represented an embezzled amount as a legitimate expense over phone, email, text, or social media to his partners, he made an intentionally fraudulent wire communication.

91.    Between April 2014 and May 2015, inclusive, Mokhtar made and/or caused to be made bank and wire transactions, totaling approximately $92,990, for which he was unable to provide any receipt or sufficient justification.  Plaintiffs are informed and believe that each of the unsupported and unjustified transactions was an act of embezzlement and wire fraud as part of a pattern of racketeering activity.  Each transaction utilized the wire facilities of the United States either directly or indirectly through a foreseeable chain of wires required for the transfer of U.S. bank funds.  The transactions are detailed in the chart below.

| Date | Amount | Account |
|------|--------|---------|
| May 26, 2015 | $400 | Bank of America '5331 |
| May 14, 2015 | $403 | Bank of America '5331 |

17

*First Amended Complaint – CV 18-2539-HSG*

| March 25, 2015 | $500 | Bank of America '5331 |
|---|---|---|
| March 10, 2015 | $9,000 | Tadhamon International Bank |
| March 2, 2015 | $8,000 | Tadhamon International Bank |
| February 26, 2015 | $7,000 | Tadhamon International Bank |
| February 16, 2015 | $5,000 | Western Union |
| February 9, 2015 | $10,000 | Tadhamon International Bank |
| February 4, 2015 | $500 | Bank of America '5331 |
| February 4, 2015 | $500 | Bank of America '5331 |
| February 4, 2015 | $186 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $186 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $186 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| February 2, 2015 | $186 | Bank of America '5331 |
| February 2, 2015 | $500 | Bank of America '5331 |
| January 28, 2015 | $500 | Bank of America '5331 |
| January 28, 2015 | $500 | Bank of America '5331 |
| January 28, 2015 | $500 | Bank of America '5331 |
| January 28, 2015 | $186 | Bank of America '5331 |
| January 27, 2015 | $500 | Bank of America '5331 |

18

| | | |
|---|---|---|
| January 27, 2015 | $186 | Bank of America '5331 |
| January 27, 2015 | $500 | Bank of America '5331 |
| January 27, 2015 | $500 | Bank of America '5331 |
| January 26, 2015 | $186 | Bank of America '5331 |
| January 20, 2015 | $186 | Bank of America '5331 |
| January 20, 2015 | $186 | Bank of America '5331 |
| January 20, 2015 | $500 | Bank of America '5331 |
| January 15, 2015 | $500 | Bank of America '5331 |
| January 14, 2015 | $500 | Bank of America '5331 |
| January 12, 2015 | $186 | Bank of America '5331 |
| January 12, 2015 | $500 | Bank of America '5331 |
| January 8, 2015 | $186 | Bank of America '5331 |
| December 8, 2014 | $18,000 | Al Shamahi Currency Exchange |
| November 19, 2014 | $500 | Bank of America '5331 |
| November 19, 2014 | $202 | Bank of America '5331 |
| November 14, 2014 | $200 | Bank of America '5331 |
| November 14, 2014 | $200 | Bank of America '5331 |
| November 13, 2014 | $200 | Bank of America '5331 |
| November 13, 2014 | $200 | Bank of America '5331 |
| November 12, 2014 | $200 | Bank of America '5331 |
| November 12, 2014 | $200 | Bank of America '5331 |
| November 12, 2014 | $200 | Bank of America '5331 |
| November 10, 2014 | $200 | Bank of America '5331 |
| November 10, 2014 | $200 | Bank of America '5331 |
| November 10, 2014 | $200 | Bank of America '5331 |
| November 10, 2014 | $200 | Bank of America '5331 |
| October 20, 2014 | $40 | Bank of America '5755 |

*First Amended Complaint – CV 18-2539-HSG*

| | | |
|---|---|---|
| October 7, 2014 | $600 | Bank of America '5755 |
| September 16, 2014 | $4,810 | Bank of America '5755 |
| September 11, 2014 | $260 | Bank of America '5755 |
| September 10, 2014 | $460 | Bank of America '5755 |
| August 19, 2014 | $5,000 | Bank of America '5755 |
| August 18, 2014 | $100 | Bank of America '5755 |
| August 5, 2014 | $1,000 | Bank of America '5755 |
| June 26, 2014 | $140 | Bank of America '5755 |
| June 23, 2014 | $140 | Bank of America '5755 |
| June 16, 2014 | $400 | Bank of America '5755 |
| June 16, 2014 | $500 | Bank of America '5755 |
| June 16, 2014 | $100 | Bank of America '5755 |
| June 13, 2014 | $500 | Bank of America '5755 |
| June 13, 2014 | $93 | Bank of America '5755 |
| June 9, 2014 | $500 | Bank of America '5755 |
| June 9, 2014 | $93 | Bank of America '5755 |
| June 5, 2014 | $500 | Bank of America '5755 |
| June 2, 2014 | $400 | Bank of America '5755 |
| May 27, 2014 | $500 | Bank of America '5755 |
| May 27, 2014 | $93 | Bank of America '5755 |
| May 22, 2014 | $500 | Bank of America '5755 |
| May 19, 2014 | $500 | Bank of America '5755 |
| May 19, 2014 | $93 | Bank of America '5755 |
| May 16, 2014 | $500 | Bank of America '5755 |
| May 15, 2014 | $93 | Bank of America '5755 |
| May 12, 2014 | $500 | Bank of America '5755 |
| April 30, 2014 | $320 | Bank of America '5755 |

*First Amended Complaint – CV 18-2539-HSG*

92.     In December 2015, Mokhtar withdrew approximately $47,952 from Mocha Mill's Bank of America account ending in '5331, for which he provided no receipt or justification.

93.     Plaintiffs are informed and believe that, in total, Mokhtar embezzled at least approximately $140,942 from Mocha Mill accounts.[1]

94.     Plaintiffs' repeatedly requested paperwork and receipts for expenditures and Mokhtar kept promising to provide it, but never did, leaving Mocha Mill no choice but to freeze Mokhtar's access to the accounts for a period of time.

95.     Plaintiffs are informed and believe that Mokhtar also embezzled actual Mocha Mill coffee beans, sold them without his partners' knowledge (causing foreseeable transactional wires), and kept the proceeds for himself and for the benefit of Port of Mokha.

96.     Plaintiffs are informed and believe that Mokhtar used some or all of the stolen and embezzled funds to finance his RICO Enterprise, including Port of Mokha, and carry out the schemes described below that ultimately allowed Port of Mokha to usurp Mocha Mill's business through a continuous pattern of racketeering activity.

**D.      Extortion as Part of a Pattern of Racketeering Activity (March 2015)**

97.     By the first quarter of 2015, Plaintiffs' significant investments had, *inter alia*: (a) enriched Mokhtar with tremendous knowledge, including optimal coffee production and processing methods; (b) funded Mokhtar's Q-grader certification, which garnered considerable respect in the coffee industry; (c) allowed Mokhtar to develop significant relationships with Yemeni farmers; (d) allowed Mokhtar to develop significant relationships with high-end coffee distributors and retailers worldwide; and (e) afforded Mokhtar considerable legitimacy in the coffee industry.  This was all funded by and supposed to be for the benefit of Mocha Mill.  Mokhtar owed a fiduciary duty to his

_____

[1] Plaintiffs reserve the right to amend the figures in this section, as their investigation and discovery are continuing.

*First Amended Complaint – CV 18-2539-HSG*

partners and to Mocha Mill, and they fully trusted him to honor that commitment.

98.    By March 2015, Mokhtar was confident that Mocha Mill's coffee would sell incredibly well and the company would be a huge multi-million dollar success.  Mokhtar also knew that he (not his business partners) had the knowledge and the relationships with the Yemeni farmers and distributors given that he had been the one traveling to Yemen to meet, connect, and work with them.  Mokhtar recognized that Mocha Mill's coffee beans (and the industry buzz surrounding them at the time) were at the core of Mocha Mill's business; without premium product, there obviously could be no Mocha Mill. But Mokhtar also recognized that he was Mocha Mill's only conduit to those beans.  The Yemeni farmers with which he had been working had grown to trust him and follow his farming and production guidance, and moreover, Mokhtar was the one actually providing the farmers the funding (albeit with Mocha Mill money) to help defray the costs of his recommended cultivation and production techniques.  The same was true of high-end distributors and retailers, most notably Blue Bottle, with whom Mokhtar had been dealing as Mocha Mill CEO.  As CEO, Mokhtar had been directly interacting with Blue Bottle's CEO and lead coffee buyer to secure purchase commitments and negotiate ongoing collaborations.  Hence, Mokhtar knew that he could walk away with those relationships (albeit in violation of his fiduciary duty and the law), because it was "Mokhtar" that farmers and distributors had come to know personally, not "Mocha Mill." At this crossroads, despite the deep trust his partners had placed in him, Mokhtar resorted to extortion as part of a pattern of racketeering activity.

99.    At or about that time, Mokhtar secretly lined up other investors to stage an extortionate coup d'etat against his partners.

100.    In March 2015, Mokhtar began demanding that his three partners give him portions of their shares for no consideration at all.  Despite the partnership agreement and his fiduciary duty, Mokhtar threatened to start a competing company with other investors.  He threatened to walk away with Mocha Mill's farmer and distributor

relationships and vast knowledgebase that the company had helped him develop.

101.    Plaintiffs were stunned.  They had completely trusted Mokhtar as their partner and CEO; they were now being taken advantage of for this trust.  Plaintiffs pleaded that Mokhtar's demands were unfair, contrary to their agreement, and would deprive them of their rightful shares; but Mokhtar was intractable in his threats and demands.

102.    Placed in fear that they would lose their entire investment because Mokhtar held all the cards, Plaintiffs acquiesced to Mokhtar's extortionate demands and signed a "Partnership Agreement" on or about March 29, 2015, each agreeing to give Mokhtar an additional 5% share in the company for a total increase of 15% for Mokhtar.  Through this agreement, Mokhtar's ownership in the company jumped from 25% to 40% for Mokhtar, while each of the remaining three partners' ownership dropped from 25% to 20%.  In one extortionate fell-swoop, Mokhtar doubled his ownership in comparison to his partners' for no consideration at all.

103.    In order to protect against future extortion from Mokhtar, the March 2015 Partnership Agreement memorialized certain conditions the parties had agreed to all along, including, *inter alia*, that: (1) no partner would engage in a competing business; and (2) Mokhtar would prepare and maintain for Mocha Mill a detailed database of Yemeni farmers that Mocha Mill had identified as producing the highest-quality coffee.

### E.    Mocha Mill Becomes Poised for Tremendous Success

104.    With the Saudi-Yemeni conflict ensuing in Yemen, Mokhtar returned to the United States in April 2015 with more samples from the coffee Mocha Mill had acquired through its significant effort and investment.  He was met with media attention.

105.    The coffee varieties Mokhtar brought back for Mocha Mill scored incredibly well.  Boot, considered among the toughest of Q-graders, gave several varieties scores that ranked them among the top coffees the world.

106.    Mokhtar also provided samples of the coffee he brought back to the CEO of

*First Amended Complaint – CV 18-2539-HSG*

Blue Bottle, James Freeman ("Freeman"), with whom he had developed a personal and professional relationship as Mocha Mill CEO.  Freeman likewise gave the coffee exceedingly high marks.  He was floored by Mocha Mill's coffee, saying of his first cupping that, *"This is what angels singing tastes like."*

107.    At the SCAA annual symposium that year (2015), the Mocha Mill coffee varieties were hailed as some of the best in show.  The coffee received attention from around the globe and Mokhtar, as Mocha Mill CEO, started making deals with high-end distributors, Blue Bottle being the most prominent and key mover.  Blue Bottle had an interest in cornering the market on specialty Yemeni coffee and adding Mocha Mill's to its retail lineup of single-origin coffees.  Blue Bottle believed it could sell Mocha Mill coffee at its retail locations for upwards of $16 per cup.

108.    Moreover, that year (2015), Blue Bottle completed a venture capital round in which it raised more than $70 million from investors.  Plaintiffs are informed and believe that Blue Bottle used its expected special access to Mocha Mill's premium Yemeni coffee as part of its growth pitch to potential investors, namely, that it would secure preferred access to this specialty coffee, sell it at an incredibly high price-point, and build tremendous brand recognition at the same time.

