1  Yasin M. Almadani (Cal. Bar No. 242798)
   ALMADANI LAW
2  14742 Beach Blvd., Suite 410
   La Mirada, California 90638
3  (213) 335-3935 | YMA@LawAlm.com

4  Terrence M. Jones (Cal. Bar No. 256603)
   THE LAW OFFICE OF TERRENCE JONES
5  6737 Bright Ave., Suite B6
   Whittier, California 90601
6  (213) 863-4490 | Terrence@JonesOnLaw.com

7  *Attorneys for Plaintiffs*

8
                **UNITED STATES DISTRICT COURT**
9
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10
                     **OAKLAND DIVISION**
11

12  MOCHA MILL, INC., *et al.*,            Case No. 4:18-CV-2539-HSG

13              Plaintiffs,
                                           **PLAINTIFFS' OPPOSITION TO**
14       v.                                **DEFENDANT METRA COMPUTER**
                                           **GROUP FZCO'S AND DEFENDANT T&H**
15  PORT OF MOKHA, INC., *et al.*,         **COMPUTERS, INC.'S MOTION TO**
                                           **DISMISS FIRST AMENDED**
16              Defendants.                **COMPLAINT**

17
                                           *And see* Declaration of Terrence Jones,
18                                         filed and served concurrently herewith

19
                                           Courtroom:   Two (Fourth Floor)
20                                         Date:        September 27, 2018
                                           Time:        2:00 p.m.
21

22                                         Hon. Haywood S. Gilliam, Jr.
                                           United States District Judge
23

24

25

26

27

28

Plaintiffs Mocha Mill, Inc., Monk of Mocha Specialty Coffee Production and Export, Inc., Ibrahim A. Alaeli, Yasir H. Khanshali, and Adnan G. Awnallah, by and through their counsel of record, Yasin M. Almadani and Terrence M. Jones, hereby file their opposition to Defendant Metra Computer Group FZCO's and Defendant T&H Computers, Inc.'s motion to dismiss the claims as against each of them set forth in the First Amended Complaint.

This opposition is based upon the attached memorandum of points and authorities, the declaration of Terrence Jones and its accompanying exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated:    August 27, 2018                    Respectfully submitted,

*/s/ Terrence M. Jones*
TERRENCE M. JONES
THE LAW OFFICE OF TERRENCE JONES

YASIN M. ALMADANI
ALMADANI LAW

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

I.   INTRODUCTION ......................................................................................................... 1

    A.   Summary of Argument .......................................................................................... 1

    B.   Each of Defendants' Respective Motions to Dismiss in this Action Suffer From
        the Same General Defect ........................................................................................ 5

II.  SUMMARY OF FACTS ............................................................................................. 7

    A.   The Formation of the Enterprise and Advancement of its General Purpose ................ 7

    B.   Metra's and T&H's Agreement to Conspire With the Enterprise and Participate
        in the Furtherance of its Criminal Endeavors ........................................................ 8

III. ARGUMENT .............................................................................................................. 9

    A.   Plaintiffs Assert Strong, Cognizable, Civil RICO Conspiracy Claims Against
        Metra and T&H .................................................................................................... 9

        1.   Overview of RICO .......................................................................................... 9

        2.   Plaintiffs Sufficiently Alleged Substantive RICO Violations Under
            1962(c) Against the Port of Mokha Defendants .......................................... 10

        3.   Plaintiffs Sufficiently Alleged RICO Conspiracy Claims Under 1962(d)
            Against Metra and T&H ............................................................................... 11

    B.   Plaintiffs Sufficiently Alleged Their State Law Claims Against Metra and T&H ......... 17

    C.   The Court May Exert Personal Jurisdiction Over Metra ......................................... 18

        1.   Metra's Formation of T&H ............................................................................ 19

        2.   The Federal Long-Arm Statute Permits Jurisdiction Over Metra ................... 20

        3.   RICO Also Provides a Basis for Jurisdiction Over Metra .............................. 23

        4.   California's Long-Arm Statute Permits Jurisdiction Over Metra ..................... 23

    D.   Plaintiffs Properly Served Metra ......................................................................... 24

IV.  CONCLUSION ......................................................................................................... 26

1

**<u>TABLE OF AUTHORITIES</u>**

2

**Federal and State Case Law**

3

*Allwaste, Inc. v. Hecht* ............................................................................................11

4

      65 F.3d 1523 (9th Cir. 1995)

5

*Asahi Metal Industry Co. v. Super. Ct.* ...................................................................22

6

      480 U.S. 102 (1987)

7

*Beck v. Prupis* .........................................................................................................10

8

      529 U.S. 494 (2000)

9

*Brayton Purcell LLP v. Recordon & Recordon* ...........................................19, 21, 24

10

      606 F.3d 1124, 1127 (9th Cir. 2010)

11

*Bridge v. Phoenix Bond & Indemnity Co.* ...............................................................10

12

      553 U.S. 639 (2008)

13

*Butcher's Union Local No. 498 v. SDC Inv., Inc.* ...................................................23

14

      788 F.2d 535 (9th Cir. 1986)

15

*Cafasso v. Gen. Dynamics C4 Sys.* .........................................................................14

16

      637 F.3d 1047 (9th Cir. 2011)

17

*Church v. Consolidated Freightways, Inc.* ..............................................................22

18

      1992 U.S. Dist. LEXIS 18234 (N.D. Cal. Sept. 15, 1992)

19

*CollegeSource, Inc. v. AcademyOne, Inc.* ...............................................................21

20

      653 F.3d 1066 (9th Cir. 2011)

21

*Cosper v. Smith & Wesson Arms Co.* ......................................................................24

22

      53 Cal. 2d 77 (Cal. 1959)

23

*Dill v. Berquist Construction Co.* ...........................................................................25

24

      24 Cal. App. 4th 1426 (1994)

25

*Doe v. Unocal Corp.* ...............................................................................................23

26

      27 F. Supp. 2d 1174 (C.D. Cal. 1998)

27

28

i

*Dole Food Co. v. Watts* ...........................................................................................................21

    303 F.3d 1104 (9th Cir. 2002)

*Eclectic Prop. E. LLC v. Marcus & Millichap Co.* ...............................................................10

    751 F.3d 990 (9th Cir. 2014)

*H.J. Inc. v Northwestern Bell Tel. Co.* ............................................................................6, 15

    492 U.S. 229 (1989)

*Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.* ....................................................22

    784 F.2d 1392 (9th Cir. 1986)

*Heidorn v. BDD Mktg. & Mgmt. Co., LLC* .........................................................................25

    2013 U.S. Dist. LEXIS 177166 (N.D. Cal., Aug. 19, 2013)

*Holland Am. Line, Inc. v. Wartsila N. Am., Inc.* .................................................................20

    485 F.3d 450 (9th Cir. 2007)

*Lopez v. Smith* ....................................................................................................................26

    203 F.3d 1122 (9th Cir. 2000)

*Odom v. Microsoft Corp.* ........................................................................................................9

    486 F.3d 541 (9th Cir. 2007)

*Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n* ...............................................12, 14

    298 F.3d 768 (9th Cir. 2002)

*Pebble Beach Co. v. Caddy* ..............................................................................................20, 21

    453 F.3d 1151 (9th Cir. 2006)

*Salinas v. United States* ......................................................................................................4, 13

    522 U.S. 52 (1997)

*Schmuck v. United States* .....................................................................................................10

    489 U.S. 705 (1989)

*Schwarzenegger v. Fred Martin Motor Co.* ..........................................................................21

    374 F.3d 797 (9th Cir. 2004)

*Sedima, S.P.R.L. v. Imrex Co., Inc* .................................................................6, 9, 10

    473 U.S. 479 (1985)

*Sinatra v. Nat'l Enquirer, Inc.* ..............................................................................22

    854 F.2d 1191 (9th Cir. 1988)

*Taubler v. Giraud* .................................................................................................23

    655 F.2d 991 (9th Cir. 1981)

*United States v. Fiander* ........................................................................................13

    547 F.3d 1036 (9th Cir. 2008)

*United States v. Garlick* ........................................................................................15

    240 F.3d 789 (9th Cir. 2004)

*United States v. Turkette* .........................................................................................6

    452 U.S. 576 (1981)

*United States v. Shafer* ..........................................................................................11

    608 F.3d 1056 (8th Cir. 2010)

*United States v. Stapleton* ......................................................................................13

    293 F.3d 1111 (9th Cir. 2002)

*Volkswagenwerk Aktiengesellschaft v. Schlunk* ......................................................26

    486 U.S. 694 (1988)

*Wash. Shoe Co. v. A-Z Sporting Goods Inc.* ..........................................................21

    704 F.3d 668 (9th Cir. 2012)

*Wells Fargo & Co. v. Wells Fargo Express Co.* ......................................................24

    556 F.2d 406 (9th Cir. 1977)

*White v. Lee* ...........................................................................................................19

    227 F.3d 1214 (9th Cir. 2000)

*Yamaha Motor Co., Ltd. v. Super. Ct.* ..............................................................4, 24

    174 Cal. App. 4th 264 (2009)

**Federal Statutes**

18 U.S.C. § 1343 ................................................................................................................11

18 U.S.C. § 1951 ................................................................................................................11

18 U.S.C. § 1957 ................................................................................................................11

18 U.S.C. § 1961 ................................................................................................................11

18 U.S.C. § 1962 ............................................................................................................*passim*

18 U.S.C. § 1965 ................................................................................................................23

**Federal Rules**

Fed. R. Civ. P. 4 ........................................................................................................20, 24

Fed. R. Civ. P. 8 ..................................................................................................................4

