1    Yasin M. Almadani (Cal. Bar No. 242798)
      ALMADANI LAW
2    14742 Beach Blvd., Suite 410
      La Mirada, California 90638
3    (213) 335-3935 | YMA@LawAlm.com

4    Terrence M. Jones (Cal. Bar No. 256603)
      THE LAW OFFICE OF TERRENCE JONES
5    6737 Bright Ave., Suite B6
      Whittier, California 90601
6    (213) 863-4490 | Terrence@JonesOnLaw.com

7    *Attorneys for Plaintiffs*

8

9

10

11

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| MOCHA MILL, INC., *et al.*, | Case No. 4:18-CV-2539-HSG |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO PORT OF MOKHA DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| v. | |
| PORT OF MOKHA, INC., *et al.*, | Hon. Haywood S. Gilliam, Jr. United States District Judge |
| Defendants. | |
| | Courtroom:  Two (Fourth Floor) |
| | Date:  September 27, 2018 |
| | Time:  2:00 p.m. |

1      Plaintiffs Mocha Mill, Inc., Monk of Mocha Specialty Coffee Production and Export, Inc.,

2  Ibrahim A. Alaeli, Yasir H. Khanshali, and Adnan G. Awnallah (collectively, "Plaintiffs"), by and

3  through their counsel of record, Yasin M. Almadani and Terrence M. Jones, hereby file their opposition

4  to Port of Mokha Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint.

5      This opposition is based upon the attached memorandum of points and authorities, the

6  declaration of Yasin M. Almadani and its accompanying exhibits, the files and records in this case, and

7  such further evidence and argument as the Court may permit.

8  Dated: August 27, 2018            Respectfully submitted,

9

10                                */s/ Yasin M. Almadani*
                              YASIN M. ALMADANI

11                              ALMADANI LAW

12                              TERRENCE M. JONES
                              THE LAW OFFICE OF TERRENCE JONES

13                              *Attorneys for Plaintiffs*

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................................. 1

II.   SUMMARY OF FACTS ALLEGED IN THE 73-PAGE CIVIL RICO COMPLAINT ................................. 2

III.  ARGUMENT ................................................................................................................... 3

    A.   Legal Standard ................................................................................................. 3

    B.   An Extortionate Agreement Signed Under Duress Cannot Justify Dismissal ...................... 4

    C.   Port of Mokha Foundation Should Remain a Defendant ................................................. 7

    D.   Plaintiffs Have Sufficiently Pled Each RICO Predicate under Rules 8(a)(2) and 9(b) ........................ 7

        1.   Introductory Allegations that Provide Context ....................................................... 8

        2.   Plaintiffs Sufficiently Plead Embezzlement and Wire Fraud from April 2014 to December 2014 as Part of a Pattern of Racketeering Activity ........................................................ 9

        3.   Plaintiffs Sufficiently Plead Extortion in March 2015 as Part of a Pattern of Racketeering Activity ............... 11

        4.   Plaintiffs Sufficiently Plead Wire Fraud and Extortion from June to November 2015 as Part of a Pattern of Racketeering Activity ........................................................ 11

        5.   Plaintiffs Sufficiently Plead Wire Fraud Schemes and Conspiracies from November 2015 to June 2016 as Part of a Pattern of Racketeering Activity ........................................ 13

    E.   POM's Remaining Arguments Concerning RICO Technicalities Either Ignore the Law or Demonstrate a Fundamental Misunderstanding of It ........................................................ 18

        1.   Plaintiffs Sufficiently Allege Enterprise and Pattern............................................... 18

        2.   Plaintiffs Sufficiently Allege RICO Conspiracy ..................................................... 22

    F.   POM's Arguments Against Plaintiffs' State Law Claims Are Misleading ......................... 23

    G.   POM's Standing Arguments Ignore Plaintiffs' Partnership and Joint Venture ..................... 25

IV.   CONCLUSION ............................................................................................................... 26

*Plaintiffs' Opposition to Blue Bottle Coffee Inc's*                          *Case No. 4:18-CV-2539-HSG*
*Motion to Dismiss Plaintiffs' First Amended Complaint*

1

## TABLE OF AUTHORITIES

2

**Federal and State Case Law**

3  *Allwaste, Inc. v. Hecht* ....................................................................................19, 20, 22

4          65 F.3d 1523 (9th Cir. 1995)

5  *Ashcroft v. Iqbal* ....................................................................................................4, 13

6          556 U.S. 662 (2009)

7  *Bell Atl. Corp. v. Twombly* ..........................................................................................3

8          550 U.S. 544 (2007)

9  *Bias v. Wells Fargo & Co.* ...........................................................................3, 9, 11, 19

10          942 F. Supp. 2d 915 (N.D. Cal. 2013)

11  *Cahill v. Liberty Mut. Ins. Co* .....................................................................................3

12          80 F.3d 336 (9th Cir. 1996)

13  *Changzhou AMEC E. Tools & Equip. Co. v. E. Tools & Equip., Inc* .........................5

14          WL 3106620 (C.D. Cal. 2012)

15  *Cedric Kushner Promotions, Ltd. v. King* ...................................................................9

16          533 U.S. 158 (2001)

17  *Graham v. Slaughter* ...................................................................................................9

18          624 F. Supp. 222 (N.D. Ill. 1985)

19  *H.J. Inc. v. Nw. Bell Tel. Co.* ..........................................................................4, 18, 20, 22

20          492 U.S. 229  (1989)

21  *Howard v. Am. Online Inc.* ........................................................................................22

22          208 F.3d 741 (9th Cir. 2000)

23  *Jack v. Trans World Airlines, Inc.* ...............................................................................6

24          854 F. Supp. 654 (N.D. Cal. 1994)

25  *Juarez v. Arcadia Financial, Ltd.* .............................................................................25

26          152 Cal. App. 4th 889 (2007)

27  *Kearns v. Ford Motor Co.* ...........................................................................................4

28          567 F.3d 1120 (9th Cir. 2009)

i

*Plaintiffs' Opposition to Blue Bottle Coffee Inc's*                    *Case No. 4:18-CV-2539-HSG*
*Motion to Dismiss Plaintiffs' First Amended Complaint*

1   *Korea Supply Co. v. Lockheed Martin Corp.* .................................................................25

2       29 Cal. 4th 1134 (2003)

3   *Levitt v. Yelp! Inc.* ..............................................................................................................5

4       765 F.3d 1123 (9th Cir. 2014)

5   *McGill v. Citibank, N.A.* ...................................................................................................24

6       2 Cal. 5th 945 (2017)

7   *Medallion Television Enterprises, Inc. v. SelecTV of California, Inc* .....................................22

8       833 F.2d 1360 (9th Cir. 1987)

9   *Mohebbi v. Khazen* ...........................................................................................................24

10      50 F. Supp. 3d 1234 (N.D. Cal. 2014)

11  *Navarro v. Block* ................................................................................................................3

12      250 F.3d 729 (9th Cir. 2001)

13  *Neibel v. Trans World Assur. Co.* ...............................................................................22, 23

14      108 F.3d 1123 (9th Cir. 1997)

15  *Odom v. Microsoft Corp.* ...............................................................................4, 9, 18, 19

16      486 F.3d 541 (9th Cir. 2007)

17  *Rutherford Holdings, LLC v. Plaza Del Rey* ......................................................................24

18      223 Cal. App. 4th 221 (2014)

19  *Schreiber Distrib. Co. v. Serv-Well Furniture Co.* .........................................................9, 12

20      806 F.2d 1393 (9th Cir. 1986)

21  *Second Measure, Inc. v. Kim* .....................................................................................6, 25

22      143 F.Supp 3d 961 (N.D. Cal. 2015)

23  *Sedima, S.P.R.L. v. Imrex Co.* ........................................................................................18

24      473 U.S. 479 (1985)

25  *Starr v. Baca* .............................................................................................................4, 13

26      652 F.3d 1202 (9th Cir. 2011)

27  *TeleVideo Sys., Inc. v. Heidenthal* ....................................................................................9

28      826 F.2d 915 (9th Cir. 1987)

*United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO* ........................5

770 F.3d 834 (9th Cir. 2014)

*United States v. Bohonus* ........................................................................................................9

628 F.2d 1167  (9th Cir. 1980)

*United States v. Cusino* .........................................................................................................12

694 F.2d 185 (9th Cir.1982)

*United States v. Garlick* ....................................................................................................9, 17

240 F.3d 789 (9th Cir. 2001)

*United States v. Fiander* ........................................................................................................23

547 F.3d 1036 (9th Cir. 2008)

*United States v. Garner* ..........................................................................................................9

663 F.2d 834 (9th Cir.1981)

*United States v. Greger* ...........................................................................................................5

716 F.2d 1275 (9th Cir.1983)

*United States v. Lynch* .............................................................................................................5

437 F.3d 902 (9th Cir. 2006)

*United States v. Rasheed* .....................................................................................................9, 12

663 F.2d 843 (9th Cir.1981)

*United States v. Shafer* ...........................................................................................................21

608 F.3d 1056 (8th Cir. 2010)

*United States v. Stapleton* .......................................................................................................12

293 F.3d 1111 (9th Cir. 2002)

*United States v. Tingey* .............................................................................................................5

30 U.S. 115 (1831)

*United States v. Ward* .............................................................................................................13

914 F.2d 1340 (9th Cir. 1990)

*Usher v. City of Los Angeles* ....................................................................................................3

828 F.2d 556 (9th Cir.1987)

iii

*Van Buskirk v. Cable News Network, Inc* ............................................................................3

