1  Yasin M. Almadani (Cal. Bar No. 242798)
   ALMADANI LAW
2  14742 Beach Blvd., Suite 410
   La Mirada, California 90638
3  (213) 335-3935 | YMA@LawAlm.com

4  Terrence M. Jones (Cal. Bar No. 256603)
   THE LAW OFFICE OF TERRENCE JONES
5  6737 Bright Ave., Suite B6
   Whittier, California 90601
6  (213) 863-4490 | Terrence@JonesOnLaw.com

7  *Attorneys for Plaintiffs*

8
                 **UNITED STATES DISTRICT COURT**
9
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10
                       **OAKLAND DIVISION**
11

12  MOCHA MILL, INC., *et al.*,            Case No. 4:18-CV-2539-HSG

13              Plaintiffs,

14                  v.                     **PLAINTIFFS' OPPOSITION TO BLUE
                                           BOTTLE COFFEE INC.'S MOTION TO
15  PORT OF MOKHA, INC., *et al.*,         DISMISS FIRST AMENDED COMPLAINT;**

16              Defendants.                Hon. Haywood S. Gilliam, Jr.
                                           United States District Judge
17
                                           Courtroom:  Two (Fourth Floor)
18                                         Date:       September 27, 2018
                                           Time:       2:00 p.m.
19

20

21

22

23

24

25

26

27

28

1    Plaintiffs Mocha Mill, Inc., Monk of Mocha Specialty Coffee Production and Export, Inc.,

2    Ibrahim A. Alaeli, Yasir H. Khanshali, and Adnan G. Awnallah (collectively, "Plaintiffs"), by and

3    through their counsel of record, Yasin M. Almadani and Terrence M. Jones, hereby file their opposition

4    to Defendant Blue Bottle Coffee Inc.'s Motion to Dismiss Plaintiffs' First Amended Complaint.

5    This opposition is based upon the attached memorandum of points and authorities, the

6    declaration of Yasin M. Almadani and its accompanying exhibits, the files and records in this case, and

7    such further evidence and argument as the Court may permit.

8    Dated: August 27, 2018                         Respectfully submitted,

9

10          ___/s/ Yasin M. Almadani_____
     YASIN M. ALMADANI
11   ALMADANI LAW

12   TERRENCE M. JONES
     THE LAW OFFICE OF TERRENCE JONES
13
     *Attorneys for Plaintiffs*

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   SUMMARY OF FACTS ALLEGED IN THE 73-PAGE CIVIL RICO COMPLAINT ....................... 1

III.    ARGUMENT ..................................................................................................... 3

A.   LEGAL STANDARD ............................................................................................. 3

B.   PLAINTIFFS HAVE SUFFICIENTLY PLED EACH RICO PREDICATE UNDER RULES 8(A)(2) AND 9(B) ........ 4

1.    PLAINTIFFS SUFFICIENTLY PLEAD EMBEZZLEMENT AND WIRE FRAUD FROM APRIL 2014 TO DECEMBER 2014 AS PART OF A PATTERN OF RACKETEERING ACTIVITY ........................................ 5

2.    PLAINTIFFS SUFFICIENTLY PLEAD EXTORTION IN MARCH 2015 AS PART OF A PATTERN OF RACKETEERING ACTIVITY ........................................................................................ 6

3.    PLAINTIFFS SUFFICIENTLY PLEAD WIRE FRAUD AND EXTORTION FROM JUNE TO NOVEMBER 2015 AS PART OF A PATTERN OF RACKETEERING ACTIVITY ............................................................ 8

4.    PLAINTIFFS SUFFICIENTLY PLEAD WIRE FRAUD SCHEMES AND CONSPIRACIES FROM NOVEMBER 2015 TO JUNE 2016 AS PART OF A PATTERN OF RACKETEERING ACTIVITY ......................................... 9

C.   BLUE BOTTLE'S ATTEMPTS TO INVENT "INTERNAL DISCREPANCIES" ARE UNSUPPORTED ................ 18

D.   BLUE BOTTLE'S REMAINING ARGUMENTS CONCERNING RICO TECHNICALITIES EITHER IGNORE THE LAW OR DEMONSTRATE A FUNDAMENTAL MISUNDERSTANDING OF IT ................................... 19

1.    PLAINTIFFS SUFFICIENTLY ALLEGE ENTERPRISE AND PATTERN ......................................... 19

2.    PLAINTIFFS SUFFICIENTLY ALLEGE RICO CONSPIRACY ................................................ 22

E.   BLUE BOTTLE'S ARGUMENTS AGAINST PLAINTIFFS' STATE LAW CLAIMS ARE MISLEADING ............ 23

F.   BLUE BOTTLE'S STANDING ARGUMENTS IGNORE PLAINTIFFS' PARTNERSHIP AND JOINT VENTURE .. 25

IV.    CONCLUSION ................................................................................................. 26

i

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Blue Bottle's Motion suffers from deliberate omissions and tactical sophistry, and is missing the depth of analysis required of such a motion, which seeks to deny Plaintiffs their day in Court.[1]

As a threshold matter, conspicuously absent from the Motion is the standard by which a motion under Rule 12(b) should be decided. Of course, this is of no surprise because the standard hurts Blue Bottle's arguments against the detailed 73-page Complaint, laying out the specific facts that comprise each claim to satisfy Rule 8 and Rule 9(b) as concerning the fraud allegations.

Also missing from the Motion are wholesale portions of the FAC and the detail in which they are pled. By this methodical cherry picking, Blue Bottle advances positions that are misleading. And while the Motion cites lashings of law (even overruled law, *see infra* § III.D.2), it provides little in the way of analysis, asserting only misleading conclusions. Blue Bottle demonstrates a fundamental misunderstanding of RICO conspiracy and its predicates.

***Issue***. Does the FAC sufficiently plead facts to make it *plausible* that between November 2015 and June 2016, Blue Bottle, *as a RICO coconspirator* under 18 U.S.C. § 1962(d): (i) knew about the Port of Mokha enterprise ("POM") and its fraud scheme to supplant Mocha Mill; and (ii) agreed to facilitate that scheme? Yes, the FAC makes RICO conspirator liability on Blue Bottle's part entirely *plausible*, in fact, probable as explained below. *See infra*, particularly § III.D.2.

## II.   SUMMARY OF FACTS ALLEGED IN THE 73-PAGE CIVIL RICO COMPLAINT

To characterize the allegations in the FAC as conclusory assertions, as Blue Bottle so attempts, is just untrue. Plaintiffs (who are represented by two former Assistant United States Attorneys) filed an incredibly detailed civil RICO complaint, alleging a long (and still continuing) pattern of racketeering activity, including fraud, extortion, and money laundering undertaken for the purpose of stealing Plaintiffs' assets and business over the course of years, leaving the company crippled. The FAC includes detailed allegations with references to specific emails, agreements, conversations, actions, and

---

[1] "Plaintiffs" refers to Plaintiffs collectively. "Blue Bottle" refers to Defendant "Blue Bottle Coffee Inc." "Motion" refers to Blue Bottle's Motion to Dismiss Plaintiffs' First Amended Complaint ("Complaint" or "FAC"). "RICO" refers to the Racketeer Influenced and Corrupt Organizations Act.

transactions evidencing RICO violations, and describes how Defendants profited from their racketeering activities to steal Mocha Mill assets, ultimately stealing a business worth $250 million.

The FAC details Mocha Mill's development. (FAC ¶¶ 89-98.) Plaintiffs' business plan was to locate, cultivate, refine, import, and sell for the first time in centuries premium Yemeni coffee under the Mocha Mill brand. (*Id.*) They partnered with Defendant Mokhtar Alkhanshali ("Mokhtar"), made him Mocha Mill CEO, and invested years of time and effort and over half a million dollars into him and the company to develop relationships with key Yemeni farmers and high-end distributors. (*Id.*) In 2015, experts scored Mocha Mill's coffee among the best tasting in the world. (*Id.* ¶¶ 105-06.) Mocha Mill was poised for tremendous success and was preparing a big launch in 2016. (*Id.* ¶¶ 104-114.) But Mokhtar, motivated by his own greed and ego, had been spearheading a years-long scheme to loot and usurp Mocha Mill's assets and business through a pattern of racketeering activity, which the FAC details with painstaking particularity: **(a)** *embezzlement by wire fraud* (Apr 2014 to Dec 2015) (*id.* ¶¶ 89-96); **(b)** *extortion* (Mar 2015) (*id.* ¶¶ 97-103); **(c)** *wire fraud* and *attempted extortion* (Jun to Nov 2015) (*id.* ¶¶ 121-125); **(d)** *wire fraud* (Nov 2015 to Jun 2016) (*id.* 24 ¶¶ 135-194); **(e)** *extortion* (Apr to Jun 2016) (*id.* ¶¶ 195-199); **(f)** *obstruction* (May 2016 to possibly present) (*id.* ¶¶ 200-201); **(g)** *money laundering* (May 2016 to present) (*id.* ¶¶ 202-204), all as part of a RICO scheme and conspiracy related by a common leader (*Mokhtar*), with common participants (*Mokhtar and his enterprise recruits*), for a common purpose (*to steal and usurp Plaintiffs' assets and business*), using common methods of commission (*wire fraud* and *extortion*), upon common victims (*Plaintiffs*).

