# EXHIBIT A

| | |
|---|---|
| 1 | Yasin M. Almadani (Cal. Bar No. 242798) |
| | ALMADANI LAW |
| 2 | 14742 Beach Blvd., Suite 410 |
| | La Mirada, California 90638 |
| 3 | (213) 335-3935 | YMA@LawAlm.com |
| 4 | Terrence M. Jones (Cal. Bar No. 256603) |
| | THE LAW OFFICE OF TERRENCE JONES |
| 5 | 6737 Bright Ave., Suite B6 |
| | Whittier, California 90601 |
| 6 | (213) 863-4490 | Terrence@JonesOnLaw.com |

**Orange Highlighting:** Legal Conclusions, Unsupported Information and Belief, and Conclusory Speculation about the Motives of Others

7  *Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

MOCHA MILL, INC., MONK OF MOCHA SPECIALTY COFFEE PRODUCTION AND EXPORT, INC., IBRAHIM A. ALAELI, YASIR H. KHANSHALI, and ADNAN G. AWNALLAH,

Plaintiffs,

v.

PORT OF MOKHA, INC., PORT OF MOKHA LLC, MOKHA FOUNDATION, BLUE BOTTLE COFFEE, INC., METRA COMPUTER GROUP FZCO, T&H COMPUTERS, INC., MOKHTAR F. ALKHANSHALI, and IBRAHIM AHMAD IBRAHIM,

Defendants.

Case No. CV 18-2539-HSG

**FIRST AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

Case Filed: April 30, 2018
Trial Date: None set

Hon. Haywood S. Gilliam, Jr.
United States District Judge

**J.   Conspiracy to Supplant Mocha Mill with Port of Mokha Using Wire Fraud as Part of a Pattern of Racketeering Activity: *Take One* (November 2015 – April 2016)**

135.   By the beginning of summer 2015, Mocha Mill had emerged as the leader in the rebirth of premium Yemeni specialty coffee; there were no other competitors in the space. The buzz around Mocha Mill's highly anticipated coffee had grown considerably. Many of Mocha Mill's coffee varieties had scored in the 90s (out of 100), ranking them among the best in the world. Blue Bottle had begun advertising the Mocha Mill coffee on its Instagram feed as early as April 2015, titillating coffee enthusiasts with the expected arrival to Blue Bottle of a most exquisite coffee sourced from the very birthplace of coffee itself.

136.   By November 2015, high-end distributors, including Blue Bottle, had placed orders and made commitments to buy the coffee from Mocha Mill for $100 to $135 per kilogram. Mokhtar (as Mocha Mill's CEO) had agreed and the coffee had been sold in principle.

137.   After Mokhtar's November 2015 fraud/extortion-based corporate *coup d'état* failed (*see supra* § V(G)), and while Mokhtar was still Mocha Mill CEO, the two heads of the RICO Enterprise (Mokhtar and Ahmad) sought to supplant Mocha Mill with Port of Mokha. To do that, they realized they needed Port of Mokha (not Mocha Mill) to be the first company to market the highly-anticipated premium Yemeni coffee so that the Port of Mokha brand (in the wake of Mocha Mill's coordinated demise) could seize the tremendous attention Mocha Mill's coffee was getting at the time. In other words, they needed to ensure that Port of Mokha (not Mocha Mill) would sell the best Yemeni coffee to high-end distributors—despite the fact that they were distributors that Mocha Mill had worked so hard to line up. Moreover, given Mokhtar's boots-on-the-ground role in Mocha Mill, he would be able—on Port of Mokha's behalf—to easily steal the farmer and distributor networks that Mocha Mill had developed through years of investment.

138.   The challenge, however, was in obtaining the actual Mocha Mill coffee beans.

*First Amended Complaint – CV 18-2539-HSG*

1 Mokhtar recognized that he could not just ask Mocha Mill to hand over the coffee so that he could leave and sell it under the Port of Mokha brand. After all, the victim Mocha Mill partners had no idea that competitor Port of Mokha was in the works—that Mokhtar and Ahmad were plotting an unlawful usurpation.

139. Mokhtar understood that if Plaintiffs got wind of his scheme, they obviously would not allow it. Plaintiffs were expecting a grand Mocha Mill launch with premier distributors and retailers, paving the way for tremendous brand value, long-lasting relationships, and increased growth. Plaintiffs had no intention of letting another company swoop in and steal the imminent fruits of Mocha Mill's labor and investments.

