Pages 1 - 41

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam, Jr., Judge

MOCHA MILL, INC.; et al.,      )
                               )
          Plaintiffs,          )
                               )
  VS.                          )      NO. C 18-02539 HSG
                               )
PORT OF MOKHA LLC; et al.,     )
                               )
          Defendants.          )
_____)
                               Oakland, California
                               Thursday, October 11, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:

                    LAW OFFICE OF TERRENCE JONES
                    6737 Bright Avenue - Suite B6
                    Whittier, California  90601
               BY:  **TERRENCE JONES, ATTORNEY AT LAW**

                    ALMADANI LAW
                    14742 Beach Bouldevard - Suite 410
                    La Mirada, California  90638
               BY:  **YASIN M. ALMADANI, ATTORNEY AT LAW**

For the Defendants Port of Mokha, Inc.; Port of Mokha LLC;
Mokha Foundation; and individual Defendants Mokhtar Alkhanshali
and Ibrahim Ahmad Ibrahim:
                    CONRAD & METLITZKY
                    Four Embarcadero Center - Suite 1400
                    San Francisco, California  94111
               BY:  **MARK CONRAD, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant Blue Bottle Coffee, Inc.:
                         KIRKLAND & ELLIS LLP
                         333 South Hope Street
                         Los Angeles, California  90071
                BY:  **MICHAEL J. SHIPLEY, ATTORNEY AT LAW**

For Defendants Metra Computer Group Fzco and T&H Computers, Inc.:
                         KERR & WAGSTAFFE
                         101 Mission Street - 18th Floor
                         San Francisco, California 94105
                BY:  **FRANK BUSCH, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | **Thursday - October 11, 2018**                    **2:33 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---000--- |
| 4 | **THE CLERK:**  We're calling C 18-2539, Mocha Mill, Inc., |
| 5 | et al., versus Port of Mokha, Inc., et al. |
| 6 | Please step forward and state your appearances for the |
| 7 | record, please. |
| 8 | **MR. JONES:**  Good afternoon, Your Honor.  Terrence |
| 9 | Jones on behalf of plaintiffs. |
| 10 | **THE COURT:**  Good afternoon, Mr. Jones. |
| 11 | **MR. ALMADANI:**  Good afternoon, Your Honor.  Yasin |
| 12 | Almadani on behalf of plaintiffs.  With us we have one of our |
| 13 | individual plaintiffs, Adnan Awnallah.  The other two |
| 14 | individual plaintiffs wanted to be here but they're traveling |
| 15 | internationally, Your Honor. |
| 16 | **THE COURT:**  Good afternoon. |
| 17 | **MR. CONRAD:**  Good afternoon, Your Honor.  Mark Conrad |
| 18 | on behalf of the Port of Mokha entities and on behalf of |
| 19 | individual defendants Mokhtar Alkhanshali and Ibrahim Ahmad |
| 20 | Ibrahim, the latter who is present in the courtroom here today. |
| 21 | **THE COURT:**  Good afternoon. |
| 22 | **MR. BUSCH:**  Good afternoon, Your Honor.  Frank Busch, |
| 23 | Kerr & Wagstaffe, on behalf of T&H and Metra. |
| 24 | **THE COURT:**  Good afternoon. |
| 25 | **MR. SHIPLEY:**  Good afternoon, Your Honor.  Michael |

4

1    Shipley from Kirkland & Ellis on behalf of Blue Bottle.

2           **THE COURT:**  All right.  Good afternoon.

3        All right.  So we are here for a hearing on motions to

4    dismiss filed on behalf of Metra, Port of Mokha, and

5    Blue Bottle.

6        I've reviewed the papers.  This is obviously something of

7    a sprawling case and I think today is the day to start

8    whittling and honing the case so I've got a number of

9    particular questions for the parties.  And then in terms of the

10   substance, I really want to focus on the RICO pattern question.

11       We don't need to talk at all about the state law claims

12   today because if a RICO claim can't be stated, ultimately the

13   state law claims will not be proceeding here, and I think

14   there's a substantial question on that issue.

15       I also believe consistent with that that we don't need to

16   do the case management conference today because I think it's

17   premature.

18       All right.  Who's up?  I think whoever is going to be

19   arguing needs to stay at the podium and we can have a

20   discussion.

21          **MR. CONRAD:**  Your Honor, I'm here on behalf of Port of

22   Mokha, which is the central target of this, but I'll invite my

23   other colleagues up if you have some questions that are

24   specific to their arguments.

25          **THE COURT:**  I think that makes sense.

1    All right.  So let's just run through some things.  First

2  of all, there's a standing challenge to Monk of Mocha.  It

3  appears undisputed that that is a nonexistent entity at this

4  point; correct?

5         **MR. ALMADANI:**  Yes, Your Honor.  It's a predecessor

6  entity to Mocha Mill.

7         **THE COURT:**  Okay.  So does anyone dispute -- I saw

8  that there was essentially a request from the plaintiffs to

9  have a stipulation from the defendants and then an agreement

10  from the Court as to whether any claims that Monk of Mocha

11  might have had can be asserted by Mocha Mill.  I'm not in the

12  business of making promises like that to the parties, but does

13  anybody dispute that we don't need to proceed with this

14  nonexistent entity as a plaintiff at this stage?

15         **MR. ALMADANI:**  No, Your Honor.

16         **THE COURT:**  All right.  So I think that dismissal for

17  lack of standing of Monk of Mocha is appropriate with the

18  understanding, and I think it's likely undisputed, that to the

19  extent claims exist, they can be brought by Mocha Mill.  I

20  suppose if that ends up being a dispute later, we'll deal with

21  it, but I doubt whether it would.

22    Agreed?

23         **MR. CONRAD:**  That makes sense to me, Your Honor, yes.

24         **THE COURT:**  All right.  Then the next question is

25  whether the individual plaintiffs have standing, and it looks

1   to me as though the law is clear that the individual plaintiffs

2   cannot assert derivative claims based on injuries to

3   Mocha Mill.  So for the plaintiffs the question is what

4   nonderivative harms to the individual plaintiffs are pled in

5   the complaint.

6        **MR. ALMADANI:**  Yes, Your Honor.  I'd be happy to

7   answer that.

8        So we've pled pretty extensive RICO violations and RICO

9   conspiracies here, Your Honor, and some of those RICO

10  activities my clients, the individual plaintiffs, were the

11  victims of those RICO activities, and I will point the Court to

12  the March 2015 extortion.