109.    Mocha Mill spent hundreds of thousands of dollars to purchase the best crops of Yemeni coffee and have the coffee carefully processed and shipped to the United States for sale to high-end distributors and retailers, many of whom had given commitments in mid-late 2015 to buy the coffee in 2016, Blue Bottle being the most significant.  Being the first-to-market with this highly anticipated premium Yemeni coffee was guaranteed to propel Mocha Mill to the forefront of the specialty coffee market.

110.    Just after his return from Yemen, Mokhtar also connected with Dave Eggers, a well-known American author from the Bay Area, and the two began collaborating on a book focused on the development of Mocha Mill and its efforts to import premium Yemeni coffee and bring it to the forefront of the specialty coffee market.

*First Amended Complaint – CV 18-2539-HSG*

111.   As CEO of Mocha Mill, Mokhtar started spending significant time with Eggers to work on the Mocha Mill book, telling Plaintiffs that this was part of his "sweat equity" in the company, and that his time as company CEO was well-spent with Eggers because the book would greatly benefit Mocha Mill's marketing and business relationships with major distributors, most prominently Blue Bottle.  Mokhtar assured Plaintiffs that the publicity for their company would be tremendous.

112.   And Mokhtar was right.  Eggers' book—entitled *The Monk of Mokha*—was ultimately released in January 2018 to great fanfare and critical acclaim.  The book became a *New York Times* "Bestseller" that month and a "Best Book" for *Amazon*, the third largest retailer in the world, in February 2018.  Except, as alleged further below, on account of Defendants' RICO conspiracy, Eggers' book profiled (falsely) the development of Port of Mokha—not Mocha Mill.  Mocha Mill was written completely out of the story, as Mokhtar, Port of Mokha, and Blue Bottle were featured as pioneers and heroes.

113.   Plaintiffs are informed and believe that Mokhtar used Mocha Mill funds, embezzled and otherwise, to pay for significant international travel with Eggers to explain the development of the Mocha Mill company (which Eggers ultimately characterized as Port of Mokha).

## F.   Mokhtar Expands the Racketeering Enterprise in Preparation for an Unlawful Corporate Takeover

114.   Mocha Mill had a blockbuster product.  By Mokhtar's estimates, Mocha Mill was valued in the tens of millions of dollars shortly after the company's successful showing at the April 2015 SCAA symposium.

115.   While still serving as CEO of Mocha Mill, Mokhtar secretly began lining up investors loyal to him; the Mocha Mill partners and shareholders were kept in the dark.

116.   Mokhtar solicited the Founders Fund ("Founders"), one of the most prominent venture capital firms in the world, to invest in Mocha Mill.  Founders was one of the earliest investors in Facebook, SpaceX, Airbnb, and other well-known companies.  Founders was interested in Mocha Mill's business, seeing tremendous potential in

premium specialty coffee sourced from Yemen, the birthplace of coffee.  Mokhtar kept
Plaintiffs (his business partners) in the dark about this opportunity.

117.   Instead, in or about Summer of 2015, Mokhtar secretly expanded the
racketeering enterprise to an association-in-fact enterprise, adding Defendant Ahmad,
Stephen Ezell ("Ezell").  Ahmad was an enterprise lieutenant while Ezell served as an
operative that Mokhtar planted as "Director" of Mocha Mill to secretly work against
Mocha Mill on the enterprise's behalf.

118.   Mokhtar also enlisted attorney Inder Comar ("Comar"), an attorney for
venture capital groups like Founders, with close ties to Eggers, to serve as the RICO
enterprise's counsel.  Mokhtar sought Comar's advice on how to execute a corporate
takeover scheme involving fraud.

119.   Member of the enterprise engaged in organized and coordinated racketeering
activity, including numerous acts of trick, fraud, deception, extortion, and money
laundering, directly and proximately harming Plaintiffs.

120.   The RICO enterprise had an informal hierarchical decision-making
structure:  Mokhtar was at the helm controlling the enterprise and controlling victim
member Mocha Mill (as its CEO) to do the enterprise's bidding; Ahmad was Mokhtar's
second-in-command, plotting, advising, and carrying out orders behind the scenes.  Ezell
was the workhorse carrying out orders from Mokhtar and Ahmad; Mokhtar gave Ezell a
double role, making him "Director of Mocha Mill," working on the inside with Mokhtar to
sabotage Mocha Mill; Comar served as the enterprise's counselor and lawyer to facilitate
the enterprise's racketeering activity; Port of Mokha was the enterprise entity designed to
benefit from the racketeering activity, initially operating in the shadows (collectively
referred to hereinafter as the "RICO Enterprise," or "Enterprise," or "Port of Mokha
Enterprise").

### G.   Conspiracy to Commit Wire Fraud and Extortion in Furtherance of a Pattern of Racketeering Activity (June - November 2015)

121.   Continuing the pattern of racketeering, in or about June 2015, Mokhtar

engaged Comar to purportedly do some corporate work for Mocha Mill.  Mokhtar and Comar, however, conspired and devised a scheme to fraudulently dilute Plaintiffs' ownership interests in Mocha Mill by having Comar provide inadvisable recommendations to Mocha Mill, with intentional material omissions, under the guise of legitimate legal advice.  Mokhtar, Comar, and others utilized the wire facilities of the United States to execute the fraud as part of a pattern of racketeering activity.

122.   On or about June 22, 2015, Comar sent Mokhtar an email advising Mokhtar to have his Mocha Mill partners mischaracterize their capital investments as "loans," despite knowing that they were capitalization investments, purportedly so that Mokhtar and his partners could avoid tax liability.  Tax evasion implications aside, this was actually a way for Mokhtar to trick his partners into diluting their ownership claims to Mocha Mill by inappropriately turning their capitalization into loans after-the-fact. Mokhtar (as CEO of Mocha Mill) forwarded Comar's email along with his (Mokhtar's) own endorsement to his unwitting partners (Plaintiffs) who were unsophisticated in the finer legal points of corporate capitalization.  Deliberately omitted from Comar and Mokhtar's emails were the negative dilution implications and potential tax evasion liability.

123.   Plaintiffs are informed and believe, and on that basis allege, that Mokhtar and Ahmad also had Comar draft a "Term Sheet Agreement" characterizing certain of Plaintiffs' capitalization investments as "loans" and giving 85% of the company to Mokhtar, again, for no real consideration at all.

124.   Between September and November 2015, Mokhtar again made extortionate threats to his Mocha Mill partners (Plaintiffs).  Mokhtar again threatened that he would start a competing company with other investors thereby unlawfully taking away Mocha Mill's knowledgebase and relationships if Plaintiffs did not sign the new agreement giving Mokhtar 85% of the company.  Mokhtar sent the above-described term sheet agreement over email at least once in October 2015.

125.   This time, Mokhtar's partners felt more protected by the March 2015 written

*First Amended Complaint – CV 18-2539-HSG*

partnership agreement that had memorialized the initial April 2014 agreement to not start competing businesses.  The partners refused to be extorted and so the Enterprise's conspiracy failed in this particular instance, moving Mokhtar to engage in more nefarious RICO activity.

### H.   The Scheme to Supplant Mocha Mill with Port of Mokha Through a Pattern of Racketeering Activity

126.   The September 2015 fraud and extortion attempts having failed, members of the Enterprise conspired amongst themselves and with others to devise and execute another wire fraud scheme.

127.   While using Mocha Mill to carry on business activities, members of the Enterprise secretly plotted to supplant Mocha Mill with a new competitor company called Port of Mokha, funded and controlled by Mokhtar, Ahmad, Founders, and others.  The objective was to steal Mocha Mill's most valuable assets, including its knowledgebase, farmer and distributor relationships, first-mover advantage, goodwill, and publicity in order to supplant Mocha Mill and leave it in obscurity.  To accomplish this, Port of Mokha would first have to steal Mocha Mill's best coffee beans.

128.   Enterprise members conspired with the other defendants, including Blue Bottle and T&H/Metra, to engage in various schemes to defraud Plaintiffs using Mokhtar's position of trust as Mocha Mill CEO.  Each scheme involved numerous foreseeable acts of wire fraud, comprising racketeering activity.

### I.   Mocha Mill CEO Mokhtar Seeks Dave Eggers' Help to Execute the RICO Enterprise's Unlawful Corporate Takeover Scheme

129.   Mocha Mill had devoted its CEO's time to travel with Eggers for the purpose of developing publicity for Mocha Mill through Eggers' book and cementing long-lasting relationships with high-end distributors and retailers.

130.   Plaintiffs are informed and believe that, in order to steal this publicity for himself and his new company, Port of Mokha, Mokhtar convinced Eggers to exclude Mocha Mill and his Mocha Mill partners from the book—despite the underlying truth that

*First Amended Complaint – CV 18-2539-HSG*

it was Mocha Mill, not Port of Mokha, that was responsible for resurrecting premium Yemeni coffee, and despite the fact that Mocha Mill had significantly underwritten the book's development with Mocha Mill's time and funds, including funds embezzled by Mokhtar.

131.   Plaintiffs are informed and believe that Eggers wanted to oblige his protagonist (Mokhtar) who was going to help Eggers sell books.  Eggers thus agreed, helping Mokhtar breach his fiduciary duty to Mocha Mill and commit intentional interference with Mocha Mill's prospective economic relationships.  Later, when the book was ready to be released, Eggers would tell Mokhtar to get ready to sell tons of "Port of Mokha" coffee.  The book and the coffee were ultimately marketed together, giving Port of Mokha (not Mocha Mill) the tremendous boost Mokhtar (as Mocha Mill CEO) had promised Plaintiffs.

132.   Plaintiffs are informed and believe that, at Mokhtar's direction, Eggers wrote a false narrative concealing Mokhtar's unlawful business dealings and schemes. Just as Mokhtar had directed, Eggers wrote Mocha Mill and the victim partners (Plaintiffs) completely out of the story.  Instead, Eggers highlighted Port of Mokha prominently alongside Blue Bottle, as well as other distributors and retailers with whom Mocha Mill was looking to develop relationships—relationships that, as a result, were siphoned to Port of Mokha.

133.   Plaintiffs are informed and believe that, untruthfully, Eggers told his readers that he had verified the facts in his book and that the book was "as accurate and thorough as possible."  Eggers knew, however, that true accuracy would hurt his narrative by exposing his protagonist, Mokhtar.

134.   Plaintiffs are informed and believe that, fearing legal action, Eggers repeatedly insisted that Mokhtar obtain a release of claims from his Mocha Mill partners.

*First Amended Complaint – CV 18-2539-HSG*

1
2

**J.** **Conspiracy to Supplant Mocha Mill with Port of Mokha Using Wire Fraud as Part of a Pattern of Racketeering Activity:** *Take One* **(November 2015 – April 2016)**

3
4
5
6
7
8
9
10

135.    By the beginning of summer 2015, Mocha Mill had emerged as the leader in the rebirth of premium Yemeni specialty coffee; there were no other competitors in the space.  The buzz around Mocha Mill's highly anticipated coffee had grown considerably.  Many of Mocha Mill's coffee varieties had scored in the 90s (out of 100), ranking them among the best in the world.  Blue Bottle had begun advertising the Mocha Mill coffee on its Instagram feed as early as April 2015, titillating coffee enthusiasts with the expected arrival to Blue Bottle of a most exquisite coffee sourced from the very birthplace of coffee itself.

11
12
13
14

136.    By November 2015, high-end distributors, including Blue Bottle, had placed orders and made commitments to buy the coffee from Mocha Mill for $100 to $135 per kilogram.  Mokhtar (as Mocha Mill's CEO) had agreed and the coffee had been sold in principle.