Fed. R. Civ. P. 9 ..................................................................................................................4

Fed. R. Civ. P. 15 ..............................................................................................................26

**California Statutes**

Cal. Code Civ. Proc. § 410.10 ......................................................................................23, 24

Cal. Code Civ. Proc. § 416.10 ...............................................................................5, 24, 25

Cal. Corp. Code § 2110 .....................................................................................................24

Cal. Corp. Code § 17701.13 ..............................................................................................25

Cal. Corp. Code § 17701.16 ........................................................................................5, 25

Cal. Pen. Code §§ 518-524 ...............................................................................................11

*Plaintiffs' Opposition to Defendant Metra Computer Group FZCO's and*
*Defendant T&H Computers, Inc.'s Motion to Dismiss First Amended Complaint*                    *Case No. 4:18-CV-2539-HSG*

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.     INTRODUCTION**

3

      **A.     Summary of Argument**

4

      Contrary to the suggestion that Defendants Metra Computer Group FZCO ("Metra") and

5

T&H Computers, Inc. ("T&H") advance in their motion, these parties are by no means "throwaway"

6

or "tack-on" defendants that played minor, tangential roles in the RICO Enterprise giving rise to this

7

suit.  The opposite is true.  Their agreement to join the Enterprise and the actions they undertook helped

8

achieve one of the Enterprise's main purposes:  to steal Mocha Mill's actual coffee beans so that they

9

could be acquired by Port of Mokha and ultimately sold to Blue Bottle.  Indeed, the acquisition of that

10

first shipment of beans marked the consummation of the Port of Mokha and Blue Bottle Defendants'[1]

11

mutual promises to each other in the overall effort to supplant Mocha Mill as the "first mover" in the

12

premium Yemeni coffee market, assume that moniker for themselves, and enjoy all the financial and

13

reputational benefits that flowed therefrom.  Hence, Plaintiffs oppose the motion to dismiss their First

14

Amended Complaint ("FAC" or "complaint") filed by Metra and T&H with the same vigor with which

15

they oppose the motions to dismiss filed by Blue Bottle and the Port of Mokha Defendants.  To be sure,

16

each Defendant named in the complaint played a pivotal role in the Enterprise's overall scheme and

17

made substantial contributions to the pattern of racketeering that began in April 2014 and continues to

18

date.  Metra's and T&H's participation in the Enterprise—from April to June 2016—was interrelated

19

with the other Defendants' preceding criminal acts; it helped bring about a key objective of one of the

20

Enterprise's major schemes (*i.e.*, to supplant Mocha Mill with Port of Mokha), involved criminal acts

21

taken in conjunction with the other Defendants (namely, the Port of Mokha Defendants), and utilized

22

the same methods of commission (*i.e.*, wire fraud).  Therefore, Metra and T&H are no less liable than

23

any of their coconspirators.

24

      As an initial matter, two issues are worth addressing before summarizing Plaintiffs' arguments

25

with respect to Metra's and T&H's motion, because they address two fundamental predicates upon

26

---

[1] Hereinafter, "Blue Bottle" shall mean and refer to Defendant Blue Bottle, Inc.  "Port of Mokha

27

Defendants" shall mean and collectively refer to:  Port of Mokha, Inc. ("Port of Mokha"); Port of Mokha LLC; Mokha Foundation; Mokhtar Alkhanshali ("Mokhtar"); and, Ibrahim Ahmad Ibrahim

28

("Ahmad").  Furthermore, Plaintiffs do not always use the last names of each individual referred to here in order to avoid confusion, given the parties have the same or very similar foreign names.

which these Defendants' motion is based that are complete artifice:  (1) that Metra and T&H are somehow "victims" because their immediate "resale" of Mocha Mill's coffee beans only returned a $1,000 profit, (*see* Def. Mtn. at pg. 2, lns. 3-7); and (2) that the individual Plaintiffs "negotiated" the sale of their most premium coffee beans with a business they "knew" to be a computer electronics company (*i.e.*, T&H Computers), (*see id*. at pg. 5, lns. 7-9).

That Metra and T&H have the gall to characterize themselves as "victims" is astounding on its face; but it is really just subterfuge.  Because, the truly material issue these Defendants wish to distract the Court from is the question of why two *computer electronics* companies would engage in a transaction to buy *coffee beans* to begin with?  And, why two computer electronics companies would "negotiate" the purchase of that coffee hand-in-hand with one person (*i.e.*, Mokhtar), consummate the purchase, and then turn around and resell the coffee just days later back to the very same person (*i.e.*, Mokhtar)?  (*See*, *generally*, FAC at ¶¶ 177-184.)

The reason Metra and T&H cannot answer these questions is because it was all a *fraud*.  It was a ruse to help facilitate one of the primary criminal endeavors of the Enterprise, which was—by any means necessary—to acquire Mocha Mill's most premium coffee beans.  In other words, the reason why two computer electronics companies cannot provide a legitimate explanation as to why they purchased $50,000 worth of coffee beans is because *there is no legitimate explanation* as to why they purchased $50,000 worth of coffee beans.  So, instead of addressing that fundamental issue, Metra and T&H have attempted to deflect and obfuscate in an effort to distract from the only logical conclusion: that, as alleged in the complaint, these Defendants willingly joined the Enterprise, were aware of its overall purpose, and intentionally acted as straw-buyers in order to defraud Mocha Mill.

Moreover, although Metra and T&H do not mention it in their motion, the reason why they helped facilitate the Enterprise's overall scheme in that regard is plainly set forth in the complaint. As alleged in the complaint, Defendant Ahmad, who principally orchestrated and directed the Enterprise's activities along with Defendant Mokhtar, (*see* FAC at ¶ 117), has a familial relationship with the principals of Metra, which directs T&H, (*see id* at ¶ 177).  Hence, the purchase of coffee beans from Mocha Mill, under the guise of the fictional "T&H *Imports*," was done as a favor for Ahmad. Notably, neither the declaration of Mohammed Eissa (*i.e.*, Metra's owner) nor the declaration of Wael

2

1    Fadl (*i.e.*, T&H Computers' General Manager) dispute this allegation.  (*See* Dkt. Nos. 39-1, 39-2.)

2    Nor do Eissa or Fadl affirmatively declare that they do *not* have any familial relationship with Ahmad.

3    (*See id*.)

4            Furthermore, Metra's and T&H's contention that the individual Plaintiffs knowingly *negotiated*

5    the sale of their coffee beans to a buyer they *knew* to be a computer electronics company (*i.e.*, to T&H

6    *Computers*) is, at best, a fundamental misreading of the plain language of the complaint, or, at worse,

7    a deliberate effort to misconstrue Plaintiffs' allegations to "poison the well" for purposes of the instant

8    motion.  (*See* Def. Mtn. at pg. 4, ln. 28 – pg. 5, ln. 15.)  As plainly alleged in the complaint, and as

9    explained further below, the individual Plaintiffs did not negotiate anything; Mokhtar and Fadl did.

10   (*See* FAC at ¶ 183(d)-(e).)  Nor were the individual Plaintiffs aware at the time that they were selling

11   their most premium coffee beans to a computer electronics company; to the contrary, as also plainly

12   averred in the complaint, Fadl communicated with Plaintiffs via email as a representative of "T&H

13   *Imports*," and ultimately, Mokhtar provided Plaintiffs with a fraudulent proof-of-payment invoice from

14   "T&H *Imports*."  (*See* FAC at ¶ 183(b)-(g).)  There is nothing ambiguous about the way that sequence

15   of events is alleged in the complaint.

16           So, Metra's and T&H's assertions that they were the "victims" of the fraud, rather than

17   complicit in it, and their assertion that the individuals Plaintiffs were fully aware that they were selling

18   their most premium initial coffee bean inventory to a computer electronics company, rather than to

19   "T&H Imports," are the fundamental predicates upon which Metra's and T&H's legal arguments are

20   based—but that which are fundamentally *wrong*.  For that reason, the legal arguments these Defendants

21   advance in the instant motion collapse upon this faulty foundation, as follows—

22           *First*, Metra's and T&H's contention that Plaintiffs did not sufficiently allege a § 1962(d) RICO

23   conspiracy claim against them fails because (1) Plaintiffs properly alleged a pattern of racketeering

24   activity by the other members of the Enterprise under § 1962(c), and (2) the complaint alleges Metra's

25   and T&H's agreement to knowingly and intentionally facilitate a criminal endeavor of the Enterprise,

26   (*see* FAC at ¶¶ 177-178)  The assertion that Plaintiffs' § 1962(d) claim fails because Plaintiffs have not

27   alleged that Metra and T&H committed two predicate acts represents a misunderstanding of RICO

28   jurisprudence, which does not require a co-conspirator to have committed a predicate act, or even an

3

1   overt act, in furtherance of the conspiracy.  *Salinas v. United States*, *infra*, 522 U.S. 52, 63 (1997).

2   Rather, to make out a viable § 1962(d) conspiracy claim, a plaintiff need only allege—as Plaintiffs have

3   here with respect to Metra and T&H—that the defendant have "intend[ed] to further an endeavor

4   which, if completed, would satisfy all of the elements of a substantive criminal offense."  *Id*. at 65.

5      **Second**, Metra's and T&H's contention that Plaintiffs have not properly alleged their attendant

6   state law claims fails because the claims are indeed sufficiently pled consistent with the pleading

7   standards of Rules 8 and 9 of the Federal Rules of Civil Procedure.  The factual bases of Plaintiffs' state

8   law claims are the same as that on which Plaintiffs' RICO claims are predicated, which are alleged with

9   significant detail and context.  The allegations of the complaint plainly set forth the bases for Metra's

10   and T&H's direct and aider-and-abettor liability.