  284 F.3d 977 (9th Cir. 2002)

*Vess v. Ciba-Geigy Corp. USA* ...........................................................................................4

  317 F.3d 1097 (9th Cir. 2003)

*Walling v. Beverly Enters.* .................................................................................................3

  476 F.2d 393 (9th Cir. 1973)

*Wilcox v. First Interstate Bank of Oregon, N.A.* ...............................................................18

  815 F.2d 522 (9th Cir. 1987)


**Federal Statutes**

18 U.S.C. § 1343 ............................................................................................................9, 20

18 U.S.C. § 1951 ............................................................................................................5, 20

18 U.S.C. § 1957 ..........................................................................................................20, 21

18 U.S.C. § 1961 ...............................................................................................................12

18 U.S.C. § 1962 .........................................................................................................*passim*


**Federal Rules**

Fed. R. Civ. P. 8 .........................................................................................................3, 5, 21

Fed. R. Civ. P. 9 .........................................................................................................*passim*

Fed. R. Civ. P. 12 ............................................................................................................3, 4

Fed. R. Evid. 604 .................................................................................................................6

Fed. R. Evid. 901 .................................................................................................................6


**California Statutes**

Cal. Bus. & Prof. Code § 17200 ........................................................................................11

*Plaintiffs' Opposition to Blue Bottle Coffee Inc's*      *Case No. 4:18-CV-2539-HSG*
*Motion to Dismiss Plaintiffs' First Amended Complaint*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

Port of Mokha Defendants' ("POM") Motion is essentially a closing argument posing as a "motion to dismiss."[1] POM inappropriately smuggles into the Motion its own set of facts under the guise of "judicial notice," inappropriately basing its arguments on disputed facts outside the FAC. It also mischaracterizes the facts alleged in the FAC, misstates the law, demonstrates a fundamental misunderstanding of RICO and its predicates, and cites overruled law on the issue of RICO conspiracy. POM presumably resorts to this because the law rejects its positions. Moreover, POM unfairly accuses Plaintiffs of "conjecture, hyperbole, and innuendo" in the face of hard facts in the FAC to the contrary. Plaintiffs are happy to prove their case in Court with hard evidence, but this is not the stage for it. For now, Plaintiffs maintain the good-faith veracity of their factual allegations, and focus on the law vis-à-vis the FAC, which is the appropriate focus here. Plaintiffs also respectfully move this Court to strike all facts in POM's motion that inappropriately goes beyond the FAC (*see* Ex. 1); the law prohibits those disputes to be resolved or even considered here.

*Issues*. (i) Does the FAC plead facts sufficiently under Rules[2] 8(a)(2) and 9(b) to make the legal claims *plausible*; (ii) are the predicates sufficiently related and continuous to establish a RICO pattern; and (iii) does a March 2015 partnership agreement, executed by extortion, as opposed to an April 2014 partnership agreement, on which this case is based, control in a way to justify dismissal.

As explained below, POM has not carried their burden because: (i) the RICO predicates are pled with painstaking particularity; (ii) pattern is established, by way of relatedness and open- and closed-ended continuity; and (iii) the March 2015 agreement resulting from extortion and duress does not justify dismissal because it is void and unenforceable and thus cannot shield POM from racketeering liability; and (iv) arbitration under the extortionate agreement is limited to disputes concerning the *interpretation of that agreement* whereas this case is does not seek to interpret that agreement,

---

[1] "Plaintiffs" refers to Plaintiffs collectively. "POM" refers to the Port of Mokha Defendants. "Motion" refers to POM's Motion to Dismiss Plaintiffs' First Amended Complaint ("Complaint" or "FAC"). "RICO" refers to the Racketeer Influenced and Corrupt Organizations Act. Furthermore, Plaintiffs do not always use the last names of all parties in order to avoid confusion, because the parties here have the same or very similar foreign names.

[2] Unless specified otherwise, "Rules" refers to the Federal Rules of Civil Procedure.

1   but rather is based on the parties' April 2014 oral partnership and joint venture agreement.

2          So, in order to grant POM's motion, the Court would have to ignore large portions of the FAC,

3   ignore all reasonable inferences, and, accept POM's misrepresentation of the law. Plaintiffs oppose.

4   **II.     SUMMARY OF FACTS ALLEGED IN THE 73-PAGE CIVIL RICO COMPLAINT**

5          To characterize the allegations in the FAC as conclusory assertions, as POM so attempts, is just

6   untrue. Plaintiffs filed an incredibly detailed civil RICO complaint, alleging a long (and still

7   continuing) pattern of racketeering activity, including fraud, extortion, and money laundering

8   undertaken for the purpose of stealing Plaintiffs' assets and business over the course of years, leaving

9   the company crippled. The FAC includes detailed allegations with references to specific emails,

10  agreements, conversations, actions, and transactions evidencing RICO violations, and describes how

11  Defendants profited from their racketeering activities to steal Mocha Mill assets, ultimately stealing a

12  business worth $250 million.

13         The FAC details Mocha Mill's development. (FAC ¶¶ 89-98.) Plaintiffs' business plan was to

14  locate, cultivate, refine, import, and sell for the first time in centuries premium Yemeni coffee under the

15  Mocha Mill brand. (*Id*.) They partnered with Defendant Mokhtar Alkhanshali ("Mokhtar"), made him

16  Mocha Mill CEO, and invested years of time and effort and over half a million dollars into him and the

17  company to develop relationships with key Yemeni farmers and high-end distributors. (*Id*.) In 2015,

18  experts scored Mocha Mill's coffee among the best tasting in the world. (*Id*. ¶¶ 105-06.) Mocha Mill

19  was poised for tremendous success and was preparing a big launch in 2016. (*Id*. ¶¶ 104-114.) But

20  Mokhtar, motivated by his own greed and ego, had been spearheading a years-long scheme to loot and

21  usurp Mocha Mill's assets and business through a pattern of racketeering activity, which the FAC

22  details with painstaking particularity: **(a)** *embezzlement by wire fraud* (Apr 2014 to Dec 2015) (*id*. ¶¶

23  89-96); **(b)** *extortion* (Mar 2015) (*id*. ¶¶ 97-103); **(c)** *wire fraud* and *attempted extortion* (Jun to Nov

24  2015) (*id*. ¶¶ 121-125); **(d)** *wire fraud* (Nov 2015 to Jun 2016) (*id*. 24 ¶¶ 135-194); **(e)** *extortion* (Apr

25  to Jun 2016) (*id*. ¶¶ 195-199); **(f)** *obstruction* (May 2016 to the present) (*id*. ¶¶ 200-201); **(g)** *money*

26  *laundering* (May 2016 to present) (*id*. ¶¶ 202-204), all undertaken as part of a RICO scheme and

27  conspiracy related by a common leader (*Mokhtar*), with common participants (*Mokhtar and his*

28

1    *enterprise recruits*), for a common purpose (*to steal and usurp Plaintiffs' assets and business*), using

2    common methods of commission (*wire fraud* and *extortion*), upon common victims (*Plaintiffs*).

3         Today, Defendants (particularly POM and Blue Bottle) thrive on the labor and assets stolen by

4    their racketeering acts. (*Id.* ¶¶ 5-9, 184-94.) Having unlawfully supplanted Mocha Mill, siphoning over

5    its first-mover advantage, assets, and relationships, POM now values its business in excess of $250

6    million. (*Id.*) POM sells its Yemeni coffee varieties to Blue Bottle for upwards of $135 per kilogram.

7    (*Id.*) Blue Bottle, in turn, sells 12-ounce retail bags of the coffee to consumers for $50 and single

8    servings for $16 per cup (*id.*); the coffee has since been awarded the highest taste score in history (*id.*

9    ¶ 135). Indeed, on the heels of introducing Mocha Mill's stolen coffee varieties to its specialty retail

10   lineup and the attendant boost to its brand and profitability, Blue Bottle sold a majority stake in its

11   company to Nestlé—the world's largest food company—for an estimated $425 million. (*Id.* ¶ 9, 191.)

12   **III.   ARGUMENT**

13        **A.   Legal Standard**

14        A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim."[3] *Navarro v.*

15   *Block*, 250 F.3d 729, 732 (9th Cir. 2001). Since Rule 12(b)(6) is concerned with a claim's sufficiency

16   rather than its substantive merits, courts typically "look only at the face of the complaint" when faced

17   with a motion to dismiss. *Van Buskirk v. Cable News Network*, *Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).

18   Allegations of material fact must be taken as true and construed in the light most favorable to the

19   nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-338 (9th Cir. 1996); *Usher v. City of*

20   *Los Angeles*, 828 F.2d 556, 561 (9th Cir.1987) (the court must presume all factual allegations of the

21   complaint to be true and draw all reasonable inferences in favor of the nonmoving party); *Walling v.*

22   *Beverly Enters.*, 476 F.2d 393, 396 (9th Cir.1973) (any existing ambiguities must be resolved in favor

23   of the pleading); *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 926 (N.D. Cal. 2013) (same).

24        Pursuant to Rule 8, a motion to dismiss should be denied where the plaintiff pleads "enough

25   facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

26   570 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court

27   to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556.

28
     ───────────────
     [3] Unless noted otherwise, the "Rules" referenced are the Federal Rules of Civil Procedure.