Today, Defendants (particularly POM and Blue Bottle) thrive on the labor and assets stolen by their racketeering acts. (Id. ¶¶ 5-9, 184-94.) Having unlawfully supplanted Mocha Mill, siphoning over its first-mover advantage, assets, and relationships, POM now values its business in excess of $250 million. (*Id.*) POM sells its Yemeni coffee varieties to Blue Bottle for upwards of $135 per kilogram. (*Id.*) Blue Bottle, in turn, sells 12-ounce retail bags of the coffee to consumers for $50 and single servings for $16 per cup (*id.*); the coffee has since been awarded the highest score in history (*id.* ¶ 135). Indeed, on the heels of introducing Mocha Mill's stolen coffee varieties to its specialty retail lineup and the attendant boost to its brand and profitability, Blue Bottle sold a majority stake in its company to Nestlé for an estimated $425 million. (*Id.* ¶ 9, 191.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III.   ARGUMENT

### A.   Legal Standard

A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim."[2] *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Since Rule 12(b)(6) is concerned with a claim's sufficiency rather than its substantive merits, courts typically "look only at the face of the complaint" when faced with a motion to dismiss. *Van Buskirk v. Cable News Network*, Inc., 284 F.3d 977, 980 (9th Cir. 2002). Allegations of material fact must be taken as true and construed in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-338 (9th Cir. 1996); *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir.1987) (the court must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party); *Walling v. Beverly Enters.*, 476 F.2d 393, 396 (9th Cir.1973) (any existing ambiguities must be resolved in favor of the pleading); *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 926 (N.D. Cal. 2013) (same).

Pursuant to Rule 8, a motion to dismiss should be denied where the plaintiff pleads "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. at 556. The plausibility standard, however, is not akin to a "probability requirement." *Id*. Thus, it remains true that "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Well-pleaded allegations are those that go beyond the elements of a crime and allege the underlying facts that establish the plausibility of those elements. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). And "if there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Id*. "Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible," *id*. (emphasis in original), and if "it is clear that no relief could be granted under any set of facts that could be proved

---

[2] Unless noted otherwise, the "Rules" referenced are the Federal Rules of Civil Procedure.

3

1    consistent with the allegations." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 249–50 (1989); *Odom v.*

2    *Microsoft Corp.*, 486 F.3d 541, 545 (9th Cir. 2007) (same).

3           Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or

4    mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

5    To comply with Rule 9(b), allegations of fraud must "be specific enough to give defendants notice of

6    the particular misconduct which is alleged to constitute the fraud charged so that they can defend

7    against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*,

8    567 F.3d 1120, 1124 (9th Cir. 2009). That is, fraud claims must be must be pled "with particularity," a

9    phrase the Ninth Circuit has interpreted as meaning, essentially, "the who, what, when, where, and how

10   of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

11          **B.      Plaintiffs Have Sufficiently Pled Each RICO Predicate under Rules 8(a)(2) and 9(b)**

12          Blue Bottle's primary contention is that "the Complaint makes not even the slightest effort to

13   afford defendants notice of how the elements of the underlying predicate offenses are satisfied." (Mot.

14   at 9.) Blue Bottle not only makes this bold claim without explanation, it misstates both the facts and the

15   law, completely ignoring Section V of the FAC, titled "Facts Common to All Counts," alleging in detail

16   (over the course of 42 pages) the facts underlying the RICO scheme and conspiracy. (FAC ¶¶ 60-204.)

17          In order to appreciate the scope of the racketeering scheme, it is important to first understand

18   Mocha Mill's formation. The company started as a two-way partnership between Plaintiff Alaeli and

19   Defendant Mokhtar in October 2013, and was expanded to a four-way equal partnership in April 2014,

20   adding Plaintiffs Khanshali and Awnallah (the "Mocha Mill Partnership"). (*Id*. ¶¶ 60-70.) Each partner

21   owned an equal share in Mocha Mill, Inc., which was formed to locate, source, cultivate, purchase,

22   import, market, and sell for the very first time ultra-premium coffee from Yemen (the birthplace of

23   coffee). (*Id*.) Plaintiffs agreed to provide the legitimacy and business acumen and pay all expenses to

24   build and grow the company into a dominant force in the coffee market, while Mokhtar, who had no

25   money or experience at the time, agreed to contribute "sweat equity" and later add capital when he had

26   the means to do so. (*Id*. ¶ 70.) The partners agreed to not start competing coffee businesses to ensure

27   against one partner walking away with the investments of the others. (*Id*. ¶ 71.) Mokhtar was made

28   CEO and given full access to Mocha Mill accounts with the agreement that he would itemize all his

4

*Plaintiff's Opposition to Blue Bottle Coffee Inc's*                    *Case No. 4:18-CV-2539-HSG*
*Motion to Dismiss Plaintiff's First Amended Complaint*

expenses with receipts or like documentation. (*Id*. ¶ 72.)

Plaintiffs invested over half a million dollars and significant time and effort to: (a) educate Mokhtar in the coffee trade; (b) have him travel nationally and internationally to develop relationships *for Mocha Mill* with Yemeni coffee farmers (to source the coffee), and high-end coffee distributors and retailers (to sell the coffee); (d) train Yemeni coffee farmers to improve the quality of their crop; (e) set up coffee processing infrastructure in Yemen; (f) ensure proper cultivation; and (g) purchase, package, and import the coffee for sale worldwide under the *Mocha Mill* brand. (*Id*. ¶¶ 73-88.)

Despite this, from nearly the beginning, Mokhtar devised and led a scheme and conspiracy to steal Mocha Mill's assets and business through a growing enterprise of associates engaging in years of racketeering activity, including wire fraud, extortion, and ongoing money laundering. (*Id*. ¶¶ 55-59.)

### 1.   *Plaintiffs Sufficiently Plead Embezzlement and Wire Fraud from April 2014 to December 2014 as Part of a Pattern of Racketeering Activity*

Against Plaintiffs' wire fraud allegations detailed over the course of 182 paragraphs and sub-paragraphs, Blue Bottle makes the unsupported claim that "[t]he wire fraud acts, in particular, are alleged in a cryptic hide-the-ball manner." (Mot. at 9). Immediately thereafter, Blue Bottle summarily characterizes all allegations as "unsupported" and "sinister," and concludes its argument right after that by citing law for the proposition that length does not necessarily equate to particularity. (*Id*.). Blue Bottle then moves on to a different (equally unsupported) argument but does nothing to explain how Plaintiffs' 41 pages of detailed facts are insufficient. (*See id*.) Plaintiffs are left to explain the obvious.

Wire fraud consists of (1) a scheme to defraud; (2) use or causing reasonably foreseeable use of the U.S. wires in furtherance of the scheme; and (3) specific intent to deceive or defraud. *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986); *Bias*, 942 F. Supp. 2d at 937; *United States v. Garner*, 663 F.2d 834, 838 (9th Cir.1981). Specific intent is shown if the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension by way of a material misrepresentation or omission of material fact. *United States v. Bohonus*, 628 F.2d 1167, 1172-73 (9th Cir. 1980). The first and third elements of wire fraud may be pled generally, and so "[t]he only aspects of wire fraud that require particularized allegations [under Rule 9(b)] are the factual circumstances of the fraud itself." *Odom*, 486 F.3d at 554.

5

*Plaintiff's Opposition to Blue Bottle Coffee Inc's*                                    *Case No. 4:18-CV-2539-HSG*
*Motion to Dismiss Plaintiff's First Amended Complaint*

Embezzlement (by wire fraud) is a predicate offense under Section 1962(c); indeed, the Supreme Court has recognized that RICO applies "when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority." *Bias*, 942 F. Supp. 2d at 939 (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001)); *see also Graham v. Slaughter*, 624 F. Supp. 222, 225 (N.D. Ill. 1985) ("two-year practice of embezzling funds from a company through otherwise separate transactions constitutes a "pattern of racketeering activity" notwithstanding the fact that the numerous acts arguably comprised a single criminal scheme").