140. In order to obtain Mocha Mill's ultra-premium coffee, Enterprise members thus devised a scheme to defraud Plaintiffs into parting with the coffee as part of a pattern of racketeering activity. Defendants Mokhtar, Ahmad, and Ezell, with Comar's counsel, conspired with Defendant Blue Bottle to mislead Plaintiffs into believing that high-end distributors and retailers (Blue Bottle among them) were no longer interested in buying Mocha Mill coffee.

141. Given the posture of the Mocha Mill brand and the excitement around its coffee, it was foreseeable to Blue Bottle and Comar that the scheme would be long and elaborate involving numerous acts of wire fraud, because email and text messages were the preferred methods of communication between the players involved and would be used extensively in the scheme.

142. To convince Plaintiffs that Blue Bottle was no longer interested in their coffee, Mokhtar first had to convince Blue Bottle to join the RICO conspiracy. Mokhtar needed Blue Bottle to:

    a. feign disinterest in Mocha Mill so that Mokhtar could convince his Mocha Mill partners (Plaintiffs) that high-end distributors like Blue Bottle were no longer interested in buying premium Yemeni coffee;

    b. direct its employees to not communicate with anyone at Mocha Mill

but Mokhar and Ezell to keep the unlawful scheme a secret;

c. shift its marketing platform from Mocha Mill to Port of Mokha by developing marketing and advertising materials that featured Mocha Mill coffee as "Port of Mokha" coffee, knowing that the coffee belonged to Mocha Mill; and

d. affirmatively delay its rollout, sacrificing freshness in favor of the fraud scheme, in order to launch a marketing and advertising campaign that jointly promoted Blue Bottle alongside Port of Mokha's release (to Blue Bottle) of its coffee for retail sale.

Mokhtar promised Blue Bottle significant benefits in return, and Blue Bottle committed itself to the scheme, as detailed below.

### 1. Blue Bottle Conspires with the RICO Enterprise

143. Plaintiffs are informed and believe that Blue Bottle CEO James Freeman and Blue Bottle Green Coffee Buyer Charlie Habegger ("Habegger") each had a close relationship and friendship with Mokhtar.

144. Plaintiffs are informed and believe that, at all times relevant to the allegations of this Complaint, Freeman and Habegger knew that Mokhtar was Mocha Mill's CEO, and as executives themselves with fiduciary duties to Blue Bottle, understood well the same obligations Mokhtar owed to Mocha Mill. Nevertheless, Freeman and Habegger conspired with Mokhtar to form an alliance and partnership with him to help him defraud Mocha Mill for the benefit of the Port of Mocha RICO Enterprise and Blue Bottle alike.

145. When CEO Freeman first cupped Mocha Mill's coffee in April 2015, he said, "This is what angels singing tastes like." As Blue Bottle wrote in its marketing materials"

> When we first tried the coffee Mokhtar Alkhanshali brought us from
> Yemen, it stopped Blue Bottle Coffee founder James Freeman in his

32

*First Amended Complaint – CV 18-2539-HSG*

tracks. He remembers exactly where it was on the cupping table—it's hard to forget *a transcendent encounter like that—and we've been <u>counting the days</u> until we could share this veritable coffee miracle from Yemen with our guests*.

146. It is common knowledge in the coffee industry that the fresher the coffee beans, the tastier the coffee. In other words, over time, coffee beans degrade and lose their taste. Therefore, high-end retailers like Blue Bottle seek to obtain and market new arrivals at the earliest possible date.

147. Plaintiffs are informed and believe that Blue Bottle was extremely anxious to acquire and sell Mocha Mill's coffee as soon its first shipment arrived in Oakland. Blue Bottle was also eager, based upon the date Mocha Mill advised the coffee would arrive stateside, to launch the associated marketing campaign leading up to that arrival date.

148. As alleged above, even before the coffee's arrival, Blue Bottle had committed to buy it from Mocha Mill and Mocha Mill had committed to sell it to Blue Bottle. A deal in spirit and principle was in place and Blue Bottle was anxious for the shipment.

149. Plaintiffs are informed and believe that, in and after November 2015, Mokhtar told Freeman about the Port of Mokha Enterprise he and Ahmad had formed to supplant Mocha Mill. Mokhtar explained his plan to leave Mocha Mill, as well as the scheme to fraudulently obtain Mocha Mill's coffee beans and usurp its business and first-mover advantage.