13       That extortion was done by Mr. Mokhtar on his individual

14  partners.  Those partners were extorted out of shares.

15  Mocha Mill's overall shares were not affected by that, but

16  Mr. Mokhtar certainly perpetrated that extortion on the

17  individual plaintiffs themselves.  That is a claim that's

18  independent of Mocha Mill's claims, Your Honor, and under *Alcan*

19  *Aluminum*, that claim should persist.  That's part of the RICO

20  activity.

21       The next one I will point to, Your Honor, is the wire

22  fraud that was perpetrated on my individual clients, not on

23  Mocha Mill but on the individual clients, to dilute their

24  shares, and that was the wire fraud where they were advised to

25  commit tax evasion and they would have their shares diluted.

1    That wire fraud was perpetrated on the individual plaintiffs,

2    Your Honor.

3        The next attempted extortion --

4        **THE COURT:**  Well, let me perhaps cut to the point.  Is

5    it pled clearly in the current complaint that these are

6    individual nonderivative harms or is the nature of the current

7    pleading it's in there somewhere?  And if it's in there

8    somewhere, why shouldn't I make you plead it with specificity

9    so that everyone has notice as to what the individual claims

10   that are nonderivative are for notice purposes?

11       **MR. ALMADANI:**  Your Honor, it's absolutely pled with

12   extreme specificity, Your Honor.  And I will note that the

13   specificity we're talking about here is really just notice as

14   to what happened and not really Rule 9 with respect to

15   extortion because that's not fraud; but I will point the Court

16   to the complaint, Section 5, part C.  That is -- I'm sorry,

17   Section 5, part D, and that is the extortion allegations in

18   part D.  And part D pretty much contains only the extortion

19   allegations.

20       The next one, the next section, subsection, that I would

21   point the Court to other individual -- another individual harm

22   was the wire fraud and --

23       **THE COURT:**  Just I'm looking at the section you were

24   talking about.

25       **MR. ALMADANI:**  Uh-huh.

1     **THE COURT:**  In paragraph 100 (reading):

2          "Mokhtar began demanding that his three partners give

3     him portions of their shares.  Despite the partnership

4     agreement, he threatened to start a competing company,

5     threatened to walk away with Mocha Mill's farmer and

6     distributor relationships."

7     How is this not a derivative harm?

8          **MR. ALMADANI:**  Because, Your Honor, the extortion is

9     being perpetrated on the individual plaintiffs.  Mocha Mill

10    would not be harmed essentially potentially if he walked away

11    with all of the relationships and all of the -- and all of

12    the -- well, if he did -- I would say that if he did walk away

13    with the relationships, potentially Mocha Mill would have been

14    harmed by that but that's not what happened.

15         What he did was he actually harmed the individual

16    plaintiffs.  He did threaten harm to the corporation but he

17    also threatened individual harm to the plaintiffs, the

18    individual plaintiffs themselves, because he extorted their

19    shares.

20         See, Your Honor, the overall shares of the company did not

21    change when Mr. Mokhtar took 40 percent for himself by taking

22    5 percent from each of his individual partners.  And those are

23    crimes perpetrated on the individual partners themselves,

24    Your Honor.  That's extortion on the individual partners and

25    that's not -- he's not extorting the company.  He's extorting

1    the individuals within the company.

2            THE COURT:  So does that mean that the extortion is

3    not a RICO predicate as to Mocha Mill?

4            MR. ALMADANI:  The extortion, Your Honor, is a RICO

5    predicate -- so a RICO predicate, Your Honor, doesn't have to

6    be directed towards just one plaintiff.  The RICO predicate is

7    established by a pattern of activity and you can have different

8    schemes.  And this particular RICO predicate was directed both

9    towards Mocha Mill and toward the individual plaintiffs.

10       Your Honor, and I will point the Court to *Alcan Aluminum*.

11   That's 493 U.S. 331 at 336, and I will quote the case

12   (reading):

13           "The law allows a shareholder with a direct personal

14           interest in a cause of action to bring a suit even if the

15           corporation's rights are also implicated."

16       So, yes --

17           THE COURT:  This wasn't a corporation, was it?

18           MR. ALMADANI:  Mocha Mill was a corporation,

19   Your Honor.

20       And so Mocha Mill was threatened but ultimately it's the

21   individual plaintiffs that were harmed by this, and so the

22   individual plaintiffs absolutely have an action that's

23   independent from what Mocha Mill was threatened.

24       Basically what Mr. Mokhtar did was say, "Look, I'm either

25   going to destroy the corporation or you give me your individual

1    shares," and that's absolutely what *Alcan Aluminum* is about.

2    Yeah, even if there's a harm threatened to the corporation, if

3    the individuals within the corporation are also threatened in

4    an independent way, which these folks were, then we have a

5    claim and they have standing.

6         THE COURT:  But I just -- I'm just -- as I understand

7    it, you're alleging that the individual plaintiffs and

8    Mr. Mokhtar were in a partnership and joint venture; right?

9         MR. ALMADANI:  Correct.

10        THE COURT:  And that partnership and joint venture is

11   alleged to have owned Mocha Mill.

12        MR. ALMADANI:  Correct.

13        THE COURT:  And I thought that your claim in your

14   papers was the individual plaintiffs have standing as Mokhtar's

15   defrauded partners.  And so if it's a -- if their standing

16   derives from their status as partners, how does the corporation

17   case that you just cited apply?

18        MR. ALMADANI:  Okay.  So, Your Honor, the partnership

19   owns the corporation.  We've established that.  So then if

20   Mr. Mokhtar is defrauding the individual plaintiffs or in this

21   case what we're talking about is extortion, so if he's

22   extorting the individual plaintiffs and he says, "Look, either

23   you give me more shares," and that's individually to them, "or

24   I destroy the corporation," that is an extortion that's being

25   committed and damaging potentially the corporation, which will

1   ultimately damage the individual plaintiffs too, but that is

2   damaging both the corporation and taking shares in an

3   extortionist way from the individual plaintiffs.

4       So this is exactly what *Alcan Aluminum* refers to,

5   Your Honor.  Yes, he threatened harm both to the corporation

6   and to the individual plaintiffs.  That's why the individual

7   plaintiffs have standing, Your Honor.

8       There are plenty of RICO activities that were done in this

9   case that harmed -- or that threatened harm either to the

10  corporation or to the individual plaintiffs, and in some

11  instances individual plaintiffs were able to wrest away from

12  that; in some instances they weren't, they were harmed.