15
16
17
18
19
20
21
22
23
24
25
26

137.    After Mokhtar's November 2015 fraud/extortion-based corporate *coup d'état* failed (*see supra* § V(G)), and while Mokhtar was still Mocha Mill CEO, the two heads of the RICO Enterprise (Mokhtar and Ahmad) sought to supplant Mocha Mill with Port of Mokha.  To do that, they realized they needed Port of Mokha (not Mocha Mill) to be the first company to market the highly-anticipated premium Yemeni coffee so that the Port of Mokha brand (in the wake of Mocha Mill's coordinated demise) could seize the tremendous attention Mocha Mill's coffee was getting at the time.  In other words, they needed to ensure that Port of Mokha (not Mocha Mill) would sell the best Yemeni coffee to high-end distributors—despite the fact that they were distributors that Mocha Mill had worked so hard to line up.  Moreover, given Mokhtar's boots-on-the-ground role in Mocha Mill, he would be able—on Port of Mokha's behalf—to easily steal the farmer and distributor networks that Mocha Mill had developed through years of investment.

27

138.    The challenge, however, was in obtaining the actual Mocha Mill coffee beans.

28

*First Amended Complaint – CV 18-2539-HSG*

Mokhtar recognized that he could not just ask Mocha Mill to hand over the coffee so that he could leave and sell it under the Port of Mokha brand.  After all, the victim Mocha Mill partners had no idea that competitor Port of Mokha was in the works—that Mokhtar and Ahmad were plotting an unlawful usurpation.

139.    Mokhtar understood that if Plaintiffs got wind of his scheme, they obviously would not allow it.  Plaintiffs were expecting a grand Mocha Mill launch with premier distributors and retailers, paving the way for tremendous brand value, long-lasting relationships, and increased growth.  Plaintiffs had no intention of letting another company swoop in and steal the imminent fruits of Mocha Mill's labor and investments.

140.    In order to obtain Mocha Mill's ultra-premium coffee, Enterprise members thus devised a scheme to defraud Plaintiffs into parting with the coffee as part of a pattern of racketeering activity.  Defendants Mokhtar, Ahmad, and Ezell, with Comar's counsel, conspired with Defendant Blue Bottle to mislead Plaintiffs into believing that high-end distributors and retailers (Blue Bottle among them) were no longer interested in buying Mocha Mill coffee.

141.    Given the posture of the Mocha Mill brand and the excitement around its coffee, it was foreseeable to Blue Bottle and Comar that the scheme would be long and elaborate involving numerous acts of wire fraud, because email and text messages were the preferred methods of communication between the players involved and would be used extensively in the scheme.

142.    To convince Plaintiffs that Blue Bottle was no longer interested in their coffee, Mokhtar first had to convince Blue Bottle to join the RICO conspiracy.  Mokhtar needed Blue Bottle to:

a.    feign disinterest in Mocha Mill so that Mokhtar could convince his Mocha Mill partners (Plaintiffs) that high-end distributors like Blue Bottle were no longer interested in buying premium Yemeni coffee;

b.    direct its employees to not communicate with anyone at Mocha Mill

31

but Mokhar and Ezell to keep the unlawful scheme a secret;

c.    shift its marketing platform from Mocha Mill to Port of Mokha by developing marketing and advertising materials that featured Mocha Mill coffee as "Port of Mokha" coffee, knowing that the coffee belonged to Mocha Mill; and

d.    affirmatively delay its rollout, sacrificing freshness in favor of the fraud scheme, in order to launch a marketing and advertising campaign that jointly promoted Blue Bottle alongside Port of Mokha's release (to Blue Bottle) of its coffee for retail sale.

Mokhtar promised Blue Bottle significant benefits in return, and Blue Bottle committed itself to the scheme, as detailed below.

### 1.    Blue Bottle Conspires with the RICO Enterprise

143.   Plaintiffs are informed and believe that Blue Bottle CEO James Freeman and Blue Bottle Green Coffee Buyer Charlie Habegger ("Habegger") each had a close relationship and friendship with Mokhtar.

144.   Plaintiffs are informed and believe that, at all times relevant to the allegations of this Complaint, Freeman and Habegger knew that Mokhtar was Mocha Mill's CEO, and as executives themselves with fiduciary duties to Blue Bottle, understood well the same obligations Mokhtar owed to Mocha Mill.  Nevertheless, Freeman and Habegger conspired with Mokhtar to form an alliance and partnership with him to help him defraud Mocha Mill for the benefit of the Port of Mocha RICO Enterprise and Blue Bottle alike.

145.   When CEO Freeman first cupped Mocha Mill's coffee in April 2015, he said, "This is what angels singing tastes like."  As Blue Bottle wrote in its marketing materials"

When we first tried the coffee Mokhtar Alkhanshali brought us from Yemen, it stopped Blue Bottle Coffee founder James Freeman in his

32

tracks.  He remembers exactly where it was on the cupping table—it's hard to forget *a transcendent encounter like that—and we've been <u>counting the days</u> until we could share this veritable coffee miracle from Yemen with our guests*.

146.    It is common knowledge in the coffee industry that the fresher the coffee beans, the tastier the coffee.  In other words, over time, coffee beans degrade and lose their taste.  Therefore, high-end retailers like Blue Bottle seek to obtain and market new arrivals at the earliest possible date.

147.    Plaintiffs are informed and believe that Blue Bottle was extremely anxious to acquire and sell Mocha Mill's coffee as soon its first shipment arrived in Oakland.  Blue Bottle was also eager, based upon the date Mocha Mill advised the coffee would arrive stateside, to launch the associated marketing campaign leading up to that arrival date.

148.    As alleged above, even before the coffee's arrival, Blue Bottle had committed to buy it from Mocha Mill and Mocha Mill had committed to sell it to Blue Bottle.  A deal in spirit and principle was in place and Blue Bottle was anxious for the shipment.

149.    Plaintiffs are informed and believe that, in and after November 2015, Mokhtar told Freeman about the Port of Mokha Enterprise he and Ahmad had formed to supplant Mocha Mill.  Mokhtar explained his plan to leave Mocha Mill, as well as the scheme to fraudulently obtain Mocha Mill's coffee beans and usurp its business and first-mover advantage.

150.    Plaintiffs are informed and believe that Freeman was naturally concerned about being able to obtain Mocha Mill's coffee without Mokhtar at the company, particularly if Mokhtar left on bad terms.  Mokhtar assured Freeman that, with Blue Bottle's help, Port of Mokha would be able to steal the coffee from Mocha Mill by deceiving Mocha Mill into believing that Blue Bottle and other high-end retailers were unwilling to buy the coffee.

151.    Plaintiffs are informed and believe that Mokhtar convinced Freeman that it

1   was in Blue Bottle's best interest to participate in the fraud scheme by explaining to
2   Freeman that the success of the Port of Mokha's scheme would benefit, Blue Bottle, as
3   well.  Mokhtar assured Freeman that Blue Bottle would receive the coffee from Port of
4   Mokha once Mocha Mill parted with it after being convinced that Blue Bottle was no
5   longer interested.  In exchange for Blue Bottle's help with the RICO scheme, Mokhtar
6   promised Freeman a partnership with the Port of Mokha Enterprise by which Blue Bottle
7   would be able to:

      a.    secure special exclusivity agreements with Port of Mokha for its top
8   Yemeni coffee varieties, in that Blue Bottle would receive first-pick
9   and beans for retail sale that other distributors would not;
10

      b.    enjoy the tremendous publicity that Mocha Mill had made possible,
11   particularly a lock-step association with Port of Mokha as the first
12   modern-day importer (Port of Mokha) and retailer (Blue Bottle) of
13   premium varieties from the birthplace of coffee, as well as prominent
14   placement in Eggers' highly anticipated book;
15

      c.    directly invest in Yemeni farmer relationships, allowing Blue Bottle to
16   market itself as an on-the-ground supporter of the resurrection of
17   premium Yemeni coffee and garner the goodwill associated with its
18   "grassroots" engagement with Yemeni farmers;
19

      d.    invest in future harvests, thereby giving Blue Bottle special access to
20   the best Yemeni coffee farms producing the best coffee in the world,
21   allowing Blue Bottle to increase its dominance as the premier
22   specialty coffee retailer in the world; and
23

      e.    maintain a close relationship with Mokhtar and Port of Mokha to
24   create a firm, long-lasting means of ensuring Blue Bottle's ability to
25   pursue the foregoing benefits in the short- and long-term.
26

27   152.   Mocha Mill had spent years building credibility in Yemen (through Mokhtar)

28

34

and had cultivated significant relationships with top coffee farmers.  Mocha Mill's investments in the Yemeni farmers and its financing program with them (through Mokhtar) had cemented strong relationships and paved the way to years of future harvests and expansion of the premium coffee business.  Mokhtar was required to keep a database of these Mocha Mill relationships; nevertheless, Port of Mokha and Blue Bottle would swoop in just before launch and steal these relationships through their RICO fraud conspiracy.

153.   Mocha Mill's unique venture had positioned it as the sole player in the specialty Yemeni coffee market, giving it tremendous negotiating leverage with high-end distributors like Blue Bottle.  Nevertheless, Port of Mokha and Blue Bottle would swoop in just before launch and siphon this competitive advantage to Port of Mokha (and derivatively Blue Bottle) through their RICO fraud conspiracy.

154.   Mocha Mill had created tremendous buzz and anticipation for its specialty Yemeni coffee, and was expecting a blockbuster launch followed by Eggers' best-selling book about the company's development that would further boost Mocha Mill's brand value.  Mocha Mill's launch value and first-mover advantage were obvious to the two CEOs (Mokhtar and Freeman), but Mokhtar sweetened the deal for Blue Bottle, explaining to Freeman that Eggers' book showcasing Port of Mokha (not Mocha Mill) would boost coffee sales for Blue Bottle.  Plaintiffs are informed and believe that Mokhtar promised to give Blue Bottle a prominent place in the book, casting the company in a very positive light to further build the Blue Bottle brand.

155.   Blue Bottle had a cozy relationship with Mokhtar, so if Mokhtar left Mocha Mill without being able to steal the business, Blue Bottle would have to develop relationships with the other Mocha Mill partners and risk having competitors vie for the same access.  Plaintiffs are informed and believe that Freeman had promised his investors special access to the Yemeni coffee which, by Blue Bottle's estimates, would sell for upwards of $50 for 12-ounce bags and $16 per cup.  Any uncertainty concerning

35

1    Mokhtar's impending departure put investor relationships in peril and caused Freeman

2    fear.  To keep investors happy (a significant motivation for any CEO), Blue Bottle needed

3    Port of Mokha to steal Mocha Mill's coffee beans and its future business; Blue Bottle

4    needed Mocha Mill to fail leaving Port of Mokha as the sole survivor in Mocha Mill's

5    demise.  Blue Bottle was highly motivated to join the conspiracy and help it succeed.

6        156.    Plaintiffs are informed and believe that Freeman, on behalf of Blue Bottle,

7    agreed to join the RICO conspiracy.  To help Mokhtar deceive Plaintiffs, Freeman and

8    others at Blue Bottle affirmatively and deliberately:

9            a.    delayed the purchase of Mocha Mill's coffee until the coffee was

10                fraudulently acquired by Port of Mokha, which, as explained further

11                below, was contrary to Blue Bottle's normal business practice and

12                commitment to selling the freshest and best-tasting coffee possible;

13           b.    concealed Blue Bottle's dealings with Port of Mokha from Mocha Mill's

14                other partners (Plaintiffs), and, as explained further below, dealt only

15                with Mokhtar and Ezell;

16           c.    delayed Blue Bottle's marketing plan and pivoted its campaign from

17                Mocha Mill to Port of Mokha, and, as explained further below, began

18                developing advertising materials to promote Mocha Mill's best coffee

19                under the Port of Mokha brand while knowing that the coffee actually

20                belonged to Mocha Mill and with the intention to help Port of Mokha

21                steal it through fraud; and

22           d.    delayed the launch of the coffee (sacrificing freshness for the scheme)

23                in order to introduce Mocha Mill's best coffee under the Port of Mokha

24                brand.

25   At the time, Blue Bottle was well aware that Mokhtar was Mocha Mill's CEO and owed

26   his company a fiduciary duty.  Blue Bottle was more than happy to affirmatively help

27   Mokhtar violate that serious duty, engaging in various deliberate acts of unfair

28

                                          36

competition to secure the aforementioned competitive advantages for itself.