11      **Third**, Metra's personal jurisdiction argument fails because the Court may exercise long-arm

12   jurisdiction over Metra on account of its purposeful direction of activities toward the United States that

13   caused Plaintiffs' harm.  Metra's two owners (including Mohammed Eissa) are the only corporate

14   directors T&H formally identified with the California Secretary of State; T&H is Metra's only wholly-

15   owned subsidiary in the entire United States; both entities are engaged in the computer electronics

16   business; and so, it is implausible that Metra does not exert complete control over T&H or supply it

17   with parts and components for sale and insertion into the stream of commerce here.

18      **Fourth**, Metra's argument that it was not properly served fails because "California law allows

19   service on a foreign corporation by serving its domestic subsidiary."  *Yamaha Motor Co., Ltd. v. Super.

20   Ct.*, *infra*, 174 Cal. App. 4th 264, 271 (2009).  That is precisely what Plaintiffs did here; Plaintiffs

21   served Metra via T&H, its California-based wholly-owned subsidiary whose corporate directors are the

22   very owners of Metra.  Further, the fact that Metra's business structure is purportedly akin to a limited

23   liability company ("LLC") in Dubai is of no consequence because a LLC may be served in the same

24   manner as a corporation under California law.  The California Revised Uniform Limited Liability

25   Company Act (which, incidentally, is part of the California *Corporations Code*) expressly provides that

26   "process may be served upon limited liability companies and foreign limited liability companies as

27   provided [in Chapter 4 of the California Code of Civil Procedure]."  Chapter 4 of the California Code of

28

Civil Procedure ("CCP") includes § 416.10(b), which expressly permits service—as was accomplished here—on a corporation's or LLC's general manager.  *See* CCC § 17701.16(a).

Accordingly, Metra's and T&H's motion should be denied in its entirety.

### B. Each of Defendants' Respective Motions to Dismiss in this Action Suffer From the Same General Defect

It is also worth noting from the outset some unfortunate commonalities amongst the motions to dismiss filed by all three groups of Defendants; Metra and T&H, the Port of Mokha Defendants, and Blue Bottle alike.[2]  Unsurprisingly, the thematic approach underlying each Defendant's attempt to convince the Court to dismiss the well-pleaded RICO claims against it is a deliberate effort to punctuate their briefing with provocative verbiage that seeks to diminish their individual roles in the Enterprise, minimize the harm their criminal conduct caused the individual Plaintiffs, and ultimately, attempts to mislead the Court with sophistry and a deliberate contorting of the plain language of the complaint. For instance, Blue Bottle characterizes itself in its motion as a mere "collateral player" in the Enterprise; an innocent business that simply decided to buy coffee from Mokhtar, whom Blue Bottle cheekily labels as only a "sales representative" for Port of Mokha.  (*See* Blue Bottle Mtn. at pg. 1, ln. 8; pg. 2, ln. 6 [Dkt. No. 43].)  But, of course, Mokhtar was the CEO of Mocha Mill and *founder* of Port of Mokha, not some line employee; he interacted directly with Blue Bottle's CEO, James Freeman.  (*See*, *e.g.*, FAC at ¶¶ 106, 143, 145, 149-151.)  And, as plainly set forth in the complaint, Mokhtar was the principal architect and lead perpetrator of the RICO scheme.  (*See*, *generally*, FAC.)  For their part, the Port of Mokha Defendants attempt to characterize the basis of this action as a "routine business dispute" and deride the complaint as "77 pages of conjecture, hyperbole, and innuendo."  (*See* Port of Mokha Mtn. at pg. 2, lns. 3-4 [Dkt. No. 41].)  Yet, shortly thereafter in their briefing, the Port of Mokha Defendants urge the Court to take judicial notice of exaggerated tales of Mokhtar's supposed "daring and desperate escape" from war-torn Yemen in which, after being "tortured by soldiers but eventually released," he absconded with coffee beans across the Red Sea in a rowboat.  (*See id* at pg. 4, lns. 1-6.) Similarly, Metra and T&H emphasize from the outset of their briefing, that "the facts in this case are so

---

[2] To the extent any of the arguments Plaintiffs make in their oppositions to Blue Bottle's and the Port of Mokha Defendants' motions to dismiss are applicable to the instant motion, Plaintiffs expressly incorporate such arguments here and the legal authorities upon which they are based.

5

*Plaintiffs' Opposition to Defendant Metra Computer Group FZCO's and*                                    *Case No. 4:18-CV-2539-HSG*
*Defendant T&H Computers, Inc.'s Motion to Dismiss First Amended Complaint*

dramatic they are featured in a novel by Dave Eggers," (*see* Def. Mtn. at pg. 1, lns. 3-4), but then conveniently fail to mention that Eggers' book ("*The Monk of Mocha*") was a *nonfiction* work—that is, a book based upon true, actual events (although, of course, with Mocha Mill deliberately written out of the narrative).  This kind of argumentative duplicity is common to all three motions pending before the Court and reflects an intellectual dishonesty that undermines the overall credibility of each of Defendants' respective positions.

Nevertheless, what is surprising about Defendants' motions, however, is the snide and mocking tone in which each brief is couched, as if Plaintiffs' 73-page complaint was made up out of whole cloth. To the contrary, the complaint includes detailed allegations with reference to specific emails, agreements, conversations, actions, and transactions evidencing the execution of the RICO scheme, along with the dates on which those acts took place and the identities of the Enterprise members who undertook them.  That is, the complaint painstakingly identifies the "who, what, when, where, and how" of the alleged criminality (doing so in both narrative and chart form), and goes to great lengths to also explain *why* the Defendants were motivated to undertake the scheme they did.  That Defendants disagree with Plaintiffs' interpretation of the nature of their conduct is to be expected, but their derision is an unhelpful distraction, and frankly, masks a lack of argumentative substance.

Moreover, that Defendants contend that they are "legitimate businesses," rather than the types of "mobsters and organized criminals" that RICO was designed to target, demonstrates a fundamental misunderstanding of the statute's remedial breadth.  *See Sedima, S.P.R.L. v. Imrex Co*., *Inc*, 473 U.S. 479, 499 (1985).  In enacting RICO, "Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises [alike]."  *Id.* (citing *United States v. Turkette*, 452 U.S. 576, 586-587 (1981)).  And, as the Supreme Court has emphasized with respect to "legitimate" businesses, they "enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences."  *Id*.  Hence, "[t]he fact that § 1964(c) is used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued."  *Id*.; *see also H.J. Inc. v Northwestern Bell Tel. Co*., 492 U.S. 229, 248-249 (1989) ("Congress acknowledges the breakdown of the traditional conception of organized crime, and responds to a new situation in which persons engaged in long-term criminal activity often operate wholly within legitimate

1    enterprises"). In other words, in the instant case, just because the predicate acts are alleged in the

2    context of purportedly "legitimate" business dealings does not mean that that dynamic renders criminal

3    conduct an impossibility. RICO jurisprudence is rife with cases in which "legitimate businesses"

4    contend that they were being unfairly swept up in RICO litigation, when upon closer examination the

5    pleadings sufficiently demonstrate a pattern of long-term racketeering activity—often rationalized

6    as "hard bargaining" (read: *extortion*) or "opposition research" (read: *corporate espionage*)

7    or "unauthorized transactions" (read: *embezzlement*). This matter is no different.

8    **II.    SUMMARY OF FACTS**

9        **A.    The Formation of the Enterprise and Advancement of its General Purpose**

10            In short, this case arises out of a calculated RICO scheme spearheaded by Mokhtar in

11    conspiracy with Blue Bottle, among others, to steal Mocha Mill's assets and business. Defendants

12    engaged in a pattern of racketeering activity to steal Mocha Mill's assets, ultimately growing so bold as

13    to supplant the "Mocha Mill" coffee company (founded by the individual Plaintiffs) with another coffee

14    company called "Port of Mokha" (founded by Mokhtar) so that Port of Mokha, rather than Mocha Mill,

15    would be hailed as the "first-mover" in the modern-day effort to source and sell ultra-premium coffee

16    from Yemen—the very birthplace of coffee as the world knows it.

17            The individual Plaintiffs' business plan was to locate, cultivate, refine, import, and sell for the

18    first time in centuries premium Yemeni coffee under the Mocha Mill brand. They partnered with

19    Mokhtar, made him Mocha Mill's CEO, and invested years of effort and over half a million dollars

20    into him and the company to develop relationships with key Yemeni farmers and high-end distributors.

21    In 2015, experts scored Mocha Mill's coffee as among the best tasting coffee in the world. Mocha Mill

22    was, thus, poised for tremendous success and began preparing a worldwide launch in 2016.

23            However, Mokhtar, motivated by his own greed and ego, recognized Mocha Mill's blockbuster

24    potential and sought to usurp the impending success for Port of Mokha, a shadow enterprise he created

25    so that he and his coconspirators could reap all the financial gain for themselves. While acting as

26    Mocha Mill's CEO (but already engaged in RICO activity), Mokhtar secretly conspired with, among

27    others, Blue Bottle (a company with which he had been dealing on Mocha Mill's behalf) to steal Mocha

28    Mill's coffee and first-mover advantage for Port of Mokha (and, derivatively, Blue Bottle) through a

7

years-long and continuing pattern of racketeering activity.  After perpetrating the fraud and stealing the business, Mokhtar attempted to extort his former partners (the individual Plaintiffs) into signing a release of claims to avoid legal exposure and hacked into Mocha Mill accounts to destroy evidence.  To date, Port of Mokha continues to engage in money laundering using criminal proceeds.