The plausibility standard, however, is not akin to a "probability requirement." *Id*. Thus, it remains true that "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Well-pleaded allegations are those that go beyond the elements of a crime and allege the underlying facts that establish the plausibility of those elements. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). And "if there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Id*. "Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible," *id*. (emphasis in original), and if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 249–50 (1989); *Odom v. Microsoft Corp.*, 486 F.3d 541, 545 (9th Cir. 2007) (same).

Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." To comply with Rule 9(b), allegations of fraud must "be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). That is, fraud claims must be must be pled "with particularity," a phrase the Ninth Circuit has interpreted as meaning, essentially, "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

### B.    An Extortionate Agreement Signed Under Duress Cannot Justify Dismissal

Plaintiffs base their Complaint on a partnership agreement entered into in April 2014. (*Id*. ¶ 70-72.) They base one of their RICO predicates on the fact that Mokhtar *extorted* his partners into signing a subsequent partnership agreement under duress in March 2015 (the "agreement-by-extortion"), which gave Mokhtar more shares and money for no consideration at all. (*Id*. ¶ 97-103.) POM offers a certified translation of the agreement-by extortion and also offers Mokhtar's own translation and interpretation of it, arguing for dismissal based on an arbitration and venue clause in that agreement. (Mot. at 9-10.)

1    POM's argument is problematic for several reasons and cannot form the basis of dismissal.

2    First, it relies on an agreement that is void and unenforceable because it resulted from extortion and was

3    signed under duress. *See Changzhou AMEC E. Tools & Equip. Co. v. E. Tools & Equip., Inc.*, WL

4    3106620, at *14-15 (C.D. Cal. 2012) ("Under California law, a contract is voidable if the agreement

5    was made under duress" where "California recognizes economic duress as a basis for vitiating a

6    coerced party's consent to an agreement."); *see also United States v. Tingey*, 30 U.S. 115, 129, 8 L. Ed.

7    66 (1831) (bond obtained by extortion held void).

8        "Extortion" under the Hobbs Act, "means the obtaining of property from another, with his

9    consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of

10   official right." 18 U.S.C. § 1951(b)(2). Fear, in the context of the Hobbs Act, can include fear of

11   economic loss. *See, e.g., Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1133–34 (9th Cir. 2014); *United States v.*

12   *Greger*, 716 F.2d 1275, 1278–79 (9th Cir.1983). A defendant commits extortion when the obtaining of

13   the property would itself be wrongful because the alleged extortionist has no lawful claim to that

14   property. *United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO*, 770

15   F.3d 834, 838 (9th Cir. 2014). Thus, a forced transaction is extortionate where nothing of objective

16   value is transferred to the plaintiff. *See id*. Only a *de minimis* effect on interstate commerce is required

17   under the Hobbs Act, and the effect need only be probable or potential, not actual. *United States v.*

18   *Lynch*, 437 F.3d 902, 908-09 (9th Cir. 2006) (*en banc*). Extortion, which is not fraud, is not subject to

19   the particularity requirement of Rule 9(b), but rather may be satisfied under Rule 8(a)(2) with a "short

20   and plain statement" demonstrating plausibility of the claim. *See supra* § III.A. The elements of

21   extortion under federal and California law are substantially the same. *Levitt*, 765 F.3d at 1133.

22       Plaintiffs allege that by the first quarter of 2015, Plaintiffs' significant investments had enriched

23   Moktar as company CEO with tremendous knowledge and industry relationships built on Mocha Mill

24   and his partners' backs. (FAC ¶ 97.) But Mokhtar continued his racketeering activity into March 2015

25   realizing that Mocha Mill was poised for tremendous success. (*Id*. ¶¶ 97-103.) In spite of his fiduciary

26   duty and agreement with his partners to not start a competing business, Mokhtar, as CEO, conducted

27   the affairs of the Mocha Mill enterprise (albeit beyond the scope of his corporate authority) by secretly

28   lining up competing investors, and began demanding that his three partners give him significant

1     portions of their Mocha Mill shares for no consideration at all, threatening to walk away with Mocha

2     Mill's farmer and distributor relationships and vast knowledgebase that the company had helped him

3     develop. (*Id*. ¶¶ 99-100). Plaintiffs pleaded with Mokhtar that his demands were contrary to their

4     agreement and would deprive them of their rightful shares, but Mokhtar was intractable. (*Id*. ¶ 101.)

5     Improperly placing Plaintiffs in fear of economic harm by threatening to walk away with company

6     assets that did not belong to him, Mokhtar extorted Plaintiffs into signing an agreement that increased

7     his share in Mocha Mill from 25% to 40% at the expense of his partners' (Plaintiffs') rightful shares for

8     no consideration at all. (*Id*. ¶ 102). Mokhtar's actions were not "hard-bargaining," as POM suggests.

9     (Mot. at 14.) Rather, they were clearly extortionate because, by his partnership agreement and fiduciary

10    duty to both his partners and the company, he was entitled neither to misappropriate company assets nor

11    to take his partners' rightful shares for free. If Mokhtar disputes this (with stories of war, not

12    appropriate for consideration here as outside the FAC, and which, in any case, do not give him license

13    to commit extortion), then there is a genuine triable issue of fact, not even appropriate for summary

14    judgement let alone a motion to dismiss. Taking Plaintiffs' allegations as true, as the law requires, the

15    agreement-by-extortion cannot serve as a basis for dismissal.

16         Second, Plaintiffs' claims must stand also because they are based on the original oral

17    partnership and joint venture agreement between Mokhtar and Plaintiffs in Oakland in April 2014,

18    which contemplated no arbitration or venue in Yemen, *and* which, by the partners' non-compete

19    agreement, prohibited the extortion that resulted in agreement POM relies on. So, because Plaintiffs

20    bring their case under the earlier valid agreement, the controversy concerning that agreement must be

21    resolved. The inquiry should end there, but *arguendo*, if the agreement were to be considered, it does

22    not support POM's argument. Mokhtar's personal testimony, translation, and interpretation in his

23    declaration (¶¶ 2-3) should be stricken because it is inadmissible hearsay outside the allegations of the

24    FAC, and because translations "from a foreign language must be properly authenticated and any

25    interpretation must be shown to be an accurate translation done by a competent translator." *Jack v.*

26    *Trans World Airlines, Inc.*, 854 F. Supp. 654, 659 (N.D. Cal. 1994) (citing Fed. R. Evid. 604 and 901).

27    Turning to the certified translation, Article 12, which forms the basis of POM's argument, is limited to

28    disputes arising "*over* the *interpretation of any of the contract's articles*." But Plaintiffs do not allege a

breach of contract; nor is their suit based on this agreement-by-extortion. Plaintiffs are not asking for any of the extortionate contract's articles to be interpreted. Quite the opposite, the FAC alleges that the "contract" serves as evidence of extortion in a racketeering pattern and is void.

### C.   Port of Mokha Foundation Should Remain a Defendant

POM argues that Defendant Mokha Foundation ("DMF") should be dismissed because it does not exist. But Mokhtar's own declaration (¶ 5) references a page on POM's website (attached hereto as Ex. 2), which shows that POM itself acknowledges the existence of Mokha Foundation, supporting Plaintiffs' allegations. (FAC ¶¶ 7, 17, 35, 193.) The remainder of ¶ 5 of Mokhtar's declaration should be stricken, however, because it is inappropriate testimony from a defendant and is outside the allegations of the FAC. Moreover, as offered, the evidence would be inadmissible at any stage of litigation as hearsay that does not conform to Fed R. Evid. 803(10), which provides that the absence of a public record must be established by testimony or certification of a proper *custodian*, which Mokhtar is not. Finally, even if a California or Delaware custodian were to establish the absence of records in her/his respective state, that does not establish that Mokha Foundation does not exist in any state or as an unincorporated entity. Therefore, taking Plaintiffs' allegations, supported by POM's own website, as true, POM's argument must be rejected.

### D.   Plaintiffs Have Sufficiently Pled Each RICO Predicate under Rules 8(a)(2) and 9(b)

POM's primary contention (*see* Mot. at 11-13) is that the FAC should be dismissed and Plaintiffs should be required to "start again" because the claims themselves do not repeat verbatim the allegations in Section V of the FAC, which: (a) is entitled "Facts Common to All Counts" (FAC at 11); (b) is incorporated by reference into the RICO claims (*id*. ¶ 210); (c) alleges in detail (over the course of 42 pages) the facts underlying the RICO scheme and conspiracy (*id*. ¶¶ 60-204); and (d) breaks out each predicate act and even *references back to the specific subsection of Section V* that details the underlying facts of the predicate act. (*Id*. ¶¶ 212-228.) The FAC is highly detailed and organized and POM's argument is misleading.

Since the claims flow from the facts in Section V, Plaintiffs deemed it excessive to repeat the allegations verbatim in each claim, as POM suggests, which would result in a complaint hundreds of pages long of mostly repetition. But if POM's suggested method is preferable to the Court, Plaintiffs

respectfully seek leave to amend. Plaintiffs maintain, however, that the clear and organized references to the very detailed Section V provide all the notice POM needs to mount a defense.