Under this rubric, Plaintiffs allege that Mokhtar's racketeering activity began in April 2014 when he (as company CEO) devised *a scheme to defraud* Mocha Mill and his business partners, *conducting the affairs of Mocha Mill* (*the enterprise*) to embezzle cash from company accounts *under the guise* of necessary and legitimate business expenses. (*Id*. ¶¶ 89-96).  Plaintiffs satisfy Rule 9(b) by alleging that over the course of 21 months (between April 2014 and December 2015), Mokhtar engaged in no less than *85 separate wire transactions* in furtherance of his fraud scheme to steal company assets (each an act of wire fraud) with *dates*, *amounts*, and *account numbers*, totaling $140,942 in embezzled funds. (*Id*. at ¶¶ 91-93). Plaintiffs allege that Mokhtar has been unable to account for this large sum of money despite his obligation to do so as Mocha Mill CEO, and that the embezzled funds were used to facilitate additional predicate racketeering acts designed to loot Mocha Mill assets, ultimately paving the path for Port of Mokha to usurp the entire business through a related pattern of racketeering activity, detailed in the FAC. (*Id*. ¶¶ 94-96). These allegations are not legal conclusions, but rather specific facts supporting the elements of wire fraud in a growing RICO scheme.

### 2.   *Plaintiffs Sufficiently Plead Extortion in March 2015 as Part of a Pattern of Racketeering Activity*

"Extortion" under the Hobbs Act, "means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Fear, in the context of the Hobbs Act, can include fear of economic loss. *See, e.g., Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1133–34 (9th Cir. 2014); *United States v. Greger*, 716 F.2d 1275, 1278–79 (9th Cir.1983). A defendant commits extortion when the obtaining of

6

*Plaintiff's Opposition to Blue Bottle Coffee Inc's*
*Motion to Dismiss Plaintiff's First Amended Complaint*                              *Case No. 4:18-CV-2539-HSG*

the property would itself be wrongful because the alleged extortionist has no lawful claim to that property. *United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO*, 770 F.3d 834, 838 (9th Cir. 2014). Thus, a forced transaction is extortionate where nothing of objective value is transferred to the plaintiff. *See id*. Only a *de minimis* effect on interstate commerce is required under the Hobbs Act, and the effect need only be probable or potential, not actual. *United States v. Lynch*, 437 F.3d 902, 908-09 (9th Cir. 2006) (*en banc*). Extortion, which is not fraud, is not subject to the particularity requirement of Rule 9(b), but rather may be satisfied under Rule 8(a)(2) with a "short and plain statement" demonstrating plausibility of the claim. *See supra* § III.A. The elements of extortion under federal and California law are substantially the same. *Levitt*, 765 F.3d at 1133.

Plaintiffs allege that by the first quarter of 2015, Plaintiffs' significant investments had enriched Moktar as company CEO with tremendous knowledge and industry relationships built on Mocha Mill and his partners' backs. (FAC ¶ 97.) But Mokhtar continued his racketeering activity into March 2015 realizing that Mocha Mill was poised for tremendous success. (*Id*. ¶¶ 97-103.) In spite of his fiduciary duty and agreement with his partners not to start a competing business, Mokhtar, as CEO, conducted the affairs of the Mocha Mill enterprise (albeit beyond the scope of his corporate authority) by secretly lining up competing investors, and began demanding that his three partners give him large portions of their Mocha Mill shares for no consideration at all, threatening to walk away with Mocha Mill's farmer and distributor relationships and vast knowledgebase that the company had helped him develop. (*Id*. ¶¶ 99-100). Plaintiffs pleaded that Mokhtar's demands were contrary to their agreement, and would deprive them of their rightful shares, but Mokhtar was intractable. (*Id*. ¶ 101.) Improperly placing Plaintiffs in fear of economic harm by threatening to walk away with company assets that did not belong to him, Mokhtar extorted Plaintiffs into signing an agreement that increased his share in Mocha Mill from 25% to 40% at the expense of his partners' (Plaintiffs') rightful shares for no consideration at all. (*Id*. ¶ 102). Mokhtar's actions were not "hard-bargaining," as Blue Bottle suggests. (Mot. at 10). Rather, they were clearly extortionate because, by his partnership agreement and fiduciary duty to both his partners and the company (as CEO), he was entitled neither to misappropriate company assets nor to take his partners' rightful shares for free. And if Mokhtar disputes this, then there is a genuine triable issue of fact, not even appropriate for summary judgement let alone a motion to dismiss.

7

And to be clear, the FAC unequivocally establishes RICO activity—that by engaging in this extortion, Mokhtar, as Mocha Mill CEO, "unlawfully conduct[ed] the affairs of the corporation . . . beyond the scope of [his] corporate authority," as part of a pattern of racketeering activity to unlawfully usurp Plaintiffs' assets and business. *See King*, 533 U.S. at 158; *see also Bias* 942 F. Supp. 2d at 939.

### 3. Plaintiffs Sufficiently Plead Wire Fraud and Extortion from June to November 2015 as Part of a Pattern of Racketeering Activity

By the summer of 2015, Mocha Mill coffee had received major attention by industry leaders and the company was poised for great success. (FAC ¶¶ 104-13.)  Upon seeing the multi-million-dollar potential, Mokhtar, as Mocha Mill CEO, solicited investors behind his partners' (Plaintiffs') backs and recruited new members into his racketeering scheme, expanding the enterprise. (*Id.* ¶¶ 114-20.) Prior to this, Mocha Mill had been the enterprise and Mokhtar had been a person employed by the enterprise conducting its affairs through a pattern of racketeering activity, including fraud and extortion. (*See* FAC ¶¶ 89-103.) In order to more effectively steal and usurp Mocha Mill's assets and business, Mokhtar expanded the enterprise into an association-in-fact enterprise to include himself, Defendant Ahmad Ibrahim ("Ahmad"), Stephen Ezell, Inder Comar ("Comar"), and, of course, victim Mocha Mill at Mokhtar's beck and call. (*Id.* ¶¶ 114-20.) This association-in-fact enterprise operated in the shadows as the "Port of Mokha" enterprise ("POM") with a hierarchical structure detailed in the Complaint. (*Id.* ¶¶ 119-20.) POM members conducted its affairs with the continuing objective to steal Mocha Mill's assets and business through a pattern of racketeering activity, including numerous acts of fraud, deception, extortion, and money laundering. (*Id.* ¶¶ 114-20, 121-204.)

Continuing the pattern of racketeering activity to steal Mocha Mill's assets and business, Mokhtar engaged Comar in or about June 2015 to purportedly do some corporate work for Mocha Mill, but in fact, the two conspired to execute a *fraud scheme* to dilute Plaintiffs' ownership in Mocha Mill by having Comar provide inadvisable (in fact, unlawful) recommendations to Plaintiffs, with intentional material omissions, under the guise of legitimate legal advice.[3] (*Id.* ¶¶ 121-22.) Plaintiffs satisfy Rule

---

[3] For this and the remaining wire fraud claims, Plaintiffs plead both a scheme and conspiracy to commit wire fraud. And while the allegations support both scheme and conspiracy, it should be noted that "the substantive law of this circuit is that co-schemer liability for mail or wire fraud does not require proof of a conspiracy." *United States v. Stapleton*, 293 F.3d 1111, 1120 (9th Cir. 2002).

9(b) alleging that in furtherance of the wire fraud scheme and conspiracy, Comar and Mokhtar sent emails (each an act of wire fraud detailing *names*, *dates*, and *content*) advising Plaintiffs to take actions that would effectively dilute their ownership in Mocha Mill and amount to tax evasion, while deliberately and with the intent to deceive omitting from those emails the negative dilution and tax fraud implications, which was certainly material information concerning the advice given.  (*Id.* ¶ 122.)

When the fraud conspiracy failed, Mokhtar attempted another round of extortion in September 2015 to usurp Mocha Mill's business, threatening again to walk away with Mocha Mill's assets and relationships and start a competing company (very similar to the March 2015 extortion). Mokhtar tried to scare his partners into giving up more shares to increase Mokhtar's share in the company to 85%, using an agreement drafted by Comar. (*Id.* ¶¶ 123-24.) This time, Plaintiffs felt more protected by the March 2015 written partnership agreement (albeit executed under duress through extortion), because the agreement memorialized their initial April 2014 partnership agreement to not start a competing business. (*Id.* ¶¶ 125, 97-103.) Plaintiffs refused but Mokhtar's attempt was still a crime. *United States v. Ward*, 914 F.2d 1340, 1345 (9th Cir. 1990) (a person may be guilty of an attempt when he takes a substantial step "to try to commit an extortion even though no extortion is in fact carried out").