150. Plaintiffs are informed and believe that Freeman was naturally concerned about being able to obtain Mocha Mill's coffee without Mokhtar at the company, particularly if Mokhtar left on bad terms. Mokhtar assured Freeman that, with Blue Bottle's help, Port of Mokha would be able to steal the coffee from Mocha Mill by deceiving Mocha Mill into believing that Blue Bottle and other high-end retailers were unwilling to buy the coffee.

151. Plaintiffs are informed and believe that Mokhtar convinced Freeman that it

33

*First Amended Complaint – CV 18-2539-HSG*

1  was in Blue Bottle's best interest to participate in the fraud scheme by explaining to
2  Freeman that the success of the Port of Mokha's scheme would benefit, Blue Bottle, as
3  well. Mokhtar assured Freeman that Blue Bottle would receive the coffee from Port of
4  Mokha once Mocha Mill parted with it after being convinced that Blue Bottle was no
5  longer interested. In exchange for Blue Bottle's help with the RICO scheme, Mokhtar
6  promised Freeman a partnership with the Port of Mokha Enterprise by which Blue Bottle
7  would be able to:

   a. secure special exclusivity agreements with Port of Mokha for its top Yemeni coffee varieties, in that Blue Bottle would receive first-pick and beans for retail sale that other distributors would not;

   b. enjoy the tremendous publicity that Mocha Mill had made possible, particularly a lock-step association with Port of Mokha as the first modern-day importer (Port of Mokha) and retailer (Blue Bottle) of premium varieties from the birthplace of coffee, as well as prominent placement in Eggers' highly anticipated book;

   c. directly invest in Yemeni farmer relationships, allowing Blue Bottle to market itself as an on-the-ground supporter of the resurrection of premium Yemeni coffee and garner the goodwill associated with its "grassroots" engagement with Yemeni farmers;

   d. invest in future harvests, thereby giving Blue Bottle special access to the best Yemeni coffee farms producing the best coffee in the world, allowing Blue Bottle to increase its dominance as the premier specialty coffee retailer in the world; and

   e. maintain a close relationship with Mokhtar and Port of Mokha to create a firm, long-lasting means of ensuring Blue Bottle's ability to pursue the foregoing benefits in the short- and long-term.

152. Mocha Mill had spent years building credibility in Yemen (through Mokhtar)

34

*First Amended Complaint – CV 18-2539-HSG*

and had cultivated significant relationships with top coffee farmers. Mocha Mill's investments in the Yemeni farmers and its financing program with them (through Mokhtar) had cemented strong relationships and paved the way to years of future harvests and expansion of the premium coffee business. Mokhtar was required to keep a database of these Mocha Mill relationships; nevertheless, Port of Mokha and Blue Bottle would swoop in just before launch and steal these relationships through their RICO fraud conspiracy.

153. Mocha Mill's unique venture had positioned it as the sole player in the specialty Yemeni coffee market, giving it tremendous negotiating leverage with high-end distributors like Blue Bottle. Nevertheless, Port of Mokha and Blue Bottle would swoop in just before launch and siphon this competitive advantage to Port of Mokha (and derivatively Blue Bottle) through their RICO fraud conspiracy.

154. Mocha Mill had created tremendous buzz and anticipation for its specialty Yemeni coffee, and was expecting a blockbuster launch followed by Eggers' best-selling book about the company's development that would further boost Mocha Mill's brand value. Mocha Mill's launch value and first-mover advantage were obvious to the two CEOs (Mokhtar and Freeman), but Mokhtar sweetened the deal for Blue Bottle, explaining to Freeman that Eggers' book showcasing Port of Mokha (not Mocha Mill) would boost coffee sales for Blue Bottle. Plaintiffs are informed and believe that Mokhtar promised to give Blue Bottle a prominent place in the book, casting the company in a very positive light to further build the Blue Bottle brand.

155. Blue Bottle had a cozy relationship with Mokhtar, so if Mokhtar left Mocha Mill without being able to steal the business, Blue Bottle would have to develop relationships with the other Mocha Mill partners and risk having competitors vie for the same access. Plaintiffs are informed and believe that Freeman had promised his investors special access to the Yemeni coffee which, by Blue Bottle's estimates, would sell for upwards of $50 for 12-ounce bags and $16 per cup. Any uncertainty concerning

35

*First Amended Complaint – CV 18-2539-HSG*

Mokhtar's impending departure put investor relationships in peril and caused Freeman fear. To keep investors happy (a significant motivation for any CEO), Blue Bottle needed Port of Mokha to steal Mocha Mill's coffee beans and its future business; Blue Bottle needed Mocha Mill to fail leaving Port of Mokha as the sole survivor in Mocha Mill's demise. Blue Bottle was highly motivated to join the conspiracy and help it succeed.