13      But here, Your Honor, we have a clear instance of the

14  individual plaintiffs being harmed.  They were extorted out of

15  shares individually, and that didn't affect ultimately

16  Mocha Mill because they gave up the shares; but if they hadn't,

17  yes, he was threatening harm to the entire corporation.  He was

18  going to walk away with all of the assets of the corporation.

19      **THE COURT:**  All right.  I want to hear a response from

20  the defendant on this point.

21      **MR. CONRAD:**  Thank you, Your Honor.

22      A couple of items on this point.  As Your Honor indicated

23  at the outset, this theory is spelled out nowhere in the

24  complaint.  It's spelled out nowhere in the opposition brief.

25  The *Alcan Aluminum* case was not cited in plaintiffs' opposition

1  brief.  We're hearing these arguments for the first time today

2  in response to Your Honor's question about how they've been

3  individually harmed, but no such theory is set out in the

4  complaint and the defendants ought to have an opportunity to

5  examine that theory.

6      So for the first time today we're hearing that there were

7  two identified acts of extortion that may have affected the

8  individual ownership interests of the individual plaintiffs.

9  That's something that we ought to be able to consider and to

10 brief on, among other issues, whether those claims assert a

11 pattern of racketeering activity with respect to the individual

12 plaintiffs.  I don't think they do, and I'd be glad to brief

13 that for the Court appropriately but we haven't had an

14 opportunity to do that because we weren't given notice of the

15 claims asserted by the individual plaintiffs in the complaint

16 against Mr. Alkhanshali, let alone against any of the other

17 defendants.

18     So I think Your Honor is exactly right, that if that -- if

19 there is going to be a nonderivative injury that is alleged on

20 behalf of the individual plaintiffs, it ought to be set out in

21 the complaint and the defendants, each of them, ought to be

22 given an opportunity to respond to it as opposed to doing it on

23 the fly here at a motion to dismiss when we haven't had notice

24 of either the arguments or the law or the theory.

25         MR. ALMADANI:  Your Honor, may I respond to that,

1  please?

2         THE COURT:  You may but the fact that *Alcan* wasn't

3  cited is not helping your cause.

4         MR. ALMADANI:  Well, Your Honor, we did make the

5  argument that the individual partners were affected.  And just,

6  you know, *Alcan Aluminum* is the law, Your Honor, and if we

7  have --

8         THE COURT:  Counsel, think about your long-term

9  credibility here when you're making these arguments.

10        MR. ALMADANI:  Your Honor, the point I was making is

11 that what we're here to consider is whether the allegations in

12 the complaint sufficiently establish standing, and so -- and I

13 would point the Court to paragraph 100, Your Honor, because the

14 paragraph, it clearly states (reading):

15        "In March 2015, Mokhtar began demanding that his three

16     partners give him a portion of their shares for no

17     consideration at all."

18        That affects the individual plaintiffs.  That's what we --

19 that's the argument that we opposed with.

20        And in the next sentence, we say (reading):

21        "Despite the partnership agreement and its fiduciary

22     duty, Mokhtar threatened to start a competing company with

23     other investors."

24        And that was the sort of false choice that he left his

25 partners with and that's how he threatened Mocha Mill as well.

1   And under the law, if we plead that, then we've pled standing.

2        **THE COURT:**  All right.  The next issue is the question

3   of personal jurisdiction over Metra.  There's no dispute that

4   T&H is raising as to personal jurisdiction, but the defendant

5   is arguing that there's no basis for -- alleged in the

6   complaint for personal jurisdiction over Metra and no evidence

7   introduced to establish a basis for personal jurisdiction, and

8   I tend to agree with that.

9        So the question for the plaintiffs is:  What is the

10  alleged basis for personal jurisdiction over Metra?  And it

11  needs to be something more than there was a conspiracy going on

12  and they're the parent so they must have known.

13       **MR. JONES:**  Good afternoon, Your Honor.  Terrence

14  Jones again on behalf of the plaintiffs.

15       The evidence that we have is the direction that Mohammad

16  Eissa, which is one of the owners of Metra, gave to Wael Fadl,

17  who was the general manager of T&H, to conspire with the

18  enterprise, to act as a straw buyer, to cooperate with

19  enterprise and create a fictional company to engage in the

20  phony negotiations with Mocha Mill and to wire them the money.

21       **THE COURT:**  Where is that alleged and where is the

22  evidence of that?

23       **MR. JONES:**  Well, it's alleged in paragraphs 177

24  through 183 of the complaint.  We did not, I will concede,

25  attach any of those particular e-mails to our complaint; but we

believe that if given the opportunity to amend, we could make those allegations and that they would be plausible.

We also believe that if we were given the opportunity to conduct some discovery, we could further flesh out some of those issues because notably T&H and Metra both, you know, submitted declarations in support of their motion, and I think it's significant what's not in those declarations and there is no affirmative statement that there is no familial relationship between defendant Ahmad and Mohammad Eissa of Metra.

There is no affirmative statement that Metra does not exert any control over its subsidiary, and there certainly is no affirmative statement that either Metra Computer nor T&H Computers are not -- you know, we really are engaged in the coffee business.

So it's our contention that taking a step back and taking a look at that broader landscape, that there is an issue with Metra directing its subsidiary to act in the way that it did because of the familial relationship with Mohammad Eissa who was one of the corporate directors of T&H and defendant Ahmad.

**THE COURT:**  I'm just not even seeing the name Mohammad Eissa in the paragraphs that you cited.

**MR. JONES:**  Oh.  Mohammad Eissa's name does not appear in those paragraphs, Your Honor.  And we -- you know, that's fair.  It appears in paragraph 178, but we elected not to use Eissa's name and just use Metra, but that's something that can

1   be fixed just by pleading.

2        THE COURT:  But you have an affirmative burden under

3   Rule 12(b)(2) at this point now that the basis for personal

4   jurisdiction has been challenged.  They have submitted evidence

5   challenging personal jurisdiction.  Now it's your burden to

6   establish that there is and it can't be, again, simply based on

7   the subsidiary relationship between the two.

8        And I think the case law is also pretty clear that the

9   gate to jurisdictional discovery requires at least some basis

10  for concluding that jurisdiction is likely to exist and can't

11  be an effort to poke around and see if it might be there.

12       What would you allege or present if I gave you another

13  chance on this question at this stage?

14       MR. JONES:  We would present more evidence relating to

15  the proof-of-payment invoice.  We would present more evidence

16  to the origin of the wire and who was listed on the wire.  And

17  we would present more e-mail evidence as between our clients

18  and Metra and T&H.