157.   Mocha Mill's coffee arrived in Oakland on February 27, 2016.  Plaintiffs are informed and believe that Mokhtar told Freeman and Habegger of the coffee's arrival at or about that time.  Blue Bottle was very anxious to obtain, market, and sell the coffee. Under normal circumstances, Blue Bottle would have purchased the coffee as soon as possible and began marketing it as early as March 2016.  Conspiring with Mokhtar, however, Blue Bottle, *inter alia*, agreed to and did affirmatively and deliberately delay its purchase, marketing, and launch of the coffee for months in furtherance of the fraud scheme to pave the way for Mokhtar to deceive Plaintiffs and steal the coffee from Mocha Mill.  In collusion, the delay was designed to mislead Plaintiffs into thinking that Blue Bottle was not interested in purchasing the coffee and that the beans were getting too old to sell to Blue Bottle and other high-end distributors.  In other words, the delay was designed to make Plaintiffs desperate to sell.

158.   Plaintiffs are informed and believe that Blue Bottle knew the coffee belonged to Mocha Mill, but Blue Bottle itself was invested in the fraud.  While helping Mokhtar deceive his partners, Blue Bottle was also helping the Enterprise plan a rollout of the coffee under the Port of Mokha brand, knowing that it would be using merchandise stolen through fraud.  Enterprise members and Blue Bottle communicated over email using wire facilities of the United States to execute the scheme.

159.   Plaintiffs are informed and believe that, in furtherance of the scheme, on February 25, 2016, Ezell, acting on orders from Mokhtar and Ahmad, sent an email to Vera [LNU], a writer for Blue Bottle, to put her in touch with Dave Eggers' assistant, concerning his book.  The email was intended to show Blue Bottle that the Enterprise would follow through with its marketing promises in exchange for Blue Bottle's cooperation with the fraud scheme.

160.   Plaintiffs are informed and believe that, in furtherance of the scheme, on May 5, 2016, Habegger met Mokhtar at Mokhtar's residence to discuss the Port of Mokha

*First Amended Complaint – CV 18-2539-HSG*

scheme and fraudulent acquisition of Mocha Mill's coffee so that it could be sold under the Port of Mokha brand.  At the time, Habegger was well aware that Mokhtar was Mocha Mill's CEO with a fiduciary duty to his company.

161.    Plaintiffs are informed and believe that, in furtherance of the scheme, on May 7, 2016, Mokhtar emailed Habegger concerning "pricing and long term projects" with Port of Mokha.  Mokhtar promised to be "flexible with the pricing of the single farmer lots."  Mokhtar also discussed Blue Bottle's opportunity to invest in future harvesting efforts, couching it as "our long term strategy" to develop the Yemeni Hayma coffee region and "the story we can both tell together about these farmers."  Both Habegger and Freeman knew that Mokhtar was CEO of Mocha Mill at the time and that the coffee belonged to Mocha Mill, not Port of Mokha.  Both knew that their plans hinged on the fraud.  Port of Mokha and Blue Bottle purposely left Plaintiffs in the dark to ensure success of the RICO conspiracy.

162.    Plaintiffs are informed and believe that, by this time, Blue Bottle was fully invested in Mokhtar's fraud scheme and Blue Bottle's plans depended on Mokhtar being able to successfully defraud Mocha Mill out of its coffee.  In furtherance of the scheme, on May 13, 2016, Habegger emailed Mokhtar stating "how this first round will set the foundation for an annual project [between Blue Bottle and Port of Mokha] . . ."  Habegger went on to write, "The next shipment that lands, which we know is going to have coffees just as beautiful (or better), will be timed with all your media work and be a slam!"  Habegger stated, "I spoke with James [Freeman] last week as I mentioned, and we are both 100% on board for pre-financing next harvest."  At the time, Habegger was well aware that Mokhtar was Mocha Mill's CEO owing a fiduciary duty to Mocha Mill.  Port of Mokha and Blue Bottle purposely left Plaintiffs in the dark to ensure success of the RICO conspiracy.

163.    Plaintiffs are informed and believe that, in furtherance of the scheme, on May 26, 2016, Clare McPharland of Blue Bottle and Ahmad of the RICO Enterprise

38

exchanged emails, copying Mokhtar and Ezell, to discuss Port of Mokha's marketing and "logistics" with Blue Bottle. At the time, Blue Bottle was aware that Mokhtar was Mocha Mill's CEO, Ezell was a Mocha Mill Director, and that the coffee still belonged to Mocha Mill. Port of Mokha and Blue Bottle purposely left Plaintiffs in the dark to ensure success of the RICO conspiracy.

164.   Plaintiffs are informed and believe that , over the next several months, Blue Bottle and Enterprise members continued to affirmatively delay the launch and sale of the coffee and keep their dealings hidden from Plaintiffs, while planning a rollout of Mocha Mill's coffee under the Port of Mokha brand, fully expecting the coffee to be stolen through fraud. Blue Bottle helped Mokhtar and Ahmad plan and execute the scheme, thereby exercising a level of management and control of the Enterprise.

165.   The scheme and Blue Bottle's part in it had the intended effect of deceiving Plaintiffs into parting with their most premium coffee for a fraction of what it was worth and allowing Port of Mokha to steal Mocha Mill's business.

166.   Plaintiffs would have never allowed the sale to competitor Port of Mokha had they known of the fraud.

### 2.   Port of Mokha Arranges for a Straw Buyer to Defraud Mocha Mill

167.   Atlas Coffee ("Atlas") is a California company specializing mostly in the shipment and storage, and sometimes the sale of coffee.

168.   Mocha Mill had engaged Atlas Coffee ("Atlas") to import and store its premium coffee pending distribution.

169.   Plaintiffs are informed and believe that, in November 2015, Mokhtar and Ezell arranged for Atlas to serve as a straw buyer for Port of Mokha as a means of fraudulently acquiring Mocha Mill's coffee. Through a series of fraudulent acts over the course of the next seven months, Mokhtar and Ezell, as Mocha Mill officers, working in concert with other Enterprise members and Blue Bottle, convinced Plaintiffs that high-end distributors were no longer interested in buying Mocha Mill coffee for over $100 per

*First Amended Complaint – CV 18-2539-HSG*

kilogram as previously thought, which was untrue.

170.    Plaintiffs are informed and believe that Mokhtar and Ezell also falsified Mocha Mill's coffee scores, showing Plaintiffs lower than actual scores in order to convince Plaintiffs to dump the coffee at bottom-dollar purportedly to salvage some measure of revenue.[2] Mokhtar and Ezell, thus, tried to convince Plaintiffs that Mocha Mill's *best* option was to sell its coffee to Atlas for $50 per kilogram, making it appear as the most profitable and efficient option given that Atlas was already storing the coffee pending distribution.  Of course, this was untrue, and Defendants knew that.

171.    Plaintiffs are informed and believe that, in December 2015, Mokhtar communicated with Comar over email seeking advice on aspects of the scheme to fraudulently obtain Mocha Mill's coffee.  In one such email, Mokhtar expressed concern that his partners (Plaintiffs) could become suspicious and derail the scheme, and asked for advice on how to keep the scheme concealed.

172.    Fearing that his scheme would be discovered, Mokhtar, as CEO of Mocha Mill, instructed Atlas not to communicate with anyone at Mocha Mill but himself and Ezell.  Atlas obliged.

173.    The Atlas scheme unfolded from about November 2015 to about April 2016, as follows:

    a.    On March 21, 2016, Ezell, as "Director of Mocha Mill," sent an email to Atlas Coffee asking Atlas to change his contact email to his Port of Mokha domain.

    b.    On March 29, 2016, in order to ensure the scheme's secrecy and success, Mokhtar sent an email to Ahmad and Ezell directing them to ensure that Atlas used only Mocha Mill (and not Port of Mokha) email addresses if Atlas were copying Plaintiffs on any email.

    c.    On March 31, 2016, Atlas emailed Ezell in his capacity as Director of

---

[2] The graders for these scores, Wieser and Benefield of Boot Coffee, would later be rewarded with roles at Port of Mokha after the company illegally supplanted Mocha Mill.

*First Amended Complaint – CV 18-2539-HSG*

Mocha Mill to discuss "the transition [of coffee] from Mocha Mill to Port of Mokha."  At this time, Ezell was serving as Director of Mocha Mill (appointed by Mokhtar), but acting on orders from Mokhtar and Ahmad as an agent for the Enterprise.

d.     On April 6, 2016, at Mokhtar and Ahmad's direction, Ezell sent Plaintiffs an email making it appear that it was in Mocha Mill's best interest for Plaintiffs to not communicate with Atlas.  Ezell reported back to Mokhtar and Ahmad about having sent the email.

e.     On April 6, 2016, on Mokhtar and Ahmad's orders, Ezell sent Plaintiffs an email, copying Mokhtar at his Mocha Mill email address, misrepresenting that Blue Bottle and other high-end distributors had lost interest in Mocha Mill coffee.  Ezell pretended that Atlas had offered to buy the Mocha Mill coffee for $50 per kilo and advised that this was Mocha Mill's best option.  Ezell made it appear that $50 per kilo was a great price for the coffee and that a higher price was unlikely given the loss of interest among the high-end distributors; Ezell knew this was false and that deals were already in place through Port of Mokha.  Ezell stated that it was "the quickest way to making money" and that he and Mokhtar agreed that this was the best course of action for Mocha Mill.

f.     On April 6, 2016, Mokhtar sent Plaintiffs an email seconding Ezell's recommendation and asking Plaintiffs to fix the relationship with Atlas that the lawyer's letter had upset, so that the deal could proceed.  Mokhtar also knew this was false and that deals were already in place through Port of Mokha.

g.     On April 10, 2016, Mokhtar sent Plaintiffs an email attaching seemingly falsified coffee scores and providing elaborate explanations

41

for why the scores were low.  This was done as part of the scheme to convince Plaintiffs that high-end distributors and retailers had lost interest in Mocha Mill coffee.

    h.    In early April 2016, Plaintiffs tried to talk to Atlas about what was happening, but Atlas kept Port of Mokha's scheme concealed.  Plaintiffs then involved a lawyer and Atlas backed out of the arrangement, deciding not to help Mokhtar and Ahmad fraudulently transfer Mocha Mill's coffee to Port of Mokha.

174.    The Atlas scheme, as detailed in the preceding paragraphs, was executed using wire facilities of the United States sending numerous wires in interstate commerce; these wires were foreseeable to Defendants and each was an act of wire fraud as part of a pattern of racketeering activity.[3]

175.    Simultaneous with his failed attempts to use Atlas as a straw buyer, Mokhtar, while still Mocha Mill's CEO, was actively negotiating the sale of Mocha Mill's coffee to high-end distributors—but doing so secretly for Port of Mokha.  That is, while telling Plaintiffs that no one was interested in buying Mocha Mill's coffee any longer, Mokhtar was secretly negotiating with other high-end distributors to secure their commitments to buy the coffee from Port of Mokha (fully expecting to steal it by fraud):

    a.    On November 22, 2015, Mokhtar sent an email to Atlas copying Enterprise members Ahmad and Ezell; Mokhtar purposely excluded Plaintiffs from this email.  The email reflected that 240 kilograms of coffee had been sold to Coutume Café in Paris for prices ranging from $220 to $300 per kilogram.

    b.    On February 8, 2016, Mokhtar sent an email to Coutume Café copying

---

[3] Plaintiffs are informed and believe that many more emails and text messages (each constituting an act of wire fraud) were sent and/or caused to be sent in the course of the scheme.  Before Mocha Mill was able to discover the fraud, Mokhtar hacked into the Mocha Mill email account and willfully and intentionally destroyed these communications to conceal the racketeering activity.  (*See infra* § V(M).)  Plaintiffs were able to recover some of the data Mokhtar had destroyed.