Today, Defendants (particularly Port of Mokha and Blue Bottle) thrive on the labor and assets stolen in the RICO scheme.  Port of Mokha and its investors, having stolen Mocha Mill's relationships and first-mover advantage, now value the company in excess of $250 million.  Port of Mokha sells its Yemeni coffee varieties to Blue Bottle for upwards of $135 per kilogram.  Blue Bottle, in turn, sells 12-ounce retail bags of the coffee to consumers for $50 and single servings for $16 *per cup*.  The coffee has since been awarded the highest taste score in history.  Indeed, on the heels of its introduction of Yemeni coffee varieties to its specialty retail lineup and the attendant boost to its brand and profitability, Blue Bottle sold a majority stake in its company to Nestlé—the largest food company in the world—for an estimated $425 million.

### B.   Metra's and T&H's Agreement to Conspire with the Enterprise and Participate in the Furtherance of its Criminal Endeavors

One of the essential aims of the Enterprise after Blue Bottle agreed to join and further the scheme was to acquire, by any means necessary, Mocha Mill's actual coffee beans.  (*See* FAC at ¶¶ 135-140.)  As detailed in the complaint, Mokhtar's and Ahmad's attempt to use Atlas Coffee as a straw-buyer to defraud Mocha Mill out of its coffee beans ultimately failed.  (*See* FAC at ¶¶ 167-174).  Hence, the pair turned to Ahmad's extended family, who own and operate Metra and T&H Computers, for help to devise another wire fraud scheme.  (*See id* at ¶¶ 177-178.)

Mokhtar and Ahmad then created the fictional "T&H *Imports*," in conspiracy with Metra and T&H *Computers* and their principals, Wael Fadl and Mohammed Eissa, in another attempt to defraud Mocha Mill out of its most premium coffee bean inventory.  (*See* FAC at ¶¶ 177-178.)  Neither Metra nor T&H was engaged in the foodstuffs business prior thereto, nor after, and neither truly intended to transition into the coffee market; the goal was simply to help the Enterprise execute the next phase of the overall scheme.  (*See* FAC at ¶ 181.)  The purpose of creating "T&H Imports" was to pose as a Dubai-based business interested in selling Mocha Mill coffee in the Middle East.  In reality, it was all a

8

ploy to serve as a straw-purchaser for Port of Mokha.  (*See id.*)  To that end, as detailed in the complaint, the Enterprise created a fake email address for "T&H Imports," (*see id* at ¶ 182); used that fake email address to communicate with Plaintiffs and convey their feigned interest as "T&H Imports" to purchase Mocha Mill's coffee, (*see id* at ¶ 183(a)); used that fake email address to forward contrived negotiations between Mokhtar and representatives of "T&H Imports" to Plaintiffs, (*see id* at ¶ 183(d)-(f); and, sent Plaintiffs a fake proof-of-purchase invoice (using Metra's address) purporting to reflect that "T&H Imports" had paid for the coffee, thereby completing the transaction, (*see id* at ¶ 183(b)).

Unfortunately, unlike with the Atlas Coffee attempt, the Metra/T&H ruse worked as the Enterprise intended in this instance and Mocha Mill was defrauded out of its most premium coffee varieties for a fraction of their actual worth.  (*See* FAC at ¶ 183(b), (f).)  And, of course, immediately after acquiring the coffee from Mocha Mill, "T&H Imports" (*i.e.*, Metra and T&H Computers) resold the coffee right back to Mokhtar and Ahmad (*i.e.*, to Port of Mokha).  (*See id* at ¶ 183(g)-(h).)  Metra and T&H never had any intention of keeping the coffee anyway; it was all a scheme to defraud Mocha Mill out of its initial inventory so that Port of Mokha and Blue Bottle could enjoy the benefits associated with being the "first mover" in the resurrection of premium Yemeni coffee and its reintroduction to the worldwide marketplace.

## III.   ARGUMENT

### A.   Plaintiffs Assert Strong, Cognizable, Civil RICO Conspiracy Claims Against Metra and T&H

#### 1.   Overview of RICO

The Supreme Court has repeatedly emphasized the breadth of the RICO statute:

> RICO is to be read *broadly*.  This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to be liberally construed to effectuate its remedial purpose, Pub. L. 91-452, §904(a), 84 Stat. 947.  The statute's remedial purposes are nowhere more evident that in the provisions of a private action for those injured by racketeering activity.

*Sedima, supra*, 473 U.S. at 497-498 (emphasis added).  Similarly, the Ninth Circuit has held that, "[a]s Congress admonished and as the Court repeated in *Sedima*, RICO should be *liberally construed*

9

1  to effectuate its remedial purposes."  *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007)

2  (quoting *Sedima*, 473 U.S. at 497-98) (emphasis added).

3  　　　　In this case, Plaintiffs allege violations of 18 U.S.C. §§ 1962(c) and (d).  Section 1962(c)

4  "makes it unlawful for any person employed by or associated with an enterprise engaged in or

5  affecting interstate or foreign commerce to conduct or participate, directly or indirectly, in the

6  conduct of such enterprise's affairs through a pattern of racketeering activity."  *Bridge v. Phoenix*

7  *Bond & Indemnity Co.,*, 553 U.S. 639, 647 (2008) (quoting 18 U.S.C. § 1964(c)).  To state a RICO

8  claim under § 1962(c), plaintiffs must plausibly allege that the defendants "participated, directly or

9  indirectly, in (1) the conduct, (2) of an enterprise that affects interstate commerce, (3) through a pattern,

10  (4) of racketeering activity."  *Eclectic Prop. E. LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997

11  (9th Cir. 2014).

12  　　　　Section 1962(d) authorizes civil suits brought by anyone "injured . . . by reason of a *conspiracy*"

13  to violate any RICO provision, including § 1962(c).  *See Beck v. Prupis*, 529 U.S. 494, 500 (2000)

14  (quoting 18 U.S.C. §§ 1962(d) and (c) in tandem) (emphasis added).  In order to maintain a viable

15  conspiracy claim, RICO plaintiffs must allege either that the defendants agreed to violate one of

16  RICO's substantive provisions, or alternatively, agreed to commit, or participated in, a violation of two

17  predicate offenses.  *See id.*

18  　　　　Mail and wire fraud are predicate acts of racketeering activity under RICO and occur

19  "whenever a person, having devised or intending to devise any scheme or artifice to defraud, uses the

20  mail [or interstate wires] for the purpose of executing such scheme or artifice or attempting so to do."

21  *Bridge*, 553 U.S. at 647.  "[A]ny mailing [or interstate wire] that is incident to an essential part of the

22  scheme satisfies the mailing [or wiring] element, even if the mailing [or wire] itself contain[s] no false

23  information."  *Id.* (quoting *Schmuck v. United States*, 489 U.S. 705, 712 (1989)) (alteration in original).

24  　　　　2.　　Plaintiffs Sufficiently Alleged Substantive RICO Violations Under 1962(c)
Against the Port of Mokha Defendants

25  　　　　Metra and T&H first contend that Plaintiffs' conspiracy claims against them under § 1962(d)

26  necessarily fail because Plaintiffs have not sufficiently pled their substantive RICO violation claims

27  against the Port of Mokha Defendants under § 1962(c).  However, as set forth in their opposition to the

28

1   Port of Mokha Defendants' motion to dismiss, Plaintiffs have indeed sufficiently pled substantive

2   RICO violations, and therefore, expressly incorporate by reference those arguments here.

3          In sum, Plaintiffs' complaint properly alleges Mokhtar's formation of the Enterprise and two-

4   year pattern of racketeering activity (from April 2014 to June 2016, and continuing today) for the

5   purpose of usurping and stealing Mocha Mill's assets and business.  Plaintiffs allege in detail that,

6   over the course of two years, Defendants conspired to engage in four interrelated wire fraud schemes in

7   violation of 18 U.S.C. § 1343, three extortion schemes in violation of 18 U.S.C. § 1951 and Cal. Penal

8   Code §§ 518-524, as well as continuing acts of money laundering in violation of 18 U.S.C. § 1957—

9   all as part of a pattern of racketeering activity as defined under 18 U.S.C. § 1961(1), and all designed by

10  a *common leader* (*i.e.*, Mokhtar) with a *common purpose* (*i.e.*, to usurp and steal Mocha Mill's assets

11  and business).

12         Plaintiffs' pleadings establish both closed- and open-ended continuity.  Closed-ended continuity

13  is established because the racketeering activity (related by common purpose and leadership) spanned

14  the course of more than two years (from April 2014 to June 2016).  *See Allwaste, Inc. v. Hecht*, 65 F.3d

15  1523, 1527-1528 (9th Cir. 1995) (while thirteen months are certainly sufficient, even under one year

16  may be sufficient).  Yet, Plaintiffs alleged acts sufficient for open-ended continuity as well, because the

17  ongoing transactional money laundering, which continues to injure Mocha Mill to date as a competitor

18  in the marketspace, constitutes repeating predicate acts.  *See* 18 U.S.C. § 1961(1); *and see United States*

19  *v. Shafer*, 608 F.3d 1056, 1067 (8th Cir. 2010) (a conviction for transactional money laundering does

20  not require exact tracing, but may be proved circumstantially by reasonable inference).  Accordingly,

21  Metra's and T&H's § 1962(d) argument, predicated on the purported insufficiency of Plaintiffs'

22  § 1962(c) allegations, should be rejected.