### 1. Introductory Allegations that Provide Context

In order to appreciate the scope of the racketeering scheme, it is important to first understand Mocha Mill's formation. The company started as a two-way partnership between Plaintiff Alaeli and Defendant Mokhtar in October 2013, and was expanded to a four-way equal partnership in April 2014, adding Plaintiffs Khanshali and Awnallah (the "Mocha Mill Partnership"). (*Id*. ¶¶ 60-70.) Each partner owned an equal share in Mocha Mill, Inc., which was formed to locate, source, cultivate, purchase, import, market, and sell for the very first time ultra-premium coffee from Yemen (the birthplace of coffee). (*Id*.) Plaintiffs agreed to provide the legitimacy and business acumen and pay all expenses to build and grow the company into a dominant force in the coffee market, while Mokhtar, who had no money or experience at the time, agreed to contribute "sweat equity" and later add capital when he had the means to do so. (*Id*. ¶ 70.) The partners agreed to not start competing coffee businesses to ensure against one partner walking away with the investments of the others. (*Id*. ¶ 71.) Mokhtar was made CEO and given full access to Mocha Mill accounts with the agreement that he would itemize all his expenses with receipts or like documentation. (*Id*. ¶ 72.)

Plaintiffs invested over half a million dollars and significant time and effort to: (a) educate Mokhtar in the coffee trade; (b) have him travel nationally and internationally to develop relationships for Mocha Mill with Yemeni coffee farmers (to source the coffee), and high-end coffee distributors and retailers (to sell the coffee); (d) train Yemeni coffee farmers to improve the quality of their crop; (e) set up coffee processing infrastructure in Yemen; (f) ensure proper cultivation; and (g) purchase, package, and import the coffee for sale worldwide under the *Mocha Mill* brand. (*Id*. ¶¶ 73-88.)

Despite this, from nearly the beginning, Mokhtar devised and led a scheme and conspiracy to steal Mocha Mill's assets and business through a growing enterprise of associates engaging in years of racketeering activity, including wire fraud, extortion, and ongoing money laundering. (*Id*. ¶¶ 55-59.)

/ / /

/ / /

### 2.    *Plaintiffs Sufficiently Plead Embezzlement and Wire Fraud from April 2014 to December 2014 as Part of a Pattern of Racketeering Activity*

Against the embezzlement wire fraud allegations (*id*. ¶¶ 89-96), POM argues that: (i) the FAC lacks sufficient particularity, (ii) Plaintiffs allege no false or misleading statement, and (iii) failure of a CEO to vanish $140,942 in company funds without providing documentation or justification does not give rise to a claim. (Mot. at 13-14.) Plaintiffs disagree. POM misunderstands wire fraud.

Wire fraud under 18 U.S.C. § 1343 consists of (1) a scheme to defraud; (2) use or causing reasonably foreseeable use of the U.S. wires in furtherance of the scheme; and (3) specific intent to deceive or defraud. *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986); *Bias*, 942 F. Supp. 2d at 937; *United States v. Garner*, 663 F.2d 834, 838 (9th Cir.1981). Specific intent is shown if the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension by way of a material misrepresentation or omission of material fact. *United States v. Bohonus*, 628 F.2d 1167, 1172-73 (9th Cir. 1980) (fraudulent scheme need not be one that includes an affirmative misrepresentation of fact, since it is only necessary to prove that the scheme was calculated to deceive persons of ordinary prudence). The first and third elements of wire fraud may be pled generally, and so "[t]he only aspects of wire fraud that require particularized allegations [under Rule 9(b)] are the factual circumstances of the fraud itself." *Odom*, 486 F.3d at 554. In a charge involving mail or wire fraud, it is not necessary to show that the scheme was successful or that the intended victim suffered a loss or that the defendants secured a gain. *Schreiber Distrib. Co.*, 806 F.2d at 1400; *United States v. Rasheed*, 663 F.2d 843, 850 (9th Cir.1981). "[E]ach use of the wires . . . constitutes a separate offense." *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001).

Embezzlement (by wire fraud) is a predicate offense under Section 1962(c); indeed, the Supreme Court has recognized that RICO applies "when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority."  *Bias*, 942 F. Supp. 2d at 939 (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001); *see TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 918 (9th Cir. 1987) (thirteen-month embezzlement scheme sufficient to establish pattern); *Graham v. Slaughter*, 624 F. Supp. 222, 225 (N.D. Ill. 1985) ("two-year practice of embezzling funds

9

from a company through otherwise separate transactions constitutes a "pattern of racketeering activity" notwithstanding the fact that the numerous acts arguably comprised a single criminal scheme").

Under this rubric, Plaintiffs allege that Mokhtar's racketeering activity began in April 2014 when he (as company CEO) devised *a scheme to defraud* Mocha Mill and his business partners, *conducting the affairs of Mocha Mill* (*the enterprise*) to embezzle cash from company accounts *under the guise* of necessary and legitimate business expenses. (*Id*. ¶¶ 89-96.) Plaintiffs satisfy Rule 9(b) by alleging that over the course of 21 months (between April 2014 and December 2015), Mokhtar engaged in no less than *85 separate wire transactions* in furtherance of his fraud scheme to steal company assets (each an act of wire fraud) with *dates*, *amounts*, and *account numbers*, totaling $140,942 in embezzled funds. (*Id*. at ¶¶ 91-93.) The entire scheme including every embezzled dollar was designed to deceive Plaintiffs. Despite repeated requests, Mokhtar never provided any justification or documentation for this very large sum, which Plaintiffs allege he used to fund POM. (*Id*. ¶¶ 94-96.)

POM's suggestion that there are no receipts or like documentation available to businessmen in Yemen relies on facts outside the record (and thus cannot be considered in deciding this Motion); in any case, the partners, all four *Yemeni* men, including Mokhtar, agreed that such documentation would be required, evidencing that they all believed such documentation was available. If there is a dispute concerning the availability of documentation in Yemen, then that is a factual dispute not appropriate for this Motion. The sizable sum of $140,942 cannot just disappear over 21 months without any record or justification (especially given a company *requirement* to provide it) thus making an inference of embezzlement not just *plausible*, but probable, regardless of whether the funds were spent on POM.

However, during this time Mokhtar did start the shadow POM enterprise, as alleged and evidenced in emails, and it is more than plausible, as alleged, that Mokhtar used the embezzled funds, at least in part, to fund his new competitor enterprise. Indeed, Plaintiffs' support their allegations with a detailed listing of the exact transactions they believe to be acts of embezzlement and wire fraud. If Mokhtar disputes this, he has the full opportunity to go transaction by transaction to mount a defense, which is all that Rule 9(b) requires.

### 3.   *Plaintiffs Sufficiently Plead Extortion in March 2015 as Part of a Pattern of Racketeering Activity*

Having detailed above the March 2015 extortion (*see supra* § III.B), Plaintiffs maintain that the FAC clearly establishes RICO activity—that by engaging in this extortion, Mokhtar, as Mocha Mill CEO, "unlawfully conduct[ed] the affairs of the corporation . . . beyond the scope of [his] corporate authority," as part of a pattern of racketeering activity to unlawfully usurp Plaintiffs' assets and business. *See King*, 533 U.S. at 158; *see also Bias* 942 F. Supp. 2d at 939.

### 4.   *Plaintiffs Sufficiently Plead Wire Fraud and Extortion from June to November 2015 as Part of a Pattern of Racketeering Activity*

Plaintiffs plead that by the summer of 2015, Mocha Mill's coffee had received significant attention by industry leaders and the company was poised for tremendous success. (FAC ¶¶ 104-13.) Upon seeing the multi-million-dollar potential, Mokhtar, while still CEO of Mocha Mill, again solicited investors behind his partners' (Plaintiffs') backs and recruited new members into his racketeering scheme, expanding the enterprise. (*Id*. ¶¶ 114-20.) Prior to this, Mocha Mill had been the enterprise and Mokhtar had been a person employed by the enterprise conducting the enterprise's affairs through a pattern of racketeering activity, including fraud and extortion. (*See supra* §§ II.B.3-4; *see also* FAC ¶¶ 89-103.) In order to more effectively steal and usurp Mocha Mill's assets and business, Mokhtar expanded the enterprise into an association-in-fact enterprise to include himself, Defendant Ahmad Ibrahim ("Ahmad"), Stephen Ezell ("Ezell"), Inder Comar ("Comar"), and, of course, victim Mocha Mill at Mokhtar's beck and call. (*Id*. ¶¶ 114-20.) This association-in-fact enterprise operated in the shadows as the "Port of Mokha" enterprise (the "POM Enterprise") with a hierarchical structure detailed in the FAC. (*Id*. ¶¶ 119-20.) POM Enterprise members conducted its affairs with the continuing objective to steal Mocha Mill's assets and business through a pattern of racketeering activity, including numerous acts of fraud, deception, extortion, and money laundering. (*Id*. ¶¶ 114-20, 121-204.)

Continuing the pattern of racketeering activity to steal Mocha Mill's assets and business, Mokhtar engaged Comar in or about June 2015 to purportedly do some corporate work for Mocha Mill, but in fact, the two conspired to execute a *fraud scheme* to dilute Plaintiffs' ownership in Mocha Mill by having Comar provide inadvisable (in fact, unlawful) recommendations to Plaintiffs,

with *intentional material omissions*, under the guise of legitimate legal advice.[4] (*Id.* ¶¶ 121-22.)
Plaintiffs satisfy Rule 9(b) alleging that in furtherance of the wire fraud scheme, Comar and Mokhtar
sent emails (each an act of wire fraud detailing *names*, *dates*, and *content*) advising Plaintiffs to take
actions that would effectively dilute their ownership in Mocha Mill and amount to tax evasion, while
*deliberately and with the intent to deceive omitting from those emails the negative dilution effects and
tax implications*, which was certainly material information concerning the advice given. (*Id.* ¶ 122.)