### 4.    *Plaintiffs Sufficiently Plead Wire Fraud Schemes and Conspiracies from November 2015 to June 2016 as Part of a Pattern of Racketeering Activity*

Plaintiffs allege that undeterred by the failed June-November 2015 wire fraud scheme and extortion attempt, Mokhtar and his associates continued their racketeering activity to steal Mocha Mill's assets and business, executing two wire fraud schemes in conspiracy with Defendants Blue Bottle and T&H/Metra to supplant Mocha Mill all together.[4] (FAC ¶ 126-28, 129-204.) Plaintiffs detail the conspiracy, alleging the underlying facts with supporting emails, admissions, conversations, and publications. (*Id.*) Nevertheless, Blue Bottle ridicules Plaintiffs' information and belief allegations in conclusory fashion, asking the Court to summarily ignore them, even though they are based on sound reason and documentation. (*See, e.g.*, Ex.1 vis-à-vis FAC ¶¶ 160-65.) But the law prohibits this—at this

---

[4] Plaintiffs allege violations of 18 U.S.C. § 1343, as well as Cal. Penal Code §§ 487 and 532. Blue Bottle claims that §§ 487 and 532 are not punishable by more than one-year imprisonment. (*See* Mot. at 9.) This is untrue.  Both crimes are "wobblers" that are punishable by more than one-year imprisonment under Cal Penal Code § 1170(h) as a result of the aggravating factors present here under Cal Rule of Court 4.421, including high monetary value and abuse of a position of trust.

1   stage, the law requires well-pleaded allegations to be presumed true. *Iqbal*, 556 at 679. And well-

2   pleaded allegations are simply those that go beyond the elements of a claim and allege the underlying

3   facts to establish the plausibility of those elements. *See Starr*, 652 F.3d at 1216. Plaintiffs' allegations

4   do just that. In fact, they go far beyond an elemental recitation to detail the scheme ("paragraph after

5   paragraph of mundane detail," as Blue Bottle puts it (Mot. at 1)) based on emails, documents, public

6   admissions, industry practice, common sense, and reasoned inference, more than sufficiently

7   establishing the plausibility of the racketeering activity and Blue Bottle's involvement in it.

8         Plaintiffs even detail the background providing the economic motivation for the fraud, alleging

9   the following: Having emerged as the pioneer and standout in the rebirth of premium Yemeni coffee,

10  Mocha Mill's coffee was among the most highly anticipated varieties of 2016 with no competitors in

11  the space. (FAC ¶¶ 104-07, 135.) Mokhtar, as Mocha Mill CEO, had developed both a professional and

12  personal relationship with Blue Bottle CEO James Freeman ("Freeman"). (*Id*. ¶ 106.) Mocha Mill had

13  impressed Freeman who had been "floored" by Mocha Mill coffee, saying of his first cupping that,

14  "***This is what angels singing tastes like***." (*Id*. ¶¶ 106-07, 145).  According to Blue Bottle, when CEO

15  Freeman first tried Mocha Mill coffee in 2015, "***it stopped [him] in his tracks***.  *He remembers exactly*

16  *where it was on the cupping table*—***it's hard to forget a transcendent encounter like that***—*and [Blue*

17  *Bottle has] been* ***counting the days*** *until [it] could share* ***this veritable coffee miracle*** *from Yemen with*

18  *[its] guests*." (*Id*. ¶ 145.) Furthermore, it is common knowledge in the coffee industry that high-end

19  retailers like Blue Bottle prefer to acquire and sell new coffee arrivals at the earliest possible date for

20  freshness and taste. (*Id*. ¶ 146.) Indeed, Blue Bottle believed it could sell the coffee at its retail locations

21  for upwards of $16 per cup and was seeking preferred access to "this veritable coffee miracle." (*Id*.

22  ¶ 107-08). Blue Bottle had even begun advertising the Mocha Mill coffee on its Instagram feed as early

23  as *April 2015*, titillating customers with the expected arrival to Blue Bottle of a most exquisite coffee

24  sourced from the very birthplace of coffee itself. (*Id*. ¶ 135). Plaintiffs further allege that that same year

25  (2015) Blue Bottle completed a venture capital round in which it raised more than $70 million, in part

26  using its expected special access to Mocha Mill's premium Yemeni coffee as part of its growth pitch to

27  potential investors, namely, that it would secure preferred access to this specialty coffee, sell it at an

28  incredibly high price-point, and build tremendous brand recognition. (*Id*. ¶ 108). There is no

1    unreasonable inference here, as Blue Bottle suggests. Indeed, Blue Bottle advertised the coffee as early

2    as April 2015 and its *CEO* called it a "miracle" likening it to "angels singing." So, when Bottle Blue,

3    whose core business is specialty coffee, expects to partner with and gain exclusivity to the most highly

4    anticipated coffee of the year—a coffee that Blue Bottle's CEO publicly compares to angelic song—the

5    only reasonable inference is that that coffee would be front and center at investment and acquisition

6    presentations. It is implausible, nearly impossible, in fact, to infer otherwise as it would be akin to

7    inferring that Apple wouldn't mention a breakthrough iPhone at an investor event.

8            Plaintiffs further allege that by November 2015, high-end distributors, including Blue Bottle,

9    had placed orders and made commitments to buy Mocha Mill coffee for $100 to $135 per kilogram. (*Id*.

10   ¶ 136.) Mokhtar (as CEO) had agreed and the coffee had been sold in principle. (*Id*.) So, using funds

11   provided by Mokhtar's partners (the individual Plaintiffs), Mocha Mill invested hundreds of thousands

12   of dollars to purchase, process, and import the best of Yemeni coffee to fill the orders, Blue Bottle's

13   order being the most significant. (*Id*. ¶109.) Mocha Mill had positioned itself to be the first (and only)

14   company to market this highly anticipated ultra-premium Yemeni coffee to high-end retailers, which

15   was sure to propel the company to the forefront of the specialty coffee market.  (*Id*.) Furthermore,

16   Mokhtar, as Mocha Mill CEO, started spending significant time with Dave Eggers (a prominent author)

17   to work on the Mocha Mill book, telling Plaintiffs that his time as company CEO was well-spent with

18   Eggers because the book would greatly benefit Mocha Mill's marketing and business relationships with

19   major distributors, most prominently Blue Bottle. (*Id*. ¶ 111-12.) Mokhtar used Mocha Mill funds,

20   embezzled and otherwise, to pay for significant international travel with Eggers to work on the book.

21   (*Id*. ¶ 113.) Ultimately, however, as part of the RICO scheme to usurp Plaintiffs' assets and business,

22   Mokhtar convinced Eggers to drop Mocha Mill from the story and, instead, falsely profile POM and

23   Blue Bottle. (*Id*. ¶¶ 112, 129-34, 159.) Contrary to Blue Bottle's suggestion, none of these allegations

24   are speculation. They are specific facts provable by emails and Eggers' own published work.

25           Plaintiffs allege that the POM associates sought to steal Mocha Mill's lucrative first-mover

26   competitive advantage and siphon Mocha Mill's most valuable assets and relationships to POM,

27   decimating competitor Mocha Mill in the process. (*Id*. ¶ 135). But POM needed Mocha Mill's coffee to

28   do that. (*Id*. ¶ 138.) Plaintiffs were expecting a grand Mocha Mill launch with premier distribution,

paving the way for tremendous brand value, long-lasting relationships, and exponential growth.  (*Id.* ¶ 139.)  Plaintiffs had no intention of allowing a competitor to swoop in and steal the imminent fruits of their years of labor and investment in Mocha Mill. (*Id*.) This is precisely why Mokhtar had been operating POM in the shadows; he understood that if Plaintiffs got wind of his scheme, they obviously would not allow it. (*Id*. ¶¶ 138-39.) This is not conjecture but provable fact.

Plaintiffs allege in great detail, citing documents and emails, that, in order to steal Mocha Mill's *most premium* coffee, Mokhtar and his RICO associates devised two *schemes to defraud* Plaintiffs into selling that coffee to a straw buyer arranged by POM. (*Id.* ¶¶ 140-94.) POM associates conspired with Blue Bottle to mislead Plaintiffs into believing that high-end retailers and distributors, most notably Blue Bottle, were no longer interested in Mocha Mill coffee. The underlying facts are detailed in the FAC and include references to emails with *names*, *dates*, and *content*. (*Id.* ¶¶ 140-94.)

As discussed above, Blue Bottle was very anxious ("counting the days," in fact) to market and sell Mocha Mill coffee as soon the first shipment arrived in Oakland, which was slated for February 2016—a deal in principle with Mocha Mill was already in place. (*Id.* ¶¶ 136, 145-48.) The POM enterprise, however, needed Blue Bottle to back off, feign disinterest, affirmatively delay its marketing and rollout campaign, and direct its employees to not communicate with anyone at Mocha Mill but POM members Mokhtar and Ezell; this was to convince Plaintiffs that Blue Bottle had lost interest and that the coffee was unmarketable. (*Id.* ¶¶ 141-42.) Blue Bottle's buy-in here was necessary, as without it, the entire scheme was in danger. For example, if Blue Bottle did not affirmatively delay purchasing or even just marketing the expected coffee on its social media feed during the scheme, *as it had already done prior to the scheme*, Mokhtar's fraud would have been exposed. Plaintiffs allege in granular detail (the opposite of "conclusory") how the scheme unfolded between the CEO of Mocha Mill and the CEO of Blue Bottle; the allegations draw upon emails, documents, public admissions, industry practice, common sense, and reasoned inference, and are thus entitled to a presumption of truth.