156.  Plaintiffs are informed and believe that Freeman, on behalf of Blue Bottle, agreed to join the RICO conspiracy. To help Mokhtar deceive Plaintiffs, Freeman and others at Blue Bottle affirmatively and deliberately:

a. delayed the purchase of Mocha Mill's coffee until the coffee was fraudulently acquired by Port of Mokha, which, as explained further below, was contrary to Blue Bottle's normal business practice and commitment to selling the freshest and best-tasting coffee possible;

b. concealed Blue Bottle's dealings with Port of Mokha from Mocha Mill's other partners (Plaintiffs), and, as explained further below, dealt only with Mokhtar and Ezell;

c. delayed Blue Bottle's marketing plan and pivoted its campaign from Mocha Mill to Port of Mokha, and, as explained further below, began developing advertising materials to promote Mocha Mill's best coffee under the Port of Mokha brand while knowing that the coffee actually belonged to Mocha Mill and with the intention to help Port of Mokha steal it through fraud; and

d. delayed the launch of the coffee (sacrificing freshness for the scheme) in order to introduce Mocha Mill's best coffee under the Port of Mokha brand.

At the time, Blue Bottle was well aware that Mokhtar was Mocha Mill's CEO and owed his company a fiduciary duty. Blue Bottle was more than happy to affirmatively help Mokhtar violate that serious duty, engaging in various deliberate acts of unfair

*First Amended Complaint – CV 18-2539-HSG*

competition to secure the aforementioned competitive advantages for itself.

157. Mocha Mill's coffee arrived in Oakland on February 27, 2016. Plaintiffs are informed and believe that Mokhtar told Freeman and Habegger of the coffee's arrival at or about that time. Blue Bottle was very anxious to obtain, market, and sell the coffee. Under normal circumstances, Blue Bottle would have purchased the coffee as soon as possible and began marketing it as early as March 2016. Conspiring with Mokhtar, however, Blue Bottle, *inter alia*, agreed to and did affirmatively and deliberately delay its purchase, marketing, and launch of the coffee for months in furtherance of the fraud scheme to pave the way for Mokhtar to deceive Plaintiffs and steal the coffee from Mocha Mill. In collusion, the delay was designed to mislead Plaintiffs into thinking that Blue Bottle was not interested in purchasing the coffee and that the beans were getting too old to sell to Blue Bottle and other high-end distributors. In other words, the delay was designed to make Plaintiffs desperate to sell.

158. Plaintiffs are informed and believe that Blue Bottle knew the coffee belonged to Mocha Mill, but Blue Bottle itself was invested in the fraud. While helping Mokhtar deceive his partners, Blue Bottle was also helping the Enterprise plan a rollout of the coffee under the Port of Mokha brand, knowing that it would be using merchandise stolen through fraud. Enterprise members and Blue Bottle communicated over email using wire facilities of the United States to execute the scheme.

159. Plaintiffs are informed and believe that, in furtherance of the scheme, on February 25, 2016, Ezell, acting on orders from Mokhtar and Ahmad, sent an email to Vera [LNU], a writer for Blue Bottle, to put her in touch with Dave Eggers' assistant, concerning his book. The email was intended to show Blue Bottle that the Enterprise would follow through with its marketing promises in exchange for Blue Bottle's cooperation with the fraud scheme.

160. Plaintiffs are informed and believe that, in furtherance of the scheme, on May 5, 2016, Habegger met Mokhtar at Mokhtar's residence to discuss the Port of Mokha

37

*First Amended Complaint – CV 18-2539-HSG*

scheme and fraudulent acquisition of Mocha Mill's coffee so that it could be sold under the Port of Mokha brand. At the time, Habegger was well aware that Mokhtar was Mocha Mill's CEO with a fiduciary duty to his company.