19       THE COURT:  All right.  So why wasn't it your burden

20  to bring that forward once they raised an evidentiary challenge

21  to the basis for personal jurisdiction?

22       MR. JONES:  Because respectfully, Your Honor, we

23  believe that what we had pled was sufficient so we would have

24  to submit on that basis.

25       THE COURT:  All right.  Mr. Busch?

1    **MR. BUSCH:**  Well, I'm not sure I have a lot to add to

2    the Court's questions there.  First of all, what the complaint

3    alleges is general jurisdiction, and I think it's pretty clear

4    that was abandoned in opposition to our motion.  There simply

5    is no argument whatsoever that there's general jurisdiction in

6    this court over a Dubai company.

7         And beyond that, I think the Court is exactly right.  It

8    is both their burden to submit evidence at this stage right now

9    to create some question of personal jurisdiction.  There was no

10   effort to do that.  The only evidence they submitted in

11   opposition was related to service, which we can talk about or

12   not at the Court's interest.

13        And, frankly, nothing that I heard would change anything.

14   You're not subject to specific jurisdiction simply because

15   there's a familial relationship between a nonparty and a party.

16   The owner of Metra is not a party here.  And, you know, at the

17   end of the day, none of this has anything to do with their

18   complete failure to allege that Metra did anything.

19        I mean, they defined the term "Eissa" once.  They never

20   use it again as the Court noted.  And the only times they use

21   the word "Metra" after that are to say "and Metra" at the end

22   of sentences.

23        So I just don't see anything here, and I do see that once

24   we challenged this, they had a burden to not only allege but to

25   present evidence, and there was no even -- no attempt to do

1    that.

2              **THE COURT:**  All right.  Any response on that?

3              **MR. JONES:**  No, Your Honor.  Submitted.

4              **THE COURT:**  All right.  The next issue is the

5    arbitration and forum selection clause.  I think this is a Port

6    of Mokha issue.

7         And really here, as I read your translation of the

8    document, it includes a provision that covers disputes over

9    interpretation of any of the contract's articles, and it

10   doesn't seem to me that that is the nature of this dispute.

11        There is a racketeering claim and a bunch of tort claims.

12   So what is your basis for concluding that the claims being

13   asserted here fall within the face of that provision?

14             **MR. CONRAD:**  Thank you, Your Honor.

15        Let me turn -- point the Court to the specific provision

16   in the agreement that I think is directly at issue as a result

17   of this proceeding.

18        Exhibit B is the English translation of the contract --

19   Exhibit B to my declaration, the Conrad declaration, is the

20   English translation of the contract, and that addresses the

21   duty of the partners not to compete against the Mocha Mill

22   enterprise.

23        This entire case, the sprawling complaint, as Your Honor

24   described it, that they have filed deals with actions by

25   Mr. Alkhanshali to lead a competitive enterprise that they

1  allege is contrary to the interest of Mocha Mill and contrary

2  to the provisions of this agreement.

3       Now, they have very deliberately and carefully pled

4  everything except a breach of contract claim, but the law is

5  very clear that you can't avoid a forum selection clause in a

6  partnership agreement that you signed by pleading everything

7  except the partner -- a breach of the partnership agreement,

8  the contract itself.

9       We cited a number of cases in our brief:  The *Long* case,

10  the *Kroll* case, the *Sprout Healthy Vending* case,

11  *Manetti-Farrow*, the *Argueta* case.  All of those cases say the

12  same thing, which is that if you've got a forum selection

13  clause in the contract, if there's a dispute arising under the

14  subject of that contract, you can't get around it by pleading

15  your claims in tort or under the RICO statute.

16       We cited specific cases saying that specifically as to

17  RICO, you can't get around your forum selection clause by

18  pleading.  So that's the response to that.

19          **THE COURT:**  Which cases are those and what courts

20  decided those cases, the RICO cases?

21          **MR. CONRAD:**  Give me one moment, Your Honor, and I

22  will find the cite for the Court.

23                      (Pause in proceedings.)

24          **THE COURT:**  I think I see it.  Is it the *Shearson/*

25  *American Express*?

1          **MR. CONRAD:**  I believe that's correct, Your Honor.

2     Thank you for being quicker on the draw.

3          **THE COURT:**  All right.

4          **MR. CONRAD:**  Actually, Your Honor, the case that I'm

5     looking at is the *Argueta* case.  It's cited on our opening

6     brief at page 10.  The cite is 87 F.3d at 324 to '25, affirming

7     dismissal of RICO claims under a forum selection clause.

8          **THE COURT:**  Oh, *Argueta*.  Is that Ninth Circuit?

9          **MR. CONRAD:**  It is.

10         **THE COURT:**  All right.  But so, here, just as a

11    factual matter, in your view, what is the dispute over

12    interpretation of any of the contract's articles?

13         **MR. CONRAD:**  So in Exhibit B to my declaration, the

14    Article (9) of the contract says (reading):

15         "Do not compete clause.  The partners pledge not to

16         engage in any of the activities that the company

17         undertakes or to compete therewith in the purpose

18         designated for it individually or with a third party."

19    The question here is whether Mr. Alkhanshali did anything

20    like that in violation of his contractual obligations, and it's

21    clearly the subject matter of this contract and the expectation

22    of the partners that that not occur.

23    And what's happened here, Your Honor, is that what

24    plaintiffs allege is a violation of this contract, that he went

25    off and started a new company in violation of his obligations

1  to the partners, and instead of actually pleading it in the

2  most natural place under the partnership agreement that they

3  themselves drafted and had him sign while he was in Yemen in

4  the middle of a Civil War, they've decided not to plead that

5  claim because they prefer to be in federal court rather than in

6  Yemen and to seek treble damages and attorneys' fees.

7         **THE COURT:**  And so in your view, the phrase

8  "interpretation of any of the contract's articles" means

9  claimed violation of any of the contract's articles?

10        **MR. CONRAD:**  Yes, Your Honor.

11        **THE COURT:**  Is there any extrinsic evidence one way or

12  the other that would give me insight into what the parties

13  meant when they wrote that?

14        **MR. CONRAD:**  There's not extrinsic evidence.  The only

15  actual evidence before the Court on this issue is

16  Mr. Alkhanshali's declaration where he indicates that --

17  although I don't believe he addresses that specific clause, I

18  think he indicates the disputes -- his understanding was the

19  disputes arising under the contract, and I don't want to

20  overstate his testimony, but disputes arising under the

21  contract would go to Yemen.