42

Ezell; Mokhtar purposely excluded Plaintiffs from this email.  The email confirmed Coutume Café's coffee order and asked Coutume to help find additional buyers in Japan.

c.      On February 16, 2016, there was an email exchange between Mokhtar, Ahmad, and Ezell reflecting plans for Port of Mokha operations and management.  The emails appear to discuss coffee orders with Blue Bottle and Coutume Café, with Atlas Coffee acting as the intermediary to process and ship the orders on behalf of Port of Mokha.  Plaintiffs were purposely excluded from this email exchange.

d.      On February 22, 2016, Ahmad sent an email to Mokhtar copying Ezell, presumably anticipating legal liability.  The email contained a very broad release of claims for Mokhtar to have Plaintiffs sign.  Plaintiffs were purposely excluded from this email.

e.      Between March 5 and March 19, 2016, there was an email exchange between Ahmad, Mokhtar, Ezell, and Blue Bottle, reflecting an agreement in principle to buy Mocha Mill coffee and continue a long-term relationship.  This appeared to be for the benefit of Port of Mokha (not Mocha Mill) even though Mokhtar was Mocha Mill's CEO at the time.  Plaintiffs were purposely excluded from this email exchange.

f.      On March 19, 2016, Ezell received an email (at his Mocha Mill address) from Conduit Coffee expressing interest in purchasing Mocha Mill coffee.  He never shared it with Plaintiffs per Mokhtar and Ahmad's orders.  Instead, on March 21, 2016, Ezell forwarded the email to his Port of Mokha email address.

g.      On March 19, 2016, Ezell received an email (at his Mocha Mill email address) from Lever Head Coffee expressing interest in purchasing

43

Mocha Mill coffee.  He never shared it with Plaintiffs per Mokhtar and Ahmad's orders.  Instead, on March 21, 2016, Ezell forwarded the email to his Port of Mokha email address.

h.   On March 23, 2016, Atlas sent an email to Ezell's Mocha Mill and Port of Mokha accounts responding to Ezell's inquiry concerning a coffee shipment request to France, presumably to Coutume.

i.   On March 26, 2016, Ahmad sent an email to the Executive Assistant of Blue Bottle CEO James Freeman to set up a meeting the week of April 11, 2016, to discuss Eggers' book and other coffee related logistics for Port of Mokha.  Mokhtar and Ezell were copied, while Plaintiffs were purposely excluded.  Mokhtar was Mocha Mill CEO at the time.

176.   Ultimately, the Atlas scheme was unsuccessful, but not for lack of effort on Defendants' part.  Defendants were undeterred and moved on to phase 2.0.

**K.   Conspiracy to Supplant Mocha Mill with Port of Mokha Using Wire Fraud as Part of a Pattern of Racketeering Activity: *Take Two* (April 2016 – June 2016)**

177.   Plaintiffs are informed and believe that, after the RICO Enterprise's scheme with Atlas collapsed, Mokhtar and Ahmad devised an alternative wire fraud scheme with a different straw purchaser as part of the same racketeering conspiracy.  Continuing with the ruse that no high-end distributor or retailer was interested in Mocha Mill Coffee, Mokhtar and Ahmad found—or rather invented—a "new buyer" for the coffee, a fake company called "T&H Imports."  Mokhtar and Ahmad created the fictional "T&H Imports," in conspiracy with Defendants T&H Computers and Metra Computer Group, both of which are companies run by Ahmad's extended family.

178.   Plaintiffs are informed and believe that "T&H Imports" was a fake company created out of thin air solely to execute the Enterprise's fraud scheme.  T&H and Metra knew of the Enterprise's objective and, acting through their executives Wael Fadl

*First Amended Complaint – CV 18-2539-HSG*

("Wael") and Mohamed Eissa ("Eissa"), agreed to help execute the fraud scheme.  T&H and Metra planned the scheme with Mokhtar and Ahmad and did as they directed, exercising a level of management and control over the Enterprise.

179.    On April 8, 2016, in furtherance of the scheme, Mokhtar resigned from his position as Mocha Mill CEO, telling Plaintiffs that he was no longer interested in selling coffee.  He, of course, did not tell Plaintiffs that he had long since formed Port of Mokha and intended to continue selling Mocha Mill's coffee albeit under his new company's brand.

180.    Mokhtar continued to secretly sabotage Mocha Mill's distributor relationships, while leading Plaintiffs to believe that he would help them sell the coffee on hand as a favor even after resigning.  Mokhtar's feigned goodwill gesture was really a step towards executing the fraud scheme.

181.    Plaintiffs are informed and believe that, as their names suggest, neither "T&H *Computers*" nor "Metra *Computer* Group" was in the coffee business.  Nevertheless, at Mokhtar and Ahmad's direction, T&H and Metra created "T&H Imports"—a fake company whose only purpose was to pose as a Dubai-based business interested in selling Mocha Mill coffee in the Middle East, but actually serving as a straw purchaser for Port of Mokha.

182.    On or before April 21, 2016, Mokhtar, Ahmed, and Wael (of T&H and Metra) created the fake email address wael.th.imports@gmail.com, in order to give the appearance of a genuine company called "T&H Imports."

183.    Through a series of seemingly genuine but actually fraudulent email communications, Enterprise members conspired with T&H and Metra to defraud Mocha Mill into selling its best coffee (worth $135 per kilogram) for just $58 per kilogram and giving up its planned launch.  In doing so, Defendants used wire facilities of the United States sending numerous wires in interstate commerce; these wires were foreseeable to Defendants and each was an act of wire fraud as part of a pattern of racketeering activity.

*First Amended Complaint – CV 18-2539-HSG*

1    Some such wires are detailed below:[4]

2         a.    On April 21, 2016, Mokhtar sent an email to Plaintiffs convincing

3                them to sell Mocha Mill coffee to "T&H Imports," a company

4                purportedly "looking to expand into coffee" in the Middle East.

5                Mokhtar recommended that Mocha Mill sell all of its coffee to "T&H

6                Imports" for $50 per kilogram and generated an invoice to that effect.

7                Defendants' scheme was successful this time and Plaintiffs relented

8                relying on Defendants' ruse.

9         b.    Subsequently, Mokhtar changed his mind about buying all of Mocha

10               Mill's coffee and picked out only the best Mocha Mill varieties, which

11               Mokhtar had promised to high-end retailers like Blue Bottle and

12               Coutume to be marketed under the Port of Mokha brand.  On April

13               25, 2016, Mokhtar wired an invoice to "T&H Computers" in Fremont,

14               California in the amount of $50,000 for 1,000 kilograms of Mocha

15               Mill's best coffee; Mokhtar had T&H Computers wire $50,000 to

16               Mocha Mill.  Mokhtar then created a counterfeit invoice in the name

17               of "T&H Imports"—using Metra's address in Dubai—stamped it

18               "Paid," and emailed it to Plaintiffs to show that "T&H Imports" had

19               paid for the coffee.  Plaintiffs, however, were under the impression

20               that "T&H Imports" was going to buy *all* of the coffee for $165,000,

21               which prompted them to question the transfer of only the best

22               varieties.

23        c.    On May 2, 2016, Wael (of T&H) sent Plaintiffs an email pretending to

24               be a *bona fide* coffee purchaser seeking transfer of Mocha Mill's best

25    _____

26        [4] Plaintiffs are informed and believe that many more emails and text messages
     (each constituting an act of wire fraud) were sent and/or caused to be sent in the course of
27    the scheme.  Before Mocha Mill was able to discover the fraud, Mokhtar hacked into the
     Mocha Mill email account and willfully and intentionally destroyed these communications
     to conceal the racketeering activity.  (*See infra* § V(M).)  Plaintiffs were able to recover
28    some of the data Mokhtar had destroyed.

46

coffee.

d.   On May 3, 2016, Mokhtar forwarded Plaintiffs an email pretending to negotiate with "T&H Imports" on Mocha Mill's behalf to make Plaintiffs believe that the deal was genuine.

e.   On May 4, 2016, Wael (of T&H) sent Mokhtar an email, copying Plaintiffs, pretending to have *bona fide* negotiations with Mokhtar while knowing all along that T&H Imports (a fake company) was a straw purchaser helping to accomplish the fraud scheme set up by the racketeering Enterprise.

f.   These fraudulent negotiations led Plaintiffs to believe that the deal was genuine.  Soon thereafter, Mocha Mill transferred to "T&H Imports" (in reality T&H Computers) 862 kilograms of its coffee (all the best varieties Mocha Mill had on hand) for the $50,000 payment, which amounted to $58 per kilogram, causing foreseeable transactional wires.

g.   Immediately thereafter, T&H Computers sold the same coffee to *Port of Mocha* for $51,000, taking a $1,000 commission for its part in the fraud scheme, causing foreseeable transactional wires.

h.   On May 17, 2016, Port of Mokha then sold under its own brand 390 kilograms of the fraudulently-obtained Mocha Mill coffee to *Blue Bottle* for $135 per kilogram, causing foreseeable transactional wires. This was exactly as Mokhtar and Freeman had intended, agreed on, and facilitated in collusion with one another.

i.   Plaintiffs are informed and believe that Port of Mokha sold the coffee to Coutume and other high-end distributors for tremendous profits, as well, causing foreseeable transactional wires.

j.   On May 31, 2016, in his continuing attempts to conceal the fraud

47

scheme, Mokhtar sent Plaintiffs an email insisting that the T&H deal was great for Mocha Mill.

k.   On June 7, 2016, Blue Bottle began selling, for the first time at its cafes across the United States and on the Internet, Mocha Mill's highly-anticipated premium Yemeni coffee (using proprietary Mocha Mill images without permission) **_under the "Port of Mokha" brand_**, causing numerous foreseeable transactional wires.  There was no mention of Mocha Mill.

184.   Having absconded with Mocha Mill's best coffee varieties through fraud and sold them to Mocha Mill's intended customers, Mokhtar left the company in a difficult situation because it still needed to sell the rest of its coffee inventory, which was not only inferior to the most premium coffee Port of Mokha and Blue Bottle had stolen, but also had aged and lost freshness over the course of the scheme.

185.   Meanwhile, Blue Bottle proceeded to execute its Yemeni coffee marketing plan exactly as it had secretly planned with Mokhtar.  Blue Bottle heavily advertised Mocha Mill's coffee under the "Port of Mokha" brand on its website, social media feeds, and blog, using Mocha Mill intellectual property without authorization.

186.   For instance, in June 2016, in furtherance of the conspiracy, Blue Bottle published a "Port of Mokha" guide that described "Mokhtar's" efforts to resurrect premium Yemeni coffee.  There was, of course, no mention of Mocha Mill—even though the guide described _Mocha Mill's_ development story and used Mocha Mill's proprietary images and photos without permission.  In order words, as planned, after stealing the coffee, Port of Mokha and Blue Bottle rewrote history to suit their bottom line, falsely convincing the coffee world that Port of Mokha (not Mocha Mill) was the Yemeni specialty coffee pioneer that had resurrected premium coffee from its very birthplace, and that Blue Bottle was the pioneer retailer and go-to source for buying the very special offering.

187.   Taking Blue Bottle's lead and direction from the marketing campaign, other

high-end retailers and distributors followed in like manner.

188. Mocha Mill's coffee—branded as "Port of Mokha" coffee—was then recognized by experts as an ultra-premium variety; it garnered some of the best coffee scores in the world and was eventually hailed by the coffee industry as one of the best coffees in history.

189. The stolen Mocha Mill coffee, along with its attendant hype and publicity, noticeably improved the brand value and goodwill of Port of Mokha, as well as of Blue Bottle, cementing long-lasting relationships for Port of Mokha that rightfully belong to Mocha Mill.

190. Port of Mokha (and derivatively Blue Bottle through their partnership) thus usurped through a RICO conspiracy Mocha Mill's entire business at the critical moment of launch. The unlawful conspiracy had its intended effect and Defendants made out in spades.

191. Plaintiffs are informed and believe that Blue Bottle benefitted significantly from the fraud and its resulting partnership with Port of Mokha, making good on its earlier promises to investors, which helped further increase the company's profile and valuation in selling a majority stake to Nestlé in 2017 for $425 million. The preferred access and marketing benefits Blue Bottle received from its participation in the RICO scheme played a material role in the Nestlé deal.

192. To date, Port of Mokha continues to thrive on the farmer and distributor relationships, opportunities, publicity, first-mover advantage, images, and other assets stolen from Mocha Mill.

193. Plaintiffs are informed and believe that a portion of each sale of Port of Mokha coffee is funneled to The Mokha Foundation, which funds certain Port of Mokha operations and helps maintain relationships with Yemeni coffee farmers by providing "microloans" and training, and increases Port of Mokha's goodwill. Blue Bottle plays a part in this funding, too. This means of operation was part of Mocha Mill's business plan

49

and was also stolen when the Defendant RICO conspirators raided Mocha Mill's assets, relationships, and ideas through Mocha Mill partner and CEO Mokhtar.