23                3.       Plaintiffs Sufficiently Alleged RICO Conspiracy Claims Under 1962(d) Against
                           Metra and T&H

24

25         To establish a RICO conspiracy, a plaintiff must allege either (1) an agreement that is a

26  substantive violation of RICO, or (2) that the defendants agreed to commit, or participated in,

27  a violation of two predicate offenses.  *United States v. Fernandez*, 388 F.3d 1199, 1221 (9th Cir. 2004).

28  (citing 18 U.S.C. § 1962(d)).  "The illegal agreement need not be express as long as its existence can

---

11

be inferred from the words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002). Here, Plaintiffs' claims as against Metra and T&H establish the second of these options; the complaint sets forth plausible allegations that these Defendants agreed to commit, or participate in, a violation of two or more predicate acts of wire fraud in furtherance of the ongoing Enterprise.

> a.   *Metra's and T&H's Agreement to Facilitate the Enterprise's Racketeering Activity*

Curiously, Metra and T&H entitled a section of their motion "Plaintiffs do not allege a Movant agreed to commit two predicate acts," but then failed to make any actual arguments with respect to their purported lack of agreement to facilitate the Enterprise's racketeering activity. (*See* Def. Mtn. at pg. 10, ln. 8.) Nor could they make any colorable arguments in that regard because their agreement to help facilitate the fraudulent acquisition of Mocha Mill's coffee beans is plainly set forth in the complaint. As explained above, after the Enterprise's initial attempt to fraudulently obtain Mocha Mill's coffee beans using Atlas Coffee Company as a straw-buyer failed, (*see* FAC at ¶¶ 167-174), "Mokhtar and Ahmad created the fictional 'T&H Imports,' in conspiracy with Defendants T&H Computers and Metra Computer Group, both of which are companies run by Ahmad's extended family." (*See* FAC at ¶ 177.) The complaint further alleges that "T&H and Metra *knew of the Enterprise's objective* and, acting through their executives Wael Fadl ("Wael") and Mohamed Eissa ("Eissa"), *agreed to help execute the fraud scheme*." (*Id*. at ¶ 178; emphasis added.) Thus, the complaint indisputably alleges that Metra's and T&H's principals had knowledge of the Enterprise's purpose and willingly agreed to join the effort to defraud Plaintiffs. Hence, there is no basis for the naked claim that the complaint fails to allege these Defendants' agreement to join the Enterprise and advance its aims.

> b.   *Metra's and T&H's Actions to Help Facilitate the Enterprise's Racketeering Activity*

Metra and T&H next assert that Plaintiffs' conspiracy claim against them fails because these Defendants did not themselves actually commit two predicate acts. However, the Supreme Court has held that if a plaintiff does not allege, or fails to sufficiently allege, that the defendant committed two racketeering acts, he may still state a claim under § 1962(d) for conspiracy so long as the conspirator is alleged to have "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements

of a substantive criminal offense." *Salinas*, *supra*, 522 U.S. at 65.  In other words, a defendant need not have personally committed a predicate act, or even an overt act in furtherance of the RICO conspiracy; "it suffices that [the defendant] adopt the goal of furthering or facilitating the criminal endeavor." *Id*. A plaintiff must allege that one participant in the enterprise committed at least two acts of racketeering and that the defendant in question "knew about and agreed to facilitate the scheme."  *Id*. at 66.  The defendant must be aware of "the essential nature and scope of the enterprise and intend[] to participate in it."  *United States v. Fiander*, 547 F.3d 1036, 1042 (9th Cir. 2008).  Moreover, where the predicate acts are wire fraud, as in this case, the Ninth Circuit has held that "knowing participants in the scheme are legally liable for their *co-schemers* use of the mails or wires."  *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002) (emphasis added) (internal quotation marks omitted).

Here, Plaintiffs have plainly alleged that Metra and T&H did in fact actually commit several predicate acts themselves.  At the very least, these Defendants helped facilitate the commission of two predicate acts by other members of the Enterprise (namely, Mokhtar, Ahmad, and Blue Bottle). The actions delineated in Paragraph 183 of the complaint clearly describe the acts of wire fraud Metra and T&H participated in.  And, indeed, these Defendants recognize as much because they, too, describe four of the predicate acts detailed in Paragraph 183 in their motion (albeit as a series of straw-man arguments, which they construct by mischaracterizing the nature of their conduct before knocking them down).  (*See* Def. Mtn. at pg. 8, ln. 24 – pg. 9, ln. 28.)  In so doing, Defendants ignore Plaintiffs' core allegations and legal theories, and erroneously ratchet up pleading standards.

To begin with, the complaint plainly alleges that, in April 2016, Metra's and T&H's principals (Fadl and Eissa) knowingly agreed with Mokhtar and Ahmad to join the ongoing Enterprise and help facilitate the effort to supplant Mocha Mill with Port of Mokha by fraudulently obtaining Mocha Mill's actual coffee beans.  (*See* FAC at ¶¶ 177-181.)  To do so, Metra, T&H, and the Port of Mokha Defendants together created a fictional company—"T&H Imports"—to act as a straw-buyer for Mocha Mill's coffee.  (*See id*.)  Having established "T&H Imports" as the foundation of this phase of the overall scheme, these Defendants engaged in several acts of wire fraud by effectuating the deceitful purchase of Mocha Mill's coffee beans through a series of deliberately false and contrived emails (sent over interstate wires).  To be sure, Metra and T&H knew:  the purpose of the scheme was to

13

fraudulently obtain Mocha Mill's premium inventory; were aware that "T&H Imports" was a play on T&H Computers, and did in fact pose as "T&H Imports;" were agreeable to the use of Metra's address in Dubai on the proof-of-purchase invoice in order to lend the appearance of legitimacy to Plaintiffs' mistaken belief that they were dealing with a foreign import company, and did in fact use Metra's address on the invoice; were agreeable to wiring $50,000 for the cost of the coffee beans, and did in fact wire the money to Mocha Mill; and, were agreeable to reselling Mocha Mill's coffee beans just days later to Port of Mokha for a sham "profit," and did in fact resell the coffee back to Mokhtar and Ahmad as the Enterprise intended.

Hence, Mokhtar's email to Plaintiffs on April 21, 2016, (*see* FAC at ¶ 183(a)), constituted a predicate act of wire fraud because it falsely stated that "T&H Imports" was "looking into expanding into coffee." Metra and T&H were plausibly aware of this email and helped facilitate the fraud by creating the fictional company in the first place and allowing Mokhtar to convey T&H Imports' interest in purchasing Mocha Mill's coffee. Thus, consistent with Rule 9(b), the complaint identifies "the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent conduct], and why it is false." *Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1055 (9th Cir. 2011).

Fadl's email to Plaintiffs on May 2, 2016, (*see* FAC at ¶ 183(c)), constituted a predicate act of wire fraud because, posing as a representative from a fake company (*i.e.*, "T&H Imports"), he conveyed his phony interest in purchasing Mocha Mill's coffee beans. So, too, did Mokhtar's email to Plaintiffs the following day, May 3, (*see* FAC at ¶ 183(d)), which incorporated a fake negotiating discussion with Fadl to buy Mocha Mill's coffee beans. The same is true of Fadl's email to Mokhtar and the individual Plaintiffs the day after that, May 4, (*see* FAC at ¶ 183(e)), in which he again pretended to be a representative of a bonafide foodstuff business interested in purchasing Mocha Mill's coffee beans. Thereafter, Metra's and T&H's wiring of $50,000 to Mocha Mill, via "T&H Imports," (*see* FAC at ¶ 183(b)), constituted a predicate act of wire fraud because the transfer of funds was pretextual in order to facilitate the sham purchase.[3] In turn, these Defendants' resale of the coffee days later right back to

---

[3] To the extent the date of the wire is unclear, that can be cured by amendment. The wire occurred following Mocha Mill's agreement to sell and prior to T&H Imports' "resale" to Port of Mokha (and its *(footnote cont'd on next page)*

1   Mokhtar for the benefit of Port of Mokha was an act of wire fraud because Port of Mokha wired

2   $51,000 right back to them.  (*See* FAC at ¶ 183(g).)

3       Metra's and T&H's arguments that these allegations lack specificity lose the forest through the

4   trees.  Read as a whole—as opposed to a myopic nitpicking of each paragraph in isolation—Section

5   V.K. of the complaint (namely, ¶¶ 177-184) plainly details Metra's and T&H's agreement to

6   intentionally facilitate the Enterprise's racketeering activity in April 2016 and advance a key goal of

7   fraudulently acquiring Mocha Mill's coffee beans by posing as a fictional import company.  In so

8   doing, between April and June of 2016, these Defendants committed numerous acts of wire fraud by

9   sending sham emails purporting to be a bonafide foodstuffs purchaser (*i.e.*, as "T&H Imports") and

10  wired money to Mocha Mill to consummate the sale.  These actions were all "a step in the plot" to

11  supplant Mocha Mill with Port of Mokha.  *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir.

12  2004) (internal quotation marks omitted).  Thus, when the issues are properly framed by the operative

13  law and the facts alleged in the complaint, it is clear that Plaintiffs have plausibly and sufficiently pled

14  their § 1962(d) conspiracy claims against Metra and T&H.