POM appears to argue that the material omissions were simply bad advice (Mot. at 14.), but that
is a factual dispute not appropriate for consideration here. Indeed, while even circumstantial evidence
can suffice to establish wire fraud, *United States v. Cusino*, 694 F.2d 185, 187 (9th Cir.1982), Plaintiffs
here detail two specific acts of wire fraud (an email from Comar to Moktar and one more from Mokhtar
to his partners); there were probably many more emails Mokhtar deleted. (FAC ¶ 122.) POM's next
contention is that there was no wire fraud because there was no loss. POM misunderstands wire fraud,
which does not require loss. *Schreiber Distrib. Co.*, 806 F.2d at 1400; *Rasheed*, 663 F.2d at 850 (9th
Cir.1981). Loss comes into play for sentencing, restitution, and damages (civilly). So, even without a
loss, criminal wire fraud can occur and serve as a RICO predicate to establish a pattern, as it does here.

When the fraud conspiracy failed, Mokhtar attempted another round of extortion in September
2015 to usurp Mocha Mill's business, threatening again to walk away with Mocha Mill's assets and
relationships and start a competing company (very similar to the March 2015 extortion). Mokhtar tried
to scare his partners into giving up more shares to increase Mokhtar's share in the company to 85%,
using an agreement drafted by Comar. (*Id.* ¶¶ 123-24.) This time, Plaintiffs felt more protected by the
March 2015 written partnership agreement (albeit executed under duress through extortion), because
the agreement memorialized their initial April 2014 partnership agreement to not start a competing
business. (*Id.* ¶¶ 125, 97-103.) Plaintiffs refused but Mokhtar's attempt was still a crime (for the same
reasons as the March 2015 extortion) and thus a RICO predicate under 18 U.S.C. § 1961(1). *See United*

---

[4] For this and the remaining wire fraud claims, Plaintiffs plead both a scheme and conspiracy to commit wire fraud. And while the allegations support both scheme and conspiracy, it should be noted that "the substantive law of this circuit is that co-schemer liability for mail or wire fraud does not require proof of a conspiracy." *United States v. Stapleton*, 293 F.3d 1111, 1120 (9th Cir. 2002).

12

1    *States v. Ward*, 914 F.2d 1340, 1345 (9th Cir. 1990) (a person may be guilty of an attempt when he

2    takes a substantial step "to try to commit an extortion even though no extortion is in fact carried out").

3        **5.    *Plaintiffs Sufficiently Plead Wire Fraud Schemes and Conspiracies from***
        ***November 2015 to June 2016 as Part of a Pattern of Racketeering Activity***

4            Plaintiffs allege that undeterred by the failure of the June-November 2015 wire fraud scheme

5    and extortion attempt, Mokhtar and his associates continued their racketeering activity to steal Mocha

6    Mill's assets and business, executing two wire fraud schemes in conspiracy with Defendants Blue

7    Bottle and T&H/Metra to supplant Mocha Mill all together. (FAC ¶ 126-28, 129-204.)

8            The law requires that well-pleaded allegations be presumed true at this stage. *Iqbal*, 556 at 679.

9    Well-pleaded allegations are those that go beyond the elements of a claim and allege the underlying

10   facts to establish the plausibility of those elements. *See Starr*, 652 F.3d at 1216. Plaintiffs' allegations

11   do just that. Indeed, as explained below, they go far beyond an elemental recitation to detail the scheme

12   based on emails, documents, conversations, public admissions, industry practice, common sense, and

13   reasoned inference, more than sufficiently establishing the plausibility of POM's racketeering activity.

14           Plaintiffs even detail the background providing the economic motivation for the fraud, alleging

15   the following: Having emerged as the pioneer and standout in the rebirth of premium Yemeni coffee,

16   Mocha Mill's coffee was among the most highly anticipated varieties of 2016 with no competitors in

17   the space. (FAC ¶¶ 104-07, 135.) Mokhtar, as CEO, had developed both a professional and personal

18   relationship with Blue Bottle CEO James Freeman ("Freeman"). (*Id*. ¶ 106.) Mocha Mill had impressed

19   Freeman who had been "floored" by Mocha Mill coffee, saying of his first cupping that, "***This is what***

20   ***angels singing tastes like***." (*Id*. ¶¶ 106-07, 145.)  According to Blue Bottle, when CEO Freeman first

21   tried Mocha Mill coffee in 2015, "***it stopped [him] in his tracks***.  *He remembers exactly where it was*

22   *on the cupping table—**it's hard to forget a transcendent encounter like that**—and [Blue Bottle has]*

23   *been **counting the days** until [it] could share **this veritable coffee miracle** from Yemen with [its]*

24   *guests*." (*Id*. ¶ 145.) Indeed, Blue Bottle believed it could sell the coffee at its retail locations for

25   upwards of $16 per cup and was seeking preferred access. (*Id*. ¶ 107-08.)

26           Plaintiffs further allege that by November 2015, high-end distributors, including Blue Bottle,

27   had placed orders and made commitments to buy Mocha Mill coffee for $100 to $135 per kilogram. (*Id*.

28

13

¶ 136.) Mokhtar (as CEO) had agreed and the coffee had been sold in principle. (*Id*.) So, using funds provided by Mokhtar's partners (the individual Plaintiffs), Mocha Mill invested hundreds of thousands of dollars to purchase, process, and import the best of Yemeni coffee to fill the orders, Blue Bottle's order being the most significant. (*Id*. ¶109.) Mocha Mill had positioned itself to be the first (and only) company to market this highly anticipated ultra-premium Yemeni coffee to high-end retailers, which was sure to propel the company to the forefront of the specialty coffee market. (*Id*.) Furthermore, Mokhtar, as Mocha Mill CEO, started spending significant time with Dave Eggers (a prominent author) to work on the Mocha Mill book, telling Plaintiffs that his time as company CEO was well-spent with Eggers because the book would greatly benefit Mocha Mill's marketing and business relationships with major distributors, most prominently Blue Bottle. (*Id*. ¶ 111-12.) Mokhtar used Mocha Mill funds, embezzled and otherwise, to pay for significant international travel with Eggers to work on the book. (*Id*. ¶ 113.) Ultimately, however, as part of the RICO scheme to usurp Plaintiffs' assets and business, Mokhtar convinced Eggers to drop Mocha Mill from the story and, instead, falsely profile POM and Blue Bottle. (*Id*. ¶¶ 112, 129-34, 159.) None of these allegations are speculation or innuendo, as POM suggests, but are specific facts provable by emails and Eggers' own published work.

POM Enterprise associates sought to steal Mocha Mill's lucrative first-mover competitive advantage and siphon Mocha Mill's most valuable assets and relationships to POM, decimating competitor Mocha Mill in the process. (*Id*. ¶ 135). But POM needed Mocha Mill's coffee to do that. (*Id*. ¶ 138.) Plaintiffs were expecting a grand Mocha Mill launch with premier distribution, paving the way for tremendous brand value, long-lasting relationships, and exponential growth. (*Id*. ¶ 139.) Plaintiffs had no intention of allowing a competitor to swoop in and steal the imminent fruits of their years of labor and investment in Mocha Mill. (*Id*.) This is precisely why Mokhtar had been operating the POM Enterprise in the shadows; he understood that if Plaintiffs got wind of his scheme, they would not allow it. (*Id*. ¶¶ 138-39.) This is not conjecture but provable fact based on emails in the FAC.

Indeed, Plaintiffs allege in great detail, citing documents and emails, that, in order to steal Mocha Mill's most premium coffee, Mokhtar and his RICO associates devised two *schemes to defraud* Plaintiffs into selling that coffee to a straw buyer arranged by POM. (*Id*. ¶¶ 140-94.) POM conspired with Blue Bottle to mislead Plaintiffs into believing that high-end retailers and distributors, most

14

1    notably Blue Bottle, were no longer interested in Mocha Mill coffee. The underlying facts are detailed

2    in the FAC and include references to emails with *names*, *dates*, and *content*. (*Id*. ¶¶ 140-94.)

3            As discussed above, Blue Bottle was very anxious ("counting the days") to market and sell

4    Mocha Mill coffee as soon the first shipment arrived in Oakland, which was slated for February 2016—

5    a deal in principle with Mocha Mill was already in place. (*Id*. ¶¶ 145-48.) The POM Enterprise,

6    however, needed Blue Bottle to back off, feign disinterest, affirmatively delay its marketing and rollout

7    campaign, and direct its employees to not communicate with anyone at Mocha Mill but POM

8    Enterprise members Mokhtar and Ezell; this was to convince Plaintiffs that Blue Bottle had lost interest

9    and that the coffee was unmarketable. (*Id*. ¶¶ 136, 141-42.) Blue Bottle's buy-in here was necessary, as

10   without it, the entire scheme was in danger. For example, if Blue Bottle did not affirmatively delay

11   purchasing or even just marketing the expected coffee on its social media feed during the scheme, *as it*

12   *had already done prior to the scheme*, Mokhtar's fraud would have been exposed. Plaintiffs allege in

13   granular detail how the scheme unfolded between the CEO of Mocha Mill and the CEO of Blue Bottle,

14   detailing the who, what, when, and why, and showing a common purpose and motive (*id*. 135-66). The

15   allegations are entitled to a presumption of truth as they draw upon documents, public admissions,

16   industry practice, emails (blatantly discussing POM while Mokhtar was Mocha Mill CEO), common

17   sense, and reasoned inference, to satisfy Rule 9(b). With Blue Bottle's help, POM fabricated a lack of

18   interest in Mocha Mill coffee to sell the story to Mokhtar's partners. (*Id*. ¶ 143-66.)