Plaintiffs explain that in and after November 2015, *Mokhtar told Freeman about the RICO enterprise* and *explained the fraud scheme to steal Mocha Mill's coffee and supplant Mocha Mill with POM*, because Mokhtar needed Blue Bottle's complicity and help. (*Id.* ¶¶ 149.) Freeman was naturally concerned about being able to obtain Mocha Mill's coffee without Mokhtar at the company, particularly

12

if Mokhtar left on bad terms. (*Id*. ¶ 150.) Mokhtar assured Freeman that with Blue Bottle's help, POM would be able to steal the coffee from Mocha Mill by deceiving Mocha Mill into believing that Blue Bottle was unwilling to buy the coffee. (*Id*.) This would additionally help Mokhtar convince his partners that other high-end retailers were also not interested, because if Blue Bottle, the most excited buyer, was out, others were, too, by extension. None of this is speculation. It is supported by Mokhtar's own emails and what Blue Bottle said and did to support the ruse, including, *inter alia*, affirmatively delaying the purchase and marketing of Mocha Mill coffee and switching the branding to "Port of Mokha" brand while the coffee still belonged to Mocha Mill; this delay went against Blue Bottle's own strongly expressed intention and industry practice to buy the coffee as soon as it arrived, and made business sense only in relation to the fraud. *See United States v. Peters*, 962 F.2d 1410, 1414 (9th Cir.1992) ("The intent to defraud may be inferred from a defendant's statements and conduct."). So, while Plaintiffs are required to establish only *plausibility*, here they go beyond to establish probability.

In further support of plausibility, Plaintiffs detail the promises Mokhtar made to Freeman for Blue Bottle's part in the fraud scheme—promises Mokhtar delivered on after stealing the coffee with Blue Bottle's help. Mokhtar convinced Freeman that it was in Blue Bottle's best interest to participate in the scheme, assuring Freeman that if Blue Bottle joined the conspiracy, it would receive the coffee from POM along with several significant benefits, including: (a) special exclusivity and first-pick of the top varieties; (b) tremendous publicity as the first modern-day importer (Port of Mokha) and retailer (Blue Bottle) of premium varieties from the birthplace of coffee, as well as prominent placement in Eggers' highly anticipated book about the coffee; (c) direct investment in Yemeni farmer relationships, allowing Blue Bottle to market itself as an on-the-ground supporter of the resurrection of premium Yemeni coffee and garner the goodwill associated with its "grassroots" engagement with Yemeni farmers; (d) investment in future harvests, giving Blue Bottle special access to the best Yemeni coffee farms producing the best coffee in the world, allowing Blue Bottle to increase its dominance as the premier specialty coffee retailer in the world; and (e) a close relationship with CEO Mokhtar and Port of Mokha to create a firm, long-lasting means of ensuring Blue Bottle's access to premium Yemeni coffee, all as a direct result of the relationships and opportunities stolen from Mocha Mill. (*Id*. ¶ 151.) These are significant benefits evidencing *a very rational economic motive* for Blue Bottle's

13

participation in the scheme. Blue Bottle suggests that it was acting with an "ordinary business purpose." (Mot. at 15.) While Blue Bottle's motive and purpose was to make money (an "ordinary" purpose), its actions to facilitate POM's fraud were illegal. Under Blue Bottle's theory of innocence, any fraud scheme where the objective is to make money (which is, incidentally, every fraud scheme) is exempt from liability. This is non-sensical. And to be clear, Plaintiffs do not simply inject modifiers like "fraudulent" to establish plausibility, as Blue Bottle suggests. Rather, akin to *Odom*, 486 F.3d at 552 (9th Cir. 2007), Plaintiffs provide the details of the scheme—the who, what, when, and why— demonstrating that Blue Bottle and POM had the common purpose of supplanting Mocha Mill with Port of Mokha by deceiving Mocha Mill out of its most valuable assets and opportunities; Plaintiffs detail supporting conversations, documents, and emails to satisfy Rule 9(b).

Blue Bottle suggests that it was merely exercising its "freedom to contract," choosing to do business with POM over Mocha Mill. (Mot. at 15.) But this ignores the facts as they existed. It would have been one thing if Mocha Mill and POM were similarly situated competitors (both with their own coffee), and Blue Bottle decided to partner with POM instead of Mocha Mill. But that is not what happened. Here, Mocha Mill's *CEO* was operating the shadow POM enterprise and looking to abscond with Mocha Mill's best products, first-mover advantage, and business relationships, and to supplant Mocha Mill with POM by convincing his partners that Blue Bottle and others were not interested in Mocha Mill coffee. At the time of the schemes, Blue Bottle knew that POM existed only as a shadow enterprise run by Mocha Mill's CEO, as evidenced by emails between the two companies (*see* Ex. 1). (FAC ¶¶ 114-120, 126-127, 143-166.) A CEO himself, Freeman fully understood the problematic breach of fiduciary duty and trickery Mokhtar's schemes would require given the blockbuster product Mocha Mill had on its hands. (*Id*. ¶¶ 136, 144-45.) And, it is only natural that Freeman was afraid to lose the special relationship to this unique coffee, which he called a "***miracle***" compared to "***angels singing***," promising his investors special access to the coffee for a most lucrative opportunity to sell it at $16 per cup. (*Id*. ¶ 155.) Blue Bottle had a cozy relationship with Mokhtar, so if Mokhtar left Mocha Mill without being able to steal the business, it would put Blue Bottle's special access at risk, possibly having to vie for such access against competitors. (*Id*.). Any uncertainty from Mokhtar's impending departure put investor relationships at peril, which is a significant motivator for any CEO. (*Id*.) Blue

1    Bottle was thus highly motivated to join POM's fraud schemes and see them through. (*Id.*)

2         The caselaw Blue Bottle cites in broad strokes, but fails to actually analyze, is inapposite. For

3    example, *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) is readily

4    distinguishable because the Court there considered the sufficiency of pricing evidence at *summary*

5    *judgment* in the *antitrust* context to find that economic motive was missing as concerning certain pricing

6    practices.  In a second example, another *antitrust* case Blue Bottle cites (*sans* analysis) is *Bell Atlantic*

7    *Corp. v. Twombly*, 550 U.S. 544 (2007); it, too, is distinguishable because there the Court held that

8    *parallel behavior* was insufficient to plausibly make out a claim for antitrust conspiracy.  Finally,

9    *Eclectic Prop. E. LLC v. Marcus & Millichap Co.*, 751 F.3d 990 (9th Cir. 2014), is distinguishable, as

10   well, because Plaintiffs' inferences in that case were clearly "*implausible.*"[5] (emphasis in original).

11        Here, on the other hand, Plaintiffs allege an explicit agreement and describe at length Blue

12   Bottle's rational economic motive to conspire, detailing, among many facts, emails discussing "Port of

13   Mokha" branding with *Mocha Mill's* CEO of *Mocha Mill's* incredibly valuable coffee that they all

14   knew Mocha Mill was seeking to market exclusively, as well as a documented months-long delay in

15   contradiction to industry practice and Blue Bottle's own self-admitted eagerness to acquire the coffee as

16   soon as possible. Viewing this in totality with the other numerous allegations, the inference of fraud is

17   not *im*plausible at all; it is entirely plausible—it is the most plausible inference of all, in fact.

18        Plaintiffs allege that Freeman and Blue Bottle agreed to participate in the POM wire fraud

19   conspiracy to deceive Plaintiffs into parting with their coffee, knowing of POM's existence and

20   objective. (FAC ¶ 156.) Freeman and others at Blue Bottle affirmatively and deliberately: (a) delayed

21   for months the purchase and launch of Mocha Mill's coffee—the coffee arrived in Oakland in February

22   2016, but Blue Bottle affirmatively delayed purchasing it until it was fraudulently acquired by POM in

23   May 2016—sacrificing sales and freshness, despite "counting the days" to its arrival; (b) delayed Blue

24   Bottle's marketing plan and pivoted its campaign from Mocha Mill to POM, developing advertising

25   materials to promote Mocha Mill's best coffee under the "Port of Mokha" brand while knowing that the

26   coffee actually belonged to Mocha Mill and with the intention to help POM steal it through fraud; and

27

28   ───────────────
        [5] Blue Bottle's remaining caselaw is cited similarly in string fashion without sufficient analysis.
     The cases do not support dismissing Plaintiffs very detailed Complaint.