161. Plaintiffs are informed and believe that, in furtherance of the scheme, on May 7, 2016, Mokhtar emailed Habegger concerning "pricing and long term projects" with Port of Mokha. Mokhtar promised to be "flexible with the pricing of the single farmer lots." Mokhtar also discussed Blue Bottle's opportunity to invest in future harvesting efforts, couching it as "our long term strategy" to develop the Yemeni Hayma coffee region and "the story we can both tell together about these farmers." Both Habegger and Freeman knew that Mokhtar was CEO of Mocha Mill at the time and that the coffee belonged to Mocha Mill, not Port of Mokha. Both knew that their plans hinged on the fraud. Port of Mokha and Blue Bottle purposely left Plaintiffs in the dark to ensure success of the RICO conspiracy.

162. Plaintiffs are informed and believe that, by this time, Blue Bottle was fully invested in Mokhtar's fraud scheme and Blue Bottle's plans depended on Mokhtar being able to successfully defraud Mocha Mill out of its coffee. In furtherance of the scheme, on May 13, 2016, Habegger emailed Mokhtar stating "how this first round will set the foundation for an annual project [between Blue Bottle and Port of Mokha] . . ." Habegger went on to write, "The next shipment that lands, which we know is going to have coffees just as beautiful (or better), will be timed with all your media work and be a slam!" Habegger stated, "I spoke with James [Freeman] last week as I mentioned, and we are both 100% on board for pre-financing next harvest." At the time, Habegger was well aware that Mokhtar was Mocha Mill's CEO owing a fiduciary duty to Mocha Mill. Port of Mokha and Blue Bottle purposely left Plaintiffs in the dark to ensure success of the RICO conspiracy.

163. Plaintiffs are informed and believe that, in furtherance of the scheme, on May 26, 2016, Clare McPharland of Blue Bottle and Ahmad of the RICO Enterprise

38

*First Amended Complaint – CV 18-2539-HSG*

exchanged emails, copying Mokhtar and Ezell, to discuss Port of Mokha's marketing and "logistics" with Blue Bottle. At the time, Blue Bottle was aware that Mokhtar was Mocha Mill's CEO, Ezell was a Mocha Mill Director, and that the coffee still belonged to Mocha Mill. Port of Mokha and Blue Bottle purposely left Plaintiffs in the dark to ensure success of the RICO conspiracy.

164. Plaintiffs are informed and believe that, over the next several months, Blue Bottle and Enterprise members continued to affirmatively delay the launch and sale of the coffee and keep their dealings hidden from Plaintiffs, while planning a rollout of Mocha Mill's coffee under the Port of Mokha brand, fully expecting the coffee to be stolen through fraud. Blue Bottle helped Mokhtar and Ahmad plan and execute the scheme, thereby exercising a level of management and control of the Enterprise.

165. The scheme and Blue Bottle's part in it had the intended effect of deceiving Plaintiffs into parting with their most premium coffee for a fraction of what it was worth and allowing Port of Mokha to steal Mocha Mill's business.

166. Plaintiffs would have never allowed the sale to competitor Port of Mokha had they known of the fraud.

### 2. *Port of Mokha Arranges for a Straw Buyer to Defraud Mocha Mill*

167. Atlas Coffee ("Atlas") is a California company specializing mostly in the shipment and storage, and sometimes the sale of coffee.

168. Mocha Mill had engaged Atlas Coffee ("Atlas") to import and store its premium coffee pending distribution.

169. Plaintiffs are informed and believe that, in November 2015, Mokhtar and Ezell arranged for Atlas to serve as a straw buyer for Port of Mokha as a means of fraudulently acquiring Mocha Mill's coffee. Through a series of fraudulent acts over the course of the next seven months, Mokhtar and Ezell, as Mocha Mill officers, working in concert with other Enterprise members and Blue Bottle, convinced Plaintiffs that high-end distributors were no longer interested in buying Mocha Mill coffee for over $100 per

39

*First Amended Complaint – CV 18-2539-HSG*

1    kilogram as previously thought, which was untrue.

    170.    Plaintiffs are informed and believe that Mokhtar and Ezell also falsified Mocha Mill's coffee scores, showing Plaintiffs lower than actual scores in order to convince Plaintiffs to dump the coffee at bottom-dollar purportedly to salvage some measure of revenue.[2]  Mokhtar and Ezell, thus, tried to convince Plaintiffs that Mocha Mill's *best* option was to sell its coffee to Atlas for $50 per kilogram, making it appear as the most profitable and efficient option given that Atlas was already storing the coffee pending distribution.  Of course, this was untrue, and Defendants knew that.