22        **THE COURT:**  All right.  Mr. Almadani?

23        **MR. ALMADANI:**  Yes, Your Honor.  Thank you.

24     So, Your Honor, this issue is -- the Court is correct.

25  The nature of the suit is it's a RICO suit.  My clients were

1    the victims of multiple crimes and those included extortion and

2    fraud, and so this is not -- this has nothing to do with the

3    interpretation of this particular contract, which we believe

4    was, and we've alleged, was begotten through extortion.

5        But, Your Honor, there's a more basic issue here, which is

6    the way that this was actually briefed is it actually is an

7    argument that the Supreme Court prohibits.  And so I'll point

8    the Court, when we first read the motion, and I'm quoting

9    straight from the motion, it was written that (reading):

10            "A motion under Rule 12(b)(3) is based on a challenge

11        to venue" -- fine, that's a 1391 challenge -- "whereas,

12        here the motion rests on a forum selection clause as

13        pleadings are not accepted as true."

14       Completely different issue, and we really were kind of

15   left guessing what the argument was.  And so we pointed the

16   Court to why this particular agreement itself is -- it's very

17   problematic to rely on because it was begotten through

18   extortion, and plus we're not asking for an interpretation here

19   of any of the clauses.  My clients have pled something

20   completely different.

21       But it's really when the reply came, Your Honor, which is

22   when we understood what they were saying.  And I'll quote from

23   the reply.  The reply says that (reading):

24            "A motion to dismiss based on a forum selection clause

25        is brought under Rule 12(b)(3)."

1      No, it's not.  The Supreme Court prohibits that argument.
2   That's the argument that they're making, is that under
3   Rule 12 -- Rule 12(b)(3) is what authorizes this -- that
4   analysis authorizes the Court to dismiss based on this forum
5   selection clause.
6      And the case that they cite for that proposition is
7   *Atlantic Marine*, Your Honor, and *Atlantic Marine* stands for the
8   exact opposite proposition.  The holding in that case is
9   that -- the Supreme Court, I'm going to quote them (reading):
10          "We reject petitioner's argument that such a clause
11      may be enforced by a motion to dismiss under
12      Rule 12(b)(3)."
13      The Supreme Court prohibits the argument that they finally
14   clarified in their reply, which is when we finally understood
15   it.
16      The challenge that they raised under Rule 12(b)(3),
17   Your Honor, should have been a 1391 analysis and we've
18   established venue under 1391.  That's in paragraph 23, and
19   we've laid out 310 some-odd paragraphs alleging how the
20   activities were committed on my clients here in this venue in
21   this forum.
22      And so we have made -- under 12(b)(3), there is no attack
23   based on a forum selection clause.  They never actually briefed
24   that issue.
25      There are other reasons why it's problematic, but the

1    Supreme Court prohibits the precise challenge which their reply

2    finally elucidates.  And we haven't had a chance to respond to

3    it until now, but they finally state in the reply what they're

4    actually arguing.  The Supreme Court prohibits that,

5    Your Honor.

6         **MR. CONRAD:**  I don't believe that's a correct

7    statement of the law, and I don't believe that's a fair

8    characterization of our briefs, Your Honor.

9         Let me just turn to the opening brief where what we said

10   on pages 9 to 10 was that there was a partnership agreement

11   between plaintiffs and Mokhtar whose terms may be properly

12   considered by the Court and that under the partnership

13   agreement, the investors agreed to resolve all disputes with

14   Mokhtar relating to the Mocha Mill business through an

15   arbitration process; and if this arbitration process failed,

16   they further agreed to assert all disputes arising between them

17   in connection with the partnership in the Commercial Court of

18   Sana'a in Yemen, and then it cites the arbitration clause and

19   the forum selection clause.  I don't know how plaintiffs could

20   have missed that that argument was about a forum selection

21   clause.

22        Turning to the question of the provisions under which this

23   argument was raised, it is clear that when you are enforcing a

24   forum selection clause within the United States, for example

25   I'm asking the Court to send it to the Southern District of

1    New York or something like that, you bring it under the venue

2    statute.

3        When you are enforcing a forum selection clause that

4    requires dismissal that involves the selection of a foreign

5    forum, in other words in another country, you bring it under

6    Rule 12(b)(3).  I believe that's an accurate statement of the

7    law.  Those are the cases that we cited in our reply brief, and

8    I'd be happy to follow-up to confirm that with Your Honor.  But

9    there's nothing improper about the motion, and it's very clear

10   that on our motion under Rule 12(b)(3), the plaintiffs need to

11   come forth with actual evidence.

12       Finally, I want to return, if I may, to Your Honor's

13   question about what is the extrinsic evidence on this point,

14   and I want to point the Court to Mr. Alkhanshali's declaration,

15   specifically paragraph 3 of that declaration.  And here's what

16   Mr. Alkhanshali has to say about the partnership agreement and

17   his understanding of it (reading):

18        "The language of the Partnership Agreement is

19        mandatory, not permissive.  It requires the partners to

20        pursue any and all claims arising out of their disputes to

21        the court in Sana'a (which is the capital of Yemen), and

22        precludes the partners from suing one another in the

23        United States, including the Northern District of

24        California."

25       That's the only testimony and evidence before the Court as

1    to the meaning of this contract; and to the extent there's any

2    ambiguity, that's what the Court has to accept.

3         **THE COURT:**  All right.  Although I don't have to

4    accept his legal characterization.  I think the extrinsic

5    evidence that would be useful would be evidence about the

6    course of negotiation, for example.

7         **MR. ALMADANI:**  Your Honor -- I apologize, Your Honor.

8         **THE COURT:**  I think I get it.  I think I understand

9    the parties' positions on this argument.

10        **MR. ALMADANI:**  May I state one thing on this,

11   Your Honor, which is something that Mr. Conrad stated that I

12   misstated and I'd like to clear up the record on that and make

13   sure that the Court knows exactly what my position is?  Because

14   I haven't misstated anything.  But if the Court would allow me,

15   please, allow me to clear -- respond to that at least.

16        **THE COURT:**  If you can do it really quickly.  This is

17   not the most pivotal issue in the case, let me put it that way.

18        **MR. ALMADANI:**  Yes, Your Honor, absolutely.

19        I will say that I was quoting from the defendants' reply

20   on page 1, line 22, a motion to dismiss based on forum

21   selection clause as brought under 12(b)(3).  That's what they

22   state that's their basis for this argument.