194.   Plaintiffs are informed and believe that the Port of Mokha entities are presently valued at upwards of $250 million.

## L.   Extortion to Obtain a Release of Claims as Part of a Pattern of Racketeering Activity

195.   Plaintiffs are informed and believe that Comar and Eggers advised Mokhtar several times to obtain a broad release of claims from Mocha Mill to avoid legal exposure. Mokhtar knew that obtaining such a release would be difficult, however, so he resorted to extortion once again.

196.   Plaintiffs are informed and believe that, despite his fiduciary duty, Mokhtar purposely allowed the "mochamill.com" website domain to expire and directed Enterprise member Ahmad to purchase the domain in or about April 2016.  Mokhtar then used the RICO Enterprise's ownership of the domain as a bargaining chip in attempts to extort Plaintiffs into signing a broad release of claims, engaging in both extortion and wire fraud.  In other words, Mokhtar told Plaintiffs that he would not relinquish ownership of Mocha Mill's website address unless they capitulated and released him from all legal liability.

197.   Furthermore, upon his resignation from Mocha Mill, Mokhtar had sole access and administrator privileges to all of Mocha Mill's internet accounts, including, *inter alia*, the log-in credentials for GoDaddy, SquareSpace, G-Suite and G-Mail, and various social media accounts such as Facebook, Twitter, and Instagram.

198.   Even after his resignation from Mocha Mill, Mokhtar refused to give Mocha Mill back these credentials and administrator privileges, essentially locking Mocha Mill out of its own accounts.  Mokhtar then used access to the accounts as a bargaining chip in attempts to extort the Mocha Mill partners into signing a broad release of claims absolving Mokhtar of all legal liability.  The extortion attempt failed and Mokhtar did not get his release.

50

199.   Instead, Mocha Mill was forced to engage in a lengthy process to regain access to its accounts directly from the service providers.  It was not until late June 2016 that Mocha Mill regained access to many of its accounts.

**M.     Obstruction and Spoliation of Evidence to Cover Up the Racketeering Conspiracy**

200.   After Mocha Mill regained access to its accounts, the company changed the credentials and took login privileges away from Mokhtar.  However, Plaintiffs inadvertently left Mokhtar's phone number on the G-Mail account as a recovery phone number.  Using this recovery phone number, Mokhtar hacked back into the Mocha Mill email account, locked Mocha Mill out again, and destroyed emails that evidenced his racketeering activity.

201.   More recently, in 2018, after sending Defendants notice of impending litigation and requests for preservation of evidence, Plaintiffs have seen potential evidence disappear off the Internet and are gravely concerned about continuing obstruction and spoliation.

**N.     Money Laundering in Furtherance of a Pattern of Racketeering Activity**

202.   Transactional money laundering, a RICO predicate codified in 18 U.S.C. § 1957, prohibits monetary transactions of over $10,000 using criminally derived property from specified unlawful activity such as fraud and extortion.

203.   Through a pattern of racketeering activity, Defendants amassed large sums of money in criminal proceeds derived from fraud and extortion.  Defendants used this money to engage in numerous monetary transactions of over $10,000 to grow Port of Mokha.

204.   Each such transaction is an act of transactional money laundering that has harmed Mocha Mill by allowing competitor Port of Mokha to advance its dominance in the specialty coffee market using criminal proceeds to crush the competition (Mocha Mill) in the process as part of a pattern of racketeering activity.

51

## VI.   DISCOVERY RULE & FRAUDULENT CONCEALMENT

### A.   Discovery Rule

205.   Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence that Defendants conspired to and did engage in a pattern of racketeering activity that involved fraud, extortion, and money laundering, giving rise to the federal and state law claims raised herein.

206.   Defendants' RICO scheme and state law violations were elaborate and well concealed.  Indeed, it was not until Plaintiffs started seeing "Port of Mokha" coffee appear at major distributors such as Blue Bottle and recovered some of the emails Mokhtar had destroyed, that Plaintiffs realized they had been defrauded.

### B.   Fraudulent Concealment

207.   Under the fraudulent concealment doctrine, the causes of action alleged herein did or will only accrue upon discovery of the true nature of the fraud-based RICO conspiracy and other violations perpetrated by Defendants.

208.   Defendants maliciously concealed from Plaintiffs material information required for the prosecution of Plaintiffs' claims.  Defendants took active and affirmative steps to hide the true character, quality, nature, and extent of their illegal RICO and fraud schemes, and other federal and state law violations.  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the true nature of the RICO conspiracy and related violations perpetrated by Defendants, because Defendant Mokhtar, *inter alia*, actively destroyed evidence to conceal his unlawful activities.

209.   Defendants are under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of the RICO and fraud schemes they perpetrated on Plaintiffs.

## VII. <u>PLAINTIFFS' CLAIMS FOR RELIEF</u>

### <u>FIRST CLAIM FOR RELIEF</u>

**(Conspiracy to Commit Violations of the**

**Racketeer Influenced and Corrupt Organizations Act)**

**[18 U.S.C. § 1962(d)]**

(*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad*)

210.   Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

211.   Plaintiffs bring this RICO claim for relief under 18 U.S.C. §§ 1962(d) and 1964 for conspiracy to violate § 1962(c), against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

212.   In or about April 2014, Mokhtar began engaging in a pattern of racketeering activity using Mocha Mill as the RICO enterprise:

      a.   From about April 2014, through about December 2015, Mokhtar committed numerous acts of **wire fraud** in violation of 18 U.S.C. §§ 1341 and 1343, and **grand theft by fraud** in violation of Cal. Penal Code §§ 487 and 532, to embezzle from Mocha Mill at least approximately $140,942 as well as proceeds from clandestine sales of stolen Mocha Mill coffee.  (*See supra* § V(C).)

      b.   In about March 2015, Mokhtar engaged in acts of **extortion** in violation of 18 U.S.C. § 1951, and Cal. Penal Code §§ 518, 519, 520, 522, and 523.  (*See supra* § V(D)).

213.   In or about April 2015 and thereafter, Mokhtar expanded the racketeering

enterprise to form a larger association-in-fact enterprise that included Mokhtar, Mocha Mill, Ahmad, Ezell, Comar, Port of Mokha, and others (for purposes of this claim for relief, the "Enterprise"). The Enterprise sought to steal for the benefit of Port of Mokha the business Mocha Mill had spent years developing. (*See supra* §§ V(F) – (K).) Enterprise members and their co-conspirators shared the objective of usurping and did usurp Mocha Mill by fraud and extortion. (*See id*.)

214.   From about June 2015 through about November 2015, Enterprise members conspired with each other and others known and unknown to Plaintiffs at this time:

a.   To commit (and did commit) numerous acts of **wire fraud** in violation of 18 U.S.C. §§ 1341 and 1343, and attempted **grand theft by fraud** under California state law in violation of Cal. Penal Code §§ 487 and 532 (*see supra* § V(G)); and

b.   To commit **extortion** in violation of 18 U.S.C. § 1951, and Cal. Penal Code §§ 518, 519, 520, 522, and 523; Defendants did commit **attempted extortion** in violation of 18 U.S.C. § 1951, and Cal. Penal Code § 524. (*See supra* § V(G).)

215.   From about November 2015 through about May 2016, Enterprise members conspired with each other, Blue Bottle, T&H, Metra, and others known and unknown to Plaintiffs at this time to commit (and did commit) racketeering acts, including **wire fraud** in violation of 18 U.S.C. §§ 1341 and 1343, and **grand theft by fraud** in violation of Cal. Penal Code §§ 487 and 532. (*See supra* §§ V(H) – (K).)

216.   From about April 2016 through about June 2016, Enterprise members conspired with each other and others known and unknown to Plaintiffs at this time to commit racketeering acts, including **extortion** in violation of 18 U.S.C. § 1951, and Cal. Penal Code §§ 518, 519, 520, 522, and 523; Defendants did commit **attempted extortion** in violation of 18 U.S.C. § 1951, and Cal. Penal Code § 524. (*See supra* § V(L).)

217.   After resigning from Mocha Mill, Mokhtar engaged in racketeering acts by

54

hacking into Mocha Mill emails accounts to destroy evidence in attempts to conceal the RICO Enterprise and its unlawful activities.  In doing so, he committed acts of **wire fraud** in violation of 18 U.S.C. §§ 1341 and 1343, by maliciously and with intent to deceive, misrepresenting himself to be a person with authorized access when he had no such authorization.  In fact, Mokhtar at the time knew that he was *prohibited* from accessing the accounts, especially for the purpose of destroying evidence of criminal activity.  (*See supra* § V(M).)

218.   From about April 2016 through the present, Enterprise members are continuing to commit racketeering acts by using criminal proceeds derived from fraud and extortion to engage in monetary transactions of over $10,000 to grow Port of Mokha; each such transaction is an act of **money laundering** in violation of 18 U.S.C. § 1957.  Port of Mokha continues to launder money to advance its dominance in the specialty coffee market thereby using criminal proceeds to cause direct and proximate injury to competitor Mocha Mill.  (*See supra* § V(N).)

219.   As detailed above, at all relevant times, each member and co-conspirator of the Enterprise was aware of its purpose and conduct, and was a knowing, willing, and active participant in that conduct.  Each member and co-conspirator of the Enterprise reaped substantial profits from the unlawful activities of the Enterprise to the detriment of Mocha Mill.

220.   As detailed above, at all relevant times, each member of the Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the Enterprise's affairs.

221.   As detailed above, at all relevant times, the Enterprise and each of its members: (a) had an existence separate and distinct from each of its members; and (b) was separate and distinct from the pattern of racketeering in which Defendants engaged.

222.   As detailed above, at all relevant times, the members and co-conspirators of

*First Amended Complaint – CV 18-2539-HSG*

the Enterprise were/are systematically linked through continually coordinated activities, financial ties, and contractual business arrangements.

223.   The Enterprise is an ongoing and continuing enterprise.  The harm it caused continues to date and it continues to engage in the laundering of criminal proceeds, directly and proximately causing ongoing harm to Mocha Mill.

224.   As detailed above, at all relevant times, the members and co-conspirators of the Enterprise could not have accomplished the purpose of the Enterprise without each other's assistance and they all, with the exception of victim Mocha Mill, profited and continue to profit financially from the Enterprise's unlawful activities.

225.   As detailed above, at all relevant times, the pattern of racketeering activity undertaken by Enterprise members and their co-conspirators required and involved the regular and foreseeable use of electronic communications including text messages, emails, social media communications, and financial wires utilizing the wire facilities of the United States.

226.   As detailed above, at all relevant times, Enterprise members functioned as a continuing unit for the purposes of engaging in the Enterprise's racketeering activity to accomplish the Enterprise's core objective to steal the assets and business (including, *inter alia*, farmer relationships, distributor relationships, first-mover advantage, publicity, and goodwill) that Mocha Mill had spent years developing and planning; each Enterprise member agreed to take actions to hide from others the existence of the Enterprise, its objectives, and its unlawful activities.

227.   As detailed above, at all relevant times, the RICO Enterprise engaged in and affected interstate commerce because it, *inter alia*: (a) involved (and continues to involve) the importation of coffee into the United States from abroad (Yemen), and the subsequent marketing and sale of that coffee nationwide and internationally; and (b) utilized wire facilities of the United States to carry out its schemes and unlawful activities.