> *c.*  *Metra's and T&H's Conduct Was Interrelated to the Enterprise's Pattern of Racketeering Activity*

15

16      A "pattern" of RICO activity requires that the predicate criminal acts be "related" and

17  "continuous."  *H.J. Inc.*, *supra*, 492 U.S. at 239.  Metra's and T&H's final argument with respect to

18  Plaintiffs' conspiracy claims against them is that what they deem the "Spring 2016 Conspiracy"—that

19  is, their participation from April to June 2016 in the (successful) effort to defraud Mocha Mill out of its

20  most premium coffee beans—fails to satisfy RICO's "pattern" requirement.  Reduced to its essence,

21  Metra's and T&H's pattern argument is really focused on the relatedness between their conduct in the

22  Spring of 2016 and the preceding actions of the Enterprise; they contend that the "FAC connects

23  Movants only to the Spring 2016 Conspiracy" in an attempt to sever their alleged conduct from that of

24  the Enterprise.  (*See* Def. Mtn. at pg. 10, lns. 24-28.)  Their argument, however, is belied by the

25

26

27  _____

28  subsequent sale to Blue Bottle).  (*See* FAC at ¶ 183(h).)  Moreover, Plaintiffs did not actually see documentation of the wire at the time; they only saw Mokhtar's proof-of-payment invoice reflecting the tender of funds.

allegations of the complaint and the clear interconnection between each phase of the Enterprise's activities.

"Criminal conduct forms a pattern if it embraces criminal acts that have the *same or similar purposes, results, participants, victims, or methods of commission*, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H. J.*, 492 U.S. at 240. Each of those factors is present here. The Enterprise's *purpose* was to steal *victim* Mocha Mill's assets and business so that, among other things, Port of Mokha and Blue Bottle would be regarded as the "first movers" in the new premium Yemeni coffee marketspace. As alleged in the complaint, and as explained above, one of the Enterprise's most significant impediments to achieving its purpose was the acquisition of Mocha Mill's actual coffee beans. That is the reason why Mokhtar and Ahmad solicited Metra and T&H as conspiring *participants* in the Enterprise. The reason for Metra's and T&H's addition to the Enterprise was for the same purpose as was Atlas Coffee's role: to misrepresent their true identities (*i.e.*, as computer electronics companies), to misrepresent their true interest in importing Yemeni coffee (there was no true interest), all in order to fraudulently obtain Mocha Mill's most premium inventory so that it could be "resold" to Port of Mokha to supplant Mocha Mill. Metra's and T&H's *methods of commission* would be, as with the other members of the Enterprise, a series of fraudulent emails each constituting independent acts of wire fraud. And, this time, unlike with the failed Atlas Coffee attempt, Metra and T&H actually achieved the *results* the Enterprise desired by deceiving Mocha Mill into completing the transaction. Therefore, Metra's and T&H's "Spring 2016 Conspiracy" was by no means an isolated episode disconnected from the Enterprise's overall purpose. To the contrary, these Defendants' participation helped accomplish one of the most critical goals of the Enterprise—to acquire Mocha Mill's coffee beans. Their conduct from April to June 2016 was part and parcel of the overall scheme.

Furthermore, by no means do Plaintiffs concede that the Enterprise's fraud would have come to end following the conclusion of the "T&H Imports" scheme to fraudulently obtain Mocha Mill's most premium initial coffee bean inventory. As detailed in the complaint, the only reason the Enterprise's fraud came to an end is because, in dealing with Mokhtar's attempts to further extort them with his hijacking of Mocha Mill's website and other internet accounts, (*see* FAC at ¶¶ 195-201), the individual

16

1   Plaintiffs reviewed Mokhtar's Mocha Mill email account and discovered the emails referenced in the

2   complaint revealing his fraud and double-dealing.  But, to be sure, had Plaintiffs not discovered

3   Mokhtar's fraud, he certainly would have continued to engage in the same types of racketeering

4   activities in an attempt to exploit Mocha Mill for the benefit his Port of Mokha entities and their

5   partnership with Blue Bottle.  Mokhtar would have continued to utilize T&H and others to deceptively

6   discourage Plaintiffs from staying in the premium Yemeni coffee market and continued to discourage

7   distributors from dealing with Mocha Mill.  Moreover, the Enterprise's racketeering activity continues

8   in the form of money launder, hurting competitor Mocha Mill.

9       **B.**     **Plaintiffs Sufficiently Alleged Their State Law Claims Against Metra and T&H**

10      Metra's and T&H's arguments with respect to Plaintiffs' state law claims fail for the same

11  reasons as do their claims with respect to Plaintiffs' RICO claims.  Generally, these Defendants contend

12  that Plaintiffs' fraud-based state law claims (Claims Four through Six) are pled with insufficient

13  particularity.  Not so.  The Court need not read the state law causes of action in a vacuum; the various

14  claims for relief flow from the same set of operative facts as do Plaintiffs' RICO claims.  And,

15  as above, the factual allegations giving rise to Plaintiffs' RICO claims are pled with ample specificity,

16  detailing the "who, what, when, where, and how" of the alleged pattern of criminality.  Plaintiffs were

17  harmed, in the immediate, by the undervalue sale of their most premium coffee beans, and, in the

18  long-term, because Port of Mohka and Blue Bottle usurped them as the "first movers" in the premium

19  Yemeni coffee marketspace and seized the consumer excitement, brand recognition, and loyalty

20  associated therewith.  Defendants' argument with respect to Plaintiffs' state law conspiracy claims fail

21  for the same reason.  As explained above with regard to Plaintiffs' § 1962(d) claims, the complaint

22  plainly sets forth allegations that Metra and T&H knew the Enterprise's purpose, and agreed to join and

23  engage in conduct to accomplish its aims.

24      Although Metra repeatedly contends that Plaintiffs have not alleged that it actually did anything,

25  that contention is belied by the averments of the complaint.  The complaint alleges that Metra's

26  principals have a familial relationship with Ahmad, which is why Eissa (Metra's owner) was willing to

27  join the Enterprise.  Moreover, given that the events giving rise to this action all generally occurred in

28  the Bay area, and given that Metra's only subsidiary company in the United States is situated in the Bay

17

1  area (*i.e.*, T&H), it is certainly plausible that Eissa directed T&H (via Fadl) to execute the actions Eissa

2  had agreed with Fadl and Mohktar that Metra would facilitate.

3      So, as alleged in the complaint, the actions Metra took are as follows:  its owner, Eissa, agreed

4  with Ahmad and Mokhtar to join the Enterprise and offered to let the Enterprise use its wholly-owned,

5  Bay area-based subsidiary (*i.e.*, T&H Computers) as an instrumentality of the straw-buyer scheme;

6  it then directed Fadl to cooperate with Ahmad and Mokhtar in creating the fictional "T&H Imports";

7  it then directed Fadl to cooperate with Ahmad and Mokhtar in engaging in phony negotiations,

8  conveyed via email utilizing interstate wires, with the individual Plaintiffs in order to defraud Mocha

9  Mill out of its most premium coffee beans; it then directed Fadl to wire $50,000 to Mocha Mill and

10  permitted Mokhtar to use Metra's address in Dubai on the proof-of-payment invoice he ultimately

11  emailed to the individual Plaintiffs to confirm that the transaction was complete; it then directed Fadl to

12  resell the coffee right back to Mokhtar for Port of Mokha's and Blue Bottle's benefit, and accept a

13  return wire of $51,000 as payment for the transaction.

14      For these reasons, Metra's and T&H's arguments regarding their aider-and-abettor liability

15  should likewise be rejected.  The allegations of the complaint support theories of liability against these

16  Defendants as both direct actors as well as aiders-and-abettors of the Enterprise's principal directors.

17  As well, Plaintiffs' negligence claims (Claims Six and Nine) survive on a direct liability theory—that

18  is, Metra and T&H should have known that their facilitation of and participation in the RICO scheme

19  would have caused Plaintiffs to lose income and assets, induced Plaintiffs to abandon significant

20  business opportunities, and interfered with prospective economic relationships.

21      Metra's and T&H's UCL argument fails for the same reasons as do these Defendant's RICO

22  "pattern" arguments.  The complaint amply sets forth allegations detailing a multi-year scheme in

23  which all of the Defendants conspired to supplant Mocha Mill with Port of Mokha.

24      **C.**    **The Court May Exert Personal Jurisdiction Over Metra**

25      Defendants contend that the court lacks personal jurisdiction over Metra, the Dubai-based

26  corporate parent of T&H that has its principal place of business in San Carlos, California (situated

27  within this judicial district), and which serves as Metra's only purported connection to the United

28  States.  At the motion to dismiss stage, "the plaintiff need only make a prima facie showing of

1  jurisdictional facts." *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir.

2  2010).  Uncontroverted allegations in the complaint must be accepted as true, and the court must

3  resolve all factual disputes in favor of the plaintiff.  *Id.*

4     1. <u>Metra's Formation of T&H</u>

5    Before analyzing whether Metra is subject to personal jurisdiction, it is worth discussing its

6  connection to California through T&H, its wholly-owned subsidiary and lone corporate presence in the

7  United States as a whole.  According to the Articles of Incorporation T&H filed with the State of

8  California's Secretary of State, the company was incorporated in October 1996.  (Exh. A; Jones Decl.

9  at ¶ 2.)[4]  In its Articles of Incorporation, T&H identified its initial agent for service of process as Tarek

10  Ismail Mohamed Ahmed and designated an initial service address in Fremont, California.  (*See id*.)

11  Since at least 2016, upon the filing of its annual Statement of Information with the Secretary of State,

12  T&H has identified Wael Fadl as its agent for service of process, and designated both a corporate and

13  service address in San Carlos.  (Exh. B; Jones Decl. at ¶ 4.)  More specifically, T&H has designated its

14  corporate and service addresses as 751 Laurel Street, #955, San Carlos, California 94070.  (*Id*.)  That

15  same address was renewed, and Fadl was redesignated as the company's registered agent for service,

16  again as of the filing of T&H's annual Statement of Information in April 2018.[5]  (Exh. C; Jones Decl.