19           Using *the fabricated "lack of interest" coordinated with Blue Bottle*, Mokhtar and his RICO

20   associates successfully *defrauded* Plaintiffs into believing that high-end distributors were not interested

21   in their coffee; *the delay in sale coordinated with Blue Bottle* had the intended effect of making

22   Plaintiffs desperate to sell the coffee cheaply to a straw purchaser secretly set up by POM, thus

23   siphoning Mocha Mill's first-mover advantage and industry relationships to POM. (*Id*. ¶¶ 167-94.)

24   Contrary to POM's unsupported argument, Plaintiffs do provide the underlying facts of the straw

25   purchase. (*Id*. ¶¶ 167-86.) Even at this early pleading stage, when evidence is difficult to come by, and

26   despite Mokhtar's destruction of evidence, Plaintiffs detail 27 emails (each an act of wire fraud)

27   (alleged with *dates*, *names*, and *content*) recounting numerous material misrepresentations in

28   furtherance of the *fraud scheme*. (*Id*.) Among these emails is clear evidence of T&H/Metra's

15

1    participation in the conspiracy, fraudulently posing as a coffee buyer (POM's straw buyer) as part of a

2    pattern of racketeering activity. (*Id*. ¶¶ 177-83).

3          To conceal the existence of POM, T&H and Metra (related computer companies run by

4    Defendant Ahmad's extended family)[5] conspired with POM to create a fictitious company called "T&H

5    Imports" purportedly interested in selling Mocha Mill coffee *in the Middle East*, because high-end

6    distributors were not interested in the coffee; they used Metra's business contact information in Dubai

7    to legitimize this fake company. (*Id*.) In reality, the coconspirators all knew that T&H would serve as a

8    straw purchaser for POM. (*Id*.) At the direction of Metra executive Mohaamed Eissa and POM, T&H

9    executive Wael Fadl ("Fadl") created a fake email account and exchanged a series of seemingly

10   genuine but actually fraudulent emails with Mokhtar (each an act of wire fraud) (alleged with *names*,

11   *dates*, and *content*) to mislead Plaintiffs and convince them to part with their blockbuster product. (*Id*.)

12         Through this fraud conspiracy, coordinated with Blue Bottle (helping POM set up the ruse for

13   the straw sale) and T&H/Metra (making the straw purchase for POM), POM succeeded in defrauding

14   Plaintiffs out of their most premium coffee, siphoning the tremendous first-mover advantage and

15   resulting business relationships (the entire business, really) to POM. (*Id*. ¶¶ 126-94.) After the straw

16   purchase, T&H/Metra immediately sold the coffee to POM, as planned, taking a commission for its part

17   in the racketeering scheme. (FAC ¶¶ 126-94.) POM then sold the best lot of that coffee to Blue Bottle,

18   as promised, for $135 per kilogram. (*Id*.) Blue Bottle proceeded to execute its marketing plan as it had

19   secretly planned with Mokhtar, heavily advertising Mocha Mill's stolen coffee under the "Port of

20   Mokha" brand, selling it like hotcakes for $16 a cup as one of the world's best coffees, after helping

21   POM convince Plaintiffs that it was unmarketable. (*Id*. ¶¶ 155, 183-189.) POM went on to project Port

22   of Mokha's value at $250 million. (*Id*. ¶ 194.)

23         As demonstrated above, pursuant to Rule 9(b), Plaintiffs support their claims detailing the who,

24   what, when, and why of the RICO fraud scheme, and citing corroborating emails, conversations,

25   documents, actions, and transactions. (*Id*. ¶¶ 135-201) Plaintiffs detail at least 35 wires (each an act of

26   wire fraud and separate racketeering act), which Plaintiffs believe to be the tip of the iceberg. (*Id*.)

27

28   _____
     [5] T&H Computers is California corporation based in San Carlos, California, and is a wholly
     owned subsidiary of Metra Computer Group based in Dubai.  (FAC ¶¶ 38-40).

These allegations more than adequately establish the elements of wire fraud, which include a scheme to defraud, foreseeable use of U.S. wires, and intent to defraud. (*See supra* § III.D.2.)

POM's argument that the forgoing wire fraud scheme has only one act of wire fraud (Mot. at 15), again, shows a fundamental misunderstanding of federal wire fraud, under which each wire in furtherance of a scheme to defraud is a separate criminal act. *See, e.g., Garlick*, 240 F.3d at 7. So, for just two wire fraud schemes (the Atlas scheme and the T&H/Metra scheme) spanning eight months, Plaintiffs have detailed approximately 35 wires (each a separate act of wire fraud and thus a separate act of racketeering), as Mokhtar actively deleted a significant number of emails (FAC ¶¶195-201). Finally, contrary to POM's unsupported assertion, the FAC contains numerous allegations (too numerous to list) detailing Defendant Ahmad Ibrahim's involvement as a RICO associate. *See generally* FAC.

In order to shield himself and his co-conspirators from legal liability, Mokhtar attempted to extort his former partners (Plaintiffs) into signing a release to claims, and also hacked into Mocha Mill accounts using his recovery phone number to destroy important evidence in or after June 2016. (*Id*. ¶¶ 195-201.) The FAC does describes the who, how, and when of the hacking, to satisfy Rule 9(b) and allow Mokhtar sufficient information to mount a defense. And while POM argues otherwise (Mot. at 15), Plaintiffs maintain that hacking into accounts to destroy emails in order to conceal a wire fraud scheme, among other criminal activity, necessarily causes numerous wires (from the hacking and the destruction of each email) in furtherance of the fraud scheme (to conceal it).

POM's suggestion that Plaintiffs have not suffered injury is plain wrong. Plaintiffs plead significant injury as a result of the racketeering activity dating back to 2014 with the embezzlement wire fraud, continuing to the March 2015 extortion, continuing to the 2015-16 wire fraud scheme, continuing to the money laundering. Today, POM thrives on the farmer and distributor relationships, publicity, first-mover advantage, images, and other assets (virtually the entire business) stolen from Mocha Mill by acts of racketeering; the company is valued at upwards of $250 million. (*Id*. ¶¶ 192-194.) A portion of coffee sales is funneled to the "Mokha Foundation," which provides "microloans" and training to Yemeni farmers to increase POM's goodwill among farmers and customers, as was Mocha Mill's business plan and practice. (*Id*. ¶ 193). Indeed, while an organized crime connection is

17

*Plaintiffs' Opposition to Blue Bottle Coffee Inc's*                                   *Case No. 4:18-CV-2539-HSG*
*Motion to Dismiss Plaintiffs' First Amended Complaint*

not required, Mokhtar acted nothing short of a mob boss perpetrating criminal scheme after criminal scheme as his ambition grew as an enterprise leader.

### E.   POM's Remaining Arguments Concerning RICO Technicalities Either Ignore the Law or Demonstrate a Fundamental Misunderstanding of It

"RICO is to be read broadly." *Odom*, 486 F.3d at 547 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985)). "To state a claim under § 1962(c) [of RICO], a plaintiff must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Id.* (quoting *Sedima*, 473 U.S. at 496). Contrary to POM's assertion (Mot. at 2), RICO requires **neither** a connection to organized crime, *see H.J. Inc*, 492 U.S. at 248 (nexus to organized crime not required), **nor** racketeering injury, *see Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 529 (9th Cir. 1987) ("racketeering injury" distinct from that caused by the predicate act not required). Having discussed "conduct" and "racketeering activity" at length above, Plaintiffs turn to the arguments concerning the "enterprise" and "pattern" elements.

### 1.   Plaintiffs Sufficiently Allege Enterprise and Pattern

The definition of **enterprise** "is not very demanding." *Odom*, 486 F.3d at 548. A single legal entity, partnership, corporation, individual, and even group associated-in-fact are all enterprises under RICO. *Id.* "[A]n associated-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Id.* at 552. A person or corporation can be an "person" for purposes of an associated-in-fact enterprise. *See id.* at 548. "[A]n associated-in-fact enterprise under RICO does not require any particular organizational structure." *Id.* at 551. "Under Section 1962(c), distinctiveness [between a person and enterprise] is satisfied and RICO applies 'when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority.'" *Bias*, 942 F. Supp. 2d at 939 (quoting *King*, 533 U.S. at 161 &166).

A **pattern** requires at least two acts of racketeering activity within a 10-year period as well as relatedness and continuity. *H.J. Inc.*, 492 U.S. at 229, 239-240. **Relatedness** is satisfied if the criminal acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 239.

1     *Continuity* "is both a closed- and open-ended concept, referring either to a closed period of

2     repeated conduct, or to past conduct that by its nature projects into the future with a threat of

3     repetition." *Id*. at 241. "*Closed-ended continuity* is established by showing that related predicate acts

4     occurred over a substantial period of time." *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1527 (9th Cir. 1995).

5     A thirteen-month period is "a substantial period of time" for purposes of closed-ended continuity, but

6     even less than a year may be sufficient, because continuity is a "flexible" concept. *Id*. at 1528 (refusing

7     to establish a bright-line one-year rule); *Heidenthal*, 826 F.2d at 918 (thirteen-month embezzlement

8     scheme sufficient to establish pattern). *Open-ended continuity* is shown if the predicate acts

9     "specifically threaten repetition" *or* "become a regular way of doing business." *Id*. But "the continuity

10    requirement does not, in itself, require that every member be involved in each of the underlying acts of

11    racketeering, or that the predicate acts be interrelated in any way." *Odom*, 486 F.3d at 552. In other

12    words, not every member needs to participate in or even know about *all* the illegal activities the other

13    members are doing or have done.