(c) concealed Blue Bottle's dealings with POM from Mocha Mill's other partners (Plaintiffs), purposely ordering its employees to communicate only with enterprise members Mokhtar and Ezell. (*Id.*) Plaintiffs allege and explain that during the entire time that executives at Blue Bottle were directing these activities to help Mokhtar execute his fraud scheme, they were well aware that Mokhtar and Ezell were Mocha Mill executives with a fiduciary duty to Mocha Mill. (*Id.* ¶¶ 144, 156-166; *see* Ex. 1.) Plaintiffs support their allegations with: (a) several emails (each an act of wire fraud) (alleged with *dates*, *names*, and *content*) between Mokhtar and Ezell and Blue Bottle executives, evidencing Blue Bottle's shady dealings with the shadow POM enterprise. (*Id.* ¶¶ 157-66, 184-87.) These emails show Blue Bottle negotiating a "Port of Mokha" partnership with *Mocha Mill's* CEO for coffee and farmer relationships that Blue Bottle knew belonged to *Mocha Mill*, making plausible (actually, probable) the inference that Blue Bottle was well aware of the POM enterprise and its unlawful objective.

Using *the fabricated "lack of interest" coordinated with Blue Bottle*, Mokhtar and his RICO associates successfully defrauded Plaintiffs into believing that high-end distributors were not interested in their coffee; *the delay in sale coordinated with Blue Bottle* had the intended effect of making Plaintiffs desperate to sell the coffee cheaply to a straw purchaser secretly set up by POM, thus siphoning Mocha Mill's first-mover advantage and industry relationships to POM. (*Id.* ¶¶ 167-94.) Contrary to Blue Bottle's unsupported argument, Plaintiffs do provide the underlying facts of the straw purchase. (*Id.* ¶¶ 167-86.) Even at this early pleading stage, when evidence is difficult to come by, Plaintiffs detail 27 emails (each an act of wire fraud) (alleged with *dates*, *names*, and *content*) recounting numerous material misrepresentations in furtherance of the fraud scheme. (*Id.*) Among these emails is clear evidence of Atlas and T&H/Metra's participation in the conspiracy, fraudulently posing as a coffee buyer (POM's straw buyer) as part of a pattern of racketeering activity.  (*Id.* ¶¶ 177-83.)

To conceal the existence of POM, T&H and Metra (related computer companies run by Defendant Ahmad's extended family)[6] conspired with POM to create a fictitious company called "T&H Imports" purportedly interested in selling Mocha Mill coffee *in the Middle East*, because high-end markets were not interested in the coffee; they used Metra's business contact information in Dubai to

---

[6] T&H Computers is California corporation based in San Carlos, California, and is a wholly owned subsidiary of Metra Computer Group based in Dubai.  (FAC ¶¶ 38-40).

*Plaintiff's Opposition to Blue Bottle Coffee Inc's*                     *Case No. 4:18-CV-2539-HSG*
*Motion to Dismiss Plaintiff's First Amended Complaint*

legitimize this fake company. (*Id.*) In reality, the coconspirators all knew that T&H would serve as a straw purchaser for POM. (*Id.*) At the direction of Metra executive Mohaamed Eissa and POM, T&H executive Wael Fadl ("Fadl") created a fake email account and exchanged a series of seemingly genuine but actually fraudulent emails with Mokhtar (each an act of wire fraud) (alleged with *names*, *dates*, and *content*) to convince Plaintiffs to part with their blockbuster product. (*Id.*)

Through this fraud conspiracy, coordinated with Blue Bottle (helping POM set up the ruse for the straw sale) and T&H/Metra (making the straw purchase for POM), POM succeeded in defrauding Plaintiffs out of their most premium coffee, siphoning the tremendous first-mover advantage and resulting business relationships (the entire business, really) to POM. (*Id.* ¶¶ 126-94.) As demonstrated above, pursuant to Rule 9(b), Plaintiffs support their claims detailing the who, what, when, and why of the RICO fraud scheme, and citing corroborating emails, conversations, documents, actions, and transactions. (*Id.*) These allegations more than adequately establish the elements of wire fraud, which include a scheme to defraud, foreseeable use of U.S. wires, and intent to defraud. (*See supra* § III.B.1.)

After the straw purchase, T&H/Metra immediately sold the coffee to POM, as planned, taking a commission for its part in the racketeering scheme. (FAC ¶¶ 126-94) POM then sold the best lot of that coffee to Blue Bottle, as promised, for $135 per kilogram. (*Id.*) Blue Bottle proceeded to execute its marketing plan exactly as it had secretly planned with Mokhtar, heavily advertising Mocha Mill's stolen coffee under the "Port of Mokha" brand, selling it like hotcakes for $16 a cup as one of the world's best coffees, after helping POM convince Plaintiffs that it was unmarketable. (*Id.* ¶¶ 155, 183-189.) Blue Bottle benefitted considerably from its part in POM's racketeering activity, resulting in the promised partnership with POM. (*Id.* at ¶ 191.) Importantly, Blue Bottle made good on its earlier promises to investors, which helped further increase the company's profile and valuation in selling a majority stake to Nestlé in 2017 for $425 million. (*Id.*)

In order to shield himself and his co-conspirators from legal liability, Mokhtar attempted to extort his former partners (Plaintiffs) into signing a release to claims, and also hacked into Mocha Mill accounts to destroy important evidence. (*Id.* ¶¶ 195-201.)

Today, POM thrives on the farmer and distributor relationships, publicity, first-mover advantage, images, and other assets stolen from Mocha Mill; the company is valued at upwards of $250

17

1   million. (*Id*. ¶¶ 192-194.) Also, a portion of POM coffee sales is funneled to the "Mokha Foundation,"

2   which provides "microloans" and training to Yemeni farmers to increase goodwill, as was Mocha

3   Mill's business plan. (*Id*. ¶ 193). Blue Bottle, too, is allowed a part in these benefits. (*Id*.)

4         Mokhtar continues to commit money laundering (in violation of 18 U.S.C. § 1957) each time he

5   makes a transaction over $10,000 using criminal proceeds from the fraud; each such transaction hurts

6   Mocha Mill as a competitor in the space, albeit crippled at the moment by POM. (*Id*. ¶¶ 202-204).

7       **C.**    **Blue Bottle's Attempts to Invent "Internal Discrepancies" Are Unsupported**

8         First, Blue Bottle argues that it is inconsistent for Plaintiffs to allege "that Blue Bottle was

9   specifically informed about Mokhtar's scheme to steal Mocha Mill's coffee and defraud the Individual

10  Plaintiffs, *see* ¶ 150," and also "suggest[] that Blue Bottle was unaware of even the existence of the

11  Individual Plaintiffs, *see* ¶ 98. (Mot. at 16.) Blue Bottle's statement concerning ¶ 98 is a distortion.

12  While Plaintiffs maintain that Mokhtar had the relationship with Blue Bottle, they never "suggest" that

13  Mocha Mill was a one-man show (*id*. ¶ 81), even alleging their own attendance at the SCAA. (*Id*. ¶ 98.)

14        Second, Blue Bottle argues that it is inconsistent for Plaintiffs to allege that Blue Bottle delayed

15  purchasing and selling Mocha Mill coffee while also alleging that Blue Bottle purchased the coffee in

16  May 2016 and began selling it in June 2017. (Mot. at 16.) This, too, is a distortion, because what is

17  actually alleged is that Blue Bottle, in its own words, was "counting the days" to the coffee's *arrival*,

18  which it knew arrived in February 2017. Blue Bottle shifted gears to assist the fraud, and delayed its

19  purchase of the coffee until POM fraudulently secured it in May 2017 by two fraud schemes to set up a

20  straw purchase with Blue Bottle's help misleading Plaintiffs into abandoning their launch.

21        Third, Blue Bottle argues that it is inconsistent for Plaintiffs to allege that Blue Bottle secured

22  special exclusivity agreements with POM while admitting that POM also sold its coffee to Blue Bottle's

23  competitors. (Mot. at 16.) This is sophistry because what is alleged is that POM committed its *best*

24  products and *preferential* access to Blue Bottle, leaving competitors with lesser access and preference.

25        Fourth, Blue Bottle argues that it is "absurd" to suggest that Blue Bottle's purchase of the very

26  first lot of Mocha Mill's most premium Yemeni coffee had anything to do with its Nestle's valuation of

27  the company. (Mot. at 16.) It is actually absurd, implausible in fact, for Blue Bottle to suggest that the

28  POM partnership and preferred access to the world's best coffee (one of the best in history) and

18

marketing benefits, including prominent placement in a *New York Times* bestseller, that Blue Bottle

received from its facilitation of the racketeering scheme play no role in the Nestlé deal. (*Id.*)

### D.    Blue Bottle's Remaining Arguments Concerning RICO Technicalities Either Ignore the Law or Demonstrate a Fundamental Misunderstanding of It

"RICO is to be read broadly." *Odom*, 486 F.3d at 547 (quoting *Sedima, S.P.R.L. v. Imrex Co.*,

473 U.S. 479, 497 (1985)). "To state a claim under § 1962(c) [of RICO], a plaintiff must allege

'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Id.* (quoting *Sedima*,

473 U.S. at 496). RICO requires neither a connection to organized crime, *see H.J. Inc*, 492 U.S. at 248

(nexus to organized crime not required), nor racketeering injury, *see Wilcox v. First Interstate Bank of*

*Oregon, N.A.*, 815 F.2d 522, 529 (9th Cir. 1987) ("racketeering injury" distinct from that caused by the

predicate act not required). Having discussed "conduct" and "racketeering activity" at length above,

Plaintiffs turn to the arguments concerning the "*enterprise*" and "*pattern*" elements.