    171.    Plaintiffs are informed and believe that, in December 2015, Mokhtar communicated with Comar over email seeking advice on aspects of the scheme to fraudulently obtain Mocha Mill's coffee.  In one such email, Mokhtar expressed concern that his partners (Plaintiffs) could become suspicious and derail the scheme, and asked for advice on how to keep the scheme concealed.

    172.    Fearing that his scheme would be discovered, Mokhtar, as CEO of Mocha Mill, instructed Atlas not to communicate with anyone at Mocha Mill but himself and Ezell.  Atlas obliged.

    173.    The Atlas scheme unfolded from about November 2015 to about April 2016, as follows:

    a.    On March 21, 2016, Ezell, as "Director of Mocha Mill," sent an email to Atlas Coffee asking Atlas to change his contact email to his Port of Mokha domain.

    b.    On March 29, 2016, in order to ensure the scheme's secrecy and success, Mokhtar sent an email to Ahmad and Ezell directing them to ensure that Atlas used only Mocha Mill (and not Port of Mokha) email addresses if Atlas were copying Plaintiffs on any email.

    c.    On March 31, 2016, Atlas emailed Ezell in his capacity as Director of

---

[2] The graders for these scores, Wieser and Benefield of Boot Coffee, would later be rewarded with roles at Port of Mokha after the company illegally supplanted Mocha Mill.

40

*First Amended Complaint – CV 18-2539-HSG*

|   |   |
|---|---|
| 1 | Mocha Mill to discuss "the transition [of coffee] from Mocha Mill to |
| 2 | Port of Mokha." At this time, Ezell was serving as Director of Mocha |
| 3 | Mill (appointed by Mokhtar), but acting on orders from Mokhtar and |
| 4 | Ahmad as an agent for the Enterprise. |

d.  On April 6, 2016, at Mokhtar and Ahmad's direction, Ezell sent Plaintiffs an email making it appear that it was in Mocha Mill's best interest for Plaintiffs to not communicate with Atlas. Ezell reported back to Mokhtar and Ahmad about having sent the email.

e.  On April 6, 2016, on Mokhtar and Ahmad's orders, Ezell sent Plaintiffs an email, copying Mokhtar at his Mocha Mill email address, misrepresenting that Blue Bottle and other high-end distributors had lost interest in Mocha Mill coffee. Ezell pretended that Atlas had offered to buy the Mocha Mill coffee for $50 per kilo and advised that this was Mocha Mill's best option. Ezell made it appear that $50 per kilo was a great price for the coffee and that a higher price was unlikely given the loss of interest among the high-end distributors; Ezell knew this was false and that deals were already in place through Port of Mokha. Ezell stated that it was "the quickest way to making money" and that he and Mokhtar agreed that this was the best course of action for Mocha Mill.

f.  On April 6, 2016, Mokhtar sent Plaintiffs an email seconding Ezell's recommendation and asking Plaintiffs to fix the relationship with Atlas that the lawyer's letter had upset, so that the deal could proceed. Mokhtar also knew this was false and that deals were already in place through Port of Mokha.

g.  On April 10, 2016, Mokhtar sent Plaintiffs an email attaching seemingly falsified coffee scores and providing elaborate explanations

41

*First Amended Complaint – CV 18-2539-HSG*

|   |   |
|---|---|
| 1 | for why the scores were low. This was done as part of the scheme to convince Plaintiffs that high-end distributors and retailers had lost interest in Mocha Mill coffee. |
| 2 |   |
| 3 |   |

h. In early April 2016, Plaintiffs tried to talk to Atlas about what was happening, but Atlas kept Port of Mokha's scheme concealed. Plaintiffs then involved a lawyer and Atlas backed out of the arrangement, deciding not to help Mokhtar and Ahmad fraudulently transfer Mocha Mill's coffee to Port of Mokha.