23        And I will represent to the Court that I am citing from

24   *Atlantic Marine*, and that's the Supreme Court case, and the

25   exact quote -- and it appears in that case many times,

 1   Your Honor, you can't miss it -- that (reading):

 2          "A motion to dismiss based on forum selection clause

 3       cannot be brought.  We reject the Petitioner's argument

 4       that such a clause may be enforced under Rule 12(b)(3)."

 5       Your Honor, I'm quoting straight from the case.  I'm not

 6   misrepresenting anything.

 7          **THE COURT:**  All right.  I'll look at the authority.

 8   We don't need to tarry longer on this.

 9       All right.  Last issue and first substantive issue,

10   pattern allegations under RICO.

11       As I understand it, the plaintiffs are asserting both

12   open-ended continuity and close-ended continuity.  With regard

13   to the open-ended continuity, I just want to be sure I

14   understand the argument.

15       It seems to me you're saying fraud occurred and later the

16   entities that committed the fraud engaged in financial

17   transactions; therefore, that must be money laundering and,

18   therefore, that brings us into the realm of open-ended

19   continuity.  Am I understanding your argument right?

20          **MR. ALMADANI:**  Essentially, Your Honor, but let me

21   unpack that under 1957.  18 U.S.C. 1957 prohibits

22   interacting -- or, I'm sorry, transacting with over $10,000 in

23   criminal proceeds.  That is a RICO predicate under 1961(1).

24   So --

25          **THE COURT:**  Clearly.  But what basis is there for

1    concluding that transactions alleged have anything to do with

2    the proceeds of the fraud alleged earlier?

3              MR. ALMADANI:  So, Your Honor, in the money -- and

4    I'll -- allow me to, please, take a look at that case.

5         Your Honor, and I'd refer the Court to *United States*

6    *versus Shafer*.  It's a case that we've cited.  Basically when

7    it comes to money laundering, it is the plaintiffs' or the

8    government -- right now the plaintiffs are in the government's

9    shoes -- are the ones that get to trace the money.  So if they

10   have acquired, let's say, $100,000 in criminal proceeds and if

11   they do a -- and that's sitting in a bank account and they do a

12   transaction of $20,000, we can trace that $20,000 and say

13   that's money laundering because the entire purpose of 1957,

14   it's a deterrence statute.  So it basically prohibits getting a

15   large amount in criminal proceeds because it prohibits you from

16   transacting with it.

17             THE COURT:  Let me ask it in a way that I think will

18   get us to where I'm trying to get quicker.

19             MR. ALMADANI:  Absolutely, Your Honor.

20             THE COURT:  What case can you cite to me that is a

21   civil RICO case that relied on the theory of open-ended

22   continuity you're advancing here?

23             MR. ALMADANI:  Based on 1957, I don't have an example

24   for the Court, Your Honor, but that does not mean that that

25   claim cannot exist, Your Honor.  It is a RICO predicate.  It is

1    ongoing.   They have criminal proceeds, and they are transacting

2    in large amounts.   So we have made out the claim.

3         I guess if the Court's question is has somebody thought of

4    that before and pled it, I haven't seen that, Your Honor; but I

5    do believe that we have a very viable theory here and my

6    clients, as competitors in the space who were decimated by this

7    activity, are continually being harmed as they continue to

8    transact with the criminal proceeds that they obtained

9    defrauding my clients.

10        **THE COURT:**  I don't doubt that you believe it.

11        Any response on that?

12        **MR. CONRAD:**  Not on that issue, Your Honor.

13        **THE COURT:**  All right.   Then with regard to

14   close-ended continuity, so a couple questions, and I think

15   these are for Mr. Almadani.

16        Really one of the key tasks for the Court in evaluating

17   this close-ended continuity issue is figuring out the time

18   spectrum understanding that the courts have said there's no

19   bright line.

20        As I understand your argument, you are including the

21   alleged embezzlement in the time span that I should consider

22   for the close-ended continuity question, and I suppose my

23   question is:   What about that conduct as alleged ties to the

24   scheme to steal Mocha Mill's business?

25        **MR. ALMADANI:**  So, Your Honor, the reason that

1    we've -- I'll answer the Court's question here.  The reason

2    that we've pled this case under RICO is we believe that there

3    were a number of criminal acts and criminal schemes committed

4    by the same particular leadership that sort of expanded the

5    enterprise.

6        And so when we -- I'd like to analogize -- sort of step

7    back and really analogize in terms of what RICO is.  So when

8    you have, let's say, organized crime, you have a gang and the

9    gang is associated -- you know, it's committing human

10   trafficking and it's committing drug dealing and it's

11   committing extortion.  All of those don't have to be

12   interrelated, Your Honor.

13       And I would point the Court to the *Odom* case, that's a

14   civil RICO case, and *Odom* states that the activities themselves

15   don't have to be interrelated but there's got to be a

16   relationship, and that relationship, Your Honor, can simply be

17   to enrich the leadership of the enterprise.

18       **THE COURT:**  But this is -- what is the indication in

19   what's alleged that there was an enterprise at that point?

20   Where is the allegation that the scheme to steal business

21   existed at the time of the embezzlement?

22       **MR. ALMADANI:**  Your Honor, but here's the -- here's

23   the crux.  It doesn't have to be there for RICO.  For RICO

24   there could be multiple schemes.  In fact, the Court in *H.J.,*

25   *Inc.*, stated that multiple schemes are indicative -- more

1   indicative of RICO.

2       So what can happen, and this is what we've alleged what

3   happened here, he started with the embezzlement, then he

4   engaged in extortion.  And where is the enterprise?  I'll point

5   the Court to the *King* case, Your Honor.  The *King* case states

6   that a victim corporation can be the subject -- or can be the

7   enterprise and a particular shareholder or executive of that

8   corporation can be the person committing the RICO violation.

9       And if the Court would give me one minute here, I've got a

10  number of cases, Your Honor, where we have -- okay.  So in

11  *TeleVideo System*, there was a 13-month embezzlement scheme.

12  That was a single-victim case.  In *Slaughter*, that was a

13  Northern District of Illinois case -- *TeleVideo Systems*, the

14  one before I cited, was a Ninth Circuit case -- it's another

15  single-victim embezzlement scheme, Your Honor.