228.   As a result of the Enterprise's racketeering activity, Port of Mokha

unlawfully supplanted Mocha Mill, causing Mocha Mill to suffer significant damages amounting to tens and hundreds of millions of dollars.  Simply put, Port of Mokha is the stolen Mocha Mill.  The Enterprise's RICO violations through its members and co-conspirators continue to victimize and injure Mocha Mill.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CLAIM FOR RELIEF

## (Violations of the Racketeer Influenced and Corrupt Organizations Act)
### [18 U.S.C. § 1962(c)]

(*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, Mokhtar, and Ahmad*)

229.    Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

230.    Plaintiffs bring this RICO claim for relief under 18 U.S.C. §§ 1962(c) and 1964 of RICO against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

231.    The allegations in this claim for relief mirror the allegations in the First Claim for Relief and so, for purposes of brevity, each and every allegation in the First Claim for Relief as well as all the preceding paragraphs are alleged herein by reference with the same force and effect as though fully set forth herein.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## THIRD CLAIM FOR RELIEF

## (Fraud & Deceit)

(*Against Defendant Mokhtar, Port of Mokha, Inc.,*

*Port of Mokha LLC, and Mokha Foundation*)

232.    Plaintiffs reallege and incorporate by reference, in this claim for relief, each

57

and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

233.   Plaintiffs bring this fraud-by-deceit claim for relief against Mokhtar, Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), and Mokha Foundation.

234.   As detailed in Section V(C), from April 2014 through December 2015, under the guise of legitimate company expenses, Mokhtar willfully, maliciously, and with intent to defraud embezzled at least approximately $140,942 from Mocha Mill for personal expenses and to fund his competitor company Port of Mokha.

235.   Plaintiffs made Mokhtar CEO of Mocha Mill and gave him full access to company accounts for legitimate company expenses.

236.   Plaintiffs relied on Mokhtar's representations that he was drawing upon Mocha Mill's accounts only for the purpose of legitimate company expenses.

237.   Mokhtar assured Plaintiffs that he would provide proof of all expenses but never did so because the expenses were not legitimate.

238.   Mokhtar's conduct directly, proximately, and substantially caused Plaintiffs to suffer significant injury.

239.   Because Mokhtar's fraudulent conduct was done maliciously, oppressively, deliberately, and/or with intent to defraud, Plaintiffs are further entitled to an award of exemplary and punitive damages, pursuant to California Civil Code section 3294.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FOURTH CLAIM FOR RELIEF

### (Fraud & Deceit)

### (Conspiracy and Aiding & Abetting)

(*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad*)

240.   Plaintiffs reallege and incorporate by reference, in this claim for relief, each

*First Amended Complaint – CV 18-2539-HSG*

1  and every allegation of the preceding paragraphs, with the same force and effect as

2  though fully set forth herein.

3      241.  Plaintiffs bring this fraud-by-deceit claim for relief against Port of Mokha,

4  Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively

5  referred to as "Port of Mokha"), Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar,

6  and Ahmad (for purposes of this claim for relief, "Defendants").

7      242.  Defendants actively engaged in, participated in, agreed to, aided and

8  abetted, conspired in, and/or furthered a fraudulent scheme, which conduct constitutes

9  fraud and deceit.  The fraud and deceit was designed as part of a deliberate and

10  intentional scheme to induce Plaintiffs to abandon significant business opportunities so

11  that Port of Mokha could supplant Mocha Mill as the company first to market Mocha

12  Mill's highly anticipated premium Yemeni coffee, thereby stealing the attendant publicity

13  and business relationships rightfully due Mocha Mill, causing Mocha Mill to suffer

14  significant injury and damages that continue to date.

15      243.  As detailed in Sections V(H) - (K), Defendants conspired and carried out

16  through a series of coordinated acts a methodical scheme to defraud Mocha Mill into

17  believing that high-end distributors and retailers were no longer interested in Mocha

18  Mill's premium coffee.  Defendants knew this to be false and willfully, maliciously, and

19  with intent to defraud intended for Plaintiffs to rely on Defendants' misrepresentations.

20  Defendants perpetrated this scheme to steal the fruits of Mocha Mill's investments and

21  supplant it with Port of Mokha.

22      244.  Plaintiffs reasonably relied on Defendants' misrepresentations.  As a result,

23  Defendants' intentional, willful, and malicious fraud and deceit directly, proximately, and

24  substantially caused Plaintiffs to suffer significant injury and damages amounting to tens

25  and hundreds of millions of dollars.

26      WHEREFORE, Plaintiffs pray for relief as set forth below.

27

28

*First Amended Complaint – CV 18-2539-HSG*

**FIFTH CLAIM FOR RELIEF**

**(Fraudulent Concealment)**

**(Conspiracy and Aiding & Abetting)**

(*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad*)

245.    Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

246.    Plaintiffs bring this fraud-by-concealment claim for relief against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

247.    Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a fraudulent scheme, which conduct constitutes fraudulent concealment.  The fraudulent concealment was designed as part of a deliberate and intentional scheme to induce Plaintiffs to abandon significant business opportunities so that Port of Mokha could supplant Mocha Mill as the company first to market Mocha Mill's highly anticipated premium Yemeni coffee, thereby stealing the attendant publicity and business relationships rightfully due Mocha Mill, causing Mocha Mill to suffer significant injury and damages that continue to date.

248.    As detailed in Sections V(H) - (K), defendant Mokhtar was in a fiduciary relationship with Plaintiffs and willfully, maliciously, and with intent to defraud actively concealed and failed to disclose that Mocha Mill's business plan was on track and that high-end coffee distributors and retailers were anxiously waiting to receive and market Mocha Mill's highly anticipated premium coffee that would thrust Mocha Mill to the forefront of the premium coffee market with significant positive publicity creating a solid future for the company.  Defendant Mokhtar conspired with the other Defendants to

1  actively conceal and failed to disclose that deals-in-principle were in place; he did this to

2  steal Mocha Mill's relationships, assets, opportunities, and business advantage in order to

3  supplant Mocha Mill with Port of Mokha.

4      249.   Through a series of coordinated acts, defendants Blue Bottle, T&H, Metra,

5  and Ahmad willfully, maliciously, and with intent to defraud conspired with Mokhtar and

6  Ezell to help perpetrate the scheme to deceive Plaintiffs out of their business.  (*See supra*

7  V(H) - V(K).)

8      250.   Plaintiffs did not know of the concealed facts.  Had Plaintiffs known the

9  truth, they would have been first to market their premium coffee at high-end distributors

10  and retailers, and would have received the continuing benefits that Port of Mokha stole

11  using fraud and deceit.

12      251.   Defendants' willful and intentional concealment directly, proximately, and

13  substantially caused Plaintiffs to suffer significant damages amounting to tens and

14  hundreds of millions of dollars.

15      WHEREFORE, Plaintiffs pray for relief as set forth below.

16  ### SIXTH CLAIM FOR RELIEF

17  ### (Negligent Misrepresentation)

18  ### (Conspiracy and Aiding & Abetting)

19  (*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

20  *Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad*)

21      252.   Plaintiffs reallege and incorporate by reference, in this claim for relief, each

22  and every allegation of the preceding paragraphs, with the same force and effect as

23  though fully set forth herein.

24      253.   Plaintiffs bring this negligent misrepresentation claim for relief against Port

25  of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are

26  collectively referred to as "Port of Mokha"), Mokha Foundation, Blue Bottle, T&H, Metra,

27  Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

28

*First Amended Complaint – CV 18-2539-HSG*

254.   Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a scheme involving negligent misrepresentations. Defendants' conduct induced Plaintiffs to abandon significant business opportunities and provided Port of Mokha the means to supplant Mocha Mill as the company first to market Mocha Mill's highly anticipated premium Yemeni coffee, thereby stealing the attendant publicity and business relationships rightfully due Mocha Mill, causing Mocha Mill to suffer significant injuries that continue to date.

255.   As detailed in Sections V(H) - (K), through a series of coordinated acts, including acts of aiding and abetting, Defendants represented to Plaintiffs that high-end distributors and retailers were no longer interested in Mocha Mill's premium coffee. Defendants were negligent because the representations were false, and Defendants had no reasonable grounds to believe they were true.

256.   Defendants intended for Plaintiffs to rely on the false representations in order to steal Mocha Mill's investments and supplant Mocha Mill with Port of Mokha.

257.   Plaintiffs did reasonably rely on Defendants' misrepresentations.  As a result, Defendants' negligent misrepresentations directly, proximately, and substantially caused Plaintiffs to suffer significant damages amounting to tens and hundreds of millions of dollars.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

### (Conspiracy and Aiding & Abetting)

(*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad*)

258.   Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

*First Amended Complaint – CV 18-2539-HSG*

259.   Plaintiffs bring this breach of fiduciary duty claim for relief against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

260.   Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a scheme involving significant breaches of fiduciary duty.  Defendants' conduct induced Plaintiffs to abandon significant business opportunities and provided Port of Mokha, by deceit and other wrongful methods, the means to supplant Mocha Mill as the company first to market Mocha Mill's highly anticipated premium Yemeni coffee, along with the attendant publicity and business relationships rightfully due Mocha Mill, causing Mocha Mill to suffer significant injuries that continue to date.

261.   As a partner and CEO of Mocha Mill, Mokhtar owed Plaintiffs a fiduciary duty of undivided loyalty, that is, a duty to act with the utmost good faith in the best interest of his partners, Mocha Mill, and its shareholders.

262.   As Director of *Mocha Mill* (albeit, planted by CEO Mokhtar), Ezell owed Mocha Mill (not Mokhtar and Port of Mokha) a fiduciary duty of undivided loyalty, that is, a duty to act with the utmost good faith in the best interest of Mocha Mill.  Ezell, however, acted against Mocha Mill interests on behalf of Port of Mokha on CEO Mokhtar's orders.

263.   At all relevant times, Blue Bottle, T&H, Metra, and Ahmad knew of Mokhtar and Ezell's fiduciary relationships and positions of trust at Mocha Mill.

264.   Without Plaintiffs' informed consent, Mokhtar and Ezell (on Mokhtar's command) knowingly and intentionally acted against Plaintiffs' interests by engaging in the RICO conspiracy detailed above, including acts of fraud and extortion.  Mokhtar acted for the benefit of Port of Mokha and with the knowledge and assistance of Blue Bottle, T&H, Metra, and Ahmad.

*First Amended Complaint – CV 18-2539-HSG*

265.    The primary goal of the numerous breaches of fiduciary duty was to steal Mocha Mill's investments and supplant Mocha Mill with Port of Mokha.  Defendants were successful in their goal and they all aided and abetted, and benefitted from Mokhtar's and Ezell's breaches of fiduciary duty.

266.    Defendants' conduct directly, proximately, and substantially caused Plaintiffs to suffer significant damages amounting to tens and hundreds of millions of dollars.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## EIGHTH CLAIM FOR RELIEF

## (Intentional Interference with Prospective Economic Relationships)
## (Conspiracy and Aiding & Abetting)

*(Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad)*

267.    Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

268.    Plaintiffs bring this intentional interference with prospective economic relationships claim for relief against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

269.    Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a scheme involving intentional interference with prospective economic relationships.  Defendants' conduct induced Plaintiffs to abandon significant business opportunities and provided Port of Mokha, by deceit and other wrongful methods, the means to supplant Mocha Mill as the company first to market Mocha Mill's highly anticipated premium Yemeni coffee, along with the attendant

*First Amended Complaint – CV 18-2539-HSG*

publicity and business relationships rightfully due Mocha Mill, causing Mocha Mill to suffer significant injury and damages that continue to date.

270.   In anticipation of the first sale of ultra-premium Yemeni coffee, Mocha Mill had set up several economic relationships (and prospective relationships) with various distributors and retailers of coffee; these relationships would have resulted in significant and continuing economic benefit to Mocha Mill as clearly demonstrated by Port of Mokha's success (built on Mocha Mill's labor and investments).

271.   Defendants knew of these relationships.  Nevertheless, Defendants willfully and intentionally engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered various RICO violations, acts of fraud, acts of extortion, and breaches of fiduciary duty.

272.   By engaging in this conduct, Defendants knew that disruption of Mocha Mill's relationships and prospective business opportunities was certain or substantially certain to occur.  In fact, the wrongful conduct was designed precisely to disrupt Mocha Mill's relationships and siphon them to Port of Mokha.

273.   Mocha Mill's relationships and business opportunities were severely disrupted, and all defendants, especially competitor Port of Mokha, benefitted significantly from this.

274.   Defendants' conduct directly, proximately, and substantially caused Plaintiffs to suffer significant and continuing injury and damages amounting to tens and hundreds of millions of dollars.

WHEREFORE, Plaintiffs pray for relief as set forth below.