17  at ¶ 4.)

18    Both T&H and Metra are engaged in the computer sales business.  (Exh. B at Box No. 16;

19  Jones Decl. at ¶ 5; *and see* Exh. 1 to Eissa Decl.)  Notably, T&H identified Mohammed Eissa and his

20  brother, Tarek Eissa, as its only two corporate directors.  (Exh. B at Box Nos. 10-11; Jones Decl. at

21  ¶ 6.)  *Both men own Metra*.  (Eissa Decl. at ¶5 ["I own Metra with Tarek Eissa"].)

22    Thus, in that regard, Eissa's and Fadl's declarations in support of Metra's and T&H's motion

23  are misleading in their assertions that "[n]either T&H nor any of T&H's employees has any

24  management or supervisory role in Metra."  (*See* Eissa Decl. at ¶ 7; Fadl Decl. at ¶ 4.)  While that

25  _____

26  [4] Given that Metra has introduced supporting declarations in conjunction with its challenge to jurisdiction, Plaintiffs construe it as a "factual attack" which, in turn, permits Plaintiffs to introduce extrinsic evidence as well.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("With a factual Rule

27  12(b)(1) attack . . . a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment").

28  [5] This is the same address at which Plaintiffs served Metra (discussed *infra* at Sect. III.D.).

1    may be true, the inverse does not stand to reason.  In other words, conspicuously absent from both

2    declarations is an affirmation that no Metra employee exerts any management or control over T&H.

3          The reason why such statement is missing is because it would be *false*; Metra does in fact direct

4    the activities of T&H.  Also notably absent from both Eissa's and Fadl's declarations is any affirmative

5    statement that, despite the fact that both entities are engaged in the computer electronics business,

6    Metra does *not* supply its subsidiary with any computer parts or components, or otherwise provide

7    support to T&H regarding these companies' common business purpose.  Therefore, as an initial matter,

8    it does not stand to reason that a Dubai-based computer electronics company, which has but a single

9    presence in the United States—in the form a wholly-owned subsidiary for which Metra's founders are

10    its corporate directors and which is likewise engaged in the computer electronics sales business—does

11    not supply its subsidiary with computer components for sale that are then pushed into the stream of

12    commerce within this state and elsewhere in the country.

13          2.    <u>The Federal Long-Arm Statute Permits Jurisdiction Over Metra</u>

14          The federal long-arm statute, Fed. R. Civ. P. 4(k)(2), permits a plaintiff to establish personal

15    jurisdiction over a foreign defendant whose alleged unlawful conduct is directed at the United States.

16    *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1158-1159 (9th Cir. 2006).  The exercise of

17    jurisdiction under Rule 4(k)(2) is proper if three factors are satisfied:  (1) the claim against the

18    defendant arises under federal law; (2) the defendant is not subject to the personal jurisdiction of any

19    state court of general jurisdiction; and (3) the federal court's exercise of personal jurisdiction comports

20    with due process.  *Id.* at 1159.

21          The first two requirements are clearly satisfied.  Plaintiffs assert claims against all Defendants

22    under RICO and Metra contends that it is not subject to personal jurisdiction anywhere in the United

23    States.  Courts in this Circuit require a defendant seeking to avoid jurisdiction under Rule 4(k)(2) to

24    name some other state in which the suit could proceed, (*see Holland Am. Line, Inc. v. Wartsila N. Am.,*

25    *Inc.*, 485 F.3d 450, 461-462 (9th Cir. 2007)), and Metra has not done so.

26          As the first two requirements are satisfied, the only remaining question is whether the exercise

27    of jurisdiction over Metra comports with due process.  *See Pebble Beach*, 453 F.3d at 1158-1159.

28    When due process is analyzed under Rule 4(k)(2), the United States, rather than any particular state,

1   is the "forum state." *Id.*.  Here, the exercise of jurisdiction over Metra is consistent with due process

2   because (1) Metra purposefully directed its activities at the United States,[6] (2) Plaintiffs' claims arise

3   out of the Metra's activities in the United States, and (3) the exercise of jurisdiction is reasonable.  *See*

4   *Brayton Purcell*, 606 F.3d at 1128.

5          First, the purposeful direction test is met if the defendant "(1) committed an intentional act,

6   (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be

7   suffered in the forum state."  *Wash. Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 673 (9th Cir.

8   2012).  Here, Plaintiffs allege that Metra and T&H engaged, generally, in a RICO conspiracy to harm

9   Mocha Mill, and, specifically, undertook a scheme to fraudulently obtain Mocha Mill's actual coffee

10  beans.  These actions were unquestionably intentional and aimed at the United States.  The entire

11  conspiracy was aimed at stealing Mocha Mill's business assets and market advantage.  Metra knew the

12  individual Plaintiffs believed they were selling their coffee beans to "T&H Imports," knew that

13  company did not truly exist, and knew it and T&H Computers were acting as straw-buyers on behalf of

14  the Enterprise and for the benefit of the Port of Mokha Defendants and Blue Bottle.

15         Second, Plaintiffs' claims against Metra arise from its activities directed at the United States.

16  Metra's participation in a conspiracy to defraud Mocha Mill in a pattern of racketeering activity is

17  sufficient to satisfy this element of the due process test.  *See CollegeSource, Inc. v. AcademyOne, Inc.*,

18  653 F.3d 1066, 1079 (9th Cir. 2011) (explaining that the second element of the due process test

19  generally is satisfied if the purposeful direction test is satisfied).

20         Third, this Court's exercise of jurisdiction is reasonable.  Once a plaintiff has made a prima

21  facie showing of sufficient contacts between the defendant and the forum, the burden shifts to the

22  defendant to present a "compelling case" that the exercise of jurisdiction would be unreasonable, and

23  therefore, violate due process.  *Id.* at 1079-1080.  Metra has not met that burden here.  *See Dole Food*

24  *Co. v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002) (describing seven due process factors).

25         The "purposeful injection" factor is closely tied with the purposeful direction analysis, (*see*

26  *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir. 1988)), and thus, strongly favors

27

28  ───────────────────────────
    [6] Purposeful direction, rather than purposeful availment, is the appropriate analytical framework here
    because Plaintiffs' claims sound in tort rather than contract.  *See Schwarzenegger v. Fred Martin Motor*
    *Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

21

1  jurisdiction.  In this case, as discussed above, Metra purposefully availed itself of the privilege of

2  conducting activities in California and elsewhere in the United States, by and through its subsidiary

3  T&H, and therefore, should find it no surprise that they can be subject to suit here.  Metra purposefully

4  directed its conduct at California and the United States, caused injury to Plaintiffs in California and the

5  United States, and therefore, must answer for their intentional tortious conduct here.  While courts are

6  sensitive to the "burden" placed on a defendant forced to litigate in a foreign country under foreign law,

7  (*see*, *e.g.*, *Asahi Metal Industry Co. v. Super. Ct.*, 480 U.S. 102, 114 (1987)), "modern advances in

8  communications and transportation have significantly reduced the burden of litigating in a foreign

9  country," (*Sinatra*, 854 F.2d at 1199).  As set forth above, Metra's owners are T&H's corporate

10  directors, so it should not come as a shock that they might have to litigate in the United States as a

11  consequence of those roles.

12        As to the third and fourth factors, certainly, "[g]reat care and reserve should be exercised when

13  extending our [country's] notions of personal jurisdiction into the international field."  *Asahi*, 480 U.S.

14  at 115.  However, "this factor is not dispositive because, if given controlling weight, it would always

15  prevent suit against a foreign national in a United States court." *Haisten v. Grass Valley Med.*

16  *Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1401-1402 (9th Cir. 1986) (quotation omitted).  Further,

17  it weighs less heavily where, as here, Defendants engaged in criminal contact with the forum that

18  causes injury to domestic plaintiffs.  And, to be certain, California and the United States have an

19  interest in providing effective judicial redress for its citizens.  *Sinatra*, 854 F.2d at 1200.  This interest

20  is particularly strong where the claim is one for tortious injury.  *Church v. Consolidated Freightways,*

21  *Inc.*, 1992 U.S. Dist. LEXIS 18234, *13 (N.D. Cal. Sept. 15, 1992) ("California has a strong interest in

22  preventing fraud by corporations residing and conducting business in California").

23        Lastly, a United States court is the most appropriate and efficient forum to adjudicate Metra's

24  conduct.  Given that the fraud was perpetrated here in the United States, much of the testimonial and

25  documentary evidence will be gathered here.  The burdens on Metra of producing evidence here in

26  California would be minimal, particularly given the long-term presence of its subsidiary T&H.

27  Accordingly, Metra failed to present a "compelling case" that jurisdiction over it is unreasonable.

28  "[U]nder the totality of the circumstances[, Metra] could reasonably anticipate being called upon to

22

1    present a defense in a distant forum." *Taubler v. Giraud*, 655 F.2d 991, 993 (9th Cir. 1981).