14          POM argues (conspicuously ignoring large portions of the FAC and providing almost no

15    analysis on the issue of relatedness) that Plaintiffs describe only a single short-term scheme with a

16    single victim. To make the argument POM picks a date range of Summer 2015 to Spring 2016. (Mot. at

17    16-18). POM's argument is an unsupported conclusion that has no basis in the FAC or the law, because

18    Plaintiffs allege much more than the short date range POM wants to focus on.

19          The ***enterprise*** element is satisfied because Plaintiffs allege that Mokhtar began the racketeering

20    activity in April 2014 (wire fraud and extortion) conducting the affairs of the Mocha Mill *enterprise*

21    (*see supra* §§ III.B, III.D.2-D.3), and grew the enterprise into the associated-in-fact POM *enterprise*

22    continuing to conduct its affairs through a pattern of racketeering activity (wire fraud, extortion, and

23    money laundering) (*see supra* §§ III.D.4-D.5). Through this expansion Mokhtar's RICO enterprise

24    maintained its leadership (*Mokhtar*), purpose (*to steal and usurp Plaintiffs' assets and business*),

25    methods of commission (*wire fraud* and *extortion*), and victims (*Plaintiffs*), simply adding participants.

26          POM seems to vaguely suggest that Mokhtar's expansion of the RICO enterprise itself

27    somehow defeated continuity. (*See* Mot. at 18-19.) This is a non-sensical position that has no support in

28    the law. To demonstrate, Plaintiffs draw an analogy to gangs and organized crime. It is common

19

1   knowledge that gangs grow and shrink, adding and dropping members overtime. To say that gang

2   expansion defeats RICO liability (by defeating continuity) would be to reward RICO expansion and

3   detonate a nuclear bomb on the RICO statute itself. That is not the law. Rather, *relatedness* is the legal

4   requirement and the FAC is very clear that the racketeering acts are related by common leadership,

5   participants, purpose, methods of commission, and victims.

6        POM cites law on the relatedness requirement, but make no effort to explain how the law

7   applies to this case. POM then inaccurately concludes that Plaintiffs plead a single scheme with a single

8   victim (even though neither of these considerations by themselves defeats RICO liability, *see infra*),

9   and move on to continuity. (Mot. at16-17.) Plaintiffs are left guess the arguments, if any, but will

10  demonstrate, nevertheless, how RICO is sufficiently pled. While multiple schemes and victims are not

11  required under RICO, *see infra*, Plaintiffs do allege multiple victims (the several Plaintiffs) and

12  multiple schemes.

13       ***Relatedness.*** As explained above, Plaintiffs detail four wire fraud schemes and/or conspiracies,

14  in violation of 18 U.S.C. § 1343, and three extortion and/or attempted extortion schemes, in violation of

15  18 U.S.C. § 1951, and Cal. Penal Code §§ 518-524, over the course of over two years, as well as

16  continuing acts of money laundering, in violation of 18 U.S.C. § 1957, all as part of a pattern of

17  racketeering activity as defined under 18 U.S.C. § 1961(1). Plaintiffs further detail the underlying facts

18  to show that the predicate acts were related as designed by a common leader (*Mokhtar*), with common

19  participants (*Mokhtar and his enterprise recruits*), for a common purpose (*to steal and usurp Plaintiffs'*

20  *assets and business*), using common methods of commission (*wire fraud* and *extortion*), upon common

21  victims (*Plaintiffs*). *See, e.g., H.J. Inc.*, 492 U.S. at 229, 239-240 (relatedness established where

22  predicate acts "have the same or similar purposes, results, participants, victims, or methods of

23  commission").

24       ***Continuity.*** Plaintiffs also establish both closed- and open-ended continuity. Even set-setting

25  aside for a moment the continuing money laundering (purely for argument's sake), ***closed-ended***

26  ***continuity*** is established because the racketeering activity (related by common leadership, participants,

27  purpose, methods of commission, victims, and results) spanned the course of *over two years* (from

28  April 2014 to June 2016), which is a sufficiently "substantial period" under the law. *See Allwaste, Inc.*,

20

*Plaintiffs' Opposition to Blue Bottle Coffee Inc's*                           *Case No. 4:18-CV-2539-HSG*
*Motion to Dismiss Plaintiffs' First Amended Complaint*

65 F.3d at 1527-28 (9th Cir. 1995) (while *thirteen-month* period is certainly sufficient, even under one year may be sufficient). Moreover, under this closed-ended rubric (not counting money laundering for argument's sake), if, for argument's sake, embezzlement were also dropped, the racketeering activity would still span 16 months (Mar 2015 – Jun 2016) (still a sufficiently "substantial period"), and if, for argument's sake, the first extortion count were also dropped, the racketeering activity would still span 13 months (Jun 2015 – Jun 2016) (still a sufficiently "substantial period").

But here, Plaintiffs have actually alleged acts sufficient for ***open-ended continuity***, because the ongoing transactional money laundering, which continues to injure Mocha Mill as a competitor, is sure to continue repeating into the future. POM suggests that the money laundering allegations should be rejected because they do not contain the specificity required under Rule 9(b). (*See* Mot. at 16.) But money laundering is not fraud and so Rule 9(b) does not apply—Rule 8(a)(2) does. Plaintiffs satisfy Rule 8 by alleging—including detailing the fraud under Rule 9(b)—how Mokhtar stole at least hundreds of thousands of dollars (if not tens of millions, if the company itself is counted), thus acquiring criminal proceeds; and with those criminal proceeds, POM continues, at least in part, to operate its large-scale international import/export business, which necessarily involves numerous transactions over $10,000—indeed, even the very first of such transactions with Blue Bottle was over $50,000 (FAC ¶ 183(h)). *See United States v. Shafer*, 608 F.3d 1056, 1067 (8th Cir. 2010) (transactional money laundering does not require exact tracing but may be proved circumstantially by reasonable inference). Taking the FAC's well-pleaded allegations as true—that Mokhtar defrauded and extorted Mocha Mill out of hundreds of thousands of dollars and is now using that money to run Port of Mokha—it is not only a reasonable inference, it is a forgone conclusion that Mokhtar continues to engage in transactions over $10,000 at least in part with the criminal proceeds that he secured by fraud—this amounts to transactional money laundering under 18 U.S.C. § 1957. The purpose of the statue is to prevent profiting from criminal proceeds. POM activity is exactly what the law forbids.

To be clear, Plaintiffs here do allege common victims (Mocha Mill and the individual Plaintiffs as Mokhtar's former partners) and related schemes. Nevertheless, POM inaccurately suggests that RICO is unavailable because Plaintiffs allege only a *single* scheme. (Mot. at 17.) Incidentally, co-defendant Blue Bottle argues the opposite, suggesting that the fact that POM engaged in *multiple*

1    criminal schemes somehow defeats continuity. (Blue Bottle Mot. at 10.) Neither is correct on the law,

2    because while a sufficiently long single scheme with a single victim suffices for RICO liability,

3    multiple schemes undertaken for a related purpose, as here, are also demonstrate continuity. *See H.J.*

4    *Inc.*, 492 U.S. at 240 (though RICO does not require multiple criminal schemes, "proof that a RICO

5    defendant has been involved in multiple criminal schemes would certainly be highly relevant to the

6    inquiry into the continuity").

7          POM also suggests that having a single victim defeats RICO liability, but this, too, is incorrect.

8    *See, e.g., Allwaste, Inc.*, 65 F.3d at 1527 (thirteen-month period of racketeering acts involving

9    essentially a single victim sufficient to establish pattern); *Heidenthal*, 826 F.2d 915, 918 (9th Cir. 1987)

10   (thirteen-month embezzlement scheme sufficient to establish pattern). Indeed, POM's lead case on the

11   issue, *Medallion Television Enterprises, Inc. v. SelecTV of California, Inc.*, is a pre-*H.J. Inc.* decision,

12   cuts against POM's single-victim idea. In *Medallion*, the Ninth Circuit did not find a RICO pattern on

13   the basis of a single fraud, but also suggested that the plaintiff may have established a pattern in its

14   single-victim RICO claim had it directed the court to "evidence that [defendant] defrauded it in any

15   other way as a part of this scheme or any other." 833 F.2d 1360, 1364 (9th Cir. 1987). Unlike

16   *Medallion Television*, Plaintiffs' case here shows a long pattern (under both closed- and open-ended

17   continuity) with numerous related criminal schemes (racketeering activity) that evolved with Mokhtar's

18   growing ambition. Mokhtar did not just set out to steal Plaintiffs' best coffee; he also engaged in

19   numerous other racketeering acts to victimize Plaintiffs, including multiple fraud schemes (FAC ¶¶ 89-

20   96, 121-25, 200), multiple extortion schemes (*id*. ¶¶ 97-103, 121-25, 195-99), obstruction of justice (*id*.

21   ¶ 200), and money laundering (*id*. ¶¶ 202-204). Even the stealing of the coffee itself involved two

22   related wire fraud conspiracies: one with Atlas (*id*. ¶¶ 135-176) and one with T&H/Metra (*id*. ¶¶ 177-

23   194). Under these facts, POM's string citation of cases (Mot. at 19) is inapposite.

24                    **2.    Plaintiffs Sufficiently Allege RICO Conspiracy**

25         POM's four-line, argument against RICO conspiracy is based largely on overruled law. POM

26   relies exclusively on *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) (Mot. at 22-23),

27   which bases its analysis largely on *Neibel v. Trans World Assur. Co.*, 108 F.3d 1123, 1127 (9th Cir.