#### 1.    *Plaintiffs Sufficiently Allege Enterprise and Pattern*

The definition of ***enterprise*** "is not very demanding." *Odom*, 486 F.3d at 548. A single legal

entity, partnership, corporation, individual, and even group associated-in-fact are all enterprises under

RICO. *Id*. "[A]n associated-in-fact enterprise is 'a group of persons associated together for a common

purpose of engaging in a course of conduct.'" *Id*. at 552. A person or corporation can be an "person" for

purposes of an associated-in-fact enterprise. *See id*. at 548. "[A]n associated-in-fact enterprise under

RICO does not require any particular organizational structure." *Id*. at 551. "Under Section 1962(c),

distinctiveness [between a person and enterprise] is satisfied and RICO applies 'when a corporate

employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he

conducts those affairs within the scope, or beyond the scope, of corporate authority.'" *Bias*, 942 F.

Supp. 2d at 939 (quoting *King*, 533 U.S. at 161 &166).

A ***pattern*** requires at least two acts of racketeering activity within a 10-year period as well as

***relatedness*** and ***continuity***. *H.J. Inc.*, 492 U.S. at 229, 239-240. ***Relatedness*** is satisfied if the criminal

acts "have the same or similar purposes, results, participants, victims, or methods of commission, or

otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id*. at 239.

***Continuity*** "is both a closed- and open-ended concept, referring either to a closed period of

19

repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id*. at 241. "***Closed-ended continuity*** is established by showing that related predicate acts occurred over a substantial period of time." *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1527 (9th Cir. 1995). A thirteen-month period is "a substantial period of time" for purposes of closed-ended continuity, but even less than a year may be sufficient, because continuity is a "flexible" concept. *Id*. at 1528 (refusing to establish a bright-line one-year rule); *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 918 (9th Cir. 1987) (thirteen-month embezzlement scheme sufficient to establish pattern). ***Open-ended continuity*** is shown if the predicate acts "specifically threaten repetition" *or* "become a regular way of doing business." *Id*. But "the continuity requirement does not, in itself, require that every member be involved in each of the underlying acts of racketeering, or that the predicate acts be interrelated in any way." *Odom*, 486 F.3d at 552. In other words, not every member needs to participate in or even know about *all* the illegal activities the other members are doing or have done.

Here, Plaintiffs satisfy both the enterprise and pattern requirements. The ***enterprise*** element is satisfied because Plaintiffs allege that Mokhtar began the racketeering activity (wire fraud and extortion) conducting the affairs of the Mocha Mill ***enterprise*** (*see supra* §§ III.B.1-2), and grew the enterprise into the associated-in-fact POM ***enterprise*** continuing to conduct its affairs through a pattern of racketeering activity (wire fraud, extortion, and money laundering) (*see supra* §§ III.B.3-4). Through this expansion Mokhtar's RICO enterprise maintained its leadership (*Mokhtar*), purpose (*to steal and usurp Plaintiffs' assets and business*), methods of commission (*wire fraud* and *extortion*), and victims (*Plaintiffs*), simply adding participants.

Blue Bottle suggests (again, without explaining how) that Mokhtar's expansion of the RICO enterprise itself somehow defeated continuity. (*See* Mot. at 10.) This is a non-sensical position that has no support in the law. To demonstrate, Plaintiffs draw an analogy to gangs and organized crime. It is common knowledge that gangs grow and shrink, adding and dropping members overtime. To say that gang expansion defeats RICO liability (by defeating continuity), as Blue Bottle suggests, would be to reward RICO expansion and limit the RICO statute contrary to prevailing law.

Rather, *relatedness* is the legal requirement and Blue Bottle's argument that Plaintiffs fail to establish "relatedness" is unsupported and untrue.  As explained above, Plaintiffs detail four wire fraud

20

schemes and/or conspiracies, in violation of 18 U.S.C. § 1343, and three extortion and/or attempted extortion schemes, in violation of 18 U.S.C. § 1951, and Cal. Penal Code §§ 518-524, over the course of over two years, as well as continuing acts of money laundering, in violation of 18 U.S.C. § 1957, all as part of a pattern of racketeering activity as defined under 18 U.S.C. § 1961(1), and all related by common leadership, participants, purpose, methods of commission, and victims; *see supra* § III.B.1 through § III.B.4 (detailing the elements of the predicate acts as well as of RICO).

Plaintiffs also establish both closed- and open-ended continuity. Even set-setting aside for a moment the continuing money laundering (purely for argument's sake), ***closed-ended continuity*** is easily established because the racketeering activity (related by common leadership, participants, purpose, methods of commission, victims, and results) spanned the course of *over two years* (from April 2014 to June 2016). *See Allwaste, Inc.*, 65 F.3d at 1527-28 (9th Cir. 1995) (while thirteen months are certainly sufficient, even under one year may be sufficient). Under this closed-ended rubric (not counting money laundering), if, for argument's sake, embezzlement were also dropped, the racketeering activity would still span 16 months (Mar 2015 – Jun 2016) (still a sufficiently "substantial period"), and if, for argument's sake, the first extortion count were also dropped, the racketeering activity would still span 13 months (Jun 2015 – Jun 2016) (still a sufficiently "substantial period").

But here, Plaintiffs have actually alleged acts sufficient for ***open-ended continuity***, because the ongoing transactional money laundering, which continues to injure Mocha Mill as a competitor, is sure to continue repeating into the future. Blue Bottle suggests that the money laundering allegations should be rejected because they do not contain the specificity required under Rule 9(b). (*See* Mot. at 12.) But money laundering is not fraud and so Rule 9(b) does not apply—Rule 8(a)(2) does. Plaintiffs satisfy Rule 8 by alleging and detailing how Mokhtar stole at least hundreds of thousands of dollars (if not tens of millions, if the company itself is counted), thus acquiring criminal proceeds; and with those criminal proceeds, POM continues, at least in part, to operate its large-scale international import/export business, which necessarily involves numerous transactions over $10,000—indeed, even the very first of such transactions with Blue Bottle was over $50,000 (FAC ¶ 183(h)). *See United States v. Shafer*, 608 F.3d 1056, 1067 (8th Cir. 2010) (transactional money laundering does not require exact tracing but may be proved circumstantially by reasonable inference). Taking the FAC's well-pleaded allegations as true—

that Mokhtar defrauded and extorted Mocha Mill out of hundreds of thousands of dollars and is now

using that money to run POM—it is not only a reasonable inference, it is a forgone conclusion that

Mokhtar continues to engage in transactions over $10,000 at least in part with the criminal proceeds he

secured—this amounts to transactional money laundering under 18 U.S.C. § 1957.

Blue Bottle also misguidedly suggests that the fact that POM members engaged in *multiple*

criminal schemes somehow defeats continuity. (Mot. at 10.) The law is quite the opposite, because

multiple schemes undertaken for a related purpose, as here, are highly suggestive of continuity. *See H.J.*

*Inc.*, 492 U.S. at 240 (though RICO does not require multiple criminal schemes, "multiple criminal

schemes would certainly be highly relevant to the inquiry into the continuity").

### 2.    *Plaintiffs Sufficiently Allege RICO Conspiracy*

Blue Bottle's arguments against RICO conspiracy are based largely on overruled law. Blue

Bottle relies heavily on *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) (Mot. at 22-23),

which bases its RICO conspiracy analysis largely on *Neibel v. Trans World Assur. Co.*, 108 F.3d 1123,

1127 (9th Cir. 1997), which was expressly overruled on the relevant law by *United States v. Fernandez*,

388 F.3d 1199, 1230 (9th Cir. 2004) ("our holding [concerning § 1962(d)] in *Neibel*, is no longer valid

after the Supreme Court's opinion in *Salinas*"). In *Salinas v. United States*, 522 U.S. 52 (1997), the

Supreme Court unanimously held that a sheriff's deputy could be convicted of conspiracy under §

1962(d) for his role in a scheme that violated the federal bribery statute even though he neither

committed nor agreed to commit the predicate acts that are required for a substantive violation of

§ 1962(c). The Court explained that "[a] conspirator must intend to further an endeavor which, if

completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he

adopt the goal of furthering or facilitating the criminal endeavor. *Id.* at 65.  Interpreting *Salinas*, the

Ninth Circuit held that "a defendant is guilty of conspiracy to violate § 1962(c) if the evidence showed

that she knowingly agreed to facilitate a scheme which includes the operation or management of a

RICO enterprise," "remov[ing] any requirement that the defendant have actually conspired to operate or

manage the enterprise herself." *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004). It is

sufficient then that the defendant "was aware of the essential nature and scope of the enterprise and

intended to participate in it," as RICO conspiracy contains "no requirement of an overt act" and is thus

22

1   "'even more comprehensive than the general conspiracy offense.'" *United States v. Fiander*, 547 F.3d

2   1036, 1040-42 (9th Cir. 2008) (quoting *Salinas*, 522 U.S. at 63).