174. The Atlas scheme, as detailed in the preceding paragraphs, was executed using wire facilities of the United States sending numerous wires in interstate commerce; these wires were foreseeable to Defendants and each was an act of wire fraud as part of a pattern of racketeering activity.[3]

175. Simultaneous with his failed attempts to use Atlas as a straw buyer, Mokhtar, while still Mocha Mill's CEO, was actively negotiating the sale of Mocha Mill's coffee to high-end distributors—but doing so secretly for Port of Mokha. That is, while telling Plaintiffs that no one was interested in buying Mocha Mill's coffee any longer, Mokhtar was secretly negotiating with other high-end distributors to secure their commitments to buy the coffee from Port of Mokha (fully expecting to steal it by fraud):

a. On November 22, 2015, Mokhtar sent an email to Atlas copying Enterprise members Ahmad and Ezell; Mokhtar purposely excluded Plaintiffs from this email. The email reflected that 240 kilograms of coffee had been sold to Coutume Café in Paris for prices ranging from $220 to $300 per kilogram.

b. On February 8, 2016, Mokhtar sent an email to Coutume Café copying

---

[3] Plaintiffs are informed and believe that many more emails and text messages (each constituting an act of wire fraud) were sent and/or caused to be sent in the course of the scheme. Before Mocha Mill was able to discover the fraud, Mokhtar hacked into the Mocha Mill email account and willfully and intentionally destroyed these communications to conceal the racketeering activity. (*See infra* § V(M).) Plaintiffs were able to recover some of the data Mokhtar had destroyed.

42

*First Amended Complaint – CV 18-2539-HSG*

| | | |
|---|---|---|
| 1 | | Ezell; Mokhtar purposely excluded Plaintiffs from this email. The |
| 2 | | email confirmed Coutume Café's coffee order and asked Coutume to |
| 3 | | help find additional buyers in Japan. |
| 4 | c. | On February 16, 2016, there was an email exchange between |
| 5 | | Mokhtar, Ahmad, and Ezell reflecting plans for Port of Mokha |
| 6 | | operations and management. The emails appear to discuss coffee |
| 7 | | orders with Blue Bottle and Coutume Café, with Atlas Coffee acting as |
| 8 | | the intermediary to process and ship the orders on behalf of Port of |
| 9 | | Mokha. Plaintiffs were purposely excluded from this email exchange. |
| 10 | d. | On February 22, 2016, Ahmad sent an email to Mokhtar copying |
| 11 | | Ezell, presumably anticipating legal liability. The email contained a |
| 12 | | very broad release of claims for Mokhtar to have Plaintiffs sign. |
| 13 | | Plaintiffs were purposely excluded from this email. |
| 14 | e. | Between March 5 and March 19, 2016, there was an email exchange |
| 15 | | between Ahmad, Mokhtar, Ezell, and Blue Bottle, reflecting an |
| 16 | | agreement in principle to buy Mocha Mill coffee and continue a long- |
| 17 | | term relationship. This appeared to be for the benefit of Port of |
| 18 | | Mokha (not Mocha Mill) even though Mokhtar was Mocha Mill's CEO |
| 19 | | at the time. Plaintiffs were purposely excluded from this email |
| 20 | | exchange. |
| 21 | f. | On March 19, 2016, Ezell received an email (at his Mocha Mill |
| 22 | | address) from Conduit Coffee expressing interest in purchasing Mocha |
| 23 | | Mill coffee. He never shared it with Plaintiffs per Mokhtar and |
| 24 | | Ahmad's orders. Instead, on March 21, 2016, Ezell forwarded the |
| 25 | | email to his Port of Mokha email address. |
| 26 | g. | On March 19, 2016, Ezell received an email (at his Mocha Mill email |
| 27 | | address) from Lever Head Coffee expressing interest in purchasing |
| 28 | | |

43

*First Amended Complaint – CV 18-2539-HSG*

1  Mocha Mill coffee. He never shared it with Plaintiffs per Mokhtar and
2  Ahmad's orders. Instead, on March 21, 2016, Ezell forwarded the
3  email to his Port of Mokha email address.
4  h.  On March 23, 2016, Atlas sent an email to Ezell's Mocha Mill and Port
5  of Mokha accounts responding to Ezell's inquiry concerning a coffee
6  shipment request to France, presumably to Coutume.
7  i.  On March 26, 2016, Ahmad sent an email to the Executive Assistant
8  of Blue Bottle CEO James Freeman to set up a meeting the week of
9  April 11, 2016, to discuss Eggers' book and other coffee related
10 logistics for Port of Mokha. Mokhtar and Ezell were copied, while
11 Plaintiffs were purposely excluded. Mokhtar was Mocha Mill CEO at
12 the time.
13  176.  Ultimately, the Atlas scheme was unsuccessful, but not for lack of effort on
14 Defendants' part. Defendants were undeterred and moved on to phase 2.0.



44

*First Amended Complaint – CV 18-2539-HSG*