16      **THE COURT:**  Right.  And I've read *TeleVideo* and the

17  other cases.  It seems to me that the cases most like this one

18  were *Medallion* and *Sever* where they deal, in essence, with a

19  particular plan to accomplish a discrete objective.  So

20  *Medallion* it's TV contract.  *Sever* also seemed to be a

21  singular-purpose case, and the Ninth Circuit discussed that.

22      Why are those cases distinguishable?

23      **MR. ALMADANI:**  Because, Your Honor, in those cases

24  there was just a one single act, but that's not what's

25  happening here, Your Honor.  There was embezzlement here.  Then

1    there was extortion.   Then he expanded the enterprise and then

2    there was another round of wire fraud.   Then there was another

3    round of attempted extortion.   Then there were two additional

4    wire fraud schemes.

5         So, Your Honor, there are multiple schemes here which

6    we've alleged.   We have -- if we had alleged -- see,

7    Your Honor's question would be exactly on point if all we had

8    alleged was the singular scheme with Blue Bottle, Port of

9    Mokha, and T&H.   If that's all we had put in our complaint,

10   that would be fine; but here, Your Honor, we've alleged a

11   number of related acts, and these acts are related in that they

12   are benefiting the particular enterprise.

13        Initially, Your Honor, it started with Port of Mokha --

14   I'm sorry -- it started with Mocha Mill as the enterprise, and

15   Mr. Mokhtar was the person committing the racketeering

16   activity, and then he --

17        THE COURT:   I'm just looking at it.   Your complaint at

18   paragraph 213 characterizes the object of the enterprise as to

19   steal for the benefit of Port of Mokha the business Mocha Mill

20   had spent years developing.

21        MR. ALMADANI:   And that is -- Your Honor, that is one

22   of the -- that is one of the objectives of the schemes,

23   Your Honor, but that is -- so what Your Honor is doing is sort

24   of looking at just that one objective.

25        But, Your Honor, if you analogize --

1    **THE COURT:**  Let me put it this way.

2    **MR. ALMADANI:**  Yeah.

3    **THE COURT:**  Where do you state another objective in

4  the complaint?  Maybe that's an easier way to get to the

5  question.

6    **MR. ALMADANI:**  I'll point the Court to paragraph 90

7  (reading):

8    "Beginning as early as April 2014, Mokhtar devised a

9    scheme to defraud Mocha Mill and its business partners by,

10    willfully with the intent to defraud, embezzling cash from

11    company accounts under the guise of necessary and

12    legitimate company expenses."

13    That is an objective and he perpetrated a scheme to carry

14  out that objective.  That's in paragraph 90.  I can -- I'll go

15  on, Your Honor, to the next --

16    **THE COURT:**  I just -- when you had the chance in your

17  first claim for relief to describe the objective, the overall

18  objective of the RICO conspiracy was the one that I just

19  described; right?  (reading)

20    "Enterprise members and their co-conspirators shared

21    the objective of usurping and did usurp Mocha Mill by

22    fraud and extortion."

23    Those were the means, but the object was stealing

24  Mocha Mill's business; right?

25    **MR. ALMADANI:**  Your Honor, we actually describe a

1    number of schemes in our claim, and I would point the Court to

2    paragraph 212 because it goes from A, B, and so there are

3    multiple objectives that are described within the complaint.

4    We incorporate those paragraphs, Your Honor.  So the paragraph

5    that I just cited to you is incorporated under paragraph 212a

6    and we cite to the exact subsection.  We say "See Supra

7    Section V-(C)" or "V(C)"; and when the Court goes to

8    Section V(C), that's paragraph 90.  So we've described the

9    objectives.

10        If the Court would like us to go back and find those

11   objectives and put it in the claim, we can certainly do that,

12   but we've alleged them in our complaint and we've simply

13   referred the Court back.

14        The objective of stealing the company was one of the

15   objectives, Your Honor, but there were a number of objectives

16   along the way.  That's why this is a RICO case because you do

17   have multiple criminal schemes here.  You have extortion and

18   wire fraud happening time and again, and those are all

19   interrelated because they have the common leadership and

20   they're there to benefit Mr. Mokhtar and his enterprise,

21   Your Honor, and we've pled them with granular particularity.

22            **THE COURT:**  You've included a lot of words, I'll give

23   you that.

24        All right.  Any response in the close-end continuity

25   issue?

1        **MR. CONRAD:**  Just a couple, Your Honor, to flesh out

2    the discussion.

3        On embezzlement, I think Your Honor is rightfully

4    suspicious that what's going on here is that they're attempting

5    to expand the time frame by dragging in a lot of stuff that is

6    not related.  They're going back three years to when he was a

7    CEO of Mocha Mill, went over to go source coffee, and met with

8    farmers in rural Yemen, and they say he didn't bring back

9    receipts and, therefore, RICO conspiracy.

10       That's not related under the -- in terms of a RICO claim.

11   If a kid sells marijuana to his friend in middle school and

12   then becomes a drug kingpin 30 years later, those two things

13   are not related for purposes of RICO in the same way that these

14   two different courses of conduct are not related.

15       With respect to the factors of what establishes

16   continuity, I think Your Honor is exactly right, the time

17   frame -- there are no bright-line rules.  But Judge Breyer's

18   decision in the *Richardson* case I think contains a helpful

19   explanation of the different factors that are considered,

20   similarly Judge Henderson's decision in *Barsky* and

21   Judge Wilkinson's decision in *Ice Cream Distributors of*

22   *Evansville*.  Those cases all nicely synthesize the law in the

23   Ninth Circuit on continuity, and I'd urge the Court to look at

24   those.

25       And, in addition, in reviewing the papers, there were two

 1  cases in particular that were cited in our brief but that I'd

 2  urge the Court to go read because they deal most specifically

 3  with a situation like this one where a former employee goes off

 4  and is accused of doing wrong by his former employer.  That's

 5  the Seventh Circuit's decision in *Midwest Grinding versus*

 6  *Spitz*, and the Southern District of New York's decision in *Pier*

 7  *Connection*, *Inc*. *versus Lakhani*.  In both of those cases we

 8  have a similar set of circumstances to the ones presented here.

 9  In both cases, the Seventh Circuit and the Southern District

10  effectively found no continuity because of the single

11  objective, the single victim, and the single course of conduct.

12          **THE COURT:**  In those cases, I may not have them at the

13  very top of my mind, but it does appear to me here that we're

14  over the year mark.  So even if it were a bright-line issue, I

15  don't know that that would pose a problem.

16      Do you agree that if I were to set aside the embezzlement

17  allegation, I'm not saying I've decided to do that or not, but

18  if I did, isn't it true that even with regard to what's left,

19  it's something a little over a year?