*First Amended Complaint – CV 18-2539-HSG*

**NINTH CLAIM FOR RELIEF**

**(Negligent Interference with Prospective Economic Relationships)**

**(Conspiracy and Aiding & Abetting)**

(*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad*)

275.   Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

276.   Plaintiffs bring this negligent interference with prospective economic relationships claim for relief against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

277.   Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a scheme involving negligent interference with prospective economic relationships.  Defendants' conduct induced Plaintiffs to abandon significant business opportunities and provided Port of Mokha, by deceit and other wrongful methods, the means to supplant Mocha Mill as the company first to market Mocha Mill's highly anticipated premium Yemeni coffee, along with the attendant publicity and business relationships rightfully due Mocha Mill, causing Mocha Mill to suffer significant injuries that continue to date.

278.   In anticipation of the first sale of ultra-premium Yemeni coffee, Mocha Mill had set up several economic relationships (and prospective relationships) with various distributors and retailers of coffee; these relationships would have resulted in significant and continuing economic benefit to Mocha Mill as clearly demonstrated by Port of Mokha's success (built on Mocha Mill's labor and investments).  Defendants either knew or should have known of these relationships and prospective relationships based on their

66

own close relationships with Mokhtar and Mocha Mill, and insight into the specialty coffee industry.

279.   Defendants knew or should have known that these relationships would be disrupted if Defendants failed to act with reasonable care when they engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered the schemes and numerous breaches of fiduciary duty orchestrated by Mokhtar and other Enterprise members.

280.   Defendants did fail to act with reasonable care by engaging in, participating in, agreeing to, aiding and abetting, conspiring in, and/or furthering the schemes and breaches of fiduciary duty orchestrated by Mokhtar and other Enterprise members.

281.   Defendants engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered various RICO violations, acts of fraud, acts of extortion, and breaches of fiduciary duty.  By engaging in this conduct, Defendants knew that disruption of the relationships was certain or substantially certain to occur.  In fact, the wrongful conduct was designed precisely to disrupt Mocha Mill's relationships for Port of Mokha's benefit.

282.   Mocha Mill's relationships and business opportunities were severely disrupted to Port of Mokha's benefit.  All defendants benefitted from this.

283.   Defendants' conduct directly, proximately, and substantially caused Plaintiffs to suffer significant damages in lost profits, past and future, amounting to tens and hundreds of millions of dollars.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## TENTH CLAIM FOR RELIEF

### (Conversion)

(*Against Defendant Mokhtar Port of Mokha, Inc.,*

*Port of Mokha LLC, and Mokha Foundation*)

284.   Plaintiffs reallege and incorporate by reference, in this claim for relief, each

67

1  and every allegation of the preceding paragraphs, with the same force and effect as

2  though fully set forth herein.

3      285.   Plaintiffs bring this conversion claim for relief against Mokhtar, Port of

4  Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are

5  collectively referred to as "Port of Mokha"), and Mokha Foundation.

6      286.   As detailed in Section V(C), from April 2014 through December 2015, under

7  the guise of legitimate company expenses, Mokhtar willfully, maliciously, and with intent

8  to defraud embezzled from Mocha Mill and Plaintiffs at least approximately $140,942 as

9  well as proceeds from clandestine sales of stolen Mocha Mill coffee, to use for personal

10  expenses and to fund his competitor company Port of Mokha.

11      287.   Because Mokhtar illegally stole and converted Mocha Mill's funds, Plaintiffs

12  have an immediate right to a return of those funds including all benefits derived

13  therefrom.

14      288.   Mokhtar continues to exercise dominion and control over those funds for the

15  benefit of himself and Port of Mokha.

16      289.   As a substantial and proximate result of Mokhtar's unlawful conversion,

17  Plaintiffs have suffered and continue to suffer injury and damages.

18      WHEREFORE, Plaintiffs pray for relief as set forth below.

19                        **ELEVENTH CLAIM FOR RELIEF**

20                              **(Conversion)**

21            (*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

22        *Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad*)

23      290.   Plaintiffs reallege and incorporate by reference, in this claim for relief, each

24  and every allegation of the preceding paragraphs, with the same force and effect as

25  though fully set forth herein.

26      291.   Plaintiffs bring this conversion claim for relief against Port of Mokha, Inc.,

27  Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred

28

68

to as "Port of Mokha"), Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

292.   Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a scheme involving conversion.  Defendants' conduct induced Plaintiffs to abandon significant business opportunities and provided Port of Mokha, by deceit and other wrongful methods, the means to supplant Mocha Mill as the company first to market Mocha Mill's highly anticipated premium Yemeni coffee, along with the attendant publicity and business relationships rightfully due Mocha Mill, causing Mocha Mill to suffer significant injuries that continue to date.

293.   Because Defendants illegally stole and converted Mocha Mill's entire business, essentially supplanting Mocha Mill with Port of Mokha, and/or aided and abetting the same, Plaintiffs have an immediate right to Port of Mokha, including damages for all past and future profits of Port of Mokha commensurate with Plaintiffs' stake, as well as punitive damages.

294.   Port of Mokha continues to exercise dominion and control over a business that rightfully belongs to Mocha Mill.  All defendants have benefitted from this.

295.   As a substantial and proximate result of Defendants' unlawful conversion of the Mocha Mill company, Plaintiffs have suffered and continue to suffer significant injury and damages amounting to tens and hundreds of millions of dollars.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## TWELVTH CLAIM FOR RELIEF

### (Unjust Enrichment)

(*Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad*)

296.   Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

*First Amended Complaint – CV 18-2539-HSG*

297.    Plaintiffs bring this unjust enrichment claim for relief against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

298.    Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a scheme involving unjust enrichment.

299.    By their wrongful acts and omissions, Defendants, and each of them, were unjustly enriched at the expense of and to the detriment of Plaintiffs or while Plaintiffs were unjustly deprived.  That is, Defendants' conduct induced Plaintiffs to abandon significant business opportunities Plaintiffs had invested serious time and money to develop, and provided Port of Mokha, by deceit and other wrongful methods, the means to supplant Mocha Mill as the company first to market Mocha Mill's highly anticipated premium Yemeni coffee, along with the attendant publicity and business relationships rightfully due Mocha Mill, causing Mocha Mill to suffer significant injuries that continue to date.

300.    Plaintiffs seek restitution from Defendants, and each of them, and seek an order of this Court disgorging all payments, commissions, profits, benefits, year-end performance or other bonuses, and other compensation obtained by Defendants, and each of them, from their wrongful conduct.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## THIRTEENTH CLAIM FOR RELIEF

## (Cal. Bus. & Prof. Code § 17200 – Unlawful, Unfair, and Fraudulent Practices)

*(Against Defendants Port of Mokha, Inc., Port of Mokha LLC,*

*Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar and Ahmad)*

301.    Plaintiffs reallege and incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

70

302.    Plaintiffs bring this unlawful, unfair, and fraudulent practices claim for relief against Port of Mokha, Inc., Port of Mokha LLC (Port of Mokha, Inc., and Port of Mokha LLC are collectively referred to as "Port of Mokha"), Mokha Foundation, Blue Bottle, T&H, Metra, Mokhtar, and Ahmad (for purposes of this claim for relief, "Defendants").

303.    California's Unfair Competition Law ("UCL") prohibits any unlawful, unfair, or fraudulent business act or practice.  *See* Cal. Bus. & Prof. Code §§ 17200 *et. seq.*  The statutory violations, fraudulent misrepresentations, and unlawful practices and acts of defendants, and each of them, mentioned previously, constitute unfair, unlawful, and/or fraudulent business acts and/or practices within the meaning of the UCL.

304.    Defendants engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered acts and practices in violation of Section 17200 *et. seq.*

305.    By engaging in the unlawful acts and/or practices alleged in this complaint, Defendants have violated several state, federal, and common laws constituting *per se* violations of Section 17200 *et. seq.*, including, but not limited to: 18 U.S.C. §§ 1341 and 1343; 18 U.S.C. § 1951; 18 U.S.C. § 1957; 18 U.S.C. § 1962; Cal. Penal Code §§ 518, 519, 520, 522, 523, and 524; Cal Civ. Code §§ 1572, 1573, 1709, and 1710; and the common law.

306.    All of defendants' unlawful, fraudulent, and unfair business practices were designed to and did deprive Plaintiffs of the continuing business profits and opportunities they were entitled to as a result of years of investment and development.

307.    As a direct and proximate result of Defendants' conduct, and each of them, Plaintiffs have suffered and are continuing to suffer injury and damages.

308.    Plaintiffs bring this claim for relief on behalf of themselves and the public as private attorneys general pursuant to Business and Professions Code § 17204.

309.    Pursuant to Business and Professions Code § 17203, Plaintiffs seek from Defendants, and each of them, restitution and disgorgement of all earnings, profits,

*First Amended Complaint – CV 18-2539-HSG*

compensations, benefits, and other ill-begotten gains obtained by defendants as a result of Defendants' conduct in violation of Business and Professions Code § 17200 *et seq*. Plaintiffs also respectfully seek reasonable attorneys' fees and costs under applicable law, including California Code of Civil Procedure § 1021.5.

310. Pursuant to Business and Professions Code § 17204, Plaintiffs seek an order from the Court enjoining defendants, and each of them, from continuing to engage in the acts set forth in this complaint, which acts constitute criminal and civil violations of the law and of Business and Professions Code § 17200 *et seq*.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff pray that the Court grant judgment against Defendants as follows:

1. An order enjoining Defendants from the further destruction/spoliation of evidence;

2. Compensatory damages in an amount according to proof;

3. Disgorgement of Port of Mokha assets and shares according to proof;

4. Restructuring of Port of Mokha to provide Plaintiffs their rightful ownership, shares, and decision-making authority in Port of Mokha;

5. Costs, restitution, and multiple damages under state law;

6. Treble damages under RICO;

7. Punitive and exemplary damages under state law;

8. Any and all applicable statutory and civil penalties;

9. Pre- and post-judgment interest on any amounts awarded;

10. An award of attorneys' fees and costs, including expert costs;

11. A declaration that all applicable statutes of limitations are tolled under the discovery rule or due to the fraudulent concealment alleged in this Complaint, and that Defendants are estopped from relying on any statute of limitations as a defense;

*First Amended Complaint – CV 18-2539-HSG*

12.     An order enjoining Defendants from dissipating assets to avoid judgment;

13.     Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

14.     Such other and further relief as the Court deems just and proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all triable issues.

Dated:  June 3, 2018                          Respectfully submitted,


                                              */s/ Yasin M. Almadani*
                                              YASIN M. ALMADANI
                                              ALMADANI LAW

                                              TERRENCE M. JONES
                                              LAW OFFICE OF TERRENCE JONES

                                              *Attorneys for Plaintiffs*

*First Amended Complaint – CV 18-2539-HSG*

1

## CERTIFICATE OF SERVICE

2

I, Yasin M. Almadani, hereby certify that I have electronically filed the above-

3

captioned document with the Clerk of the Court using the CM/ECF system, which will

4

automatically send an e-mail notification of such filing to Defendants' counsel of record

5

as listed below:

6

7

Michael Shipley
KIRKLAND & ELLIS LLP

8

333 South Hope Street
Suite 2900

9

Los Angeles, California 90071

10

T: (213) 680-8400
E: michael.shipley@kirkland.com

11

Mark Conrad
CONRAD & METLITSKY
Four Embarcadero Center
Suite 1400
San Francisco, California 94111
T: (415) 343-7100
E: mconrad@conradmetlitzky.com

12

*Counsel for Defendant*
*Blue Bottle Coffee, Inc.*

13

14

*Counsel for Defendants*
*Port of Mokha, Inc., Port of Mokha*
*LLC, Mokha Foundation, Mokhtar F.*
*Alkhanshali, and Ibrahim Ahmad*
*Ibrahim*

15

16

I declare under penalty of perjury under the laws of the United States that the

17

foregoing is true and correct.

18

Dated:  June 3, 2018

19

20

Respectfully submitted,

 */s/ Yasin M. Almadani*
YASIN M. ALMADANI
ALMADANI LAW

21

22

TERRENCE M. JONES
THE LAW OFFICE OF TERRENCE JONES

23

*Attorneys for Plaintiffs*

24

25

26

27

28