2    Therefore, the Court should deny Metra's challenge to personal jurisdiction.

3             **3.**      <u>RICO Also Provides a Basis for Jurisdiction Over Metra</u>

4          RICO provides an independent basis for the Court's jurisdiction over Metra.  *See* 18 U.S.C.

5    § 1965(b); *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986)

6    ("Congress intended the 'ends of justice' provision [of § 1965(b)] to enable plaintiffs to bring all

7    members of a nationwide RICO conspiracy before a court in a single trial").  To demonstrate that a

8    court has jurisdiction over a defendant under § 1965(b), plaintiffs must meet four requirements.  First,

9    they must "allege[] a multidistrict conspiracy that encompasse[s] [the defendants]." *Butcher's Union*,

10   788 F.2d at 539.  Plaintiffs have done that here; the RICO conspiracy involves Defendants from

11   California and the United Arab Emirates.  Second, "the court [must have] personal jurisdiction over at

12   least one of the participants in the alleged multidistrict conspiracy." *Id.*  Here, it cannot reasonably be

13   disputed that the court has jurisdiction over the other California-based Defendants (*i.e.*, Blue Bottle and

14   the Port of Mokha Defendants).  Third, there must be "no other district in which a court will have

15   personal jurisdiction over all of the alleged co-conspirators." *Id.*  Here, no other district court has

16   personal jurisdiction over all of the alleged co-conspirators because Metra asserts it is not subject to

17   jurisdiction in any state.  Fourth, the defendants must be served in the United States.  *See Doe v. Unocal*

18   *Corp.*, 27 F. Supp. 2d 1174, 1184 (C.D. Cal. 1998), *aff'd*, 248 F.3d 915.  As set forth below, Plaintiffs

19   properly served Metra through T&H here in this judicial district.

20            **4.**      <u>California's Long-Arm Statute Permits Jurisdiction Over Metra</u>

21         As Metra is subject to jurisdiction based on the federal long-arm statute and RICO, the Court

22   need not consider whether Plaintiffs have alleged sufficient minimum contacts with California to

23   support the exercise of jurisdiction under CCP § 410.10.  If the Court determines that those provisions

24   are inapplicable, a California court's exercise of jurisdiction over Metra is proper if (1) Metra

25   purposefully directed their activities at California, (2) the Plaintiffs' claims arise out of Metra's

26   activities in California, and (3) the exercise of jurisdiction is reasonable.  *See Brayton Purcell*, 606 F.3d

27   at 1128.  Jurisdiction is proper under California's long-arm statute based on the same conduct that

28   supports the exercise of personal jurisdiction under Rule 4(k)(2).  Metra targeted its conduct not only at

23

1   the United States as a whole, but also specifically at the state of California.  Consequently, this Court

2   has jurisdiction over Metra under Cal. Code Civ. P. § 410.10.[7]

3       **D.**    **Plaintiffs Properly Served Metra**

4          The Federal Rules of Civil Procedure permit service upon a corporation within the United States

5   as prescribed by the law of the forum state or the state in which service is made.  *See* Fed. R. Civ. P.

6   4(h)(1)(A) & 4(e)(1).  California law, in turn, permits service upon a corporation by delivering

7   a copy of the summons and the complaint to a "general manager" of the corporation pursuant to CCP

8   § 416.10(b) ("A summons may be served on a corporation by delivering a copy of the summons and the

9   complaint . . . [t]o the general manager[.]"  A related service-of-process statute, § 2110 of California

10  Corporations Code ("CCC"), likewise permits service of process upon a foreign corporation doing

11  business in California by serving "its general manager in this state."

12         In *Cosper v. Smith & Wesson Arms Co*., the California Supreme Court, interpreting a

13  predecessor to CCC § 2110, held that the service-of-process statutes are satisfied if service is effected

14  on an agent "of sufficient character and rank to make it reasonably certain that the defendant will be

15  apprised of the service made."  *Cosper*, 53 Cal. 2d 77 (Cal. 1959).  Following *Cosper*, the most recent

16  decision from the California Court of Appeal declares outright that "California law allows service on a

17  foreign corporation by serving its domestic subsidiary."  *Yamaha Motor Co., Ltd. v. Super. Ct.*, 174 Cal.

18  App. 4th 264, 271 (2009) (capitalization altered).  Hence, consistent with CCP § 416.10, *Cosper*, and

19  *Yamaha Motor Co*., Plaintiffs served Metra by personally serving T&H, its general manager in this

20  state.

21         As indicated in the proof of service Plaintiffs filed before this Court thereafter, T&H was served

22  on June 7, 2018, by personally delivering a copy of the summons and complaint to the address of the

23  agent for service of process T&H registered with the California Secretary of State.  (Exh. D; Jones

24

---

25  [7] If the Court concludes that Plaintiffs have not made a prima facie case that personal jurisdiction over
    Metra is proper, jurisdictional discovery is warranted to permit Plaintiffs to develop the factual record
26  regarding Metra's conduct in the United States related to the "T&H Imports" scheme.  Jurisdictional
    discovery ordinarily should be granted "where pertinent facts bearing on the question of jurisdiction are
27  controverted . . . or where a more satisfactory showing of the facts is necessary."  *Wells Fargo & Co. v.
    Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977) (holding that district court abused its
28  discretion in refusing to permit jurisdictional discovery).

Decl. at ¶ 7.)  T&H contends that this was improper because that address is a "UPS Store."  However, that is a predicament of their own making since that is the address they have officially registered with the Secretary of State since at least 2016.  (Exh. B; Jones Decl. at ¶ 4.)  As such, Plaintiffs were entitled to rely on it.  Moreover, that all appears to be inconsequential since T&H received the summons, complaint, and accompanying cover letter.  *See Dill v. Berquist Construction Co.*, 24 Cal. App. 4th 1426, 1437 (1994) (explaining that, under California law, substantial compliance is sufficient, and thus, service on a corporation would be sufficient even if the summons were not addressed to the correct individual at the corporation so long as it was received by that individual).

The fact that Metra purports to be "Free Zone Company" in Dubai, which it declares is akin to a LLC in the United States, is also inconsequential.  This is so, because in California, LLCs are treated similar to corporations for purposes of service given that a "limited liability company is a hybrid business entity formed *under the Corporations Code*."  *Heidorn v. BDD Mktg. & Mgmt. Co., LLC*, Case No. C-13-00229 JCS, 2013 U.S. Dist. LEXIS 177166, at *57-58 (N.D. Cal., Aug. 19, 2013) (citation omitted; emphasis added).  Like corporations, a LLC "has a legal existence separate from its members" and "provides members with limited liability to the same extent enjoyed by corporate shareholders."  *See id.*

Furthermore, the "California Revised Uniform Limited Liability Company Act" is part of the Corporations Code.  *See* CCC §§ 17701 *et seq.*  And, under this statutory framework, as with corporations, LLCs are required to maintain a registered agent for service of process with the California Secretary of State.  CCC § 17701.13(c).  Section 17701.16 specifically addresses service on LLCs, providing that they may be served consistent with "Chapter 4 (commencing with Section 413.10) of Title 5 of Part 2 of the Code of Civil Procedure."  CCC § 17701.16(a).  Chapter 4 of the CCP includes § 416.10(b), which, as set forth above, expressly authorizes service on a corporation by delivery of a copy of the summons and complaint "[t]o the person designated as an agent for service of process."  In other words, LLCs may be served in the same manner as can corporations—which is precisely what Plaintiffs did here.  Hence, Metra has been properly served and is subject to this Court's jurisdiction.

1

**IV.     CONCLUSION**

2          For the foregoing reasons, Plaintiffs respectfully request that the Court deny Metra's and T&H's

3 motion in its entirety.  If the Court is inclined to grant these Defendants' motion, in part or in full,

4 Plaintiffs respectfully request that such order be without prejudice and with leave to amend so that they

5 have the opportunity cure any defects the Court might find.  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th

6 Cir. 2000) (en banc) (emphasizing that, consistent with Fed R. Civ. P. 15(a), courts should liberally

7 grant leave to amend dismissed causes of action (even in circumstances where no request was made)).

8 Further, if the Court is inclined to find that service on Metra was improper, Plaintiffs are willing to

9 utilize the Hague Convention on the "Service Abroad of Judicial and Extrajudicial Documents in Civil

10 or Commercial Matters," to effect service on Metra, as the United Arab Emirates is a signatory thereto.

11 *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988) (foreign corporations can

12 be served through the Hague Convention so long as their country of incorporation is a signatory to the

13 treaty).

14

15   Dated:  August 27, 2018                    Respectfully submitted,

16                                               */s/ Terrence M. Jones*
                                                 TERRENCE M. JONES
17                                               THE LAW OFFICE OF TERRENCE JONES

18                                               YASIN M. ALMADANI
19                                               ALMADANI LAW

20                                               *Attorneys for Plaintiffs*

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, Terrence Jones, hereby certify that I have electronically filed the above-captioned document with the Clerk of the Court using the CM/ECF system, which will automatically send an e-mail notification of such filing to Defendants' counsel of record as listed below:

Michael Shipley
KIRKLAND & ELLIS LLP
333 South Hope Street, Suite 2900
Los Angeles, CA 90071
T: (213) 680-8400
E: michael.shipley@kirkland.com

*Attorneys for Defendant*
*Blue Bottle Coffee, Inc.*

Mark R. Conrad
CONRAD & METLITZKY LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
T: (415) 343-7102
E-Mail: mconrad@conradmetlitzky.com

*Attorneys for Defendants Port of Mokha, Inc.,*
*Port of Mokha LLC, Mokha Foundation, Mokhtar*
*Alkhanshali, and Ibrahim Ahmad Ibrahim*

Frank Busch
KERR & WAGSTAFFE LLP
101 Mission Street, 18th Floor
San Francisco, CA 94105
T: (415) 357-8902
E: busch@kerrwagstaffe.com

*Attorneys for Defendants*
*Metra Computer Group FZCO*
*and T&H Computers, Inc.*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated:  August 27, 2018

Yasin M. Almadani
ALMADANI LAW

Terrence M. Jones
THE LAW OFFICE OF TERRENCE JONES

  /s/ Terrence M. Jones

*Attorneys for Plaintiffs*