28   1997), which was expressly overruled on the relevant law by *United States v. Fernandez*, 388 F.3d

                                              22

1199, 1230 (9th Cir. 2004) ("our holding [concerning § 1962(d)] in *Neibel*, is no longer valid after the Supreme Court's opinion in *Salinas*"). As more fully detailed in Plaintiffs' Opposition to Blue Bottle's Motion to Dismiss, RICO conspiracy does not require a substantive violation of RICO. *Salinas v. United States*, 522 U.S. 52 (1997). Rather, it is sufficient that the defendant "was aware of the essential nature and scope of the enterprise and intended to participate in it," because RICO conspiracy contains "no requirement of an overt act" and is thus "'even more comprehensive than the general conspiracy offense.'" *United States v. Fiander*, 547 F.3d 1036, 1040-42 (9th Cir. 2008) (quoting *Salinas*, 522 U.S. at 63).

Applying these principles, Plaintiffs allege that POM, Blue Bottle, and T&H/Metra agreed to participate in and facilitate POM's wire fraud schemes with full knowledge of the POM enterprise, its leadership and members, and its purpose to steal Mocha Mill's assets and business; in doing so, the coconspirators sent countless (certainly more than two) emails (each being an act of wire fraud). (FAC ¶¶ 126-194). Plaintiffs' allegations make entirely plausible that the coconspirators knowingly adopted POM's goal of defrauding Plaintiffs and agreed to facilitate the fraud scheme, which certainly included the operation or management of the POM Enterprise by allowing POM to advance a key objective. *Id*.

### F.   POM's Arguments Against Plaintiffs' State Law Claims Are Misleading

POM argues that Plaintiffs' state law claims are not alleged with sufficient particularity (Mot. at 22.) This is misleading because POM's arguments require the Court to completely ignore Section V of the FAC entitled "Facts Common to All Counts" (¶¶ 60-204), which is incorporated by reference into each claim.  Because the claims flow from the same set of operative facts, Plaintiffs deemed it unnecessary to repeat the allegations verbatim in each claim, which would result in a complaint hundreds of pages long of mostly repetition. But if the Court so prefers, Plaintiffs respectfully seek leave to amend. Plaintiffs maintain, however, that Section V is sufficiently detailed and provides all the notice POM needs to mount a defense to each claim.

As for POM's arguments concerning *theories of liability*, Section V makes very clear (detailing the underlying facts) that POM bears direct liability for its racketeering activity, and conspiracy liability for agreements to commit such the crimes—as detailed above, the allegations in Section V of the FAC detail all actions and agreements to provide sufficient notice to POM. Based on the FAC, POM cannot

1    escape direct liability for any of the claims. The POM Enterprise was Mokhtar's brainchild and the

2    primary beneficiary of his years-long pattern of racketeering activity. The fact that the POM Enterprise

3    operated in the shadows as an associated-in-fact enterprise as opposed to a legal entity does not absolve

4    it of RICO liability in the same way a gang not registered with a state cannot escape RICO liability on

5    that basis. Indeed, RICO explicitly encompasses liability for informal enterprises. Finally, the

6    negligence claims (Claims Six and Nine) should survive on a direct liability theory—that POM should

7    have known that its facilitation of and participation in the RICO and fraud schemes would have caused

8    Plaintiffs to lose income and assets, induced Plaintiffs to abandon significant business opportunities,

9    and interfered with prospective economic relationships.

10          Concerning the *common law fraud and misrepresentation claims* (Claims Four to Six), Plaintiffs

11   sufficiently plead these claims for the same reasons as explained in the sections discussing wire fraud.

12   The additional elements of the common law fraud—reliance and resulting injury—are also detailed in

13   § V of the FAC, ¶¶ 184-194, 202-204.

14          Concerning *conversion* (Claims Ten and Eleven), Claim Ten, that POM converted at least

15   $140,942 through wire fraud, is established by facts alleged in the FAC § V.C, while Claim Eleven that

16   POM converted almost all of Mocha Mill's assets and opportunities is established by the facts alleged

17   in FAC §§ V.H - V.K.

18          POM seeks to dismiss the *unjust enrichment* claim because "there is no standalone cause of

19   action for unjust enrichment." (Mot. at 24.) What POM fails to appreciate is that California has a split

20   of authority on the issue, *Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1260 (N.D. Cal. 2014), and courts

21   have frequently construed "unjust enrichment" as a "quasi-contract claim seeking restitution."

22   *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014). Here, Plaintiffs' unjust

23   enrichment claim can lie under California law as "the result of a failure to make restitution under

24   circumstances where it is equitable to do so." *Mohebbi*, 50 F. Supp. 3d at 1260. POM was unjustly

25   enriched with Mocha Mill's assets and business, thereby warranting restitution.

26          California's *unfair competition law* (UCL) redresses "any unlawful, unfair or fraudulent

27   business act or practice." *McGill v. Citibank*, N.A., 2 Cal. 5th 945, 954 (2017) (citing Cal. Bus. & Prof.

28   Code, § 17200). UCL entitles private parties to both injunctive relief and restitution. *See* Cal. Cal. Bus.

& Prof. Code, § 17203. "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Korea Supply Co. v. Lockheed Martin Corp*., 29 Cal. 4th 1134, 1149 (2003). But restitution under the UCL "is not limited only to the return of money or property that was once in the possession of [the plaintiff]," and "is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest." *Juarez v. Arcadia Financial, Ltd*., 152 Cal. App. 4th 889, 894 (2007) (quoting *Korea Supply*, 29 Cal. 4th at 1149). Applying these principles here, Plaintiffs allege that through RICO violations and fraud conspiracies, POM defrauded Mocha Mill out of its best coffee at the critical moment of launch, virtually stealing and siphoning to POM all assets and opportunities that rightfully belong to Mocha Mill. Under UCL, Plaintiffs seek restitution for the fraudulent coffee sale as well as the resulting loss of the business in which Plaintiff certainly have a vested interest. Plaintiffs also seek an injunction enjoining Defendants from profiting off of their criminal endeavor and restructuring Port of Mokha to provide Plaintiffs their rightful shares and decision-making authority in a company built on Plaintiffs' backs and stolen through fraud and racketeering. The claim should stand.

### G.    POM's Standing Arguments Ignore Plaintiffs' Partnership and Joint Venture

POM's arguments against standing (Mot. at 20-21) miss the point that the individual Plaintiffs entered into a partnership and joint venture with Mokhtar and it is the partnership that owns Mocha Mill. (*See* FAC 61-72.) Thus, in addition to Mocha Mill's standing as the defrauded corporation, the individual Plaintiffs have standing as Mokhtar's defrauded partners. *See, e.g., Second Measure, Inc. v. Kim*, 143 F.Supp 3d 961, 971 (N.D. Cal. 2015). As for the Monk of Mocha plaintiff (named in an abundance of caution for its early investments), if all Defendants stipulate and the Court agrees that Mocha Mill, as successor to Monk of Mocha, retains all Monk of Mocha claims, as POM suggests (*id*.), then Plaintiffs would agree to dismiss the Monk of Mocha plaintiff only.

/ / /

/ / /

1

2   **IV.     CONCLUSION**

3          For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion

4   or, if the Court finds a deficiency, at least provide Plaintiffs the opportunity to amend their Complaint.

5

6    Dated: August 27, 2018                          Respectfully submitted,

7                                                    */s/ Yasin M. Almadani*
                                                     YASIN M. ALMADANI
8                                                    ALMADANI LAW

9                                                    TERRENCE M. JONES
                                                     THE LAW OFFICE OF TERRENCE JONES
10

11                                                   *Attorneys for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2     I, Yasin M. Almadni, hereby certify that I have electronically filed the above-captioned

3 document with the Clerk of the Court using the CM/ECF system, which will automatically send an e-

4 mail notification of such filing to Defendants' counsel of record as listed below:

5

6   Michael Shipley                          Mark R. Conrad
    KIRKLAND & ELLIS LLP                      CONRAD & METLITZKY LLP
7   333 South Hope Street, Suite 2900        4 Embarcadero Center, Suite 1400
    Los Angeles, CA 90071                    San Francisco, CA 94111
8   T: (213) 680-8400                        T: (415) 343-7102
    E: michael.shipley@kirkland.com          E-Mail: mconrad@conradmetlitzky.com
9

10  *Attorneys for Defendant*                *Attorneys for Defendants Port of Mokha, Inc.,*
    *Blue Bottle Coffee, Inc.*               *Port of Mokha LLC, Mokha Foundation, Mokhtar*
11                                           *Alkhanshali, and Ibrahim Ahmad Ibrahim*

12

13  Frank Busch
    KERR & WAGSTAFFE LLP
14  101 Mission Street, 18th Floor
    San Francisco, CA 94105
15  T: (415) 357-8902
    E: busch@kerrwagstaffe.com
16

17  *Attorneys for Defendants*
    *Metra Computer Group FZCO*
18  *and T&H Computers, Inc.*

19

20    I declare under penalty of perjury under the laws of the State of California that the foregoing is

21 true and correct.

22  Dated:  August 27, 2018                  Yasin M. Almadni
                                             ALMADANI LAW
23
                                             Terrence M. Jones
24                                           THE LAW OFFICE OF TERRENCE JONES

25                                            */s/ Yasin M. Almadani*

26                                           *Attorneys for Plaintiffs*

27

28