3         Applying these principles, Plaintiffs allege that Blue Bottle agreed to participate in and facilitate

4   POM's wire fraud scheme with full knowledge of the POM enterprise, its leadership and members, and

5   its purpose to steal Mocha Mill's assets and business; in doing so, Blue Bottle sent many (certainly

6   more than two) emails (each being an act of wire fraud). (FAC ¶¶ 126-194). Plaintiffs' allegations make

7   entirely plausible that Blue Bottle knowingly adopted a RICO enterprise's (POM) criminal objective of

8   defrauding Plaintiffs into a straw sale of their best coffee, and agreed to facilitate that fraudulent sale by

9   helping POM set up the circumstances for it, which certainly included the operation or management of

10   the POM enterprise by allowing POM to advance a key objective. *Id*.

11         **E.    Blue Bottle's Arguments Against Plaintiffs' State Law Claims Are Misleading**

12         Blue Bottle argues that Plaintiffs' state law claims are "threadbare recitals of the elements" and

13   accuses Plaintiffs of "shotgun pleading." (*See, e.g.,* Mot. at 17). This is misleading because Blue

14   Bottle's arguments require the Court to completely ignore Section V of the FAC entitled "Facts

15   Common to All Counts" (¶¶ 60-204), which is incorporated by reference into each claim.  Because the

16   claims flow from the same set of operative facts, Plaintiffs deemed it unnecessary to repeat the

17   allegations verbatim in each claim, as Blue Bottle suggests, which would result in a complaint hundreds

18   of pages long of mostly repetition. But if Blue Bottle's suggested method is preferable to the Court,

19   Plaintiffs respectfully seek leave to amend. Plaintiffs maintain, however, that Section V is sufficiently

20   detailed and provides all the notice Blue Bottle needs to mount a defense to each claim.

21         As for Blue Bottle's arguments concerning ***theories of liability***, Section V makes very clear

22   (detailing the underlying facts) that Blue Bottle bears conspirator liability for its agreement and actions

23   to facilitate POM's fraud scheme, as well as direct liability as an aider and abettor for substantially

24   assisting POM commit fraud and breach his fiduciary duty. *See supra* § III.B.4. The negligence claims

25   (Claims Six and Nine) also flow from the same set of operative facts (FAC § V) and survive on direct

26   liability—that Blue Bottle should have known that its facilitation of and participation in the RICO and

27   fraud schemes would have caused Plaintiffs to lose income and assets, induced Plaintiffs to abandon

28   significant business opportunities, and interfered with prospective economic relationships reasonably

23

*Plaintiff's Opposition to Blue Bottle Coffee Inc's
Motion to Dismiss Plaintiff's First Amended Complaint*          *Case No. 4:18-CV-2539-HSG*

foreseeable to Blue Bottle by knowledge of the industry and exclusivity negotiations with POM.

Concerning the **common law fraud and misrepresentation claims** (Claims Four to Six), Plaintiffs sufficiently plead these claims for the same reasons as explained in § III.B.4 of this brief. The additional elements of the common law fraud—reliance and resulting injury—are detailed in § V of the FAC, ¶¶ 184-194, 202-204. Blue Bottle misrepresents that Plaintiffs fail to allege that Blue Bottle knew of Mokhtar and Ezell's fiduciary relationships and positions of trust at Mocha Mill. Aside from the intimate relationship between CEO Freeman and CEO Mokhtar, there are actual emails evidencing knowledge of the fiduciary relationships, to further support conspiracy. (*See* Ex. 1; FAC 144, 156, 160).

As concerning the **economic interference claims** (Claims Eight and Nine), the allegations in the FAC § V establish that the fraud scheme had the intended effect of siphoning Mocha Mill's entire business to POM, which included foreseeable prospective relationships with Blue Bottle *and* other high-end distributors and retailers. (FAC ¶¶ 4, 56, 73, 86, 97-98, 107, 109, 111, 129, 132, 136-42, 151-53, 157, 169, 173, 175, 183, 187). While Blue Bottle could not have interfered with its own relationship, it certainly did conspire and aid and abet the interference with other high-end distributors and retailers by facilitating the enterprise's fraud scheme. Contrary to Blue Bottle's claim that it owed no duty to Mocha Mill, every person owes every other person a duty to not commit or facilitate fraud.

Concerning the **conversion** claim (Claim Eleven), Blue Bottle did not assist POM in stealing *only* goodwill, it substantially assisted POM in stealing Mocha Mill's entire business to cripple it.

Blue Bottle seeks to dismiss the **unjust enrichment** claim because "there is no standalone cause of action for unjust enrichment." (Mot. at 24.) What Blue Bottle fails to appreciate is that California has a split of authority on the issue, *Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1260 (N.D. Cal. 2014), and courts have frequently construed "unjust enrichment" as a "quasi-contract claim seeking restitution." *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231, 166 Cal. Rptr. 3d 864 (2014) Here, Plaintiffs' unjust enrichment claim can lie under California law as "the result of a failure to make restitution under circumstances where it is equitable to do so." *Mohebbi*, 50 F. Supp. 3d at 1260. POM and Blue Bottle were unjustly enriched with Mocha Mill's assets, thereby warranting restitution.

California's **unfair competition law** (UCL) redresses "any unlawful, unfair or fraudulent business act or practice." *McGill v. Citibank*, N.A., 2 Cal. 5th 945, 954, 393 P.3d 85, 89 (2017) (citing

24

Cal. Bus. & Prof. Code, § 17200). UCL entitles private parties to both injunctive relief and restitution. *See* Cal. Cal. Bus. & Prof. Code, § 17203. "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003). But restitution under the UCL "is not limited only to the return of money or property that was once in the possession of [the plaintiff]," and "is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest." *Juarez v. Arcadia Financial, Ltd.*, 152 Cal. App. 4th 889, 894 (2007) (quoting *Korea Supply*, 29 Cal. 4th at 1149). Applying these principles here, Plaintiffs allege that through RICO violations and a fraud conspriacy, Blue Bottle helped POM defraud Mocha Mill out of its best coffee at the critical moment of launch, virtually stealing and siphoning to POM all assets and opportunities that rightfully belong to Mocha Mill. Under UCL, Plaintiffs seek restitution for the fraudulent coffee sale as well as the resulting loss of the business in which Plaintiff certainly have a vested interest. Plaintiffs also seek an injunction enjoining Defendants from profiting off of their criminal endeavor and restructuring POM to provide Plaintiffs their rightful shares and decision-making authority in a company built on Plaintiffs' backs and stolen through fraud and racketeering. The claim should stand.

### F.   Blue Bottle's Standing Arguments Ignore Plaintiffs' Partnership and Joint Venture

Blue Bottle's arguments against standing (Mot. at 6-7) miss the point that the individual Plaintiffs entered into a partnership and joint venture with Mokhtar and it is the partnership and joint venture that owns Mocha Mill. (*See* FAC 61-72.) Thus, in addition to Mocha Mill's standing as the defrauded corporation, the individual Plaintiffs have standing as Mokhtar's defrauded partners. *See, e.g., Second Measure, Inc. v. Kim*, 143 F.Supp 3d 961, 971 (N.D. Cal. 2015). As for the Monk of Mocha[7] plaintiff (named in an abundance of caution for its early investments), if all Defendants stipulate and the Court agrees that Mocha Mill, as successor to Monk of Mocha, retains all Monk of Mocha claims, as suggested (*id*.), then Plaintiffs would agree to dismiss the Monk of Mocha plaintiff only.

---

[7] Plaintiffs move to strike ¶ 3 of the Declaration of Michael Shipley as testimony outside the FAC and hearsay inadmissible under Fed. R. Evid. 803(10), as Michael Shipley is not a custodian.

25

1

## IV.   CONCLUSION

2

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion

3

or at least provide Plaintiffs the opportunity to amend their Complaint.

4

Dated: August 27, 2018                               Respectfully submitted,

5

*/s/ Yasin M. Almadani*
_____
6                                                         YASIN M. ALMADANI
                                                          ALMADANI LAW

7
                                                          TERRENCE M. JONES
                                                          THE LAW OFFICE OF TERRENCE JONES
8

9                                                         *Attorneys for Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Plaintiff's Opposition to Blue Bottle Coffee Inc's*                               *Case No. 4:18-CV-2539-HSG*
*Motion to Dismiss Plaintiff's First Amended Complaint*