20          **MR. CONRAD:**  The complaint on this point is sort of

21  clear as mud as to when what began but I will concede,

22  Your Honor, that there is activity described as of June 2015

23  continuing into roughly June of 2016, which is a year.

24      I'm not here to argue to Your Honor that because we are

25  over or under 12 months or 9 months or 15 months, therefore, we

1    are out.  Our argument is a little more nuanced than that, and

2    I think the case law requires a little bit more nuance than

3    that, which is that the nature of the scheme alleged simply

4    isn't a continuous RICO scheme.

5              **THE COURT:**  Fair enough.

6              **MR. ALMADANI:**  Your Honor, the Court asked me a

7    question.  I'd like to point the Court to the exact paragraph.

8    The Court asked me about how the embezzlement relates to the

9    rest of the RICO scheme and whether we've pled that.

10         You know, I believe it absolutely does, but here we've

11   actually alleged it in paragraph 96 where we allege that

12   Mr. Mokhtar used some or all of the stolen funds to fund his

13   Port of Mokha enterprise, and that shows a relationship,

14   Your Honor, and certainly we've pled that in paragraph 96.

15         I will also point to the Court that Mr. Conrad is

16   incorrect.  If the Court were to discount the embezzlement, the

17   activity still starts in March 2015 with the extortion and it

18   goes down all the way into, I believe, July 2016 when

19   Mr. Mokhtar hacked into the company accounts to destroy e-mail,

20   which goes to intent and consciousness of guilt.

21         So, in any case, Your Honor, it's wrong regardless of the

22   embezzlement, but I would claim, Your Honor, that we have pled

23   facts sufficient to relate the embezzlement back.  And, in

24   fact, in terms of how RICO is to be interpreted, you know, if a

25   gang is indicted under RICO, just because they have committed

1    extortion and they've committed drug dealing and there's no --

2    whether -- you know, the participants of those are the same or

3    not or whether they even know about each other is irrelevant.

4         And the *Odom* case, Your Honor, I would ask the Court --

5    this is a Ninth Circuit case, not a Seventh Circuit case, not a

6    Southern District of New York case, but a Ninth Circuit case

7    *Odom v. Microsoft*, that's the case that actually goes through

8    and informs the Court that RICO is to be interpreted broadly,

9    Your Honor.  It goes through -- it labors through four

10   Supreme Court cases and admonishes that RICO is not to be read

11   narrowly, it's to be read broadly.

12        It quotes *Sedima* in doing that, and in that case the Court

13   is very clear that the interrelationship does not have to be

14   the sort of relation that we've actually pled here.  It can be

15   something more tenuous than that.  We've pled it in paragraph

16   96, but it can be more tenuous, Your Honor.

17        **THE COURT:**  All right.  I understand the parties'

18   positions on that as well, and that's the extent of the

19   questions that I have.  I'll take it under submission and aim

20   to issue an order as soon as I can.

21        And as I said at the beginning, I don't think this is the

22   time to set a case management schedule yet because I think

23   there's a fair amount in flux in the case.

24        **MR. CONRAD:**  Thank you, Your Honor.

25        **MR. ALMADANI:**  Your Honor, may I add one more point

1   that I was prepared to make up here?  The Court didn't ask

2   about it, but I would like to address that.

3         THE COURT:  What is it?

4         MR. ALMADANI:  And that is in regards to the Mokha

5   Foundation argument that Port of Mokha has made saying that the

6   Mokha Foundation does not exist, and --

7         THE COURT:  If you want to address it briefly, you

8   can.

9         MR. ALMADANI:  Yes, Your Honor.

10       So, Your Honor, if the Court goes to the Mokha Foundation

11  website, which they've -- actually in their reply they said

12  it's unauthenticated, they actually authenticated in the

13  Alkhanshali declaration in their own briefings in paragraph 5.

14  That's on page 2, line 8, they've authenticated that particular

15  website, and I actually have printed the website.  I would like

16  the Court to look at it if the Court would be willing.

17        THE COURT:  I don't need to.

18        MR. ALMADANI:  Well, the website, Your Honor, shows

19  that the Mokha Foundation exists.  They represent it to be an

20  entity.  In fact, they have a button on it that says "Donate,"

21  and the Court can look at it because they've brought it into

22  play in their declaration.  And when you click on "Donate," it

23  takes you to a page where it suggests you're making a tax

24  deductible donation.  And for them to now come in here and say

25  that this entity does not exist, that's further evidence of

1   ongoing continuity because if they're representing to the

2   public the public is making a tax-deductible donation and

3   they're coming in here and telling this Court that this

4   foundation doesn't even exist, that's troublesome, Your Honor.

5          **MR. CONRAD:**  Let me respond and let me be very clear

6   about what's going on here.  The Mokha Foundation is a

7   charitable drive to make sure that poor farmers in Yemen get

8   the resources that they need to grow coffee.  It is run through

9   a fiscal sponsorship with a 501(c)(3) that has nothing to do

10  with any of the defendants.

11       The reason we haven't identified that is because everyone

12  who comes anywhere near Mr. Alkhanshali finds themself wrapped

13  up in a federal lawsuit and accused of being engaged in a RICO

14  enterprise.  Nothing that Mr. Almadani just said comes anywhere

15  close to establishing that there is an entity as they've

16  described it for him to sue.

17         **MR. ALMADANI:**  Their website establishes it,

18  Your Honor.  I would just encourage the Court to look at that.

19         **THE COURT:**  What do you mean?  What are you talking

20  about?  The point is, is it a legal entity capable of being

21  sued?  What are you talking their website establishes it?  What

22  are you talking about?

23       They said that it's not a subsidiary.  You haven't

24  presented anything to dispute that.  I am unclear what the

25  point of this is, but talking about a button on the website

1  doesn't establish that there's a suable entity here, which is

2  the only question that's before me right now.

3           **MR. ALMADANI:**  Okay, Your Honor.  That's fine.  Thank

4  you.

5           **THE COURT:**  Submitted.

6           **MR. CONRAD:**  Thank you, Your Honor.

7                (Proceedings adjourned at 3:30 p.m.)

8                        ---oOo---

9

10

11                  <u>CERTIFICATE OF REPORTER</u>

12           I certify that the foregoing is a correct transcript

13  from the record of proceedings in the above-entitled matter.

14

15  DATE:   Thursday, October 18, 2018

16

17

18

19  _____

20      Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

21

22

23

24

25